RECEIVED
Civil Action No. 93-T-1178-N

94 APR -8 AM 10: 24

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
U.S. DISTRICT COURT
MIDDLE DIST OF ALA
NORTHERN DIVISION

FILED

APR 8 1994



## GAY LESBIAN BISEXUAL ALLIANCE,

Plaintiff,

v.

JIMMY EVANS, in his official capacity as Attorney General
of the State of Alabama, FREDERICK P. WHIDDON, in his official
capacity as President of the University of South Alabama, and
DALE T. ADAMS, in his official capacity as Dean of Students
of the University of South Alabama,

Defendants.

## PLAINTIFF'S BRIEF ON THE MERITS

RUTH E. HARLOW
WILLIAM B. RUBENSTEIN
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
132 West 43rd Street
New York, NY 10036
(212) 944-9800, ext. 545

FERN SINGER
WATTERSON & SINGER
P.O. Box 530412
Birmingham, AL 35253
(205) 871-3980

ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY AND ANALYSIS OF THIS DISPUTE'S BASIC FACTS . . . . . . 4

    A.    The Context in Which Section 16-1-28 Became Law . . . 4

    B.    The Statute . . . . . . . . . . . . . . . . . . . . . 9

        1.    Part (a) As Written . . . . . . . . . . . . . 11

        2.    Part (a) As Intended and As Generally
               Understood . . . . . . . . . . . . . . . . . 13

        3.    Part (b) . . . . . . . . . . . . . . . . . . 17

        4.    Part (c) . . . . . . . . . . . . . . . . . . 19

    C.    Defendants' Enforcement of Section 16-1-28
        Against Plaintiff . . . . . . . . . . . . . . . . . 20

        1.    Student Organizations at USA . . . . . . . . 21

        2.    The Gay Lesbian Bisexual Alliance . . . . . 24

        3.    The Targeting of and Harm to GLBA Under
               Section 16-1-28 . . . . . . . . . . . . . . 26

LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 45

    I.    SECTION 16-1-28, ON ITS FACE, VIOLATES CORE FIRST
        AMENDMENT PRINCIPLES THAT ARE ESPECIALLY STRINGENT
        IN THE UNIVERSITY SETTING . . . . . . . . . . . . . 45

        A.    Section 16-1-28 Discriminates on the Basis
            of Content and Viewpoint, Is Not Justified
            by a Compelling State Interest, and Is Not
            Narrowly Tailored; Moreover, the Statute's
            Clear Purpose Is the Suppression of
            "Dangerous" Ideas . . . . . . . . . . . . . 47

            1.    The Governing Legal Standards . . . . . 47

            2.    Section 16-1-28 Fails Under All of
                These Rules . . . . . . . . . . . . . . 51

                a.    Impermissible, Viewpoint-Based
                     Purpose . . . . . . . . . . . . . 55

     b.  No Proof of a Compelling State
       Interest . . . . . . . . . . . . . . . 55

     c.  Statute is Not Narrowly Tailored . . 58

  B. Section 16-1-28 Also Imposes Unconstitutional
   Conditions on the Enjoyment of Governmental
   Benefits . . . . . . . . . . . . . . . . . . . . 63

    1. The State's Ability to Condition
     Government Funding Is Limited . . . . . . 63

    2. Section 16-1-28 Goes Well Beyond the
     Permissible Conditioning of Government
     Subsidies . . . . . . . . . . . . . . . . 65

 II. SECTION 16-1-28 FAILS THE STRINGENT VAGUENESS TEST
   THAT APPLIES TO RESTRICTIONS OF EXPRESSION . . . . 67

 III. SECTION 16-1-28 IS UNCONSTITUTIONALLY
   OVERBROAD . . . . . . . . . . . . . . . . . . . . . . . 73

 IV. AS APPLIED, SECTION 16-1-28 HAS BEEN USED BY
   DEFENDANTS TO DISCRIMINATE AGAINST PLAINTIFF
   ON THE BASIS OF THE GROUP'S IDENTITY AND
   VIEWPOINT . . . . . . . . . . . . . . . . . . . . . . . 74

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 80

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . 81

## TABLE OF AUTHORITIES

CASES:

Alabama Education Association v. Wallace, 362 F.Supp.
    682 (M.D. Ala. 1973) . . . . . . . . . . . . . . . . . 72

Ashton v. Kentucky, 384 U.S. 195 (1966) . . . . . . . . . . 57

Board of Education of Oklahoma City v. National Gay
    Task Force, 729 F.2d 1270 (10th Cir. 1984),
    aff'd by an equally divided Court, 470 U.S.
    903 (1985) . . . . . . . . . . . . . . . . . 60-61, 73-74

Board of Trustees of the Leland Stanford Junior
    University v. Sullivan, 773 F.Supp. 472
    (D.D.C. 1991) . . . . . . . . . . . . . . 46-47, 64, 66, 77

Brandenburg v. Ohio, 395 U.S.
    444 (1969) . . . . . . . . . . . . . 50, 51, 58, 59, 60, 73

Brooks v. Auburn University, 412 F.2d 1171 (5th
    Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . 45

Clean-Up '84 v. Heinrich, 759 F.2d 1511 (11th Cir. 1985) . . 73

Crowder v. Housing Authority of the City of Atlanta,
    990 F.2d 586 (11th Cir. 1993) . . . . . . . . . . . . . 54

Department of Education v. Lewis, 416
    So.2d 455 (Fl. 1982) . . . . . . . . . . . . . 50, 60, 77

Doe v. University of Michigan, 721 F.Supp.
    852 (E.D. Mich. 1989) . . . . . . . . . . . . . . . . . 73

FCC v. League of Women Voters, 468 U.S. 364 (1984) . . . 65, 66

Finley v. National Endowment for the Arts, 795 F.Supp.
    1457 (C.D. Cal. 1992) . . . . . . . . . . . . . . . . . 67

Gay Activists Alliance v. Board of Regents of the
    University of Oklahoma, 638 P.2d 1116 (Ok. 1981) . . . . . 3

Gay Alliance of Students v. Matthews, 544 F.2d
    166 (4th Cir. 1976) . . . . . . . . . . . . . 3, 59, 61, 74

Gay and Lesbian Students Association v.
    Gohn, 850 F.2d 361 (8th Cir. 1988) . . 3, 46, 52, 54, 59, 78

iv

Gay Lib v. University of Missouri, 558 F.2d 848
    (8th Cir. 1977), cert. denied, 434 U.S.
    1080 (1978) . . . . . . . . . . . . . . . . . . 3, 45, 59

Gay Students Organization of University of New
    Hampshire v. Bonner, 509 F.2d 652
    (1st Cir. 1974) . . . . . . . . . . . . . 3, 45, 59-60, 76

Gay Student Services v. Texas A & M
    University, 737 F.2d 1317 (5th Cir.
    1984) cert. denied 471 U.S.
    1001 (1985) . . . . . . . . . . . . . 3, 49, 52, 53-54, 61

Gooding v. Wilson, 405 U.S. 518 (1972) . . . . . . . . . . . 73

Grayned v. City of Rockford, 408 U.S. 104 (1972) . . . . 68, 71

Hays County Guardian v. Supple, 969 F.2d 111
    (5th Cir. 1992), cert. denied, 122
    L.Ed.2d 371 (1993) . . . . . . . . . . . . . . . . . . . 54

Healy v. James, 408 U.S. 169
    (1972) . . . . . . . . . . . . . 49, 50, 51, 52, 58, 59, 60

Hoffman Estates v. Flipside, 455 U.S. 489 (1982) . . . . . . 68

Iota Xi Chapter of Sigma Chi Fraternity v. George Mason
    University, 773 F.Supp. 792 (E.D. Va. 1991),
    aff'd 993 F.2d 386 (4th Cir. 1993) . . . . . . . . . . . 49

International Society for Krishna Consciousness v. Eaves,
    601 F.2d 809 (5th Cir. 1979) . . . . . . . . . . . . . . 72

Keyishian v. Board of Regents of New York,
    385 U.S. 589 (1967) . . . . . . . . . . . . . 45-46, 68, 72

NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958) . . 51-52

Perry Education Association v. Perry Local Educators'
    Association, 460 U.S. 37 (1983) . . . . . . . . . . . . 49

Police Department v. Mosley, 408 U.S. 92 (1972) . . . . . . 75

R.A.V. v. City of St. Paul, 505 U.S. --, 120 L.Ed.2d
    305 (1992) . . . . . . . . . . . . . . . . . . . 47, 48, 54

Regan v. Taxation with Representation of Washington,
    461 U.S. 540 (1983) . . . . . . . . . . . . . . . . . . 55

Rust v. Sullivan, 500 U.S. 173, 114 L.Ed.2d
    233 (1991) . . . . . . . . . . . . . . . . . 46, 63, 64, 65

v

Rutan v. Republican Party of Illinois, 497 U.S. 62, --,
    111 L.Ed.2d 52 (1990)  . . . . . . . . . . . . . . . . . . . 4

Sawyer v. Sandstrom, 615 F.2d 311 (5th Cir. 1980) . . . . . . 67

Shelton v. Tucker, 364 U.S. 479 (1960)  . . . . . . . . . . . 45

Simon & Schuster v. New York State Crime Victims
    Board, 116 L.Ed.2d 476 (1991)  . . . . . . 47-48, 54, 55-56

Student Coalition for Gay Rights v. Austin Peay State
    University, 477 F.Supp. 1267 (M.D. Tenn. 1979) . . . . . . 3

Sweezy v. New Hampshire, 354 U.S. 234 (1957)  . . . . . . . . 45

Texas v. Johnson, 491 U.S. 397 (1989) . . . . . . . . . . 49, 55

Tipton v. University of Hawaii, 15 F.3d 922, 1994
    U.S. App. LEXIS 1994, *14 (9th Cir. 1994) . . . . . . . 78

University of Southern Mississippi Chapter of the
    M.C.L.U. v. University of Southern Mississippi,
    452 F.2d 564 (1971)  . . . . . . . . . . . . . . . . . . 54

West Virginia State Board of Education v. Barnette,
    319 U.S. 624 (1943)  . . . . . . . . . . . . . . . . . . 50

Widmar v. Vincent, 454 U.S. 263 (1981) . . . . . 46, 48, 52, 54

Wood v. Davidson, 351 F.Supp. 543 (N.D. Ga. 1972) . . . . . 3, 60

STATUTES:

Alabama Education Code, Section 16-1-28 . . . . . . . . . passim

OTHER AUTHORITY:

David Cole, Beyond Unconstitutional Conditions: Charting
    Spheres of Neutrality in Government-Funded Speech,
    67 N.Y.U. L. Rev. 675, (1992)  . . . . . . . . . . . . . 63

Gregory Herek, Myths About Sexual Orientation: A
    Lawyer's Guide to Social Science Research,
    1 Law & Sexuality 133 (1991) . . . . . . . . . . . . . 13, 14

Developments in the Law -- Sexual Orientation and
    the Law 102 Harv. L. Rev. 1508 (1989)  . . . . . . . . . 13

Webster's Ninth New Collegiate Dictionary 690 (1984) . . . . 14

vi

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

94 APR -8 AM 10: 24

GAY LESBIAN BISEXUAL ALLIANCE,
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

vs.

JIMMY EVANS, in his official capacity
as Attorney General of the State of
Alabama, FREDERICK P. WHIDDON, in his
official capacity as President of the
University of South Alabama, and DALE
T. ADAMS, in his official capacity as
Dean of Students of the University of
South Alabama,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action
No. 93-T-1178-N

## PLAINTIFF'S BRIEF ON THE MERITS

In this action, plaintiff Gay Lesbian Bisexual Alliance
(GLBA) challenges the constitutionality, on its face and as
applied, of Section 16-1-28 of the Alabama Education Code -- a
sweeping but imprecisely-worded provision that (a) attempts to
bar certain groups from receiving any kind of direct or indirect
recognition or support from public colleges and universities in
the State of Alabama, and (b) conditions the receipt of any funds
or use of any facilities at public universities by any
organization upon the organization policing its membership for
criminal law violations and refraining from certain categories of
expression. Plaintiff contends that Section 16-1-28
impermissibly restricts freedom of expression and freedom of
association on the basis of content and viewpoint. Plaintiff
also argues that, in addition to the law's substantive First

Amendment infirmity, it is unconstitutionally vague and overbroad. Finally, as applied to plaintiff by defendants, Section 16-1-28's viewpoint bias has become even more clear. Relying on Section 16-1-28, defendants have denied the plaintiff student group equal treatment at the University of South Alabama -- based upon GLBA's acceptance of and identification with homosexuality -- in violation of the Equal Protection Clause as well as the First Amendment.

The parties have agreed that this case shall be submitted to the Court for final decision on a joint written record. In accordance with the Court's Order of January 25, 1994, that Joint Record of the Parties was filed with the Clerk of the Court on March 18, 1994.[1] Plaintiff submits this memorandum as its "pre-trial brief" pursuant to the January 25th Order.

## PRELIMINARY STATEMENT

This case does not arise in a vacuum, either within Alabama or within the whole of the United States. By enacting Section 16-1-28, the Alabama legislature has attempted to do what numerous individual universities across the country have tried to do over the last twenty-five years: keep lesbian and gay student

---

[1]The Joint Record consists of 110 documents bound together in two volumes and two separately-bound deposition transcripts. Citations herein to documents other than the deposition transcripts will be indicated "JR" followed by the volume and page numbers. Citations to the deposition transcripts will be indicated "Adams Dep." or "Evans Dep." followed by the page number.

2

groups off college campuses. In every such attempt by public universities to totally exclude such groups or limit their functioning, the courts have emphatically recognized the free speech and free association rights of gay-identified groups and rejected the universities' efforts to squelch their expression.[2]

Because vocal opponents of the Auburn Gay and Lesbian Association failed in a frontal attack on that group at Auburn University, and perhaps because of this imposing body of precedent, Alabama has now chosen state legislation and a slightly more indirect method of controlling debate at its public universities. This new approach, however, far from sidestepping constitutional problems, covers so much more expression in such an exceedingly vague fashion that it is more violative of First Amendment freedoms than prior ad hoc instances of universities denying recognition or funding to lesbian and gay groups.[3] Plaintiff asks this Court to invalidate Section 16-1-28 and to make clear that, in this instance like many others, a state

[2]Gay and Lesbian Students Association v. Gohn, 850 F.2d 361 (8th Cir. 1988); Gay Student Services v. Texas A & M University, 737 F.2d 1317 (5th Cir. 1984), cert. denied, 471 U.S. 1001 (1985); Gay Lib v. University of Missouri, 558 F.2d 848 (8th Cir. 1977), cert. denied, 434 U.S. 1080 (1978); Gay Alliance of Students v. Matthews, 544 F.2d 166 (4th Cir. 1976); Gay Students Organization of University of New Hampshire v. Bonner, 509 F.2d 652 (1st Cir. 1974); Student Coalition for Gay Rights v. Austin Peay State University, 477 F. Supp. 1267 (M.D. Tenn. 1979); Wood v. Davidson, 351 F. Supp. 543 (N.D. Ga. 1972); Gay Activists Alliance v. Board of Regents of the University of Oklahoma, 638 P.2d 1116 (Ok. 1981).

[3]Nor is Alabama's legislative approach unprecedented. A strikingly similar Florida statute was ruled unconstitutional under both the Florida and federal constitutions in Department of Education v. Lewis, 416 So. 2d 455 (Fl. 1982).

cannot do indirectly or surreptitiously what the Constitution prohibits it from doing directly. See, e.g., Rutan v. Republican Party of Illinois, 497 U.S. 62, 111 L.Ed. 2d 52, 65 (1990).

## SUMMARY AND ANALYSIS OF THIS DISPUTE'S BASIC FACTS

### A. The Context in Which Section 16-1-28 Became Law.

The proposed legislation that eventually became Section 16-1-28 was first introduced in the Alabama House of Representatives on February 26, 1992. JR I 0002 (Stipulation of All the Parties). The Governor signed Section 16-1-28 into law on May 14, 1992. Id.; JR I 0044 (session law version of Section 16-1-28). This contested statute, however, grew directly out of earlier events in the state that are relevant to the Court's consideration of its constitutionality. Those events are described in this section.

In 1990, a new student organization called the Auburn Gay and Lesbian Association (AGLA) sought "a probationary charter and eventually official recognition" at Auburn University, a public school. JR I 0076 (letter from President of AGLA).[4] In keeping with Auburn's established rules for the recognition of such school-sanctioned student groups, AGLA received its probationary one-year charter from the Auburn Student Government Association

---

[4]AGLA described its purposes as "social, service[,] and support of gays, lesbians, and other interested individuals at Auburn University. Activities will include weekly meetings, educational forums, picnics, and community service." Id.

4

(Auburn SGA). JR I 0077 (notice from Auburn SGA). When AGLA's one-year probationary status ended and it applied in the fall of 1991 for a permanent charter, however, the Auburn SGA voted to deny the group permanent status as an officially-recognized campus organization. JR I 0082 (Auburn SGA resolution).

In explaining its action, the Auburn SGA stated that "the Student Senate has rejected the Charter of the Auburn Gay and Lesbian Association because said group does not meet the ideas [sic] entrusted to the Student Senate on behalf of the students at Auburn" and specifically referred to the laws "prohibiting sodomy and sexual misconduct, viz §§13A-6-63, & 65, 1975 Code of Alabama." JR I 0082-83. The SGA further stated that "[i]t is the organization and the matters for which [AGLA] stands to which the Student Government Association objects." JR I 0083.

AGLA appealed the denial of its permanent charter to the Auburn administration. On January 7, 1992, Auburn's Vice President for Student Affairs announced that the university would recognize AGLA as "a chartered student organization with the privileges and responsibilities applicable to other organizations." JR I 0080 (letter from Auburn Vice President to Auburn SGA President). Despite further appeals by the Auburn SGA, and pressure from Auburn alumni, the Rutherford Institute and a group called "Students for a Healthy Auburn," the Auburn administration repeatedly reaffirmed its decision to grant AGLA

5

the charter.[5]  In a January 14, 1992, letter, the Dean of
Student Services emphasized, "[p]lease understand that this
decision is based on current law regarding rights under the First
Amendment and not on judgments concerning conduct."  JR I 0085
(letter to President of Auburn SGA).[6]

The controversy surrounding AGLA and its permanent charter
generated considerable press coverage throughout the state.  JR I
0091-0175 (examples).  That controversy also triggered various
actions by the Alabama legislature.  On January 31, 1992, for
example, the Alabama Senate passed Resolution No. 92-005 in
response to the dispute at Auburn.  JR I 0002 (stipulation).  The
resolution, entitled "Expressing Support of the Student Senate of
the Student Government Association of Auburn University," states
in part:

> WHEREAS, the State of Alabama has criminal laws
> which prohibit certain acts (see Section 13A-6-65 and
> 13A-5-12, Code of Alabama, 1975); and
>
> WHEREAS, the Senate of Alabama believes that the
> majority of the students in the universities and
> colleges of this state share the same values and
> beliefs of the majority of citizens of this state; ...

---

[5]JR I 0178 (Auburn Alumni Association statement); JR I 0086-
87, 0089-90 (Rutherford Institute press release & letter to State
Superintendent of Education); JR I 0088 ("Students for a Healthy
Auburn" form letter); JR I 0081, 0085 (Auburn's Jan. 9 & 14
letters to President of Auburn SGA).

[6]For additional summaries of the basic facts related to the
dispute about AGLA's charter, see also JR I 0186-87 (Memorandum
Opinion in Auburn University v. AGLA et al.); JR I 0045-46
(resolution of the Alabama Senate); JR I 0047-49 (resolution of
the Alabama House); and JR I 0233-34 (Declaration of John W.
Bales, member of the Board of Directors of AGLA).

6

BE IT RESOLVED BY THE SENATE OF THE LEGISLATURE OF ALABAMA, That this body commends Student Government Associations, the Student Senates, and their leaders, and indeed students when they take courageous stands against positions and actions that are not only prohibited by laws of the State of Alabama but are contrary to the values and beliefs of the people of this state.

BE IT FURTHER RESOLVED:  ...

2.    That the Senate of Alabama recognizes that, as an example, the Student Government Association, the Student Senate, and numerous students at Auburn University took courageous stands, when on November 25, 1991 and January 7, 1992, they boldly objected to what is or may be considered the "politically correct" position prevalent on many college campuses across this country in the acceptance of erotic life styles.

3.    [And] That the Senate of Alabama does not condone violations of the laws of the State of Alabama, nor does it recognize an erotic life style, but rather acknowledges that the State of Alabama is and resolves that it shall remain, historically traditional in its views of the family, and that the State of Alabama is a place where families can live and grow without being debased or immoralized.

JR I 0045-46 (full text of Senate resolution).

On February 18, 1992, Representative Perry O. Hooper, Jr., wrote to defendant Jimmy Evans and requested the Attorney General's opinion "as to whether an organization that professes to be homosexual or lesbian may use state funding or state supported facilities to foster or promote those illegal, sexually deviate activities as defined in the sodomy and sexual misconduct laws under Sections 13A-6-63, 13A-6-64, and 13A-6-65[.]"  JR I 0050 (letter from Hooper to Evans).

On February 26, the House of Representatives passed its own resolution in support of the ASGA, resolving in part:

7

2. That the House of Representatives of Alabama recognizes that the Student Government Association, Student Senate, and the students of Auburn University have done the right thing, regardless of what is considered the "politically correct" position prevalent on college campuses across this country of accepting the homosexual life style.

3. That the House of Representatives of Alabama does not condone violations of the laws of the State of Alabama, nor does it recognize the homosexual life style, but rather acknowledges that the State of Alabama is and resolves that it shall remain, historically traditional in its view of the family, . . . .

4. [And] That the House of Representatives of Alabama requests all interested parties to recognize the correctness of the position of the Auburn Student Senate and to support that position in every way.

JR I 0047-49 (full text of House resolution).

That same day, February 26, the bill that would become Section 16-1-28 -- H. 454 -- was introduced for consideration by the House. JR I 0002 (stipulation). While H. 454 was before the legislature, Representative Hooper (one of the bill's sponsors) received the Attorney General's opinion that he had earlier requested. JR I 0057-0060 (Mar. 19, 1992, opinion letter). Defendant Evans's office concluded that "an organization that professes to be comprised of homosexuals and/or lesbians may not receive state funding or use state-supported facilities to foster or promote those illegal, sexually deviate activities defined in the sodomy and sexual misconduct laws[.]" JR I 0060.

Upon receiving the opinion letter, Representative Hooper issued a written statement, commenting that:

Briefly, the opinion stated that public monies may not be used to fund the activities of an organization which

8

supports behavior which directly or indirectly
encourages sexual misconduct. ...

   I have supported from the very beginning the
action taken by the Student Government Association at
Auburn[.] ... We hear about how unfair it is to
discriminate against homosexuals. But who in their
right mind would put them in any position within our
educational system where they might become role models
for the young? I say - can anything destroy the
possibility of happiness for a young person more than
turning him or her away from traditional marriage and
family life, to the dismal sewers of sodomy and
lesbianism?

JR I 0061-63 (full text of written statement).

   Press accounts of H. 454's consideration and passage in the

spring of 1992 uniformly described the bill as a measure directed

at lesbian and gay student groups. JR I 0192-0197 (examples).

All of the press coverage also traced this legislation back to

the dispute over AGLA's permanent charter. Id.[7] Members of the

Alabama legislature quoted in the media coverage likewise

consistently referred to H. 454 as a device designed to restrict

gay and lesbian student groups such as AGLA. Id.[8]

---

[7]As 1992 progressed and the public controversy about AGLA
failed to subside, Auburn University sought a declaratory
judgment from this Court with regard to the student group's First
Amendment rights. JR I 0064-75 (complaint). In a May 11, 1992,
decision, the Court ruled, however, that no justiciable
controversy existed between Auburn and AGLA, or any of the
additional named defendants, so long as the school continued to
recognize AGLA as an official campus organization like any other.
Judge Ira DeMent rejected Auburn's argument "that this matter is
ripe for the court's review because it has created a
'confrontational atmosphere' which threatens to erode the
administration's ability to govern the university and its ability
to maintain good relations with alumni and with the Alabama
legislature." JR I 0189 (Memorandum Opinion).

[8]The Alabama legislature does not maintain any official
legislative history of its deliberations.

9

B.  The Statute.

Against this background, the Alabama House and Senate enacted the statute at issue here.  H. 454, as passed by the full legislature and signed by Governor Hunt, included the following preamble/statement of purpose:

> To prohibit any college or university from spending public funds or using public facilities, directly or indirectly, to sanction, recognize, or support any group that promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws; to prohibit any group from permitting or encouraging its members or others to engage in or provide materials on how to engage in the lifestyle or actions.

JR I 0043 (session law).  The three substantive parts of Section 16-1-28 provide:

> (a)  No public funds or public facilities shall be used by any college or university to, directly or indirectly, sanction, recognize, or support the activities or existence of any organization or group that fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws of Sections 13A-6-63 to 13A-6-65, inclusive.
>
> (b)  No organization or group that receives public funds or uses public facilities, directly or indirectly, at any college or university shall permit or encourage its members or encourage other persons to engage in any such unlawful acts or provide information or materials that explain how such acts may be engaged in or performed.
>
> (c)  This act shall not be construed to be a prior restraint of the first amendment protected speech.  It shall not apply to any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state.

Ala. Code § 16-1-28; JR I 0043-44 (session law).[9]

---

[9]The only substantive difference between the statement of purpose and the actual text of the law comes at the end of the statement of purpose, where it includes "the lifestyle" as well

10

This statute requires phrase-by-phrase analysis for an accurate sense of its scope and indeterminacy to emerge. Plaintiff, therefore, parses each aspect of Section 16-1-28 in this segment of the Summary and Analysis of the Facts.

1. Part (a) As Written.

Part (a), as written, essentially requires a public college or university to bar from its campus "any organization or group that fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws" of Alabama (Sections 13A-6-63 to 13A-6-65, inclusive). Sections 13A-6-63 through 13A-6-65 of the Alabama Criminal Code outlaw, inter alia, forcible acts of "deviate sexual intercourse;" such acts with a minor or someone incapable of consent; vaginal intercourse under certain circumstances, including where the consent of a female is obtained through the use of any fraud or artifice by the male (Section 13A-6-65(a)(1)); and consensual oral or anal intercourse between any two unmarried persons -- of the same or of different genders (Section 13A-6-65(a)(3)).

Part (a) erects an absolute bar because the college or university cannot use any public facilities or funds to directly or indirectly "sanction, recognize, or support the activities or existence of any" such covered group. Thus, even allowing members of a covered group to set foot on public university

---

as "actions" in prohibiting any covered group "from permitting or encouraging its members or others to engage in or provide materials on how to engage in the [purportedly prohibited] lifestyle or actions."

11

grounds would appear to violate part (a).[10]  Under the
comprehensive language of part (a), a public university certainly
could not allow "any group that fosters or promotes a lifestyle
or actions prohibited by the sodomy and sexual misconduct laws"
to hold a forum or speech, no matter what the topic, in a campus
auditorium; could not officially recognize such a group as a
university organization; and could not allow public funds to
directly or indirectly underwrite any of a covered group's
activities.

Part (a), however, provides no guidance as to what kind of
organization or group might "foster[] or promote[] a lifestyle or
actions prohibited by the sodomy and sexual misconduct laws," nor
as to what actions might be deemed to "foster" or "promote" the
specified "lifestyle or actions."  Neither does part (a) explain
how to interpret the phrase "a lifestyle ... prohibited by the
sodomy and sexual misconduct laws," given that Sections 13A-6-63
through 13A-6-65 nowhere make criminal a "lifestyle."

Part (a) as written, therefore, creates a clear rule against
groups considered to have the one specified type of program or
effect, but leaves unanswered how any particular group might in
fact, by its purposes, actions or beliefs, come within part (a)'s
coverage.  The provision eliminates from public college campuses
all organizations or groups that are somehow determined by the

---

[10]Those university grounds are public property and are
maintained by public funds.  Allowing a covered group to do
anything on the campus grounds would sanction, recognize and
support at least the existence of the organization.

12

state to "foster" or "promote" a particular end -- "a lifestyle or actions prohibited by the sodomy and sexual misconduct laws." In contrast, a group designed or deemed to <u>discourage</u> "a lifestyle or actions prohibited by the sodomy and sexual misconduct law" suffers no limitation of its activities on Alabama public university campuses under part (a).[11]

2. <u>Part (a) As Intended and As Generally Understood</u>.

Neither part (a) nor any of the other provisions of Section 16-1-28 ever mentions homosexuality or gay and lesbian student groups. Indeed, the criminal laws upon which Section 16-1-28 purports to rest, Sections 13A-6-63 through 13A-6-65, all relate either to "deviate sexual intercourse" -- various acts, defined in Section 13A-6-60(2) and including oral and anal sex, that can be engaged in by both heterosexuals and homosexuals -- or to "sexual [vaginal] intercourse" under certain conditions, which

---

[11]Part (a), like part (b), would also apply to public funding given to a private university, or to an organization operating at a private university, and would prohibit directly or indirectly supporting particular organizations with that public funding. The impact of part (a) and the entire statute, however, is much greater at public schools because there the entire institution is created by public funds and operates in public facilities. With regard to public institutions, part (a) would have the same effect if it simply began "no public college or university shall, directly or indirectly, sanction ...." Throughout this brief, plaintiff's arguments focus on Section 16-1-28's effects on group activity and expression at public schools. The law's restrictions on groups supported by public monies but operating at private schools, however, are similarly unconstitutional. <u>See</u> <u>infra</u> 62-67 (unconstitutional conditions analysis).

13

only a male/female couple can participate in.[12]  There is

nothing in the text of part (a) or the text of the referenced

criminal code sections that would logically link part (a) to

homosexuality or to groups associated with that particular sexual

orientation.

The only word in part (a) that might even hint, to some

readers, at homosexuality is the word "lifestyle."  The phrase

"homosexual lifestyle" is often used to refer in a derogatory

manner to the way that gay men and lesbians live, though there

obviously is no single "lifestyle" or way that homosexuals

conduct themselves in the world.[13]  In the Alabama legislative

resolutions that immediately preceded passage of Section 16-1-28

and that illuminate the legislature's intentions, "lifestyle" is

indeed qualified by "homosexual" and "erotic" and vigorously

denounced.  JR I 0048 (resolution of the House); JR I 0046

(resolution of the Senate).  When given its plain, non-derogatory

---

[12]See Developments in the Law -- Sexual Orientation and the Law, 102 Harv. L. Rev. 1508, 1568-69 (1989) ("[s]exual orientation classifications and sodomy, however, are entirely separate phenomena"); id. at 1569 n.98 (collecting studies showing high rate of oral and anal sex among both heterosexuals and homosexuals).

Moreover, contrary to myth, there is no connection between a homosexual sexual orientation and committing forcible criminal sex acts.  Gay men are particularly portrayed as preying on children.  See Gregory Herek, Myths About Sexual Orientation: A Lawyer's Guide to Social Science Research, 1 Law & Sexuality 133, 152 (1991).  The best scientific evidence shows, however, "that gay men are no more likely than heterosexual men to molest children."  Id. at 156.

[13]See, e.g., Herek, supra, at 164 ("lesbian and gay male couples manifest the same range of diversity as heterosexual couples").

14

meaning, by contrast, the word "lifestyle"[14] in part (a) -- particularly, as it is, bereft of any adjective narrowing it or any corresponding reference in the specified criminal laws -- stands without an apparent purpose in the text of the statute.

Despite its literal wording, however, there can be no doubt that the legislature intended part (a) and the whole of Section 16-1-28 to at least encompass and therefore prohibit gay-and-lesbian-identified student organizations[15] at public universities, such as AGLA and plaintiff. The legislature sought to further its view of "the values and beliefs of the people of this state"[16] by "standing against"[17] those gay and lesbian groups "in every way."[18] Plaintiff submits that the history of Section 16-1-28's origins, outlined in section 1 above,

---

[14]Webster's defines "lifestyle" as "the typical way of life[.]" Webster's Ninth New Collegiate Dictionary 690 (1984).

[15]These groups are typically and in this brief referred to as "gay and lesbian" or "gay, lesbian and bisexual" student groups. Such shorthand is imprecise, however, because the groups are not simply collections of gay men, lesbians and bisexuals. Rather, the distinctive characteristic of the groups is their open identification with and support of those minority sexual orientations. These groups often include heterosexual members, just as gay students belong to all kinds of other campus organizations.

[16]JR I 0045 (Senate resolution); JR I 0048 (House resolution).

[17]JR I 0048 (House resolution); see also JR I 0045 (Senate resolution commending "courageous stands against positions and actions ... contrary to the views and beliefs of the people").

[18]JR I 0048 (House resolution).

15

conclusively establishes this legislative purpose.[19]  Moreover,
it is clear that the press, the public, and those potentially
covered by the legislation generally understood it -- in spite of
its inapposite and opaque language -- to particularly target gay
and lesbian student groups.  JR I 0192-0197 (press coverage); JR
I 0218 (Declaration of George Hite Wilson); JR I 0234
(Declaration of John W. Bales); Adams Dep. 31, 36-37;[20] see also
infra Statement of Facts, section 3 (application of Section 16-1-
28 to plaintiff).  Defendant Evans affirmed this understanding of
part (a), as covering gay and lesbian student groups, in a July
29, 1993, Attorney General's opinion.  JR 0210-0211 (opinion
issued in response to request by defendant Whiddon).

Thus, there are two ways to read part (a): (1) as written --
a reading that gives no clue as to the kinds of groups or actions
that would trigger coverage by the provision; or (2) as intended
-- a reading that identifies gay and lesbian student groups as a
specific target of the law, but that still provides no indication
of how those groups become covered under the literal language of

_____

[19]Plaintiff notes, in addition, that there is absolutely no
evidence in the record that suggests any other motivation behind
or target of Section 16-1-28.

[20]Defendant Dale Adams, Dean of Student Services at the
University of South Alabama, testified for example that "The
whole issue had arisen at Auburn.  And I think that was the
purpose for the law and why it was written."  Id. at 31.  He went
on to state that "I have some trouble with the wording of the
bill and what it means.  But I think in the context of what was
happening at the time, since it appeared to me that the law was
being passed for the -- to deal with the controversy that was in
the state.  That to me, the context of it, was why I felt the
group was being, GLBA was at risk in the situation."  Id. at 36-
37.

16

the statute, or whether there is anything they could possibly do to escape coverage by part (a). Under the second reading, part (a) works to eliminate from public college campuses organizations that identify with, support, and pursue educational and political issues that are important to, gay men and lesbians. Any groups that approach homosexuality from a different, negative perspective remain able to enjoy the use of university facilities and funds.

3.  Part (b).

Even if an organization survives part (a) of Section 16-1-28 and is not absolutely barred from all activities on public school campuses, part (b) applies to the group and imposes its own limitations. Part (b) has two components. Both components are conditions on the receipt (direct or indirect) of public funds and/or the use of public facilities at a college or university. The first component forbids any group that receives public monies or that uses public facilities (e.g., all officially-recognized campus student groups, because at a minimum they meet on campus in public facilities, and all groups from outside the university who rent or use for free a public university's auditorium) from "permit[ting] or encourag[ing] its members or encourag[ing] other persons to engage in" the acts made unlawful by the Alabama sodomy and sexual misconduct laws. This provision requires both university-affiliated and non-university-affiliated groups to police their members in some unspecified fashion. This restriction also demands that groups receiving public money or

17

using public facilities limit their programs, so as not to
somehow "encourage" criminal law violations by their members or
others. Moreover, the restriction applies to the organization
and its activities while the group is using public funds or
facilities, and the restriction continues to apply to the group
if it is off campus, operating with only private resources.

The second component of part (b) similarly conditions the
receipt of public funds and use of public facilities, mandating
that if a group takes advantage of university facilities or
funding it may never "permit or encourage its members or
encourage other persons to ... provide information or materials
that explain how such acts [prohibited by the sodomy and sexual
misconduct laws] may be engaged in or performed." Because, as
noted above, Sections 13A-6-63 through 13A-6-65 apply to vaginal
intercourse under certain circumstances and to all consensual
oral or anal intercourse participated in by non-married couples,
as well as to other acts, the "materials that explain how such
acts may be engaged in" encompass a considerable amount of
information about human sexuality. This forbidden category of
expression also includes important advice and materials on the
prevention of sexually-transmitted diseases, most notably HIV
disease.

Under part (b), for example, a group that uses any campus
facilities or any public funding can never, on or off campus,
instruct students or others on how and when to use condoms to
protect their health and the health of their partners. Such a

18

group could not even "encourage" a professor of biology or a
doctor to provide that information. Ironically, part (b)'s
prohibition on the sharing of information is so broad that a
group receiving public funds or using public facilities could not
circulate among its members copies of the sodomy and sexual
misconduct statutes -- yet, under the first component of part
(b), the same group is supposed to ensure that none of its
members violate those provisions.

4.  Part (c).

Part (c) adds two caveats to the earlier provisions of
Section 16-1-28.  The first sentence in part (c) purports to
clarify that the law "shall not be construed to be a prior
restraint of the first amendment protected speech."  It is
impossible, however, to "construe" parts (a) and (b) as not
imposing prior restraints on constitutionally-protected
expression.  If the language of those provisions is to mean
anything like what it literally says or what it was intended to
mean, Section 16-1-28 effects a prior restraint by, inter alia,
(i) preventing certain groups from existing at all on public
university campuses and (ii) preventing the groups that are
allowed to use university facilities or funds from ever providing
(or encouraging others to provide) information about how various
sexual acts might be performed.  See, e.g., Widmar v. Vincent,
454 U.S. 263 (1981), and Board of Trustees of the Leland Stanford
Junior University v. Sullivan, 773 F. Supp. 472 (D.D.C. 1991),
discussed infra.

19

The second sentence in part (c) excludes one very narrow
category of group from Section 16-1-28's coverage: "It shall not
apply to any organization or group whose activities are limited
solely to the political advocacy of a change in the sodomy and
sexual misconduct laws of this state." Ala. Code § 16-1-28(c)
(emphasis added). This caveat, though, does not define the
precise contours of the permissible "political advocacy."
Moreover, such an exemption is virtually useless for officially-
recognized student groups at Alabama public universities. These
on-campus organizations are designed to provide benefits for the
campus community; it is highly unlikely that a group would be
created by students and chartered by the school if its sole focus
was in Montgomery, urging the state legislature to amend the
criminal laws. As the following description of plaintiff GLBA,
other campus groups and campus events at the University of South
Alabama, and the enforcement of Section 16-1-28 shows, the
reality of organizational activity at Alabama universities is
much different and more varied than the second caveat in part (c)
might indicate.

C. Defendants' Enforcement of Section 16-1-28 Against Plaintiff.

Defendants Frederick P. Whiddon, the President of USA, Dale
T. Adams, the Dean of Student Services at USA, and Jimmy Evans,
Attorney General of the State of Alabama, have interpreted
Section 16-1-28 to apply to plaintiff GLBA and have enforced that

law against the USA gay and lesbian student group.  The facts
relating to this detrimental enforcement are outlined below.[21]

1.  Student Organizations at USA.

The University of South Alabama attempts to encourage a wide
variety of student groups to be active on its campus.  Adams Dep.
12.  The university believes that the activity of student groups
"enhances the life on campus[.]"  Adams Dep. 12.  As Dean Adams
explained,

> I think we would hope that [in the] outside of the
> classroom activities that occur that students have an
> opportunity to see all of life as it exists, you know,
> from a practical and applied sense.  And it's an
> opportunity for our students to encounter different
> viewpoints, ideas, perspectives.  And we think that's
> important because we are committed, as our mission
> statement says, "to the education of the whole person."

Adams Dep. 13.[22]

The university is also committed to freedom of expression
and, in particular, to academic freedom.  The USA Code of

---

[21]Plaintiff particularly refers the Court to the Declaration
of George Hite Wilson, President of GLBA, which provides a
detailed history of GLBA and the use of Section 16-1-28 to
interfere with its activities.  JR I 0212-0229.

[22]Adams Dep. 11-12.  In keeping with its goal of a vibrant
campus, USA publishes several documents that aim to assist
students in joining and running university organizations.  A
1993-94 publication called "Make the Connection," JR II 0530-
0544, for example, describes all of the student organizations and
emphasizes that "[i]nvolvement in out-of-class activities can
significantly enhance the quality of your college experience[.]"
JR II 0532.  See also JR 0454-0559 ("The Gang's All Here," 1992-
93 version of the directory of student organizations); JR 0560-
0563 (publication for freshman called "We're Here to Help You ...
Get Involved").  A more detailed publication called "Keep the
Connection," JR II 0478-0489, is a resource manual for student
organizations.  This booklet contains all of the rules that apply
to student groups, as well as numerous suggestions on how to keep
a successful organization going.

21

Conduct, for example, designates as "misconduct" "[i]ntentionally and substantially interfering with the freedom of expression of others on University premises or at University-sponsored activities." JR II 0503. The "Spirit of South Alabama" "supports giving all persons the right to go wherever they lawfully would like to go and express themselves freely." JR II 0480. Likewise, the mission statement of USA promises that "the University will provide appropriate instructional and investigative facilities within an atmosphere of academic freedom[.]" JR II 0510. The mission statement stresses that "the University must encourage and foster the qualities expected of leaders, such as integrity, service, stewardship, involvement and respect for individuals, as well as an appreciation for diversity." JR II 0509.

Within this conception of its goals, the University has set up a simple procedure for the formation and registration of new student organizations. JR II 0483.[23] Once registered, a student group enjoys various benefits at the school. USA, for example, has built the University Center to serve as "the official meeting place for all campus activities." JR II 0506. Recognized student organizations are not charged fees for holding their meetings in the Center's seven meeting rooms, which can be

---

[23]Registered student organizations are not permitted to discriminate "in any manner on the basis of sex, race, creed, color, religion, national origin, age, disability, or sexual orientation." JR II 0483 ("Keep the Connection"); Adams Dep. 13-14. Thus, many groups have gay, lesbian and bisexual, as well as heterosexual, members.

reserved on a first-come-first-serve basis. Id. The Center also has larger space for "social or conference style gatherings." Id.[24] In addition, USA offers on-campus banking services to registered student organizations. JR II 0484. Registered student groups are also eligible to apply for direct university funding through the Student Government Association (SGA). JR II 0484-0485.[25]

The SGA is itself a large student organization that conducts its own activities in addition to funding other groups. Each quarter, the SGA spends or gives out a budget in the tens of thousands of dollars. See, e.g., JR II 0433 (Spring Quarter 1993 budget of $48,000). The money for that budget comes from the student activities fees that are paid by each student to USA along with tuition. Adams Dep. 18-19. Another large USA organization, also funded through student activities fees, is Jaguar Productions. JR II 0507-0508. "JP" is responsible for

---

[24]Other university facilities are also available for use by registered student organizations, with those organizations and other University-affiliated groups having "priority in use over non-University organizations in all facilities." JR II 0489.

Many non-University organizations, however, do take advantage of USA's facilities by reserving space through the Division of Student Services. JR I 0292 (explaining Attachment XXIII to Whiddon and Adams document production); JR II 0565-0568 (Attachment XXIII -- list of non-university groups that have reserved and used USA facilities, 1990-1993).

[25]Although not mentioned in the SGA rules that govern the eligibility for and process of funding, JR II 0484-0485, Dean Adams has testified that USA has a policy that partisan political student groups and religious student groups are not eligible for SGA funding. All other registered student organizations are eligible. Adams Dep. at 16-18.

sponsoring programs of general interest on the USA campus and
operates under the supervision of Paula Smith, a university
employee. Adams Dep. 90-92.

Excluding the unique SGA and Jaguar Productions, there are
currently over 100 registered student organizations at USA. JR
II 0518-0526 (list of 119 groups from 1993-95 student handbook,
"The Lowdown"); JR II 0562 ("[m]ore than one hundred and thirty
honor societies, professional and departmental organizations,
special interest clubs, and religious groups are active"). The
registered student groups range, for example, from the Alpha Area
Council, which plans social activities for particular dorm
residents; to the Arab Student Organization, which works to
develop "a closer bond between Arab students and the university
community;" to Baptist Campus Ministries; to the Society of Women
Engineers; to Students Together Against Racism, which aims to
"encourage friendship and association between racial groups." JR
II 0518-0526. In addition to the registered student groups, the
SGA, and Jaguar Productions, USA is also home to an
Interfraternity Council, a Panhellenic Council, and ten
fraternities and eight sororities. JR II 0527-0529.[26]

2. The Gay Lesbian Bisexual Alliance.

Among those dozens of organizations, plaintiff GLBA has been
the only group at USA affected by Section 16-1-28. See infra at
26-44. GLBA was first formed as the Gay and Lesbian Student

_____

[26]These Greek groups are, like registered student
organizations, eligible for SGA funding.

24

Alliance in late 1991. JR II 0309-0323 (USA's file on plaintiff as a registered student organization). The group complied with all the requirements for official recognition and began functioning as a registered student organization in the Winter (first) Quarter of 1992. Id.; JR I 0212 (Declaration of George Hite Wilson, president of GLBA ("Wilson Dec."), ¶¶ 1-2). In the Winter Quarter of 1993, the group changed its name to the Gay Lesbian Bisexual Alliance. JR II 0320.

GLBA seeks to "provide a foundation for unification for homosexual and nonhomosexual people of the student population." JR II 0311 (GLBA Constitution). The group is an educational, social, political and cultural organization. JR I 0213-16 (Wilson Dec. ¶¶ 3-13). It is open to all members of the USA community, heterosexual as well as gay or bisexual, but provides a singularly supportive environment for gay, lesbian and bisexual students. JR I 0214 (Wilson Dec. ¶ 6). GLBA is "an open forum where current political issues can be discussed" and an organization that works "to further basic human rights and awareness within the university," including working "fervently to combat homophobia." JR II 0316-17 (Request to Form an Organization and Justification for Need); JR I 0213 (Wilson Dec. ¶ 4).

In addition to specifically gay/bisexual issues, GLBA focuses on AIDS awareness and education, both among its membership and in its programs for others. JR I 0214-0215 (Wilson Dec. ¶ 8). The group meets weekly on campus, with GLBA

25

members also visiting classes and participating in forums to educate and to advance GLBA's views, and the group itself sponsoring events for the entire university community. JR I 0215-16 (Wilson Dec. ¶¶ 11-13). GLBA has never had as one of its purposes the goal of bringing about violations of any of the criminal laws of Alabama, nor has it lobbied the state legislature for a repeal of the consensual sexual misconduct law, Section 13A-6-65(a)(3), or any other criminal statute. JR I 0215 (Wilson Dec. ¶¶ 9-10).

Defendant Adams testified that GLBA has made numerous "positive contributions" to the university community since its inception two and one-half years ago:

I think they are working in trying to promote AIDS awareness and AIDS education. I think they have provided the support of the community for students who are gay, lesbian or bisexual. I think they have educated other students and faculty and staff on our campus about the issues related to gay life.

Adams Dep. 26. He also stated that GLBA has never "done anything that ... has interfered with the educational mission of the university." Adams Dep. 26-27. Dean Adams, one of the two USA officials most involved with student organizations, has no reason to believe that GLBA or any of its members have ever violated any Alabama criminal statute. Adams Dep. 11, 27.

3. The Targeting of and Harm to GLBA Under Section 16-1-28.

In the spring of 1992, while the controversy surrounding the Auburn Gay and Lesbian Association remained "hot," Adams Dep. 42, and H. 454 was before the legislature, Defendant Adams met with GLBA to advise the organization to postpone a dance that it had

26

planned to hold that spring for all students at USA. JR I 0219
(Wilson Dec. ¶¶ 18-19). Adams recommended that, especially
because "a church group ... was getting ready to have a state
convention, and one of their issues at the time was
homosexuality,"[27] GLBA should delay its dance and remain "low
key" until "things cool[ed] down." Adams Dep. 42. Adams
particularly advised GLBA to wait until the legislature had
concluded its deliberations on H. 454, which Adams did not
believe would pass. JR I 0219 (Wilson Dec. ¶ 19); Adams Dep. 42;
see also id. at 32-33 (Adams advised by Rep. Kvalheim that H. 454
would not pass). "Because GLBA wanted to maintain good relations
with the Dean and the school, and because we had been lead to
believe that we would only need to curtail our activities for a
very short time, GLBA did follow Dean Adams's advice and
postponed the dance." JR I 0219 (Wilson Dec. ¶ 20).

    Section 16-1-28 soon became law, however, and significantly
curtailed GLBA's ability to function as a campus organization.
From the summer of 1992 to the present, defendants have applied
the statute to GLBA alone and have, under the guise of this law:
(1) rendered on-campus banking facilities useless for GLBA; (2)
disqualified GLBA from receiving SGA funding, despite the SGA
having voted to fund the group; (3) convened a "fact-finding

_____

[27]In February 1992, USA received letters from Baptist Campus
Ministries and various ministers, complaining about GLBA's
presence on campus. JR II 0324-0325 (minutes of Student Services
Staff meetings that note receipt of these letters). The Student
Services Staff consists of the USA employees who report directly
to defendant Adams. Adams Dep. 34-35. Dean Adams reviews each
meeting's minutes before they are finalized. Adams Dep. 35.

committee" to investigate GLBA and its members; and (4) generally treated GLBA as belonging to a second-class category, all by itself, among the many organizations using USA facilities and being supported by university funds. Moreover, defendants concede that they cannot point to language in the statute itself and particular facts about GLBA's activities that they have definitively relied upon to apply the law against GLBA; rather, they have interpreted part (a) of Section 16-1-28 to relate to this gay and lesbian student group because it was the controversy about such a group at Auburn that triggered the legislation.[28]

---

[28]See Adams Dep. 36-27 (Q: "And what is it about the wording of the bill that specifically leads you to believe it would have an impact on the GLBA?" A: "Well, I don't know whether the wording of the bill or whether the circumstances at the time. I think that had more to do with it than how the bill is worded. ..."); id. at 74-75 (Q: "And why does that language trigger some connection to the Gay Lesbian Bisexual Alliance?" A: "Well, I don't know that the words in and of themselves do, except in the context of the law as I explained to you before. This law was passed, and I think it was understood to be passed, in direct opposition to any homosexual group having access to a campus or to funds. ... in the context of the law being passed we all understood, I think[,] those of us in higher education, what it meant. What the effort was ...."); id. at 93-94 (enforcement focus on GLBA because of the background of the legislation).

See also JR I 0210-0211 (opinion letter to defendant Whiddon from Attorney General's office, providing no explanation for its conclusion that GLBA funding is prohibited under part (a) of Section 16-1-28); Evans Dep. 24-25, (Q: "... What facts led to the conclusion that [GLBA] was a group that fostered or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws?" A: "I think Mr. Whiddon noted in his letter ... that the charter of the organization did not promote a lifestyle prohibited by the sodomy and sexual misconduct laws of Alabama. I really don't know the facts involved at the University of South Alabama."); id. at 26 ("I don't have and did not have at the time I approved this opinion a command of the facts at the University of South Alabama. Now, I noted in Mr. Whiddon's letter that he says that the charter of the organization does not promote a lifestyle prohibited by the

28

GLBA's difficulties are thus an outgrowth of the Auburn controversy and, more broadly, of homosexuality being a controversial issue. They are not the result of some careful interpretation and application of Section 16-1-28's uncertain requirements.[29]

The first setback that GLBA suffered after the passage of Section 16-1-28 related to its request for an on-campus bank account. In June of 1992, the then President of the group, Carol

sodomy and misconduct laws. There must have been some consideration at the staff level that perhaps they did. I don't know."); id. at 26-31 (defendant Evans unable to identify any information in the materials provided by defendant Whiddon to his office that would indicate that funding the GLBA violates part (a) of Section 16-1-28).

[29]See JR I 0249-50 (defendant Adams's response to an interrogatory: "I was not certain as to what organizations would be deemed to 'foster or promote a lifestyle or actions prohibited by the sodomy and sexual misconduct laws ....' The University administration was not certain as to that utilization of the terminology, either. ... I do not personally believe that the GLBA comes under the statute."); JR I 0267 (defendant Whiddon's response to an interrogatory: "the Defendants were not certain what organizations would 'foster or promote a lifestyle or actions prohibited by the sodomy and sexual misconduct laws .... [T]he Attorney General's opinion ... did not provide clarification .... Based on the description of the GLBA's purposes in its charter, the Defendants' understanding of the GLBA's activities, and the Defendants' understanding of the words 'foster or promote,' the Defendants do not personally believe that the GLBA comes under the statute.").

See also Evans Dep. 16-17 (surmising that a group that "advocate[d] those practices" would be covered by the law, but also testifying that "to advocate" is not the same thing as "to foster or promote"); id. at 29 (testifying that if GLBA goals do "not mean the violations of those [sodomy and sexual misconduct] laws then I see nothing wrong with it"); id. at 31 (stating, in contradiction to earlier testimony, that "if you're talking about the advocation, the right of a person to advocate ... then I can't find anything wrong with it" under Section 16-1-28); citations in footnote 28.

29

Story, wrote to the USA administration requesting such an account. JR II 0327 (request letter); Wilson Dec. ¶ 21. Dean Adams's initial reaction was to grant the request, but before responding to GLBA he consulted with Maxey Roberts, the USA counsel. JR II 0328 (memorandum from Adams to Roberts). After his communication with Roberts, Dean Adams reported to GLBA that the school would not simply go ahead and open an account, as is customary for any recognized student organization. As George Hite Wilson, current President of GLBA, testifies in his declaration,

> The university took the position that if we placed funds in such an account, those funds would be subject to Section 16-1-28 and could not be spent by GLBA -- at least until legal questions around that law were clarified. The school effectively denied our request by informing us that, at that time, such an account would be useless or even detrimental to our financial situation, given the school's interpretation of Section 16-1-28 as possibly relating to GLBA.

Wilson Dec. ¶ 22. Dean Adams "assume[s] that we didn't [open the account] because we were waiting for whatever decisions were going to be made relative to this to be made. ... I would assume that I told them that until we could figure out what this law meant that we were not going to do that." Adams Dep. 51-52.

The university thus determined that, of all the student groups at USA, GLBA would uniquely[30] be deprived of any real use

[30]See Adams Dep. 54 (Q: "Did you advise any other student group that because of this legislation their money, if put in an on-campus bank account, might be unavailable to them?" A: "No."); JR I 0238, 0241 (defendants Whiddon and Adams admit Request to Admit No. 6, that "USA has not informed any other student organization, aside from GLBA, that Section 16-1-28 raises any issue with regard to such other organization's on-

30

of an on-campus bank account -- one of the routine privileges of recognized organization status -- at least until the school could become more certain as to the requirements of Section 16-1-28.[31] Despite a renewed request during the summer of 1993 for such a bank account, JR II 0453 (1993 request letter), the university had not changed its position with regard to GLBA and on-campus banking facilities as of September 1993, when this law suit was filed (nor has it changed its position at any time up to the present). See Adams Dep. 93; Wilson Dec. ¶ 45. Because GLBA could not establish an on-campus bank account, the group not only could nowhere receive free banking (and instead had to pay the fees of a commercial bank),[32] but also could not even potentially take advantage of SGA on-campus money transfers to allow before-the-fact SGA funding of GLBA programs.[33]

_____

campus bank account").

[31]The school's position was not merely that GLBA could not use an on-campus account to receive and spend SGA funding. Rather, the school warned GLBA that if it put its own, private funds into an on-campus account, that money could thereby be transformed into "public" funds and frozen under Section 16-1-28. Adams Dep. 49, 53-54.

[32]See, e.g., JR II 0399 (revised Winter Quarter 1993 GLBA budget request reflecting bank fees); JR II 0242 (Spring Quarter 1993 budget request reflecting same).

[33]As Dean Adams explained during his deposition, if a student group has an on-campus account and is voted funding by the SGA, that funding can be transferred to the group prior to its scheduled event for disbursement before-the-fact. If, on the other hand, a group budgeted for SGA funding only has off-campus banking facilities, that group must spend its own money for the budgeted items and then later, upon presenting receipts, get reimbursed through an SGA check. Adams Dep. 22-24; see also JR II 0484 (Chapter 700, rule 6 of the SGA Code-of-Laws).

However, as early as the summer of 1992, the university had already decided that any SGA funding of GLBA would have to be "put on hold" until further legal clarification of Section 16-1-28 could be obtained. In the spring or summer of 1992, defendant Adams and others had concluded that "since the bill was vague to us and we did not really understand some of the words in it that we were going to have to get an attorney general's opinion sooner or later on what it meant." Adams Dep. 45-46. The school determined that, during this process of attempting to gain clarification of the law's requirements, SGA funding could not go to GLBA:

> Q: Did you mention -- do you recall mentioning to George Hite Wilson during that time period that you felt you would have to eventually seek an attorney general's opinion?
>
> A: Yeah.
>
> Q: When you say you felt you would eventually need to seek an attorney general's opinion, what would trigger that need?
>
> A: Funding. I mean, we were already doing the other. And we decided unless somebody directed us otherwise we were not going to go back on that position, in terms of registration. But when we [got] to the funding issue I felt we had to go and make sure from the attorney general's point of view what the words meant.
>
> Q: Did you see a particular distinction in the legislation between funding and facilities?
>
> A: No.
>
> Q: And when you say that you would have to get some direction from the attorney general about the funding, was it your opinion that you would need that direction before you could approve funding to the Gay Lesbian Bisexual Alliance?

A:   Yes, correct.  That was the position we took, yes.

Adams Dep. 46-47.  The SGA funding of all other groups, no matter what the content of their programs, would proceed normally.[34]

When the university came to this position that funding could not go to the gay and lesbian student group -- because of the ties between GLBA, AGLA and the genesis of the statute,[35] and despite university officials' belief that GLBA was not covered by the literal language of Section 16-1-28[36] -- the USA administrators were well aware that GLBA desired SGA funding.[37]  In early November 1992, GLBA did submit its first-ever budget request to the SGA.  JR II 0333-34 (GLBA's Fall Quarter 1992 budget request form).  The group requested $100 to cover publicity for GLBA's planned World AIDS Day program on December 1, 1992.  Id.

Before that budget request formally came before the SGA, however, George Hite Wilson was called to a meeting with Michael Mitchell, president of the SGA, and Dean Adams.

---

[34]See Adams Dep. 92 (Q: "[H]ave you ever had any discussions regarding the SGA funding of any other group, aside from the GLBA, in light of Section 16-1-28?"  A: "No.");  Adams Dep. 92-93 (Q: "Have you ever had any discussion regarding any aspect of the enforcement of Section 16-1-28 that related to a student group other than the GLBA?"  A: "No.").

[35]See supra footnotes 28 and 29.

[36]See supra footnotes 28 and 29.

[37]See JR II 0328 (defendant Adams memo July 31, 1992, memo stating that "I am sure [GLBA bank account request] is a forerunner to asking for funds");  JR II 0331-0332 (Oct. 6, 1992, Student Services Staff Meeting minutes reporting that "[t]he Gay-Lesbian Student Alliance will be asking SGA for money.").

> Dean Adams reiterated that the university did not understand its obligations under the new statute. He stated that funding could not go directly to the GLBA because USA had not received clarification about the law's requirements. He indicated that USA had asked the Attorney General to interpret the law. Instead of the SGA considering GLBA's budget request, Dean Adams directed that funding for the World AIDS Day publicity be funneled through one of the SGA's own committees.

Wilson Dec. ¶ 25; see also Adams Dep. 59-62. In keeping with defendant Adams's directions, GLBA's budget request disappeared from the SGA agenda and the SGA Public Relations and Advertising Committee spent $102.50 to produce flyers for World AIDS Day. JR II 0336 (appropriations bill); JR II 0364 (SGA minutes passing that appropriation); Wilson Dec. ¶ 26. GLBA successfully presented a symposium, including safer-sex panels, and other activities in commemoration of World AIDS Day. Wilson Dec. ¶ 26; JR II 0337-40 (information on World AIDS Day programs).

Though this re-routing of funds helped GLBA in Fall Quarter 1992, the impact of USA's rule against direct funding to that organization was much harsher in the Winter and Spring Quarters of 1993. For Winter Quarter 1993, GLBA submitted a budget request asking for $884 from the SGA, with approximately $625 budgeted to bring a guest speaker to USA for a program on the legal rights of gay men, lesbians, and people with AIDS. JR II 0382-0384; Wilson Dec. ¶ 27, 32-33. Before the main SGA budget meeting of that quarter, however, SGA President Mitchell called GLBA President Wilson to inform him that "Dean Adams had directed the SGA to table the budget request until the request could be reviewed by the Attorney General." Wilson Dec. ¶ 28.

34

Upset at this continuing obstruction, Wilson told Mitchell that he would like to meet with him to discuss the matter. Wilson Dec. ¶ 28. Later that day (January 25, 1993), members of the SGA, GLBA and Dean Adams met at the SGA offices. Mitchell stated that the executive council had preliminarily approved funding GLBA in the amount of $651 for its speaker's bureau program. Wilson Dec. ¶¶ 29-30; JR II 0384 (initialed GLBA budget request indicating what SGA planned to fund). Defendant Adams did not alter his statement that the GLBA request should be tabled, explaining that Roberts "had specifically advised him not to approve any funding to the GLBA until the Attorney General had issued an opinion." Wilson Dec. ¶ 29. See also Adams Dep. 69-70 (admitting that "I may have" discussed tabling the request with Mr. Mitchell). This intervention caused GLBA's requested $884 and preliminarily-approved $651 to be removed from the proposed Winter Quarter 1993 budget of the SGA. JR II 0385 (first proposed budget); JR II 0386 (altered proposed budget). That night, the SGA meeting proceeded without a vote on funding the GLBA. JR II 0387-0393 (Jan. 25, 1993, SGA Senate Minutes).

On January 27, 1993, Dean Adams wrote Wilson, stating:

Given the law passed and the restrictions placed on funding and space for certain groups on campus, we are asking the attorney general's office to interpret the law in light of your organization's recent funding request. The language of the bill seems ambiguous and we need clarification before we can proceed with funding.

Please submit a complete list of speakers, topics, and overall purpose for the activities you propose for funding. This will be submitted for review by the attorney general's office.

35

JR II 0396. Wilson promptly complied with this request, submitting a much more detailed version of GLBA's budget request to Mitchell, who passed it along to Maxey Roberts for submission to the Attorney General. JR II 0397-0400 (revised Winter Quarter 1993 budget); JR II 0401-0405 (transmittal from Mitchell to Roberts). The university's position remained that it could not allow SGA funding of GLBA until the school had received guidance from the Attorney General. Adams Dep. 70-71.

This situation continued throughout the Winter Quarter and forced GLBA to cancel its planned major speaking engagement. Wilson Dec. ¶ 33. The out-of-town speaker scheduled to make a presentation on gay- and AIDS-related legal issues for GLBA that quarter has never subsequently appeared on the USA campus. Wilson Dec. ¶ 33.

By the Spring Quarter, GLBA still hoped that the long-promised Attorney General's opinion might arrive and lift the bar to SGA funding, although the organization's "frustration with the negative impact of Section 16-1-28 and the university's approach to it was mounting." Wilson Dec. ¶ 34. That quarter, GLBA submitted a detailed SGA budget request, asking for a total of $720. The main budget item consisted of funding for a new scheduled speaker, a graduate fellow from Emory University. JR II 0422-44.

The SGA initially determined that it could not vote to fund GLBA, given Dean Adams's prior directive on that group's Winter Quarter request. Wilson Dec. ¶ 36; JR II 0432 (proposed Spring

36

Quarter 1993 budget indicating $0 for GLBA). At the April 19, 1993, SGA Senate meeting, however, that body passed an appropriation of $570 to GLBA to pay for, among other things, the scheduled speaker. The SGA "believed that the GLBA should receive funding, notwithstanding Section 16-1-28" because of the worth of its planned educational programs.[38] Dean Adams told the Senate members that evening that they "should do what they had to do and that I would do what I had to do." Adams Dep. 76. He made clear at the meeting that if the Senate proceeded to pass the GLBA allocation, he would not be in a position to sign off on the actual funding until he received guidance from the Attorney General. Adams Dep. 76-77.

At no time during the Spring Quarter of 1993 did Dean Adams notify GLBA that the allocation of $570 would actually be available for the group's use. Adams Dep. 79; Wilson Dec. ¶ 40. Indeed, he continued to tell the group that its "funding will be held up until we receive approval from the Attorney General." JR II 0449 (May 18, 1993, Student Staff Meeting minutes).[39] That

_____

[38]Wilson Dec. ¶ 36; JR II 0448 (Student Services Staff minutes showing that "students felt since [GLBA] program was educational in nature there was no reason to continue to deny their application"); JR II 0433 (indicating $570 allocation).

[39]During his deposition, Dean Adams intimated that he expected GLBA to proceed with its planned speaking engagement even though he had made it clear to the group that no actual reimbursement through SGA funds would be available. His reasoning was "students often will do that ... simply because I made a statement or something does not prevent students from doing what they think they ought to do ...." Adams Dep. 84. He admitted, however, that if he had been presented with paperwork to effectuate the SGA funding, he could not have approved that funding without his approval being contrary to the school's well-

37

quarter elapsed with still no word from the Attorney General's office and GLBA unable to either open an on-campus bank account or receive SGA funds. GLBA was forced to cancel its planned speaking engagement with John Howard, the graduate fellow from Emory. Wilson Dec. ¶ 40.[40]

_____

established position against such funding and contrary to the direction that he had gotten from other university officials. Adams Dep. 82-83.

There can be no dispute that GLBA taking any additional steps would have involved futile or even detrimental acts from the perspective of the group. As George Hite Wilson explains, "To proceed any farther with our plans for a GLBA-sponsored speech and campus visit by Mr. Howard, GLBA would have had to have committed to paying (or actually paid) several hundred dollars for Mr. Howard's expenses and honorarium. GLBA obviously could not proceed to that point because, without SGA funding forthcoming, we had no source for that kind of significant money." JR I 0226 (Wilson Dec. ¶ 41).

The SGA had approved an allocation to GLBA in the amount of $570 and what stood in the way of the group's receipt of the money and its planned speaker's visit was the firm position of the school against any public funds going to the group.

[40]Dean Adams now contends that the GLBA "had withdrawn their request" for the Spring Quarter SGA funds because "there had been some controversy in the group over the speaker they wanted to bring in[.]" Adams Dep. 79. He states that his only source for the information about the purported controversy was Michael Mitchell, who had allegedly spoken with George Hite Wilson about it. Adams Dep. 79-80.

This contention of a controversy and the withdrawal of GLBA's request is false. It is contradicted by all evidence other than defendant Adams's vague recollection. (Defendant Whiddon adopts the contention in his interrogatory responses, but Adams is given as the source of information. See JR I 0273.) Contradicting Dean Adams, Mitchell states in his declaration that he "did not discuss whether the [Spring Quarter 1993] speaking engagement would actually go forward as planned with anyone from GLBA." JR I 0231 (Mitchell Dec. ¶ 3). He also testifies that "GLBA never withdrew its request for funding; rather, the group simply never submitted receipts for reimbursement of the allocated funds." Id. at ¶ 6. He points out that "[i]f the GLBA had submitted receipts for reimbursement, the decision as to

38

In fact, notwithstanding its knowledge since July 1992 that GLBA would seek SGA funding and its continual representations to the group since then that it was seeking clarification, the university had not officially requested an opinion from Attorney General Evans until February 1993. JR I 0198 (letter dated Feb. 12, 1993). When defendant Whiddon did write the Attorney General requesting advice on Section 16-1-28 as it might apply to the USA gay and lesbian group, he did not even submit with his request the detailed Winter Quarter 1993 budget that GLBA had been asked to prepare specifically for that purpose. JR I 0199-0209 (complete attachments that accompanied Whiddon's letter). Instead, USA forwarded to the Attorney General's office only very general information about the nature of the group that the school had long had possessed. Id.[41]

---

whether to permit actual payment of the funds ... would have been made by Dean Adams and perhaps other university officials." Id. at ¶ 7.

George Hite Wilson's declaration also makes clear that "[a]t no point during either the winter or spring quarters was there ever a dispute within GLBA as to the speaker we planned for the quarter. At no point did GLBA ever withdraw its requests for SGA funding." JR I 0226 (Wilson Dec. ¶ 42). There are no documents in the record that support Dean Adams's contention of a controversy and withdrawal of the funding request.

[41]Dean Adams continued to string GLBA along in a letter sent to George Hite Wilson after the close of the Spring Quarter: "As I indicated to you earlier, given the current law passed in the 1992 legislative session, the University has asked the Attorney General to give an opinion as to the legality of funding your organization. We are still waiting for that opinion." JR II 0452 (letter dated June 29, 1993). This further belies any backing off from its requests for funding by GLBA.

The Attorney General, responding to President Whiddon's letter, issued an opinion over five months later. JR I 0210 (opinion dated July 29, 1993). The two-page opinion merely quoted the prior Attorney General's opinion to Representative Hooper, quoted part (a) of Section 16-1-28, and answered "in the negative" defendant Whiddon's inquiry as to whether GLBA could be funded without violating the statute. JR I 0210-11. It provided no analysis of the aspects of GLBA that caused it to allegedly run afoul of the statute, nor did the opinion explain what particular aspect(s) of part (a) were implicated by GLBA's activities. Id.

As Dean Adams has testified, "the opinion simply reiterated the language. It did not clarify the language for us." Adams Dep. 94. The next step that the university took was to invent its own enforcement process for Section 16-1-28, a fact-finding process that, again, would focus exclusively on GLBA.[42] Dean Adams appointed a "fact-finding committee," but had no way to direct the substance of the committee's endeavor because of

_____

[42]See JR I 0238, 0240 (defendants Whiddon and Adams admit the substance of Requests to Admit No. 2 & No. 3 -- that the university had not decided to undertake a fact-finding inquiry regarding any other student group, aside from GLBA, in connection with Section 16-1-28); Adams Dep. 94-95 (Q: "Were there any other groups aside from the GLBA that were to be studied by such a fact-finding committee?" A: "... And I think we felt we needed to get through this first fact-finding process and see if, indeed, we could conduct one in a way which was both within the law and definitive enough for us to proceed. Then we would talk about other groups. But initially there was no serious consideration of taking any other groups through this process.").

40

Section 16-1-28's uncertainty.[43]  The committee process was to

include interviewing GLBA members and any others whom the

committee felt relevant.  JR II 0456.  While the committee was at

work, GLBA would remain ineligible for SGA funding.  Adams Dep.

97.[44]  By memorandum dated August 26, 1993, Dean Adams informed

GLBA of the impending investigation and stated that he hoped "we

can have our fact finding completed by the beginning of the fall

quarter."[45]

When suit was filed on the first day of Fall Quarter,

September 23, 1993, the committee had apparently not begun work.

The committee convened for one meeting on October 4, but then

---

[43]In his instructional memo to the six-member committee,
Dean Adams acknowledged, "This is a very controversial subject.
I understand that we are trying to deal with a very ambiguous
law."  JR II 0456.  He suggested that the committee, among other
things, "[a]gree on definitions," review the constitution of GLBA
and conduct interviews.  Id.  He stated that if the group has
"violated the law, they could lose their registration and must
cease and desist from any activity which violated the
aforementioned statute."  Id.

[44]GLBA has continued to apply for SGA funds each quarter,
although after the forced speech cancellations in the Winter and
Spring Quarters of 1993, the organization has had to scale back
its planning for the future -- on the unfortunate, but correct,
assumption that SGA funding would remain barred by the
administration indefinitely.  JR I 0227 (Wilson Dec. ¶ 44) ("[w]e
were not having any success planning significant events and
actually obtaining the SGA funds that we needed to carry them
out").  During the Summer Quarter of 1993, Wilson was
inexplicably allowed to be reimbursed in SGA funds for $16.31
that he had spent on annual awards for GLBA members.  Id.

[45]JR II 0455.  The memorandum also stated, "Based on this
group's finding we will determine your eligibility for funding.
I am sorry for this further action, but the attorney general's
opinion leaves us without definition of 'foster and promote.'"
Id.

41

recessed its efforts on advice of counsel. JR II 0457; JR II 0458.

On October 11, 1993, John Howard from Emory University visited the USA campus and gave a speech on the "History of Gay and Lesbian America." JR II 0564 (schedule of Jaguar Production events). He came not under the auspices of and on behalf of GLBA, but as part of Jaguar Productions's programming. Id. George Hite Wilson had himself begun the process of bringing about this delayed, altered appearance by Howard when it became clear in the Spring Quarter of 1993 that USA would not back down on its position of forbidding the actual funding of GLBA and that Howard's appearance for the group would likely have to be cancelled. JR I 0226 (Wilson Dec. ¶ 39). Because Howard appeared under the auspices of JP, the university sought to "balance" his engagement with another speaker: "when we do bring any kind of controversial speaker to campus, whether it's abortion or whatever it may be, political issues, we try to be sure that we bring all sides of an issue to the students' attention[.]" Adams Dep. 90. Dean Adams recommended a corresponding speech by Dr. Dan McGee, Adams Dep. 91, who did appear for JP on November 15, 1993, to discuss "Homosexuality: Moral Dimensions of the Current Debate[.]" JR II 0564.

With the filing of plaintiff's suit "[a]ll actions [at USA] were frozen until this issue was resolved." JR I 0246 (interrogatory responses of defendant Adams). In addition to the university administration's continuing opposition, the SGA is

42

itself now opposed to even voting for allocations to GLBA. As
the SGA President states in his declaration,

> During this school year, the existence of the
> Attorney General's opinion issued in the summer of 1993
> has made a majority of SGA senators unwilling to
> allocate money to the GLBA; the senators believe that
> such an allocation might mean that they personally
> would be violating the new state law. The Attorney
> General's opinion and the continuing uncertainty about
> what the statute means have in effect guaranteed that
> the GLBA will not be voted any significant funds by the
> SGA until this law suit resolves whether the new law
> should have any impact on our funding decisions.

JR I 0231-32 (Mitchell Dec. ¶ 8).

GLBA President Wilson summarizes the effects of defendants'

enforcement of Section 16-1-28 over the last two years as

follows:

> For our organization to serve its purposes, GLBA's
> visibility as a group of students that believes in
> equality and fair treatment for gay, lesbian and
> bisexual people must be apparent to all students,
> faculty and administrators at USA. GLBA must be able
> to shape its own programs and convey its own messages,
> separate and apart from the programs of the school or
> of other organizations. Our ability, however, to
> expand GLBA's presence on campus, to sponsor GLBA's own
> events, and to advance GLBA's political goals within
> the university community has been severely limited by
> the new Alabama Education Code Section 16-1-28 and the
> application of that law to our group. Because of the
> university's approach to this law (and later the
> Attorney General's interpretation of it), GLBA has
> uniquely been unable to use an on-campus bank account,
> to spend SGA funds, and to operate with equal status
> among all the student groups at USA[.]

> The enforcement of Section 16-1-28 has interfered
> with GLBA's ability to attract new members and to
> maintain existing members. Supposedly to enable the
> school to comply with that law, GLBA is being treated
> differently and less favorably than any other student
> organization by the university administration. This
> signal from the university, backed up by the state law
> and the subsequent Attorney General's opinion under it,
> that our group is somehow uniquely tainted has made

43

gay, lesbian and bisexual students less willing to have
a public profile on campus and thus less willing to
participate in the activities of GLBA. The
university's stance and the law have similarly
discouraged heterosexuals from being associated with
this disfavored group.

... GLBA's very point is that gay, lesbian, and
bisexual students and groups affiliated with them
should be treated in the same fashion as other students
and groups at USA. By forcing GLBA to limit its own
programs, refusing to allow the SGA funding of GLBA
without a prior request for guidance from the Attorney
General, and later initiating a unique, invasive "fact-
finding" effort to evaluate GLBA while funding
continued to remain unavailable, the university has
harmed the group and its goals.

Although the enforcement of Section 16-1-28
against GLBA has so far focused on issues surrounding
SGA funding and the university's control of public
monies, the language of the statute seems to us to
apply equally to the use of any campus facilities. We
fear that if GLBA continues to be considered a group
covered by the restrictions in Section 16-1-28, we will
eventually be deprived of our status as a recognized
student organization and denied the ability to meet
anywhere on USA's campus. Complete enforcement of
Section 16-1-28 against GLBA would mean the end of the
organization, for it is an organization specifically
designed and joined for purposes of addressing the
atmosphere and the discussion of various issues on the
campus of this university.

JR I 0216-18 (Wilson Dec. ¶¶ 13-16).

44

## LEGAL ARGUMENT

I.   SECTION 16-1-28, ON ITS FACE, VIOLATES CORE FIRST AMENDMENT
     PRINCIPLES THAT ARE ESPECIALLY STRINGENT IN THE UNIVERSITY
     SETTING.

Just as the University of South Alabama has itself generally

recognized the necessity of freedom of expression and association

on a public university campus, the Supreme Court has repeatedly

emphasized that First Amendment freedoms are nowhere more

important.   See, e.g., Shelton v. Tucker, 364 U.S. 479, 487

(1960) (in teachers' freedom of association case, declaring that

"[t]he vigilant protection of constitutional freedoms is nowhere

more vital than in the community of American schools"); Sweezy v.

New Hampshire, 354 U.S. 234, 250 (1957) (in case involving

compelled interrogation of professor, stressing that "[t]he

essentiality of freedom in the community of American universities

is almost self-evident").[46]  In Keyishian v. Board of Regents of

New York, 385 U.S. 589 (1967), the Court explained,

> Our Nation is deeply committed to safeguarding
> academic freedom[.]  ....  The Nation's future depends
> upon leaders trained through wide exposure to that

---

[46]See also Brooks v. Auburn University, 412 F.2d 1171, 1173
(5th Cir. 1969) ("The responsibilities on courts and university
presidents in the area of First Amendment rights [are] heavy
indeed."); Gay Lib v. University of Missouri, 558 F.2d 848, 857
(8th Cir. 1977) ("axiomatic that the First Amendment must
flourish as much in the academic setting as anywhere else. ...
To invoke censorship in an academic environment is hardly the
recognition of a healthy democratic society."); Gay Students
Organization of the University of New Hampshire v. Bonner, 509
F.2d 652, 658 (1974) ("the First Amendment applies with full
vigor on the campuses of state universities").

> robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." United States v. Associated Press, 52 F Supp 362, 372.

385 U.S. at 603. Thus, Section 16-1-28's focus on the university environment calls for the strict application of free expression and free association principles to test its constitutionality.

Two sets of First Amendment principles are most relevant to plaintiff's facial First Amendment claims in this case. The first and primary set consists of the compelling state interest/strict scrutiny test and its permutations -- the basic rule being that where the government restricts expression based upon its content "[i]t must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Widmar v. Vincent, 454 U.S. 263, 270 (1981); see also Gay and Lesbian Students Association v. Gohn, 850 F.2d 361, 366 (8th Cir. 1988) (citing Widmar and emphasizing that "[t]his is an extremely difficult standard for the government to meet").

The second, more specialized set of principles, which relates to only one aspect of Section 16-1-28 but further illuminates that law's invalidity, are those rules found in the "unconstitutional condition" cases. As the Supreme Court reiterated in Rust v. Sullivan, 500 U.S. 173, 114 L. Ed. 2d 233, 257-58 (1991), it is constitutionally impermissible for the state to condition receipt of a government benefit on an organization absolutely forsaking certain expression. See also Board of Trustees of the Leland Stanford Junior University v. Sullivan,

46

773 F. Supp. 472, 476, 478 (D.D.C. 1991) (<u>Rust</u> explicitly distinguished the "denial of a benefit to an individual on account of his speech or expression" as "constitutionally prohibited"; there is no "invitation to government censorship wherever public funds flow").

These two most helpful strands of First Amendment doctrine are described and applied to Section 16-1-28 in sections A and B below.[47]

A. Section 16-1-28 Discriminates on the Basis of Content and Viewpoint, Is Not Justified by a Compelling State Interest, and Is Not Narrowly Tailored; Moreover, the Statute's Clear Purpose Is the Suppression of "Dangerous" Ideas. _____ _____ _____ _____

1. The Governing Legal Standards.

"Content-based regulations [on expression] are presumptively invalid." <u>R.A.V. v. City of St. Paul</u>, 505 U.S. ___, 120 L. Ed. 2d 305, 317 (1992); <u>see also</u> <u>Simon & Schuster v. Crime Victims Board</u>, 116 L. Ed. 2d 476, 486-87 (1991) ("A statute is

_____

[47]Plaintiff refers to these doctrines as "most relevant" and "most helpful" because all of First Amendment law supports striking down Section 16-1-28 as unconstitutional. In this brief, Plaintiff focuses on the primary flaws in the statute and the primary support for those flaws' constitutional infirmity. Plaintiff's argument provides numerous <u>independent</u> bases for finding Section 16-1-28 invalid on its face.

The doctrines discussed throughout this brief apply equally to the right of free speech and the right of expressive association (which is not explicitly mentioned in, but necessarily follows from, the named rights in the First Amendment). Plaintiff therefore does not separate out distinct free expression and free association claims.

47

presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). As recently reiterated by the Court, "the 'danger of censorship' presented by a facially content-based statute requires that that weapon be employed only where it is 'necessary to serve the asserted [compelling] interest[.]'" R.A.V., 120 L. Ed. 2d at 325-26 (emphasis and inserted word in original; citations omitted).

In Widmar v. Vincent, supra, the Supreme Court unequivocally held that the compelling state interest test applies to the content-based exclusion of particular student groups from the use of university facilities that are generally open to such groups. See 454 U.S. at 267-70. The Court noted that the exclusion of a student group from university facilities is a form of prior restraint. 454 U.S. at 267 n.5.[48] The Widmar decision held that the University of Missouri, having opened its facilities to student organizations, could not "enforce a content-based exclusion of religious speech" because the school had failed to justify that policy under the applicable, strict constitutional standards. 454 U.S. at 277.

Viewpoint discrimination among types of expression -- a subset of content-based discrimination -- is even more

---

[48]As the Court put it, "students enjoy First Amendment rights of speech and association on the campus, and ... the 'denial [to particular groups] of use of campus facilities for meetings and other appropriate purposes' must be subject to the level of scrutiny appropriate to any form of prior restraint." Id. (insertion in original; citation omitted).

48

constitutionally suspect. Even where a university has not generally opened a particular forum for student or other expression, "viewpoint based discrimination [is] forbidden" unless the state can satisfy the compelling state interest test. Gay Student Services v. Texas A & M University, 737 F.2d 1317, 1333 (1984) (relying upon Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37 (1983)).

Indeed, if the very purpose of a state regulation is the suppression of a viewpoint perceived to be "dangerous" or "unhealthy," the regulation is unconstitutional for that reason alone and no further analysis need be undertaken. See, e.g., Healy v. James, 408 U.S. 169, 187-88 (1972) ("The College, acting here as an instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent."); Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University, 773 F. Supp. 792, 793 (E.D. Va. 1991) ("a state university may not hinder the exercise of First Amendment rights simply because it feels that exposure to a given group's ideas may be somehow harmful to certain students"), aff'd 993 F.2d 386 (4th Cir. 1993). This rule follows from the proposition that "[t]he right of persons to express themselves freely is not limited to statements of views

49

that are acceptable to the majority of people. ...  The real
purpose of the First Amendment is to protect also the expression
of sentiments that the majority finds unacceptable or even
unthinkable."  Department of Education v. Lewis, 416 So. 2d 455,
461 (Fl. 1982).[49]

Finally, Healy v. James, supra, and Brandenburg v. Ohio, 395
U.S. 444 (1969), establish one relevant caveat to the above
summary of core content/viewpoint precedents.  Those cases
address one narrow category of speech content that can be
forbidden by the state:  All kinds of advocacy and expression --
however abhorrent to some or to a majority -- are protected by
the First Amendment, including advocacy of "the use of force or
of law violation except where such advocacy is directed to
inciting or producing imminent lawless action and is likely to
incite or produce such action."  Brandenburg, 395 U.S. at 447
(emphasis added).  Under the latter, very limited circumstances,
advocacy in essence crosses the line into action that can be
legally proscribed.  395 U.S. at 448-49.[50]  Put another way, the
tailored Brandenburg formulation defines the scope of the

---

[49]See also West Virginia State Board of Education v.
Barnette, 319 U.S. 624, 642 (1943) ("Freedom to differ is not
limited to things that do not matter much.  That would be a mere
shadow of freedom.  The test of its substance is the right to
differ as to things that touch the heart of the existing
order.").

[50]This very narrow exception to general free speech
protection also clearly applies in the same limited fashion to
freedom of association.  "Statutes affecting the right of
assembly, like those touching on freedom of speech, must observe
the fundamental distinctions between mere advocacy and incitement
to imminent lawless action."  395 U.S. at 449 n.4.

50

advocacy that government has a compelling need to forbid in order to maintain its system of laws. Government reliance on the Brandenburg concept, however, remains difficult for the state to sustain in any given case.

In Healy, for example, a public university asserted that potential campus disruption justified its failure to recognize a chapter of Students for a Democratic Society (SDS) at the school. The Supreme Court rejected the argument, stressing the lack of "substantial evidence" to support the university's contention. Healy, 408 U.S. at 190. It emphasized that the "critical line" was the one drawn in Brandenburg and that, without convincing proof of incitement to "imminent lawless action," the students' First Amendment rights must prevail. Id. at 189-191.[51]

    2.   Section 16-1-28 Fails Under All of
         These Rules.

Both parts (a) and (b) of Section 16-1-28 restrict constitutionally-protected expression and association[52] on the

_____  _____

[51]Without substantial record evidence to support a state justification of "imminent lawless action," the government's argument constitutes "little more than the sort of 'undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression.'" 408 U.S. at 191 (inserted work in original; citation omitted).

[52]Although technically the first step in any First Amendment analysis is whether the state's action does indeed interfere in some way with constitutionally-protected activity, there can be no question here that Section 16-1-28 does so. This law's multifaceted interference with protected associational activity and expression is obvious. The types of expression -- inter alia political, cultural, and scientific -- that Section 16-1-28 would limit are central to the purpose of the First Amendment. See, e.g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 461

51

basis of content and viewpoint. See supra, Statement of Facts, Section 2. Even the viewpoint bias of the law is apparent in the statute's own language. Under part (a), no group can have any presence on a public university campus if it is deemed to "foster[] or promote a lifestyle or actions prohibited by the sodomy and sexual misconduct laws." Those groups with viewpoints that discourage such "a lifestyle or actions" are not restricted. Likewise, according to part (b), no group that uses university facilities or funds can "encourage its members or other persons to ... provide information or materials that explain how such acts may be engaged in[.]" Those groups that discourage the provision of that information remain free to exercise their First Amendment rights on campus.

Looked at more concretely, if a women's organization approached a professor or other expert to give a talk on rape laws in a university auditorium and encouraged the professor to

---

(1958) ("[o]f course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters").

The infringement that Section 16-1-28 mandates includes, but is not limited to, the type of interference found in, for example, Healy v. James, 408 U.S. at 181, 184 ("There can be no doubt that denial of official recognition ... to college organizations burdens or abridges [the First Amendment] associational right. ... denial of recognition [is] a form of prior restraint"); Widmar v. Vincent, 454 U.S. at 267 n.5 (denial of use of campus facilities to particular groups burdens rights of speech and association); and Gay and Lesbian Students Association v. Gohn, 850 F.2d at 366-67 (conditioning receipt of student activity funds on group's identity or viewpoint infringes constitutionally-protected interests). See also Gay Student Services v. Texas A & M University, 737 F.2d at 1327 n.15 (describing various aspects of associational interference that are also all present under Section 16-1-28).

talk specifically about what acts were punished in what ways, that group could be forever barred from school facilities because it had violated part (b). On the other hand, if a religious organization brought in a speaker to lecture on the immorality of ever discussing sexual acts, and the speaker himself never indicated "how such acts may be engaged in," the religious organization could flourish despite part (b).

Under part (a), a fraternity might be thrown off campus because the state determined that its culture and its social rituals "foster[ed] and promot[ed]" men obtaining consent for vaginal intercourse through fraud or artifice (13A-6-65(a)(1)), or "foster[ed] and promot[ed]" unmarried couples participating in consensual oral sex (13A-6-65(a)(3)). Likewise, a college chapter of the ACLU could well be implicated under part (a), because of the organization's position that all private consensual sexual activity among adults is constitutionally protected. A sorority or a conservative political group that affirmatively discouraged any form of premarital sex could, by contrast, continue to use university facilities and funds. These kinds of viewpoint distinctions -- which can significantly constrict and skew the discourse on Alabama college campuses -- demand strict scrutiny.[53]

---

[53]Because Section 16-1-28 embodies both content- and viewpoint-based discrimination, it is unnecessary to consider the public/non-public forum cases in determining the constitutional standard to apply to this statute's various applications. Where a state regulation functions "to 'discourage one viewpoint and advance another,' strict scrutiny would apply 'regardless of whether a public forum [was] involved.'" Gay Student Services v.

Thus, the compelling state interest test applies to the whole of Section 16-1-28's substantive restrictions. See, e.g., R.A.V.; Widmar; Gay and Lesbian Students Association v. Gohn; Gay Student Services v. Texas A & M University; see also, University of Southern Mississippi Chapter of the M.C.L.U. v. University of Southern Mississippi, 452 F.2d 564, 566 (1971) ("When the restriction upon student expression takes the form of an attempt to predict in advance the content and consequences of that expression, it is tantamount to a prior restraint and carries a heavy burden against its constitutionality.").

For defendants to satisfy their heavy burden here, they would have to prove, first, that Section 16-1-28 serves a state interest of the highest order and, second, that such compelling state interest could not be adequately served through some means less restrictive of First Amendment freedoms. See, e.g., Simon & Schuster, Inc. v. New York State Crime Victims Board, 116 L.Ed.2d at 490-91 (emphasizing that even if compelling state interest is established, regulation must be precisely tailored to match that

_____  _____

Texas A & M University, 737 F.2d at 1332 (quoting Perry).

Furthermore, Section 16-1-28 restricts expression in all kinds of fora, including the well-established public fora of government-owned auditoriums and meeting rooms that are generally open to all groups. See Widmar, 454 U.S. at 267; Crowder v. Housing Authority of the City of Atlanta, 990 F.2d 586, 591 (11th Cir. 1993) (auditorium in public housing held to be a limited public forum for residents; "the auditorium here corresponds to the university facilities held to be a public forum in Widmar"); see also Hays County Guardian v. Supple, 969 F.2d 111, 118 (5th Cir. 1992) (holding outdoor university premises to be limited public forum), cert. denied, 122 L. Ed. 2d 371 (1993).

54

particular interest). On this record, defendants can satisfy
neither part of their two-step burden. Moreover, the Court need
not even proceed to a full application of the compelling state
interest test, because the record establishes that in enacting
Section 16-1-28 the legislature impermissibly sought to silence
"dangerous" groups and ideas.

      a. Impermissible, Viewpoint-Based Purpose.

This case presents the rare instance where a government
purpose of deterring certain expression is apparent. Through its
resolutions and the chain of events leading up to Section 16-1-
28, the Alabama legislature has made clear that its goal here was
to ensure that colleges and universities in the state would not
"accept[] the homosexual life style" by supporting student groups
identified with that "lifestyle." JR I 0048 (House resolution).
See Part A of the Summary and Analysis of the Facts. Because
Section 16-1-28 infringes upon constitutionally-protected speech
and expression with that improper purpose, it cannot withstand
judicial scrutiny. See, e.g., Texas v. Johnson, supra; Regan v.
Taxation with Representation of Washington, 461 U.S. 540, 548
(1983) (government many not "discriminate invidiously in its
subsidies in such a way as to 'aim at the suppression of
dangerous ideas.'").

      b. No Proof of a Compelling State Interest.

Yet "'illicit legislative intent is not the sine qua non of
a violation of the First Amendment.'" Simon & Schuster, 116 L.
Ed. 2d at 488 (citation omitted). "'[E]ven regulations aimed at

proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment.'" Id. Whether or not this Court accepts plaintiff's characterization of the legislative purpose, and whether or not the Court reads Section 16-1-28 as written or as generally understood, this statute fails the compelling state interest test.

None of the three defendants have placed into the record any documents or affidavits that might substantiate a connection between this law and a grave state interest. Defendants cannot even point to any facts that tie this legislation to any legitimate state need at all. Defendant Adams admits that, based upon his significant experience at an Alabama public university, he sees no need whatsoever for this law. Adams Dep. 30. Dean Adams in fact told the USA legislative liaison that he hoped H. 454 would not pass. Id. Dean Adams recounted in his deposition and interrogatory responses that other public universities in the state are simply ignoring Section 16-1-28. Id. at 72; JR I 0247.

Similarly, Attorney General Evans testified that he is "totally without ... knowledge" as to any facts that might support the need for Section 16-1-28. Evans Dep. 15. The only "problem" he can point to that this new statute might ameliorate is the "controversy which was the press item which surrounded, I assume, the passage of this legislation." Id. The Attorney General, other than furnishing his opinion letter to defendant Whiddon, has taken no steps to enforce Section 16-1-28, nor has he received any requests to enforce it. Evans Dep. 10.

When asked "what interests of the state of Alabama does this statute attempt to advance?," Evans Dep. 12, defendant Evans first stated "I don't have any views about what this statute is deciding to do other than what it says; it's self-explanatory[.]" Evans Dep. 13. The Attorney General subsequently referred to the "police power" and the state's "interest in taking steps through the civil law or the criminal law, to prevent violations of the law." Id. at 14. Other than preventing violations of the criminal laws that are referenced in Section 16-1-28, the Attorney General is unaware of any other legitimate state interests that might be connected with the statute at issue in this case. Evans Dep. 14-15.

Conceding that the state has a proper interest in enforcing its criminal laws, this record still does not establish that the criminal laws referred to in Section 16-1-28 are not themselves sufficient to bring about compliance.[54] There is no evidence in the record that the activities of any groups or organizations, operating on Alabama campuses or elsewhere in the state, are leading to any violations of Section 13A-6-63 through 13A-6-65, let alone that such violations are uncontrollable without some civil statutory addition to the police power already embodied in

---

[54]See Ashton v. Kentucky, 384 U.S. 195, 200 (1966) ("When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer.").

the criminal statutes themselves.[55]  Indeed,  Attorney General
Evans construes "lifestyle" in part (a) to refer to criminal
solicitation or aiding and abetting of the sodomy/sexual
misconduct offenses -- thereby admitting an overlap between the
state purpose he has hypothesized here and the legal restrictions
that already existed without Section 16-1-28.  Evans Dep. 17-18.
He has not proffered any evidence to explain why, if such a
"lifestyle" needs to be curbed, enforcement of the appropriate
portions of the Alabama Criminal Code cannot accomplish the task.
See, e.g., Ala. Code § 13A-2-23 (aiding and abetting provision).

Thus, though preventing violations of criminal statutes is
undoubtedly a valid state interest, there is no evidence before
this Court that a compelling government interest existed, prior
to passage of Section 16-1-28, in increasing the state's police
powers relative to the sodomy and sexual misconduct prohibitions.
Section 16-1-28 should be declared unconstitutional on its face
because defendants have not shown that a compelling state
interest justifies the statute.

c.  Statute Is Not Narrowly Tailored.

Moreover, even if the Court were to find such a compelling
state interest in curbing group activity and expression that
leads to violations of Sections 13A-6-63 through 13A-6-65,

---

[55]Defendant Adams, for example, when asked "whether there's
any kind of criminal activity on campus that has been a problem
for the university in the last few years," did not cite
violations of the sodomy and sexual misconduct laws -- rather, he
referred to "petty theft and cars broken into and that type of
thing."  Adams Dep. at 27-28.

<u>Brandenburg</u> and <u>Healy</u> establish the required narrow tailoring for regulations adopted to advance that interest. Section 16-1-28 is vastly too invasive of speech and association to meet the least restrictive means aspect of strict scrutiny.

   <u>Brandenburg</u> and <u>Healy</u> require a "substantial" showing that particular advocacy is inciting and will likely lead to "imminent lawless action" before even the direct advocacy of illegal acts can be regulated. <u>Healy</u>, 408 U.S. at 188-90. Section 16-1-28, on the other hand, establishes in part (a) a blanket rule that any group that is somehow deemed to merely "foster" or "promote" either a "lifestyle" or the referenced illegal acts can be completely expelled from Alabama campuses.[56] Part (b) of the law is still broader (and less likely to serve the supposed state interest), because it forbids any university-supported organization from allowing its members, or encouraging others, to simply explain how the referenced criminal laws might be violated -- even if that explanation's purpose is to guard against such violations. The "restriction of First Amendment rights ... may be justified only by a far greater showing of a likelihood of imminent lawless action[.]" <u>Gay Lib v. University of Missouri</u>, 558 F.2d at 855 (rejecting, as insufficient basis for denying recognition to gay group, "expert" testimony "that wherever you

_____   _____   _____

[56]The Attorney General's first opinion failed to make this crucial distinction between inciting imminent lawless action and advocating, "foster[ing]" or "promot[ing]" violations of the law. The operative distinction is not, as that opinion states, "between things that an organization may advocate concerning changes in laws as opposed to advocating the actual breaking of existing laws." JR I 0058.

59

have a convocation of homosexuals," you are going to have increased illegal homosexual activity).[57]

Two statutes very similar to Section 16-1-28 have previously been struck down as unconstitutionally exceeding the Brandenburg rule. In Department of Education v. Lewis, supra, the Florida Supreme Court held the following provision in a state Department of Education appropriations bill to violate the First Amendment:

No funds appropriated herein shall be used to finance any state-supported public or private postsecondary educational institution that charters or gives official recognition or knowingly gives assistance to or provides meeting facilities for any group or organization that recommends or advocates sexual relations between persons not married to each other.

416 So. 2d at 458. Citing Brandenburg and Healy, the court reasoned that, while universities and other state actors could clearly enforce valid regulations relating to conduct, this kind

---

[57]See also Gay and Lesbian Students Association v. Gohn, 850 F.2d at 368 ("True, sodomy is illegal in Arkansas. However, the GLSA does not advocate sodomy, and, even if it did, its speech about an illegal activity would still be protected by the First Amendment. People may extol the virtues of arson or even cannibalism. They simply may not commit the acts."); Gay Alliance of Students v. Matthews, 544 F.2d at 166 (even if allowing a particular organization on campus increases the opportunity for illegal sexual relations, "that fact is insufficient to overcome the associational rights" of the group's members); Gay Students Organization of University of New Hampshire v. Bonner, 509 F.2d at 663 ("Mere 'undifferentiated fear or apprehension' of illegal conduct ... is not enough to overcome First Amendment rights and speculation that individuals might at some time engage in illegal activity is insufficient to justify regulation by the state."); Wood v. Davidson, 351 F. Supp. 543, 547 (N.D. Ga. 1972) ("there must be substantial evidence to warrant the conclusion that violence or disruption will erupt if a particular activity is allowed to take place on campus. In short, there must be objectively demonstrated a 'clear and present danger[.]'").

of limitation on First Amendment rights blatantly violates the Bill of Rights. 416 So. 2d at 461-63.

In Board of Education of Oklahoma City v. National Gay Task Force, 729 F.2d 1270 (10th Cir. 1984), aff'd by an equally divided Court, 470 U.S. 903 (1985), the federal courts struck down that portion of an Oklahoma statute punishing teachers for "advocating, soliciting, imposing, encouraging, or promoting public or private homosexual activity in a manner that creates a substantial risk that such conduct will come to the attention of school children or school employees." 729 F.2d at 1274. The Tenth Circuit's reasoning highlights the flaws in Section 16-1-28 as well:

> The First Amendment protects "advocacy" even of illegal conduct except when "advocacy" is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg, .... The First Amendment does not permit someone to be punished for advocating illegal conduct at some indefinite future time. Hess v. Indiana, 414 U.S. 105 ... (1973).
>
> "Encouraging" and "promoting," like "advocating," do not necessarily imply incitement to imminent action. [Rather, they include] statements, which are aimed at legal and social change, [that] are at the core of First Amendment protections.

729 F.2d at 1274.

Section 16-1-28's use of such nebulous words as "foster," "promote," and "encourage;" its extrapolation of Sections 13A-6-63 through 13A-6-65 to prohibit some "lifestyle" not referred to in any of those provisions;[58] its absolute bar on discussion of

---

[58]Extrapolation from particular criminalized acts to punishing a person's "lifestyle" or "status" is unconstitutional. See Gay Alliance of Students v. Mathews, 544 F.2d at 166 ("While

61

"how such acts may be engaged in;" its failure to include any requirement of "imminent action;" and its failure to set up strict proof requirements before the state can effectuate the law's mandated censorship, inter alia, establish that the statute is not narrowly tailored and that it is unconstitutional on that basis alone. Even if defendants attempt to offer belated "compelling state interests" at this junction, such a sweeping restriction of expression at Alabama universities cannot possibly be necessary to serve any legitimate government goal.

\* \* \*

In sum, plaintiff urges the Court to recognize that Section 16-1-28 does not closely fit some legitimate goal of the state, nor does the record contain any evidence supporting a vital state interest, precisely because the true goal of this statute was an illegitimate one -- suppressing disfavored campus organizations. If the Court makes that finding of improper purpose, its inquiry can end there and the statute must be invalidated. But even if the Court does not find as a matter of fact that the legislature had such an intent, Section 16-1-28's facially content- and viewpoint-based regulations of expression should be struck down as wholly failing the compelling state interest test.

---

Virginia law proscribes the practice of certain forms of homosexuality, Va.Code § 18.2-361, Virginia law does not make it a crime to be a homosexual. Indeed, a statute criminalizing such status ... would be invalid. See Robinson v. California, 370 U.S. 660 ... (1962).") (emphasis in original); Gay Student Services v. Texas A & M University, 737 F.2d at 1328 ("while Texas may prohibit certain homosexual practices, no Texas law makes it a crime to be a homosexual.").

62

B.   Section 16-1-28 Also Imposes Unconstitutional
     Conditions on the Enjoyment of Government Benefits.

     Plaintiff submits that the above discussion conclusively
establishes Section 16-1-28's facial invalidity.  To underscore
that point, however, plaintiff briefly analyzes the statute from
the perspective of "unconstitutional conditions" jurisprudence.
The governing case law makes clear that, despite Section 16-1-
28's repeated references to public funding, this statute
excessively restricts First Amendment freedoms.

           1.   The State's Ability to Condition Government
                Funding Is Limited.

     The simplest and most useful formulation of the
unconstitutional conditions doctrine is the following:  "it
forbids the government from leveraging its benefits into control
of speech [or association] by imposing conditions that extend
beyond how the [government] benefit itself will be used."  David
Cole, Beyond Unconstitutional Conditions: Charting Spheres of
Neutrality in Government-Funded Speech, 67 N.Y.U. L. Rev. 675,
701 (1992).  As the Supreme Court explained in Rust, supra,

     our "unconstitutional conditions" cases involve
     situations in which the government has placed a
     condition on the recipient of the subsidy rather than
     on a particular program or service, thus effectively
     prohibiting the recipient from engaging in the
     protected conduct outside the scope of the federally
     funded program.

114 L. Ed. 2d at 257-58 (emphasis in original).  Although under
some circumstances it is permissible to require that a government

                                  63

grant be used for a particular purpose,[59] it is clearly unconstitutional to "broadly forbid[] the recipients of the funds from engaging in [particular speech] at any time, under any auspices, and wholly apart from the particular program that is being aided" with the government grant. Board of Trustees of Leland Stanford Junior University v. Sullivan, 773 F. Supp. at 476.

Furthermore, in the university context conditions on state grant monies -- even if limited so as to condition only use of those particular monies and not to condition all speech by the recipient -- are particularly difficult to sustain. See Rust 114 L. Ed. 2d at 260 (pointing out, for example, that "we have recognized that the university is a traditional sphere of free expression so fundamental to the functioning of society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines");[60] Stanford v. Sullivan, 773 F. Supp. at 476-78 (the

---

[59]In Rust, for example, the Supreme Court upheld conditions placed upon the use of Title X grant monies dedicated to family planning. The Court found that the "regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities distinct from Title X activities." 114 L. Ed. 2d at 257.

[60]In this part of its opinion, the Rust Court also made clear that the conditioning-of-public-benefits analysis has no place in assessing limitations on the use of a public forum or limited public forum. See id. at 259-60 ("this Court has recognized that the existence of a Government 'subsidy,' in the form of Government-owned property, does not justify the restriction of speech in areas that have 'been traditionally open to the public for expressive activity,' ... or have been

64

university setting limits permissible funding conditions more severely than did the setting at issue in Rust).

A state's power to condition the use of public funds also remains limited, moreover, by the prohibition against the government goal of suppressing one viewpoint. In FCC v. League of Women Voters, 468 U.S. 364 (1984), for example, in the course of rejecting restrictions on the program content of publicly-supported broadcasting stations, the Supreme Court stressed that:

"A regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a 'law ... abridging the freedom of speech, or of the press.'"

468 U.S. at 383-84 (citations omitted). See also Rust, 114 L. Ed. 2d at 256 ("This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of [the project's] scope.").

2. Section 16-1-28 Goes Well Beyond the Permissible Conditioning of Government Subsidies.

On all three of these separate grounds for finding a restriction linked to a government subsidy unconstitutional, the statute at issue here fails. Because Section 16-1-28 conditions

'expressly dedicated to speech activity.'"). To the extent, therefore, that Section 16-1-28 relates to public forums, there is absolutely no chance that a "government subsidy" analysis is appropriate. As shown below, moreover, no aspect of Section 16-1-28 is properly viewed as merely limiting the use of how government subsidies are spent -- rather, both parts (a) and (b) impose broader, unconstitutional conditions on all activities by covered groups and their members.

groups and not merely the use of public funds, because it broadly
limits freedom of expression at universities, and because it
serves the illegitimate purpose of handicapping a particular
viewpoint, this law cannot be construed as merely a measure
designed to preserve the integrity of a government grant program
and be sustained on that basis.

Although Section 16-1-28 enlists colleges and universities
to enforce its restrictions, the First Amendment activity and the
conditional government subsidies covered by the statute relate to
groups or organizations that might operate at those schools.  If
such groups come within the purview of the law, they are totally
denied government funding (in part (a)) or restricted by their
receipt of government funding (in part (b)) based upon the whole
of the group's identity and expression -- not based upon whether
they will or have used the government dollars in a proper way.
Section 16-1-28, like the regulations struck down in FCC v.
League of Women Voters and Stanford v. Sullivan, imposes
unconstitutional conditions on recipients or potential recipients
of public funding by requiring groups to completely give up
various types of expression in order to remain eligible for
government subsidy.

The law of unconstitutional conditions, in addition,
highlights why part (b)'s policing requirement is insupportable.
Section 16-1-28's mandate that no group can receive public funds
or use public facilities if any of its members have engaged in
any of the acts outlawed by Sections 13A-6-63 through 13A-6-65

66

unconstitutionally restricts freedom of association as a condition for receiving public support. Importantly, part (b) does not say that public funds may not be used to violate those criminal laws; rather, it says that anyone who has engaged in the forbidden acts must be banished from publicly supported organizations. Even if the group member that has violated one of those laws is not involved in the group activity subsidized by public funds, the organization itself runs afoul of Section 16-1-28(b) if it continues to allow his or her membership. Otherwise protected associations, however, cannot lose their First Amendment protection by including within their ranks one or more "criminals." See, e.g., Sawyer v. Sandstrom, 615 F.2d 311 (5th Cir. 1980) (striking down, as impermissibly interfering with freedom of association, ordinance that punished "mere association with an individual known to be in possession of or engaged in the use of narcotics"). By requiring funded groups to never include within their membership those who have engaged in prohibited acts, part (b) unconstitutionally conditions public support.

## II. SECTION 16-1-28 FAILS THE STRINGENT VAGUENESS TEST THAT APPLIES TO RESTRICTIONS ON EXPRESSION.

In addition to its facial substantive First Amendment violations, discussed above, Section 16-1-28 violates the rights to due process and freedom of expression by its extraordinary vagueness. Due process "requires that a statute be sufficiently clearly defined so as not to cause persons 'of common

67

intelligence--necessarily [to] guess at its meaning and [to] differ as to its application.' Connally v. General Construction Co., 269 U.S. 385, 391 ... (1926)." Finley v. National Endowment for the Arts, 795 F. Supp. 1457, 1471 (C.D. Cal. 1992). If a statute threatens to inhibit "the right of free speech or of association, a more stringent vagueness test should apply." Hoffman Estates v. Flipside, 455 U.S. 489, 499 (1982). In Keyishian, when faced with an imprecise enactment that limited academic freedom, the Supreme Court "emphasize[d] once again that '[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms. ... [S]tandards of permissible statutory vagueness are strict in the area of free expression.'" 385 U.S. at 603-04 (citation omitted).

This vagueness doctrine requiring special clarity in laws regulating freedom of speech and association rests upon three important values, all of which are offended by the statute at issue here:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the

68

unlawful zone' ... than if the boundaries were clearly
marked."

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)
(emphasis added). As discussed below, Section 16-1-28 (1) fails
to give fair warning of what it prohibits; (2) does not provide
explicit standards to be applied by government enforcers, and
does not even specify the enforcement process, thereby inviting
discriminatory application; and (3) creates a profound chilling
effect for those who fear that they may be covered by its
restrictions.

Although the sweep of its language is clearly quite broad,
Section 16-1-28 establishes no discernible line dividing
permitted association and speech from association and speech that
are restricted by part (a) or part (b). What kind of group, or
what actions by any group, for example, might be deemed to
"foster" violations of the forcible "deviate sexual intercourse"
provision? If gay groups are indeed targeted by this law, is
there any way that a gay and lesbian student group could limit
its social, educational and political activity to prevent
enforcement of Section 16-1-28 against it? Do all groups that
function as a meeting place for like-minded adults "foster" or
"promote" consensual sexual relations and thus promote violations
of Section 13A-6-65(a)(3)? What does it mean to "encourage"
others to violate the referenced criminal laws? How explicit
does one have to be to "provide information ... that explain[s]
how such acts may be engaged in"? And when does an organization

69

go beyond "political advocacy of a change in the sodomy and sexual misconduct laws of this state"?

Student groups, university administrators, and the Attorney General have all, directly or indirectly, acknowledged this statute's lack of precision. As George Hite Wilson states in his declaration, "GLBA has never been told what, if anything, it could do to ensure that Section 16-1-28 did not cover GLBA's activities or its members[.]" JR I 0229 (Wilson Dec. ¶ 50). Michael Mitchell, President of USA's student government, has noted "the continuing uncertainty about what the statute means[.]" JR I 0231 (Mitchell Dec. ¶ 8). At Auburn, a member of AGLA's Board of Directors likewise states that "review of what we should or should not do is complicated by the fact that no one really understands the precise conduct or speech that would violate" the statute. JR I 0235 (Bales Dec. ¶ 7).

Defendants Adams and Whiddon have repeatedly conceded that Section 16-1-28 is "vague,"[61] that its wording is troublesome,[62] that its terminology is "not certain,"[63] and that, in an effort to ameliorate that very problem, the university sought -- but did not obtain -- clarification from the Attorney General.[64] Those defendants have, further, provided information about other

---

[61]Adams Dep. 31; id. at 45.

[62]Adams Dep. at 36.

[63]JR I 0249-50 (Adams's interrogatory responses); JR I 0267 (Whiddon interrogatory responses).

[64]JR I 0249-50 (Adams's interrogatory responses); JR I 0267 (Whiddon interrogatory responses).

70

Alabama schools also finding Section 16-1-28's requirements unintelligible.[65] The Attorney General's office, in responding to USA's opinion request, was unable to explain its determination in anything other than a conclusory fashion. JR I 0210-11. When asked to analyze the statute himself, the Attorney General gave conflicting testimony. See supra note 29. Defendant Evans was also unable to explain what facts about GLBA had led his office to the conclusion that the organization was covered under part (a) of the statute. See supra note 28.

Moreover, the imprecise enforcement standards embodied in Section 16-1-28 have already led to the "arbitrary and discriminatory enforcement" that due process requirements seek to prevent. Grayned, 408 U.S. at 408. As shown by the factual chronology above, at 26-44, and the as-applied legal argument below, at 74-79, plaintiff has unequally and unjustifiably borne the brunt of this enactment because gay-identified campus groups are controversial in the state.

Finally, the chilling effect of Section 16-1-28 is apparent. Groups such as AGLA, not yet directly hurt under the enactment, have become "have become very conservative in [their] on-campus activities in the hopes of at least continuing to exist as a recognized student organization." JR I 0234 (Bales Dec. ¶ 5).

_____

[65]Dean Adams, for example, states in his interrogatory responses: "Generally what I learned from the other institutions ... was that they were either ignoring the law or that they had been advised by their university counsel that the law was so vague or had such questions with regard to constitutionality that the position of the institution would be that they would proceed with providing funds ...." JR I 0247.

71

Even for plaintiff, already impaired by the law, Section 16-1-28 leaves it guessing and worried as to what "missteps" it might take to bring about complete enforcement and ejection from the USA campus. JR I 0217-18 (Wilson Dec. ¶ 16).

"Vague measures regulating first amendment freedoms," such as Section 16-1-28, enable "administrative officials to act as censors, deciding for themselves which expressive activities to permit. The very existence of this censorial power, regardless of how or whether it is exercised, is unacceptable." International Society for Krishna Consciousness v. Eaves, 601 F.2d 809, 822-23 (5th Cir. 1979). In Alabama Education Association v. Wallace, 362 F. Supp. 682 (M.D. Ala. 1973), a three-judge panel of this Court held that a statute punishing teachers for "participat[ing] in, encourag[ing] or condon[ing] any mass truancy ... or any extra-curricular demonstration" was unconstitutionally vague on its face because of the very slippery "participating in, encouraging or condoning" language. 362 F. Supp. at 686-87. See also Keyishian, 385 U.S. at 599 (finding unconstitutionally vague a bar against "advocat[ing], advis[ing], or teach[ing]" the referenced doctrine). The Court should similarly hold here that language such as "promot[ing]," "foster[ing]," and "encourag[ing]" is too imprecise, especially in the context of Section 16-1-28 as a whole and its regulation of expression in the university environment.

III. SECTION 16-1-28 IS UNCONSTITUTIONALLY OVERBROAD.

From yet another perspective, Section 16-1-28 fails
constitutional muster because it is substantially overbroad. To
survive overbreadth scrutiny:

> the statute must be carefully drawn or be
> authoritatively construed to punish only unprotected
> speech and not be susceptible of application to
> protected expression. "Because First Amendment
> freedoms need breathing space to survive, government
> may regulate in the area only with narrow specificity."

Gooding v. Wilson, 405 U.S. 518, 522 (1972) (quoting NAACP v.
Button, 371 U.S. 415, 433 (1963)). "For a court to find that a
statute is overbroad, it must find the existence of a 'realistic
danger that the statute itself will significantly compromise
recognized first amendment protections of parties not before the
court.'" Clean-Up '84 v. Heinrich, 759 F.2d 1511, 1513 (11th
Cir. 1985); see also Doe v. University of Michigan, 721 F. Supp.
852, 864 (E.D. Mich. 1989) ("[a] law regulating speech will be
deemed overbroad if it sweeps within its ambit a substantial
amount of protected speech").[66]

As discussed in point I, above, the only conceivable type of
expression that Section 16-1-28 could constitutionally regulate

---

[66]Plaintiff obviously believes that Section 16-1-28
compromises its own First Amendment rights. In making the
overbreadth claim, however, plaintiff seeks to emphasize that the
free association and expression of many other groups not before
the Court, of many different varieties, are also endangered by
this statute. The overbreadth claim -- as with the vagueness
claim and the primary claim that Section 16-1-28 is unjustifiably
content- and viewpoint-based on its face -- underscores that the
relief needed here is a total invalidation of the statute and an
injunction preventing its enforcement against any entity.

73

is expression "directed to inciting or producing imminent lawless action and ... likely to incite or produce such action." Brandenburg, 395 U.S. at 447. But Section 16-1-28's language is grossly overencompassing if that is its goal.

For the same reasons that the "advocating, soliciting, imposing, encouraging, or promoting public or private homosexual activity" provision was found unconstitutionally overbroad in National Gay Task Force v. Board of Education of the City of Oklahoma City, this enactment should likewise be ruled too expansive: "'encouraging' and 'promoting,' like 'advocating,' do not necessarily imply incitement to imminent lawless action" and "the deterrent effect [of such a statute aimed at all organizations operating at colleges and universities] is both real and substantial." 729 F.2d at 1274. See also Gay Alliance of Students v. Matthews, 544 F.2d at 162, 166 (barring gay group to assertedly diminish homosexual conduct "is overkill"; "the suppression of associational rights because the opportunity for homosexual contacts is increased constitutes prohibited overbreadth").

IV. AS APPLIED, SECTION 16-1-28 HAS BEEN USED BY DEFENDANTS TO DISCRIMINATE AGAINST PLAINTIFF ON THE BASIS OF THE GROUP'S IDENTITY AND VIEWPOINT.

The content and viewpoint bias inherent in the broad language of Section 16-1-28, see supra at 10-20, 51-54, has narrowly crystallized in defendants' application of the statute

74

to plaintiff GLBA.[67]  In violation of both the First Amendment and the Equal Protection clause, the USA defendants and the Attorney General have enforced the statute solely against GLBA and simply because it is a gay-identified student group.  In so doing, the defendants have impermissibly "discriminat[ed] among different users of the same medium for expression." Police Department v. Mosley, 408 U.S. 92, 96, 95 (1972) (holding that ordinance that discriminated among different forms of picketing violated the Equal Protection Clause; likewise, "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content"). Plaintiff's as-applied claim places GLBA in exactly the same position as all the gay and lesbian student groups denied recognition or funding in the many prior ad hoc decision cases. See supra footnote 2.  The unequal treatment of GLBA can no more be constitutionally tolerated here, under cover of statute, than the differential treatment in those cases.

GLBA, like its counterparts at other schools, gathers together and expresses itself on campus for political, educational, social and cultural purposes. See supra at 24-44.

---

[67]All of the constitutional problems with Section 16-1-28 on its face have carried over to defendants' application of this law to plaintiff.  Defendants application of the statute, for example, has been so vague in its reasoning that defendants themselves cannot articulate why GLBA is restricted under the language of this legislation. See supra at 28-29.  Only the central aspect of defendants' unconstitutional enforcement -- the viewpoint discrimination against plaintiff as a gay-associated student group -- is emphasized here.

As the First Circuit found in 1974 with regard to a similar

group:

> The [group's] efforts to organize the homosexual
> minority, "educate" the public as to its plight, and
> obtain for it better treatment from individuals and
> from the government thus represent but another example
> of the associational activity unequivocally singled out
> for protection in the very "core" of association cases
> decided by the Supreme Court.
>
>      \* \* \*
>
>    ... And beyond the specific communications at
> such events is the basic "message" [the group] seeks to
> convey--that homosexuals exist, that they feel
> repressed by existing laws and attitudes, that they
> wish to emerge from their isolation, and that public
> understanding of their attitudes and problems is
> desirable for society.

Gay Students Organization of the University of New Hampshire v.

Bonner, 509 F.2d at 660, 661. There can be no question that

GLBA's conduct is constitutionally protected.

Furthermore, defendants have admittedly and intentionally

singled GLBA out for differential treatment because it is a

gay/lesbian/bisexual student group. See supra footnotes 28 and

29. The whole enforcement history underscores that, in

defendants' view, direct support of GLBA must be withheld, though

the very same expression funded or carried out under the auspices

of another organization is acceptable. The University of South

Alabama was more than willing to "work with the GLBA" to arrange

for speakers or funding to support the group's ideas so long as

the GLBA was not being directly funded and allowed to carry out

those ideas on its own. See JR I 0248, 0251 (defendant Adams's

interrogatory responses). While GLBA remained ineligible for SGA

funding, other registered student organizations obtained SGA
money for social events (where presumably both heterosexuals and
homosexuals would gather)[68] or for bringing speakers of special
interest to campus.[69] The Red Cross conducted AIDS education at
USA and Jaguar Productions sponsored "sexual awareness week"
periodically, providing explicit information about sexual
practices.[70] Yet no other organization was even threatened with
interference pursuant to Section 16-1-28.

Because defendants have rendered it impossible for GLBA to
maintain an on-campus bank account, to receive its own SGA
funding, and to pursue its activities without the invasive,
unbounded investigation of a "fact-finding committee," their
enforcement of Section 16-1-28 has severely harmed plaintiff.
Contrary to defendants' apparent belief, the delay of expression
constitutes a significant First Amendment violation. See, e.g.,
Stanford v. Sullivan, 773 F. Supp. at 474 n.7 ("It is immaterial
that the restraint does not last forever. Even a restraint of
speech for a limited period is inconsistent with the First
Amendment.").

_____

[68]See, e.g., JR II 0375-77 (funded social event for Greek
Week); JR II 0372-74 (funded budget for Black Student Union lip-
sync and talent show) JR II 0419-0421 (funded celebration of
Vietnamese New Year).

[69]See, e.g., JR II 0378-80 (funded budget for bringing
editor of Working Mother to campus).

[70]See JR II 0308 (description of Sexual Awareness Week);
Adams Dep. 101-02 (same).

77

Likewise, being forced to subsume its desired activities under the rubric of Jaguar Productions (with its required balancing of viewpoints) or to resort to other non-GLBA means of attempting to get its ideas across has impermissibly handicapped this group. As USA states in its literature for registered student organizations, "[o]f course clubs and organizations want to have [their own] successful programs and activities, or the organization has no functional purpose for which to exist." JR II 0486 ("Keep the Connection"). To allow GLBA to formulate ideas, but not to have equal access to funding and other university benefits to put forth those ideas, serves to silence the group. See Department of Education v. Lewis, 416 So. 2d at 462 ("the argument that withholding of the privileges of recognition (e.g. use of campus meeting facilities) leaves students and teachers free to express any views privately, informally, and off-campus and therefore does not affect First Amendment rights is without merit").

The "basic premises" that defendants have violated are these: although "a group has no right to [university] funding, ... when funds are made available, they must be distributed in a viewpoint-neutral manner[.]" Gay and Lesbian Students Association v. Gohn, 850 F.2d at 366; see also Tipton v. University of Hawaii, 15 F.3d 922, ___, 1994 U.S. App. LEXIS 1884, *14 (9th Cir. 1994) ("funding policy ... to promote the extracurricular activities of students ... must be applied uniformly to all qualified applicants. Decisions denying funding

for an expressive event based on the nature of an applicant
rather than on established [viewpoint-neutral] funding criteria
will be subjected to heightened scrutiny."). As in Gohn, the
denial of SGA funding to the USA gay student group fails the
applicable constitutional standard, the compelling state interest
test. See Gohn, 850 F.2d at 366-68.

There is no evidence in the record that would support even
the bare rationality of defendants' regime, whereby John Howard
can speak and be paid through student activities fees for Jaguar
Productions, but not speak and be paid through the same source of
public money for plaintiff. Neither the school nor the Attorney
General can point to any activities of GLBA that would rationally
justify limiting its access to funding, yet all three of the
defendants have acted to do just that. The only explanation for
such a scenario is a bare desire to limit GLBA's visibility and
its basic message -- that gay, lesbian, and bisexual people are
present at USA and that the rest of the population needs to learn
and think about that fact. Defendants' intentional interference
with GLBA's activities, primarily but not exclusively through
barring its access to SGA funds, unconstitutionally discriminates
against plaintiff.

## CONCLUSION

For all the foregoing reasons, plaintiff asks this Court to
find the whole of Section 16-1-28 unconstitutional on its face
and to enjoin any further enforcement of that statute. If the
Court does not conclude that the statute should be facially
invalidated, plaintiff requests that at a minimum its application
to GLBA be found unconstitutional and its future enforcement
against that group enjoined.

Dated: April 8, 1994

Fern Singer
Watterson and Singer
Post Office Box 530412
Birmingham, Alabama 35253
(205) 871-3980
As Cooperating Attorney
  for the ACLU of Alabama

Ruth E. Harlow
William B. Rubenstein
American Civil Liberties
  Union Foundation
132 West 43rd Street
New York, New York 10036
(212) 944-9800, Ext. 545

ATTORNEYS FOR PLAINTIFFS

80

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GAY LESBIAN BISEXUAL ALLIANCE, )
                                )
            Plaintiff,          )
                                )
     vs.                        )
                                )
JIMMY EVANS, in his official capacity )
as Attorney General of the State of   )    Civil Action
Alabama, FREDERICK P. WHIDDON, in his )    No. 93-T-1178-N
official capacity as President of the )
University of South Alabama, and DALE )
T. ADAMS, in his official capacity as )
Dean of Students of the University of )
South Alabama,                  )
                                )
            Defendants.         )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served each of

defendants' counsel one copy of the Plaintiff's Brief on the

Merits, via Federal Express for delivery on April 8, addressed as

follows:

> Howard A. Mandell, Esq.
> 25 South Court Street
> Montgomery, AL 36103
>
> J. Fairley McDonald III
> Copeland, Franco, Screws & Gill
> 444 South Perry Street
> Montgomery, AL 36104

This 7th day of April 1994.

Ruth E. Harlow

81