IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FILED

MAY 24 1994

THOMAS C. CAVER, CLERK
BY _____
DEPUTY CLERK

GAY LESBIAN BISEXUAL )
ALLIANCE, )
 )
        Plaintiff, )
 )
vs. )          CASE NUMBER
 )          CV-93-T-1178-N
JIMMY EVANS, in his official )
capacity as Attorney General )
of the State of Alabama; )
et al., etc., )
 )
        Defendants. )

---

**DEFENDANTS' JOINT PRE-TRIAL BRIEF AND
MEMORANDUM OF AUTHORITIES ON THE MERITS
AND DEFENDANTS' PROVISIONAL JOINT MOTION FOR
LEAVE OF COURT TO FILE SUPPLEMENTAL BRIEF**

---

J. FAIRLEY MCDONALD, III
GEORGE W. WALKER, III
Copeland, Franco, Screws
  & Gill, P.A.
444 South Perry Street
P. O. Box 347
Montgomery, Alabama  36101
(205) 834-1180

Attorneys for Defendant
FREDERICK WHIDDON in his
official capacity as
President of the University
of South Alabama and for
Defendant DALE T. ADAMS
in his official capacity
as Dean of Students of the
University of South Alabama

GEORGE E. JONES, III
DEPUTY ATTORNEY GENERAL
STATE OF ALABAMA

ANGELA C. TURNER
DEPUTY ATTORNEY GENERAL
STATE OF ALABAMA

Office of the Attorney General
Civil Litigation Division
Alabama State House
11 South Union Street
Montgomery, Alabama  36130
(205) 242-7418
(205) 242-7458 (fax)

Attorneys for Defendant JIMMY
EVANS in his official capacity
as Attorney General of the
State of Alabama



# TABLE OF CONTENTS

PAGE(S)

Table of Cases and Authorities..................... iv

Introduction to Brief............................. 1

Preliminary Statement............................. 5

Procedural and Factual History.................... 8

Introduction to Argument.......................... 33

Argument

I.   THE PLAINTIFF'S ARGUMENT(S) WITH
     RESPECT TO STRICT APPLICATION OF
     FREE EXPRESSION AND FREE
     ASSOCIATION PRINCIPLES TO TEST THE
     CONSTITUTIONALITY OF LEGISLATION
     IN THE UNIVERSITY ENVIRONMENT ARE
     SPECIOUS BECAUSE, GENERALLY, THE
     STATE IS UNDER NO OBLIGATION TO
     FUND THE EXERCISE OF
     CONSTITUTIONAL RIGHTS................... 36

II.  BECAUSE SODOMY AND SEXUAL
     MISCONDUCT ARE NOT ACTIVITIES THAT
     FALL WITHIN THE PROTECTION OF THE
     FIRST AMENDMENT, THE STATUTE IN
     QUESTION DOES NOT HAVE TO BE
     JUSTIFIED BY A COMPELLING
     GOVERNMENTAL INTEREST.................. 40

III. THE STATUTE IN QUESTION IS A
     VIEWPOINT NEUTRAL MEANS FOR
     ENSURING THAT GOVERNMENT FUNDS AND
     GOVERNMENT FACILITIES ARE USED
     ONLY FOR THE PURPOSES FOR WHICH
     THEY WERE GRANTED...................... 45

i

IV.  THE STATUTE IN QUESTION CLEARLY
     SEEKS TO REGULATE CONDUCT WHICH IS
     INCIDENTAL TO SPEECH AND IT DOES
     NOT FORBID THE COMMUNICATION OF
     SPECIFIC IDEAS........................... 52

     A.  Conduct............................. 54

     B.  Content............................. 55

V.   THE STATUTE IN QUESTION IS A
     REASONABLE REGULATION PROMULGATED
     BY THE STATE OF ALABAMA UNDER ITS
     POLICE POWER FOR THE PROTECTION OF
     THE PUBLIC HEALTH, SAFETY, AND
     MORALS.................................. 65

     A.  §16-1-28, Code of Alabama
         1975, is Not Overbroad and
         Does Not Bar a Broad Range of
         Speech at a Particular
         Location or Under a
         Particular Circumstance............ 65

     B.  §16-1-28, Code of Alabama
         1975, is Not Void for
         Vagueness Because it Gives
         Reasonable Notice as to What
         is Prohibited and is Clear as
         to What Speech is
         Prohibited......................... 66

     C.  §16-1-28, Code of Alabama
         1975, Does Not Give State
         Officials Broad and
         Unfettered Discretion for
         Applying the Law and Contains
         Defined, Fixed, and
         Ascertainable Standards for
         It's Application................... 67

VI.  NOT ALL REGULATION OF SYMBOLIC
     CONDUCT WHICH IS UNDERTAKEN AS
     PART OF VERBAL COMMUNICATION, SUCH
     AS THAT PROSCRIBED BY THE STATUTE
     IN QUESTION, IS PROHIBITED BY THE
     UNITED STATES CONSTITUTION............. 69

VII.   THE STATUTE IN QUESTION DOES NOT
       CONSTITUTE A PRIOR RESTRAINT;
       HOWEVER, IN THE ALTERNATIVE, IF
       THE COURT DOES SO CONSTRUE THE
       STATUTE, THEN IT CAN STILL SUSTAIN
       THE STATUTE BECAUSE IT IS NARROWLY
       TAILORED TO ACHIEVE A COMPELLING
       AND SIGNIFICANT GOVERNMENTAL
       INTEREST.................................   71

VIII.  THE STATUTE IN QUESTION DOES NOT
       CONSTITUTE AN INFRINGEMENT UPON
       FREEDOM OF ASSOCIATION AND BELIEF;
       HOWEVER, IN THE ALTERNATIVE, IF
       THE COURT DOES SO CONSTRUE THE
       STATUTE, THEN IT CAN STILL SUSTAIN
       THE STATUTE AS SERVING A
       COMPELLING STATE INTEREST BECAUSE
       THE RIGHT TO ASSOCIATE FOR
       EXPRESSIVE PURPOSES IS NOT
       ABSOLUTE UNDER THE UNITED STATES
       CONSTITUTION.............................   74

IX.    DEFENDANTS' RESPONSE TO AUTHORITIES
       CITED IN TEXT OF PLAINTIFF'S BRIEF
       ON THE MERITS............................   76

Conclusion.........................................   77

Provisional Joint Motion for Leave
   of Court to File Supplemental Brief.............   81

Certificate of Service.............................   83

Index to Exhibits..................................   84

TABLE OF CASES AND AUTHORITIES

PAGE(S)

Arkansas Writers Project, Inc.
    v. Ragland,
    481 U.S. 221, 234,
    107 S.Ct. 1722, 1730,
    95 L.Ed.2d 209 (1987)......................... 46, 50

Auburn University v. The Auburn Gay
    and Lesbian Association,
    Civil Action No. 92-D-374-E,
    U.S. District Court for the
    Middle District of Alabama................... 13

Bantam Books v. Sullivan,
    372 U.S. 58, 83 S.Ct. 631,
    9 L.Ed.2d 584 (1963)......................... 71

Barnes v. Glen Theatres, Inc.,
    501 U.S., at ____ ____,
    115 L.Ed.2d 504, 111 S.Ct. 2456
    (Souter, J., concurring in judgment)......... 61, 62,
                                                  69

Bethel School Dist. No. 403 v. Fraser,
    106 S.Ct. 3159, 478 U.S. 675,
    92 L.Ed.2d 549 (1986)....................... 37, 38,
                                                  39

Board of Airport Commissioners v.
    Jews for Jesus,
    482 U.S. 569 (1987)......................... 65

Board of Directors of Rotary Club
    International v. Rotary Club of Duarte,
    481 U.S. 537 (1987)......................... 74

Bowers v. Hardwick,
    106 S.Ct. 2841 (1986)....................... 40, 42,
                                                  54

Buckley v. Valeo,
    424 U.S. 1, 96 S.Ct. 612,
    46 L.Ed.2d 659 (1976)....................... 48

iv

Calash v. City of Bridgeport,
       788 F.2d 80 (2d Cir. 1986).................... 52, 75

Cammarano v. United States,
       358 U.S. 498, 513,
       79 S.Ct. 524, 533,
       3 L.Ed.2d 462 (1969))........................ 47, 48

Chaplinsky v. New Hampshire,
       315 U.S. 568, 62 S.Ct. 766,
       86 L.Ed. 1031 (1942)......................... 57

City of Lakewood v. Plain Dealer
       Publishing Co.,
       486 U.S. 750 (1988).......................... 67

Clark v. Community for Creative Nonviolence,
       486 U.S. 288 (1984).......................... 69

Consolidated Edison Co.,
       447 U.S., at 536,
       65 L.Ed.2d 319, 100 S.Ct. 2326............... 59

Cornelius v. NAACP Legal Defense
       and Education Fund,
       473 U.S. 788, 105 S.Ct. 3439,
       3448, 87 L.Ed.2d 567 (1985).................. 75

Dallas v. Stranglin,
       490 U.S. 19 (1989)........................... 74

Ex Parte Weaver,
       570 So.2d 675 (Ala. 1990).................... 6, 19

FCC v. League of Women Voters of California,
       468 U.S. 364, 383-384,
       82 L.Ed.2d 278,
       104 S.Ct. 3106 (1984)........................ 59

FTC v. Superior Court Trial Lawyers Assn.,
    493 U.S. 411, 425-432,
    107 L.Ed.2d 851, 110 S.Ct. 768
    (1990)....................................... 62

Forsyth County, Georgia v.
    Nationalist Movement,
    112 S.Ct. 2395 (1992)........................ 67

Gentile v. State Bar,
    111 S.Ct. 2770 (1991)........................ 67

Griswold v. Connecticut,
    381 U.S. at 506,
    85 S.Ct. at 1693............................. 42

Harris v. McRae,
    448 U.S., at 317, n. 19,
    100 S.Ct., at 2688, n. 19................... 47, 48,
                                                49

Houston v. Hill,
    482 U.S. 451 (1987)......................... 65

IDK, Inc. v. Clark County,
    836 F.2d 1185, 1189
    (9th Cir. 1988)............................. 37

Konigsburg v. State Bar of California,
    366 U.S. 36, 81 S.Ct. 997,
    6 L.Ed.2d 105 (1961),
    rehearing denied 368 U.S. 869,
    82 S.Ct. 21, 7 L.Ed.2d 69 (1961)............. 52

Kucharek v. Hanaway,
    902 F.2d 513, 517 (CA7 1990),
    cert. denied, 498 U.S. ____,
    112 L.Ed.2d 702, 111 S.Ct. 713
    (1991)...................................... 60

Leathers v. Medlock,
    499 U.S. ____, ____,
    113 L.Ed.2d 494,
    111 S.Ct. 1438 (1991)........................  59

Lewis v. City of New Orleans,
    415 U.S. 130 (1974)..........................  65

Linmark Associates, Inc. v. Township
    of Willingboro,
    431 U.S. 85, 97 S.Ct. 1614,
    52 L.Ed.2d 155 (1977)........................  52

Lipscomb v. Simmons,
    962 F.2d 1374, 1379
    (9th Cir. 1992) (en banc)....................  36

Lovell v. City of Griffin,
    303 U.S. 444 (1938)..........................  67

Madison School District v. Wisconsin
    Employment Relations Commission,
    429 U.S. 167, 97 S.Ct. 421,
    50 L.Ed.2d 376 (1976)........................  52

Maher v. Roe,
    432 U.S., at 475,
    97 S.Ct., at 2383............................  47, 48,
                                                   49

Martin v. City of Struthers,
    319 U.S. 141 (1943)..........................  65

Metromedia, Inc. v. San Diego,
    453 U.S. 490, 555,
    69 L.Ed.2d 800,
    101 S.Ct. 2882 (1981)........................  63

Minneapolis Star & Tribune Co. v.
    Minnesota Comm'r of Revenue,
    460 U.S. 575, 103 S.Ct. 1365,
    75 L.Ed.2d 295 (1983)........................  50

Morales v. Trans World Airlines, Inc.,
    504 U.S. ____, 119 L.Ed.2d 157,
    112 S.Ct. ____ (1992)........................    61

Moore v. East Cleveland,
    431 U.S. 494, 503,
    97 S.Ct. 1932, 52 L.Ed.2d 531
    (1977).......................................    42

NAACP v. Alabama,
    377 U.S. 288 (1964)..........................    65

NAACP v. Burton,
    371 U.S. 415 (1963)..........................    67

Near v. Minnesota,
    283 U.S. 697, 51 S.Ct. 625,
    75 L.Ed. 1357 (1931).........................    71

New York State Club Association, Inc.
    v. New York City,
    487 U.S. 1 (1988)............................    74

New York Times v. United States,
    403 U.S. 713, 91 S.Ct. 2140,
    29 L.Ed.2d 822 (1971)........................    71

Ohralik v. Ohio State Bar Assn.,
    436 U.S. 447, 56 L.Ed.2d 444,
    98 S.Ct. 1912 (1978).........................    61

Organization for a Better Austin v. Keefe,
    402 U.S. 415, 91 S.Ct. 1575,
    29 L.Ed.2d 1 (1971)..........................    71

Palko v. Connecticut,
    302 U.S. 319, 325, 326,
    58 S.Ct. 149, 151, 152,
    82 L.Ed. 288 (1937)..........................    41

Papachristou v. City of Jacksonville,
    405 U.S. 156 (1972)..........................    66, 67

Police Dept. of Chicago v. Mosley,
    408 U.S. at 95-98,
    33 L.Ed.2d 212, 92 S.Ct. 2286................ 59

Posadas de Puerto Rico,
    478 U.S., at 342-343,
    92 L.Ed.2d 266, 106 S.Ct. 2968.............. 63

R.A.V. v. St. Paul,
    120 L.Ed.2d 305, 320-322 (1992).............. 58

Regan v. Taxation With Representation
    of Wash.................................... 46, 47,
                                               48, 49

Renton v. Playtime Theatres, Inc.,
    475 U.S. 41, 48, 89 L.Ed.2d 29,
    106 S.Ct. 925 (1986)........................ 61

Roberts v. United States Jaycees,
    468 U.S. 609 (1984)......................... 74

Rust v. Sullivan,
    500 U.S. 173, ____,
    111 S.Ct. 1759, 1772,
    114 L.Ed.2d 233 (1991)...................... 36, 45,
                                               50

Saia v. New York,
    334 U.S. 558 (1948)......................... 67

Schaumburg v. Citizens for a Better
    Environment,
    444 U.S. 620 (1980)......................... 65

Shuttlesworth v. Birmingham,
    394 U.S. 147 (1969)......................... 67

Simon & Schuster,
    502 U.S., at ____,
    116 L.Ed.2d 476, 112 S.Ct. 501.............. 59

Terminiello v. City of Chicago,
    337 U.S. (1949)................................ 65

Tipton v. University of Hawaii,
    15 F.3d 922, 926
    (9th Cir. 1994).............................. 36, 55

United States v. Grace,
    461 U.S. 171, 103 S.Ct. 1702,
    75 L.Ed. 736 (1983)......................... 53, 55,
                                                57

United States v. O'Brien,
    391 U.S. 367, 88 S.Ct. 1673,
    20 L.Ed.2d 672 (1968),
    rehearing denied 393 U.S. 900,
    89 S.Ct. 63, 21 L.Ed.2d 188
    (1968)...................................... 53, 54,
                                                62, 69

United States v. Salerno,
    481 U.S. 739, 107 S.Ct. 2095,
    95 L.Ed.2d 967 (1987)....................... 37

Virginia Pharmacy Bd. v. Virginia
    Citizens Consumer Council, Inc.,
    425 U.S. 748, 771-772,
    48 L.Ed.2d 346, 96 S.Ct. 1817
    (1976)...................................... 61

Watts v. United States,
    394 U.S. 705, 707,
    22 L.Ed.2d 664, 89 S.Ct. 1399
    (1979)...................................... 60

Wayte v. United States,
    470 U.S. 598 (1985)......................... 69

Young v. American Mini Theatres, Inc.,
    427 U.S. 50, 71, n. 34,
    49 L.Ed.2d 310, 96 S.Ct. 2440
    (1976) (plurality); id., at 80-82,
    49 L.Ed.2d 310, 96 S.Ct. 2440
    (Powell, J., concurring).................... 61

Acts 1992, No. 92-439,
    p. 869, Sections 1-3......................... 9

Section 13A-2-23, Code of Alabama, 1975........... 43

Section 13A-4-1, Code of Alabama, 1975........... 43

Section 13A-4-2, Code of Alabama, 1975........... 43

Section 13A-4-3, Code of Alabama, 1975........... 43

Section 13A-6-60(2), Code of Alabama, 1975........ 10, 37,
                                                   43

Section 13A-6-62, Code of Alabama, 1975........... 30

Section 13A-6-63, Code of Alabama, 1975........... 9, 10,
                                                   30

Section 13A-6-64, Code of Alabama, 1975........... 9, 10,
                                                   30

Section 13A-6-65, Code of Alabama, 1975........... 9, 10,
                                                   30

Section 16-1-8, Code of Alabama 1975.............. 74

Section 16-1-28, Code of Alabama 1975............. passim

Section 16-55-1, et seq.,
    Code of Alabama 1975......................... 6, 14

Section 36-15-21, Code of Alabama 1975............ 19

29 C.F.R. Section 1604.11 (1991).................. 62

18 U.S.C. Section 242............................. 62

18 U.S.C. Section 871............................. 60

22 U.S.C. Section 4411(b)......................... 49

42 U.S.C. Section 1981............................ 62

42 U.S.C. Section 1982............................ 62

42 U.S.C. Section 2000e-2........................ 62

18 U.S.C.S. Section 242.......................... 62

18 U.S.C.S. Section 871.......................... 60

3 R. Rotunda, J. Nowak, and J. Young,
   Treatise on Constitutional Law:
   Substance and Procedure
      Section 20.47 (1986)........................ 52

The American Heritage Dictionary,
      at 551, 724 (2nd College Ed. 1985)........... 72

The Random House College Dictionary,
      at 547, 768 (Rev.Ed. 1980).................. 72

West's Legal Thesaurus/Dictionary,
      at 346, 454 (1st Ed. 1985).................. 72

## INTRODUCTION TO BRIEF

This Pre-Trial Brief and Memorandum of Authorities has been jointly submitted by the Defendants in the above-styled and numbered cause pursuant to the provisions of this Honorable Court's Order of January 25, 1994, as amended by Order of the Court dated May 13, 1994. A Provisional Joint Motion for Leave of Court to File a Supplemental Brief is filed contemporaneously herewith.

The procedural and factual history of this case is not complex or unusual, but a true characterization thereof is material to this Honorable Court's understanding of the narrowness of the constitutional issues presented in this litigation. This Introduction to Brief is necessary because of the unusual way in which the Plaintiff has structured some forty-four (44) pages of its Brief on the Merits with respect to the procedural and factual history of this case. In sum, the Plaintiff's Brief on the Merits includes a number of assertions and generalizations which are not legally authoritative and that are not cited to the record.

The Defendants, as more fully set forth hereinbelow, dispute the relevancy, materiality, and substance of said assertions and generalizations. We respectfully urge this Honorable Court in reaching a decision on the merits, in fact we implore the Court, to be persuaded by substantive

-1-

legal argument, and not by the emotionally-charged
political innuendo, the unsupported assertions, or the
blatant political and social characterizations advanced by
the Plaintiff in its Brief on the Merits. The time of this
Honorable Court is much too valuable to be wasted on such
trivialities and it is for this reason, as well as obvious
others, that we ask the Court to carefully focus on the
narrow constitutional issues which have been presented, and
not to be impervious of the Plaintiff's charming but
strained presentation of the facts and of the law.

     At the risk of generalization,[1] and if one may
express oneself so bluntly, counsel for the Plaintiff who
are appearing in this action at the behest of the American
Civil Liberties Union ("ACLU"), an organization of noble

_____

     [1]This writer is painfully aware that generalizations
and assumptions are not conducive to harmonious
professional relationships between adverse counsel.  For
instance on one occasion, after seeking and receiving the
indulgence of a particular trial court on a procedural
matter of some inconsequence, opposing counsel in that case
remarked of this writer, "isn't that just like them?"  This
writer was then left to ponder just what this remark meant,
particular in the context of the term "them," and
unfortunately was left with no alternative but to conclude
that the opposing counsel in that instance was embittered
with pre-conceived notions, or prejudices if one will,
about state attorneys and the integrity, motives, and
professionalism of lawyers in government service.  Such
generalizations and assumptions are even more curious when
they reek of hypocrisy.

-2-

purposes for which this writer has much respect, are
misguidedly inclined to assume the worst possible motives
of the legislative and executive branches of the State of
Alabama with respect to the enactment and enforcement of
§16-1-28, Code of Alabama 1975.

Therefore, bluntly speaking, insofar as this writer
can discern, the attitude of the ACLU (as evidenced by the
context and content of its brief in behalf of GLBA) seems
to be: "the victor will not be asked afterward whether
he/she fairly and accurately represented the underlying
facts or not in starting and waging this litigation; it is
not right that matters but victory." The Plaintiff's
self-opinionated recitation of the facts in their brief
implies that §16-1-28 was enacted on threadbare pretexts,
and that the statute constitutes an unfair, mean-spirited
and unconscionable act of discrimination against
homosexuals. The Plaintiffs also imply that the GLBA at
the University of South Alabama has been denied official
recognition and enjoyment of privileges that are available
to other officially recognized student organizations.
Nothing could be further from the truth.

In order to prevent any possible misinterpretation of
the underlying factual issues, we respectfully urge this
Honorable Court to review our recitation of the facts and
to focus careful attention upon the fundamental

-3-

constitutional issues upon which the Plaintiff's arguments
must ultimately succeed or fail.

## PRELIMINARY STATEMENT

### A.  Defendants' Alternative Statements and Alternative Defenses.

As more fully set forth hereinbelow, a number of the Statements and Defenses advanced by the Defendants in this Joint Brief on the Merits are presented alternatively and hypothetically, and independently of one another.  The Defendants hereby respectfully submit that their legal arguments made in the alternative and/or by hypothesis are made without in any way waiving or intending to waive their principal position in this brief that the provisions of §16-1-28, Code of Alabama 1975, as amended, are not repugnant to federal constitutional principles and the federal case law which construes those principles, and that this statute is constitutional in its entirety.

### B.  The Joint Position of the Defendants.

On or about April 29, 1994, one of the undersigned counsel for Defendants Whiddon and Adams wrote the Court a letter, duly served upon opposing counsel, explaining that Defendant Evans, as Attorney General of the State of Alabama, had assumed responsibility for tendering a Joint Brief on the Merits for all of the named Defendants.  A true copy of that letter is attached hereto as Exhibit "A"

and incorporated by reference herein. Because this letter may unintentionally imply to the Court and to the Plaintiff that the three separate Defendants to this litigation have been "absorbed" or "merged" into one Defendant, Attorney General Jimmy Evans, we believe that a point of clarification is in order.

Pursuant to §36-15-21, Code of Alabama 1975, "[a]ll litigation concerning the interest of the state, or any department thereof, shall be under the direction and control of the attorney general, and the employment of any attorneys for the purposes of representing the state or any department thereof shall be by the attorney general . . . ." This statutory authority, which was upheld and discussed at length by the Supreme Court of Alabama in Ex Parte Weaver, 570 So.2d 675 (Ala. 1990), stands for the proposition that the Attorney General is empowered, when he appears for state officers, to establish and formulate a uniform and consistent legal policy to further the interest of the State and the public which his office represents.[2]

---

[2]True copies of §36-15-21, Code of Alabama 1975, and of the decision of the Supreme Court of Alabama in Ex Parte Weaver, supra, are attached hereto as Exhibits "B" and "C" and incorporated by reference herein.

Thus, there remain three separate, distinct, and independent parties-Defendant to this litigation: Jimmy Evans in his official capacity as Attorney General of the State of Alabama, Frederick P. Whiddon in his official capacity as President of the University of South Alabama, and Dale T. Adams in his official capacity as Dean of Students of the University of South Alabama.

PROCEDURAL AND FACTUAL HISTORY

A.    The Challenged Statute.

§16-1-28, Code of Alabama 1975, as amended by
approval of the Alabama Legislature and the Governor of
Alabama on May 14, 1992, provides as follows:

> "§16-1-8.  No public funds or
> public facilities to be used to
> promote lifestyle or activities
> prohibited by sodomy and sexual
> misconduct laws.
>
> (a)  No public funds or public
> facilities shall be used by any
> college or university to, directly
> or indirectly, sanction,
> recognize, or support the
> activities or existence of any
> organization or group that fosters
> or promotes a lifestyle or actions
> prohibited by the sodomy and
> sexual misconduct laws of Sections
> 13A-6-63 to 13A-6-65, inclusive.
>
> (b)  No organization or group that
> receives public funds or uses
> public facilities, directly or
> indirectly, at any college or
> university shall permit or
> encourage its members or encourage
> other persons to engage in any
> such unlawful acts or provide
> information or materials that
> explain how such acts may be
> engaged in or performed.
>
> (c)  This section shall not be
> construed to be a prior restraint
> of the first amendment protected
> speech.  It shall not apply to any
> organization or group whose
> activities are limited solely to
> the political advocacy of a change

-8-

in the sodomy and sexual
misconduct laws of this state.
(Acts 1992, No. 92-439, p. 869,
§§1-3.)"

In its text, this statute specifically refers to three
provisions in the Alabama Criminal Code: (i)  §13A-6-63,
Code of Alabama 1975, which defines the Class A felony of
"sodomy in the first degree" to include "deviate sexual
intercourse" with another by "forcible compulsion,"
"deviate sexual intercourse" with a person "incapable of
consent," or "deviate sexual intercourse" by a person over
sixteen years of age with a person less than twelve years
of age; (ii) §13A-6-64, Code of Alabama 1975, which
defines the Class C felony of "sodomy in the second degree"
to include "deviate sexual intercourse" by a person over
the age of sixteen years with a person between the ages of
sixteen and twelve years, and "deviate sexual intercourse"
with a person "incapable of consent by reason of being
mentally defective"; and (iii) §13A-6-65, Code of Alabama
1975, which defines the Class A misdemeanor of "sexual
misconduct" to include sexual intercourse with a female
without her consent under certain defined circumstances or
with consent obtained by "the use of any fraud or
artifice," sexual intercourse by a female with a male
without the male's consent, and "deviate sexual
intercourse" with another under circumstances other than

-9-

those covered by §§13A-6-63 and 13A-6-64 with consent being no defense in such an instance. For purpose of these sections, "deviate sexual intercourse" is defined by statute to be "[a]ny act of sexual gratification between persons not married to each other involving the sex organs of one person and the mouth or anus of another." §13A-6-60(2), Code of Alabama 1975 (1993 Supp.).[3]

B. Course of Proceedings.

On September 27, 1993, the Gay Lesbian Bisexual Alliance ["GLBA"] at the University of South Alabama ["USA"], through legal counsel, filed its Complaint in this Court naming as Defendants Jimmy Evans, in his official capacity as Attorney General of Alabama, and Frederick P. Whiddon and Dale T. Adams, in their official capacities as President and Dean of Student Services, respectively, at the University of South Alabama ["USA"] [1 JR 3-22]. The Complaint attacks the constitutionality and enforceability of §16-1-28 on at least four identifiable grounds: (i) it avers that the

_____

[3]True copies of §§ 13A-6-60, 13A-6-63, 13A-6-64, and 13A-6-65 are attached hereto as Exhibits "D", "E", "F", and "G," respectively, and are incorporated by reference herein.

-10-

statute, both facially and as applied, violates the First
Amendment to the United States Constitution, made
applicable to the States through the due process clause of
the Fourteenth Amendment, by imposing "content- and
viewpoint-based limitations on speech and expression by
organizations that receive public funds and/or use state
university facilities" and by otherwise "restrict[ing]
the speech and expression" of the GLBA and its members [1
JR 18]; (ii) it avers that the statute, both facially and
as applied, violates "associational rights" also guaranteed
by the First Amendment [1 JR 18-19]; (iii) it avers
that the statute is so vague, over-broad, and
"unintelligible" as to violate the First Amendment and due
process guarantees under the Fourteenth Amendment [1 JR
19-20]; and (iv) that application of the statute to the
GLBA and similar groups at other Alabama public colleges
and universities abridges the equal protection guarantees
of the Fourteenth Amendment [1 JR 20-21]. As such, the
GLBA seeks a declaration from this Court that §16-1-28 is
unconstitutional and requests the issuance of an injunction
prohibiting its enforcement, all in addition to whatever
other relief the GLBA claims is warranted under the
circumstances [1 JR 21-22].

    University of South Alabama officers Whiddon and Adams
answered the Complaint on October 20, 1993, by admitting a

-11-

number of the Complaint's factual averments, by denying
others, and by generally denying that the statute is
unconstitutional [1 JR 23-30]. Attorney General Evans,
however, moved the Court on October 8, 1993, to dismiss him
from the litigation on the stated grounds, among others,
that he was "neither a real party in interest nor an
indispensable or necessary party to this litigation" and
that "[c]omplete relief" could be afforded between the
remaining parties since the Attorney General "intends to
fully comply with all final Orders of this Court,
regardless of whether he is formally a Party." After
briefing of this motion by the GLBA and the Attorney
General, this Court entered an order on December 27, 1993,
denying the requested relief [1 JR 31-35]. Attorney
General Evans answered the Complaint on February 18, 1994,
by maintaining, in relevant part, that §16-1-28 is
constitutional and enforceable [1 JR 36-42]. By
agreement of the parties and at the request of the Court,
this case is now being submitted for final decision on the
basis of a jointly prepared record supplemented by two
depositions [1 JR 1], and the parties' written and oral
arguments.

-12-

C.  Facts Relevant to the GLBA and the University of
    South Alabama.

A significant portion of the facts recited by the GLBA
in its opening brief pertains to the "history" of
§16-1-28, Code of Alabama 1975, and its claimed genesis in
a dispute concerning a gay and lesbian student organization
at Auburn University (another public university in the
State of Alabama) which ultimately resulted in litigation
in this Court and various pronouncements by the Alabama
Legislature or its members in the form of resolutions and
material reported in the news media.[4]  While officials
at the University of South Alabama were generally aware of
these circumstances, there is no evidence that the USA in
general, or by and through its officers Whiddon and Adams
in particular, had the slightest involvement in the
drafting or passage by the Alabama legislature of what
became §16-1-28, Code of Alabama 1975, or otherwise
advocated or supported its implementation.  Indeed, Dean
Adams, while being advised that legislation among these
lines was pending, believed that the legislation would not

_____

[4]Auburn University v. The Auburn Gay and Lesbian
Association, Civil Action No. 92-D-374-E, United States
District Court for the Middle District of Alabama, the Hon.
Ira DeMent, U.S. District Judge.  Memorandum Opinion issued
on May 11, 1992.  [1 JR 0186].

-13-

ultimately pass, that [in his lay opinion] it was "possibly unconstitutional" in its current form, and that, in any event, he was not in favor of it [Adams dep. 28-33]. USA concurs that the law appears to have been intended by the Alabama Legislature to address gay and lesbian student organizations at Alabama's public colleges and universities [e.g., Adams dep. 74-75]. Accordingly, for the most part, the following factual summary does not deal with the underlying circumstances which may have precipitated passage of the challenged statute but, more particularly, it addresses the experiences of USA and the GLBA in confronting the statute and its effects.

USA, which is a "public body corporate" established and existing under provisions of Alabama law, see e.g., §§16-55-1, et seq., Code of Alabama 1975, permits the registration of student organizations which meet certain requirements[5] and provides various specific information in support of their applications for recognition [e.g., 2 JR 483]. The University believes

---

[5]Among other requirements, a student organization may not discriminate "in any manner" on the basis of sex, race, creed, color, religion, national origin, age, disability or "sexual orientation" [2 JR 483].

that such organizations "enhance[] the life on campus
of the students" by allowing students "to encounter
different viewpoints, ideas [and] perspectives"
[Adams dep. 12, 13]. In late 1991, a group of USA
students applied for official recognition under the name
"Gay and Lesbian Student Alliance,"[6] having a stated
"primary" goal of "further[ing] basic human rights and
awareness within the university, among the students, and in
the community-at-large" [2 JR 316]. In a separate
document entitled "Justification for Need," the "Gay and
Lesbian Student Alliance" explained that, because the
"needs" of gay and lesbian students had "not been meet in
the past" at USA, the organization would attempt "to
address these needs by focusing [o]n emotional,
political, and psychological awareness of the homosexual
student" [2 JR 317]. The proposed organization would
thus serve "as an open forum where current political
issues [could] be discussed" and, through its various
activities, the organization would help "heighten the
awareness of the student body to the needs of its large gay
and lesbian population and [would] work fervently to

---

[6]The organization's name was subsequently changed to
the "Gay Lesbian Bisexual Alliance" [1 JR 212 ¶2] and will
be referred to by the acronym "GLBA".

-15-

combat homophobia and to foster understanding of the
dangers of homophobia on a university campus" [id.].
The organization intended to furnish information and
assistance on issues concerning "the general health and
well-being of its members and the university community as a
whole" and serve as a "support system" for its members and
as "an information source" for the rest of USA [id.].
The group's constitution contained the stated purpose "to
provide a foundation for unification for homosexual and
nonhomosexual people of the student population, in order to
draw support to further our efforts in educating all
members of the university community on the fears and
dangers of homophobia and to provide a support system for
the University of South Alabama's homosexual students" [2
JR 311]. The organization, which changed its name to the
"Gay Lesbian Bisexual Alliance" in the first part of 1993,
has variously described itself as "social/special interest"
and "political/social" in nature with a primary focus on
"social, political and cultural issues and events of
interest to gay, lesbian and bisexual people" [1 JR 214
¶6].

        According to GLBA president George Hite Wilson, the
GLBA membership includes heterosexual and homosexual
students, involves itself in various political issues, but
claims it has not advocated violation of Alabama's criminal

-16-

sodomy statutes or even urged that those provisions be
repealed [1 JR 215 ¶¶8-10]. Dean Adams considers
that the GLBA has made positive contributions to USA in the
areas of HIV/AIDS education, support for gay, lesbian, or
bisexual students, and in education of others about issues
pertaining to "gay life" [Adams dep. 26]; he does not
feel the group has interfered with USA's educational
mission or that [he has knowledge that] it or its
members have violated provisions of Alabama criminal
statutes [Adams dep. 27].

The GLBA was granted recognition in either late 1991
or early 1992 [Adams dep. 25-26].[7]  In early 1992,
prior to the approval of §16-1-28 in May of that year,
Dean Adams, being aware of criticism from local religious
bodies about a homosexual presence on the USA campus in
general and the GLBA in particular and of the continuing
dispute at Auburn University over chartering a similar
group [see e.g., 2 JR 324-326], met with the GLBA to
discuss "how we ought to proceed here on this campus
[and] I think it was sort of a joint agreement on our
part that we would try to do everything pretty low key here

_____

[7]The Office of Campus Involvement, under Dean Adams'
direction, is responsible for registration of organizations
[Adams dep. 9].

-17-

until the things were settled at Auburn, primarily through the court" [Adams dep. 38-43]. During this period, the GLBA was planning to "hold[ ] a dance, open to everyone at USA, to celebrate [the GlBA's] first year of existence" [1 JR 219 ¶19], but, after conferring with Dean Adams, the GLBA agreed to "postpone" the dance consistent with the "low key" approach suggested by Dean Adams [Adams dep. 42].[8] By this advice, however, Dean Adams was not attempting "to restrain them in any way from doing what they wanted to do" [Adams dep. 42], for if the GLBA had "said they wanted to go ahead and do it [the dance] we would have tried to facilitate that" [Adams dep. 43].

Contrary to Dean Adams' [lay] belief, expressed to the GLBA, that the legislative proposal would fail [e.g., 1 JR 219 ¶¶20], the act that became §16-1-28, Code of Alabama 1975, was approved by the Legislature and the Governor in May, 1992. While Dean Adams, in his lay opinion, saw no need for the legislation in the first place, did not understand its requirements, and in his lay

---

[8]GLBA president Wilson acknowledges that the group agreed to postpone the dance but attributes the postponement to references by Dean Adams to the Alabama Legislature's consideration of the bill which would become §16-1-28 [1 JR 219 ¶¶19-20].

opinion doubted its constitutionality[9] [Adams dep.
28-33], he was nevertheless concerned about the effect
the law might have on the ability of USA to directly fund
the GLBA and thought it prudent at some point to obtain
legal advice from the Attorney General about the
interpretation and enforcement of the statute, particularly
if the GLBA actually sought funding [1 JR 245 ¶6; Adams
dep. 48]. There was no intent to withdraw the GLBA's
status as a registered student organization [Adams dep.
45], and USA proposed to continue to allow the GLBA to
use USA facilities [1 JR 248 ¶9]. In June, 1992, the
GLBA first requested access to a "university bank account,"
a banking-type service which USA offers to registered
student organizations through its business office [1 JR
219-220 ¶21; 2 JR 327, 484; Adams dep. 48]. Dean Adams
transmitted this request to USA's internal counsel in late
July, 1992, with a cover memorandum seeking an "opinion and

_____

[9]Herein illustrates the necessity for §36-15-21, Code
of Alabama 1975, as affirmed by the Supreme Court of
Alabama in Ex Parte Weaver, supra. If the Dean of Students
at a public university had the power to confess the
unconstitutionality of a statute, simply because he deems
it in his lay opinion to be unconstitutional, the Attorney
General's ability to establish and formulate a uniform and
consistent legal policy to further the interest of the
State and the public his office represents would be
irreparably thwarted.

-19-

recommendation for our action in this matter" in light of
§16-1-28 [2 JR 328].  This memorandum expressed Dean
Adams' belief, based on the GLBA's constitution, that the
organization's stated purpose of "education and support"
would not be in violation of §16-1-28 [id.].  Based
on information that the University of Alabama at Birmingham
had "declared" a similar group [to be] "'legal,'" Dean
Adams recommended that USA "stay the course at this point"
and "open an account" for the GLBA, and further noted that
the GLBA had been allowed "to contune to use the
facilities" [id.].  Dean Adams separately shared with
the GLBA that if the organization's money was put into a
"university bank account," it might be possible for the
GLBA to lose use of the money because USA "may be blocked
[by the statute] in some way as they are making
expenditures of their [GLBA's] money" [Adams dep. 49,
53; see 1 JR 220 ¶22].  As such, the GLBA was not
prohibited from opening such an account, but Dean Adams
recommended that the group instead open an account with a
commercial bank, which USA student organizations commonly
do [1 JR 251 ¶14; 253 ¶15; 255 ¶17].  This type
of advice, which follows from the concept of institutional
control that attaches to funds in the custody of the
University [1 JR 252-253 ¶15], was not specific to

-20-

the GLBA, but equally applicable to all student
organizations:

> "I always remind groups who want
> to open a university banking
> account that they are then -- that
> that money, as I understand it,
> and as the state auditor
> understands it, becomes state
> money and is therefore subject to
> the review of the auditor and
> state audit rules.  And so some
> things that they have liberty to
> do with money on an outside
> account they would not have
> liberty to do with a university
> account."

[Adams dep. 56].  The GLBA opened an account with a
local bank and later sought the reimbursement of the
service charges as part of its budget requests to the
Student Government Association [2 JR 399, 422].[10]

The Student Government Association ["SGA"] at USA
is empowered to allocate funding derived from student

_____

[10]The GLBA seems to claim that the real disadvantage
from lack of access to a USA account lies in the area of
the transfer of SGA appropriations since the GLBA believes
that, if SGA funds are placed in a campus account, they can
be obtained for "disbursement before-the-fact" [GLBA's
Brief p. 31, n. 33].  Dean Adams does suggest this at one
point in his deposition, but notes that he was not exactly
clear on the process [Adams dep. 24].  In fact, SGA
allocations are disbursed in the form of a reimbursement
based on receipts, so the type of account - commercial or
campus - is irrelevant [e.g., Adams dep. 24-25; 2 JR
484-485, 500, 501].

activity fees to student organizations if, among other
things, the activities being funding or subsidized,
"benefit the University and the students in a timely and
direct manner," the organization seeking an allocation has
"demonstrate[d] that a substantial effort has been
made, on the part of that organization, to fund the project
on its own," and funding requests are accompanied by
"itemized price estimates" [2 JR 484].[11]  Once the
SGA Senate has made an appropriation, the funds are
available for use upon presentation of receipts and further
approval by Dean Adams of a "requisition" [Adams dep.
20-25].  The GLBA's June, 1992, request for access to a
"university bank account, constituted notice to Dean Adams
that the group would be seeking an SGA allocation at some
point in the future [2 JR 328], a prospect which posed
some concern to Dean Adams since he felt that he would need
an opinion from the Attorney General concerning the effect
of §16-1-28 before he "could sign off on any requisition
for GLBA" [Adams dep. 58].  At some point during the
fall of 1992, Dean Adams became aware that the GLBA
intended to seek limited funding from the SGA in connection

---

[11]Funding is not available for partisan "political" or
"religious" organizations [Adams dep. 16-18], and cannot be
sought or used for certain expenses [2 JR 484-485, 501].

with the GLBA's sponsorship of or participation in an event
known as "World AIDS Day," which was scheduled to take
place on the USA campus in December, 1992 [Adams dep. 57;
2 JR 332, 337]. Dean Adams met with George Hite Wilson,
the president of GLBA, and Michael Mitchell, the president
of SGA, to determine whether some of the activities for
that event might be funded through having the SGA print
flyers and the like "without getting into a situation of
someone saying that we were not observing the law, whatever
it meant -- or means" [Adams dep. 61; 1 JR 221 ¶25].
The GLBA did indeed seek $100 from the SGA in early
November, 1992, to defray the "printing cost of posters for
campus distribution" [2 JR 333-334], but the actual
printing costs of $102.50 for 100 flyers ended up being
routed through the Public Relations/Advertising Committee
by the SGA and approved by the SGA [1 JR 221 ¶26; 2 JR
335, 336]. The flyers were printed [2 JR 339] and
the "World AIDS Day" event otherwise occurred as scheduled
[1 JR 221-222 ¶21].

In early January, 1993, the GLBA submitted a second
request for an SGA allocation, this time seeking a total of
$884 for use in connection with an Alabama GLBA "group
conference" to be held at USA on February 20 and 21, 1993,
for the establishment of a "resource library," and in
connection with a guest speakers forum and a speakers

-23-

bureau [1 JR 222 ¶27; 2 JR 382-384]. At some point
prior to the actual SGA Senate budget meeting on January
25, 1993, the "executive council" of the SGA Senate
committee reviewed the GLBA's budget request and, by
eliminating some of the line items, proposed an adjusted
figure of $651 for SGA approval [1 JR 222 ¶29; 2 JR
384]. According to George Hite Wilson, the GLBA's
president, on the day of the SGA Senate budget meeting he
was informed by Michael Mitchell, the SGA president, that
Dean Adams "had directed the SGA to table the budget
request until the [opinion] request could be reviewed
by the Attorney General" [1 JR 222 ¶28]. Mr.
Mitchell does not confirm this claim in his affidavit [1
JR 230-232], but Dean Adams agreed during his deposition
that he may have indicated to Mr. Mitchell that the
allocation request be "tabled" until USA could obtain
further guidance from the Attorney General [Adams dep.
69-70]. In any event, the $651 funding allocation to the
GLBA proposed by the SGA executive counsel was not raised
or considered during the SGA budget meeting on January 25
[1 JR 223 ¶30; 2 JR 386-393]. During a staff meeting
the next day, it was reported that the GLBA had made a
funding request and that the request would "be presented to
the Attorney General for [his] approval" [2 JR
394]. The minutes of this meeting also indicated that

-24-

USA was being placed in "a Catch 22 situation" since "if the State rules against funding and we abide by that ruling, groups who support human rights such as the American Civil Liberties Union will get involved" but if the ruling was ignored, "the State will pursue the issue" [2 JR 395].

On January 27, 1993, Dean Adams wrote GLBA president Wilson to note that, in light of §16-1-28, Code of Alabama 1975, USA was requesting the Attorney General to "interpret the law in light of your organization's recent funding request," particularly since "[t]he language of the bill seems ambiguous and we need clarification before we can proceed with funding" [2 JR 396]. By this letter, Dean Adams requested the GLBA to "submit a complete list of speakers, topics, and overall purpose for the activities you propose for funding" for submission to the Attorney General [id.]. That letter prompted Mr. Wilson to prepare another appropriation request which sought $698 from the SGA for the purposes of providing a speakers bureau and a guest speaker in the person of William Rubenstein, an attorney who is ostensibly versed in legal issues involving the gay and lesbian community [1 JR 223-224 ¶32, 2 JR 402-405].

On February 12, 1993, USA President Whiddon wrote the Attorney General to request an opinion about whether USA,

-25-

through its SGA, could fund the GLBA's revised request in
the amount of $698 in light of §16-1-28 [1 JR 198].
Enclosed with Dr. Whiddon's letter was organizational
documentation concerning the GLBA [1 JR 199-209] but,
apparently, the funding request itself was not actually
sent to the Attorney General although it was summarized in
the letter.  USA took no further action concerning the
revised allocation request because of a "reluctance to
provide direct funding to the GLBA without guidance from
the Attorney General [Adams dep. 70-71].  According to
GLBA president Wilson, the GLBA was unable to have Mr.
Rubenstein speak on campus, presumably due to lack of
available funding [1 JR 224 ¶33].  There is no
indication, however, that the GLBA presented Dean Adams
with a speaker's contract, which is the normal procedure
[Adams dep. 83-84], or otherwise sought reimbursement
from the SGA.  In anticipation of the SGA budgeting process
for the spring quarter, 1993, the GLBA prepared and
submitted another request which sought $720 that the GLBA
proposed to use in connection with a speakers bureau and
for miscellaneous expenses [1 JR 224-225 ¶35; 2 JR
422-424].  The bulk of the speakers bureau component of
the budget request pertained to expenses associated with
the GLBA's plan to bring John Howard, a graduate fellow
from Emory University, to the USA campus in May, 1993 [1

-26-

JR 225 ¶35, 2 JR 424].  On April 19, 1993, the SGA
approved allocation of funds to the GLBA [1 JR 225 ¶36;
2 JR 429, 432, 433].[12]  Dean Adams, who was in
attendance, indicated during the meeting that USA was still
waiting for an opinion from the Attorney General and "that
I didn't know what action I would have to take or could
take," but "the [SGA] Senate should do what they had to
do and that I would do what I had to do"  [Adams dep. 76;
1 JR 225 ¶37].  GLBA president Wilson maintains, and
Dean Adams basically concurred, that Dean Adams expressed
to the SGA Senate that he would have to consider
withholding approval of any allocation pending an opinion
from the Attorney General [1 JR 225 ¶37; Adams dep.
76-77].  According to minutes of a May 18, 1993, staff
meeting, the GLBA was informed that funding would be held
up until "approval" was received from the Attorney General,
though "[o]ffers have been made to assist them with
programs etc. through other avenues" [2 JR 449].  The
minutes indicate, however, that he GLBA had "anticipated

---

[12]There is some slight dispute about the amount that
the SGA approved.  The SGA meeting minutes [at 2 JR 429]
referenced a figure of $500, SGA budget forms report $570
[2 JR 432, 433], and Mr. Wilson's affidavit indicates that
the SGA "voted to fund our speaker's bureau activities
(totalling $570)" [1 JR 225 ¶356].

our decision on their request for funding" and "[t]he
ACLU will be getting involved" [id.]. Mr. Wilson
attests that, notwithstanding the appropriation by the SGA,
the GLBA could not take direct steps to have Mr. Howard
actually speak at USA during the spring quarter, 1993,
because it could not commit to funding his appearance
without the certainty of being able to have access to the
SGA allocation [1 Jr 225-226 ¶¶38, 40, 41]. Dean
Adams, apparently expecting the GLBA to seek reimbursement
for Mr. Howard's appearance, recalled a conversation with
SGA president Mitchell in which Mitchell reported that GLBA
president Wilson had informed him of "some controversy in
the group over the speaker they wanted to bring in, or
whether the speaker was going to be available to them," so
the GLBA had decided not to bring the speaker [Adams dep.
79; emphasis supplied]. Mr. Mitchell indicates in his
affidavit that he had not discussed the matter with the
GLBA, but he did have a conversation with Dean Adams "in
which I informed him that the SGA had not gotten any
further paperwork associated with GLBA's planned event,"
which "never took place, because the organization never
submitted receipts to the SGA for processing and
reimbursement" [2 JR 231 ¶¶4-5; emphasis
supplied]. Mr. Wilson denies the existence of any
dispute over a speaker [1 JR 226 ¶42]. In any event,

-28-

Mr. Wilson immediately commenced efforts to have Jaguar
Productions, a programming board also funded by student
activity fees [Adams dep. 12, 102], sponsor Mr.
Howard's appearance at USA, and that appearance ultimately
took place in October, 1993, though another speaker was
included in the program to "balance" the presentation [1
JR 226 ¶39; 2 JR 452; Adams dep. 79-80, 87-90].[13]

On June 29, 1993, Dean Adams  wrote to GLBA president
Wilson to report that USA was "still waiting" for an
opinion from the Attorney General concerning the "legality
of funding your organization's request" [2 JR 452].
According to Mr. Wilson's affidavit, the GLBA submitted a
"much smaller budget request" in the amount of $198.85 to
the SGA for the summer quarter, 1993, but the SGA ended up
voting on July 26, 1993, to reimburse the GLBA for $16.31
expended in connection with awards certificates [1 JR
227 ¶44].  On July 29, 1993, the Attorney General
responded to Dr. Whiddon's February, 1993, opinion request
[2 JR 210-211].  In the response, authored by Assistant
Attorney General James R. Solomon, Jr., the Chief of the
Attorney General's Opinions Division, the Attorney General

---

[13]Mr. Wilson was on the governing board of Jaquar
Productions at the time [Adams dep. 79-80].

referred to an opinion that had been previously issued to
State Representative Perry O. Hooper, Jr., in February,
1992 [1 JR 57-60], and to §16-1-28, Code of Alabama
1975. The Attorney General concluded that "[t]he
Student Government Association may not provide funds to any
organization that fosters or promotes a lifestyle or
actions prohibited by §§13A-6-62 to 13A-6-65,
inclusive, Code of Alabama 1975," and thus answered in the
"negative" Dr. Whiddon's question about whether USA could
provide funding to the GLBA without violating the statute
[2 JR 211]. Dean Adams, in consultation with USA's
in-house attorney, decided that "we would have to deal with
[the statute] and that we would go through a
fact-finding process" that would hopefully "define the
words 'foster and promote' based on what legal definitions
were available to us" and convene a "fact-finding group to
determine whether the GLBA had indeed violated -- or were
in violation of the law" [Adams dep. 94]. Though the
preliminary focus of this process would indeed be on the
GLBA [see 2 JR. 456], consistent with Dean Adams'
understanding of the background of the legislation as being
targeted at gay and lesbian student groups on State college
and university campuses [e.g., Adams dep. 37], Dean
Adams envisioned that there might be discussion "about
whether there are any other groups" [covered under the

-30-

statute] in the event that the "fact-finding process"
could be conducted "in a way which was both within the law
and definition enough for us to proceed" [Adams dep.
95]. Dean Adams selected the members of this committee,
which was composed of some faculty members, some members of
Dr. Adams' staff, and some students, and conducted an
initial "planning" meeting to discuss the parameters of the
committee's future activities [Adams dep. 96-98; 2 JR
457]. Dean Adams expected the committee to move as
quickly as possible and to come to some conclusions prior
to the fall quarter budget meeting [Adams dep. 100]
but, as it turned out, the committee's activities were
suspended just after the first meeting [2 JR 458] in
light of the commencement of this litigation and neither
any "fact-finding" as such nor any committee decision has
ever been handed down [2 JR 240 ¶1].

At some point in early October, 1993, after the filing
of this suit, the GLBA submitted another appropriation
request to the SGA for $275.00 to be used for such purposes
as purchasing information packets, renting a videotape for
a special event, and the like [2 JR 459-461]. This
initial request was defeated in the SGA Senate on October
12, 1993 [2 JR 466], and an amended request for $210.00
likewise failed on November 1, 1993 [2 JR 469]. The
SGA president opines that, in light of the Attorney

-31-

General's opinion, many of the student senators are
"unwilling to allocate money to the GLBA" on the belief
that "such an allocation might mean that they personally
would be violating the new state law" [1 JR 231 ¶8].
As such, the SGA president does not anticipate SGA approval
of "significant funds" to the GLBA "until this law suit
resolves whether the new law should have any impact on our
funding decisions" [1 JR 232¶   ].

## INTRODUCTION TO ARGUMENT

The Defendants respectfully suggest that many cases
before this Honorable Court will have a much more
complicated set of facts that lead to litigation; however,
we also suggest that no case, such as that sub judice, will
in reality have a less complicated set of facts than the
mischaracterized factual arguments which have been advanced
by the Plaintiff in this cause.  In fact, we respectfully
submit that in their Brief on the Merits the Plaintiff, in
a blatant attempt to inflame the passions of this Honorable
Court, has engaged in an interminable exposition of
mischaracterization of the facts in order to ferment the
reader's mind with visions of an alleged homophobic
atmosphere at the University of South Alabama which
consists of oppression of the GLBA, "gay bashing," and
wholesale violation(s) of individual liberty and freedom.

The strategy and technique of the Plaintiff in its
brief appears to be that of "political correctness
warfare."  Indeed, the Plaintiff's Brief on the Merits is
some eighty (80) pages in length but yet their argument of
the substantive legal issues presented by this case does
not even begin until page forty-five (45)!  We respectfully
submit that the atmosphere on the campus of the University
of South Alabama, in the context of this litigation, is in
fact not an atmosphere of homophobic oppression of the GLBA

-33-

as the Plaintiff seems to claim.  The Plaintiff's counsel
have drawn a picture of the underlying factual posture of
this case which their imagination has now established
indelibly in their heads.  They can see nothing but their
version, which is really an amazing one, in view of the
fact that there is absolutely no evidence before this
Honorable Court of threats, of threats physical violence,
of hostility, or of actual violence of any kind against the
Plaintiff and the members of its group.  Moreover, it is
clear from the jointly prepared record, as supplemented by
two depositions, that the Gay Lesbian Bisexual Alliance at
the University of South Alabama has been recognized by the
granting of an official character, that the charter has not
been revoked, and that the constitutional rights of
individual members of the GLBA have not been infringed.
Indeed, all the direct and implied argument(s) by the
Plaintiff to the contrary are clearly belied by the
stipulated record.

Therefore, as originally set forth hereinabove, we
respectfully urge this Honorable Court, in rendering a
decision on the merits, to carefully focus on the narrow
constitutional question(s) which have been presented for
adjudication, and not to be swayed by emotionally-charged
argument(s) of the Plaintiff which have no foundation in

-34-

law or fact and which are irrelevant and immaterial to the
narrow legal issues.

In its review of the Plaintiff's narration of the
underlying facts, a narration which is abstract,
immaterial, but a "flailing of the air," completely futile,
and entirely and purposely specious in nature, we
respectfully submit that this Honorable Court should look
for answers to some very definite questions.  Has any
individual member of the GLBA at the University of South
Alabama been prevented from engaging in constitutionally
protected speech or association?  Has the charter of the
GLBA at the University of South Alabama been revoked or
suspended?  Has the administration of the University of
South Alabama engaged in a pattern or practice of treating
the GLBA differently from other student groups without
legal cause?

-35-

I. THE PLAINTIFF'S ARGUMENT(S) WITH RESPECT TO STRICT APPLICATION OF FREE EXPRESSION AND FREE ASSOCIATION PRINCIPLES TO TEST THE CONSTITUTIONALITY OF LEGISLATION IN THE UNIVERSITY ENVIRONMENT ARE SPECIOUS BECAUSE, GENERALLY, THE STATE IS UNDER NO OBLIGATION TO FUND THE EXERCISE OF CONSTITUTIONAL RIGHTS.

Because, they say, §16-1-28, Code of Alabama 1975, as amended, focuses on public university campuses, and because in this case a controversy with respect thereto has arisen in a university environment, the Plaintiff argues for strict application of free association principles to test its constitutionality. While this argument is deceptively attractive, the Defendants would argue that in reality it is without merit because:

> "Generally speaking, the state is under no obligation to fund the exercise of constitutional rights. E.g., Lipscomb v. Simmons, 962 F.2d 1374, 1379 (9th Cir. 1992) (en banc). 'The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way.' Rust v. Sullivan, 500 U.S. 173, ___, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991)."

Tipton v. University of Hawaii, 15 F.3d 922, 926 (9th Cir. 1994). Indeed, "[s]o long as a state policy can be

-36-

applied constitutionally under some set of circumstances, a
facial challenge to that policy must ordinarily fail." Id.
at 925, citing with approval, United States v. Salerno, 481
U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 967 (1987); IDK, Inc.
v. Clark County, 836 F.2d 1185, 1189 (9th Cir. 1988).

     In addition, it is singular to note that by analogy
the Supreme Court of the United States, applying the same
or similar principles with respect to secondary schools,
has held that "[t]he First Amendment does not prevent
[ ] school officials from determining that . . . vulgar
and lewd speech . . . would undermine the school's basic
educational mission. A . . . assembly or classroom is no
place for a sexually explicit monologue . . . [and]
vulgar speech and lewd conduct is wholly inconsistent with
the 'fundamental values' of public school education."
Bethel School Dist. No. 403 v. Fraser, 106 S.Ct. 3159, 478
U.S. 675, 92 L.Ed.2d 549 (1986).

     Because the fostering and the promotion of homosexual
conduct, and the provision of visual or other materials in
support thereof would, by its very nature, involve
discussions or demonstrations with respect to acts of ". . .
sexual gratification between persons not married to each
other involving the sex organs of one person and the mouth
or anus of another," see e.g., §13A-6-60(2), Code of
Alabama 1975, it strains the realm of credulity for anyone

-37-

to suggest or to expect that a speech or presentation on the campus of the University of South Alabama promoting or fostering homosexual misconduct would be anything less than _very_ elaborately, _very_ graphically, and _very_ explicitly vulgar and lewd.

And, as the Supreme Court explicitly noted in Bethel School District No. 403, supra:

> "Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the 'fundamental values necessary to the maintenance of a democratic political system' disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the 'work of schools.' (citation omitted) . . .
>
> The process of education [of] our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers -- and indeed the older students -- demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class. Inescapably, like parents, they are role models.

-38-

> The schools, as instruments of the
> state, may determine that the
> essential lessons of civil, mature
> conduct cannot be conveyed in a
> school that tolerates lewd,
> indecent, or offensive speech and
> conduct . . . ."

106 S.Ct. at 3164.

As these decisions seem to strongly suggest, the interests of the State in proscribing conduct incidental to speech, such as that conduct which is at issue in the matter at bar with respect to the proscriptions of §16-1-28, Code of Alabama 1975, as amended, are sometimes entitled to greater judicial deference when the forum is a publicly-supported school or college.

II. BECAUSE SODOMY AND SEXUAL MISCONDUCT ARE NOT ACTIVITIES THAT FALL WITHIN THE PROTECTION OF THE FIRST AMENDMENT, THE STATUTE IN QUESTION DOES NOT HAVE TO BE JUSTIFIED BY A COMPELLING GOVERNMENTAL INTEREST.

It is the settled jurisprudence of the Supreme Court of the United States that the constitution does not confer a fundamental right upon homosexuals to engage in sodomy and sexual misconduct: Bowers v. Hardwick, 106 S.Ct. 2841 (1986). In this landmark case, which arose from an action by a practicing homosexual challenging the constitutionality of Georgia's sodomy statute, the Court explicitly held that:

> "This case does not require a judgment on whether laws against sodomy between consenting adults in general, or between homosexuals in particular, are wise or desirable . . . [t]he issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time . . . . we think it evident that none of the rights announced in the cases cited by respondent bears any resemblance to the claimed constitutional right of homosexuals to engage in acts of sodomy that is asserted in this case. No connection between family, marriage, or procreation on the one hand and homosexual activity on the other has been demonstrated . . . by respondent.

Moreover, any claim that these cases nevertheless stand for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription is unsupportable . . . .

Precedent aside, however, respondent would have us announce . . . a fundamental right to engage in homosexual sodomy. This we are quite unwilling to do. It is true that despite the language of the Due Process Clauses of the Fifth and Fourteenth Amendments, which appears to focus only on the processes by which life, liberty, or property is taken, the cases are legion in which those Clauses have been interpreted to have substantive content, subsuming rights that to a great extent are immune from federal or state regulation or proscription . . . .

Striving to assure itself and the public that announcing rights not readily identifiable in the Constitution's text involves much more than the imposition of the Justices' own choice of values on the States and the Federal Government, the Court has sought to identify the nature of the rights qualifying for heightened judicial protection. In Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 151, 152, 82 L.Ed. 288 (1937), it was said that this category includes those fundamental liberties that are 'implicit in the concept of ordered liberty,' such that neither liberty nor justice would exist if [they] were sacrificed.' A different description of fundamental

liberties appeared in Moore v.
East Cleveland, 431 U.S. 494, 503,
97 S.Ct. 1932, 52 L.Ed.2d 531
(1977) (opinion of POWELL, J.),
where they are characterized as
those liberties that are 'deeply
rooted in this Nation's history
and tradition.' Id., at 503, 97
S.Ct. at 1938 (POWELL, J.). See
also Griswold v. Connecticut, 381
U.S. at 506, 85 S.Ct. at 1693.

It is obvious to us that
neither of these formulations
would extend a fundamental right
to homosexuals to engage in acts
of consensual sodomy.
Proscriptions against that conduct
have ancient roots. See generally
Survey on the Constitutional Right
to Privacy in the Context of
Homosexual Activity, 40 U.Miami
L.Rev. 521, 525 (1986). Sodomy
was a criminal offense at common
law and was forbidden by the laws
of the original thirteen States
when they ratified the Bill of
Rights. In 1868, when the
Fourteenth Amendment was ratified,
all but 5 of the 37 States in the
Union had criminal sodomy laws.
In fact, until 1961, all 50 States
outlawed sodomy, and today, 24
States and the District of
Columbia continue to provide
criminal penalties for sodomy
performed in private and between
consenting adults. See Survey,
U.Miami L.Rev., supra, at 524, n.
9. Against this background, to
claim that a right to engage in
such conduct is 'deeply rooted in
this Nation's history and
tradition' or 'implicit in the
concept of ordered liberty' is, at
best, facetious.'

106 S.Ct. 2843-2846.'"

The Defendants respectfully submit that if the State of Alabama may enact laws which proscribe homosexual misconduct, or "sodomy," as a criminal offense then it therefore follows, a fortiori, that the State may constitutionally enact laws which are designed to prohibit conduct which aids, furthers, or abets the commission of a criminal sodomy offense.

On its face §16-1-28, Code of Alabama 1975, as amended, seeks to proscribe conduct which aids, furthers, or abets the commission of criminal sodomy offenses. The statute is aimed at prohibiting ". . . [the] foster[ing] or promot[ion] of . . . actions [which] are prohibited by the sodomy and sexual misconduct laws of [Alabama]." In addition, the statute seeks to proscribe the encouragement of "unlawful acts," such as sodomy, which are classified as criminal offenses under §§13A-6-60, et seq., Code of Alabama 1975, and to proscribe the dissemination of materials that would assist persons possessing mens rea in engaging in unlawful sexual conduct.

The Plaintiff does not challenge the constitutionality of other inchoate statutes, i.e., §13A-4-1 (criminal solicitation); §13A-4-2 (attempt); §13A-4-3 (criminal conspiracy); or §13A-2-23 (complicity). If a person whose sexual orientation is admittedly "gay" or "lesbian"

-43-

## III. THE STATUTE IN QUESTION IS A VIEWPOINT NEUTRAL MEANS FOR ENSURING THAT GOVERNMENT FUNDS AND GOVERNMENT FACILITIES ARE USED ONLY FOR THE PURPOSES FOR WHICH THEY WERE GRANTED.

The Defendants would respectfully submit that §16-1-28, Code of Alabama 1975, as amended, amounts to nothing more than a viewpoint neutral means for ensuring that government funds and government facilities are used only for the purposes for which they were granted. The decision of the Supreme Court of the United States in Rust v. Sullivan, 111 S.Ct. 1759 (1991) is authoritatively instructive on this issue.

In Rust v. Sullivan, supra, the Supreme Court upheld a provision of a federal government program providing funding to certain organizations that provide "family planning services," but prohibiting persons or groups who receive the funds from providing abortion information as part of their service. Fund recipients can provide information only at a time and place separate from the federally funded family planning service. The Court reasoned that the government is not required to provide subsidies for abortion, and the restriction is merely a viewpoint neutral means of ensuring that government funds are spent only on the family planning services for which they were granted.

The First Amendment arguments advanced by the petitioners in Rust v. Sullivan, supra, which are

-45-

strikingly similar to the First Amendment arguments

advanced by the Plaintiff in the matter at bar, were

squarely rejected by the Supreme Court.

> "Petitioners contend that the
> regulations violate the First
> Amendment by impermissibly
> discriminating based on viewpoint
> because they prohibit 'all
> discussion about abortion as a
> lawful option - including
> counseling, referral, and the
> provision of neutral and accurate
> information about ending a
> pregnancy - while compelling the
> clinic or counselor to provide
> information that promotes
> continuing a pregnancy to term.'
> Brief for Petitioners in No.
> 89-1391, p. 11. They assert that
> the regulations violate the 'free
> speech rights of private health
> care organizations that receive
> Title X funds, of their staff, and
> of their patients' by
> impermissibly imposing 'viewpoint
> - discriminatory conditions on
> government subsidies' and thus
> penaliz[e] speech funded with
> non-Title X monies.' Id., at 13,
> 14, 24. Because 'Title X
> continues to fund speech ancillary
> to pregnancy testing in a manner
> that is not evenhanded with
> respect to views and information
> about abortion, it invidiously
> discriminates on the basis of
> viewpoint.' Id., at 18. Relying
> on Regan v. Taxation With
> Representation of Wash., and
> Arkansas Writers Project, Inc. v.
> Ragland, 481 U.S. 221, 234, 107
> S.Ct. 1722, 1730, 95 L.Ed.2d 209
> (1987), petitioners also assert
> that while the Government may
> place certain conditions on the

receipts of federal subsidies, it may not 'discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.' Regan, supra, 461 U.S., at 548, 103 S.Ct., at 2002 (quoting Cammarano v. United States, 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1969)).

There is no question but that the statutory prohibition contained in § 1008 is constitutional. In Maher v. Roe, supra, we upheld a state welfare regulation under which Medicaid recipients received payments for services related to childbirth, but not for nontherapeutic abortions. The Court rejected the claim that this unequal subsidization worked a violation of the Constitution. We held that the government may 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds.' Id., 432 U.S., at 474, 97 S.Ct., at 2382. Here the Government is exercising the authority it possesses under Maher and McRae to subsidize family planning services which will lead to conception and childbirth, and declining to 'promote or encourage abortion.' The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion

-47-

of the other. '[A]
legislature's decision not to
subsidize the exercise of a
fundamental right does not
infringe the right.' Regan,
supra, 461 U.S., at 549, 103
S.Ct., at 2003. See also,
Buckley v. Valeo, 424 U.S. 1, 96
S.Ct. 612, 46 L.Ed.2d 659 (1976);
Cammarono v. United States,
supra. 'A refusal to fund
protected activity, without more,
cannot be equated with the
imposition of a 'penalty' on that
activity.' McRae, 448 U.S., at
317, n. 19, 100 S.Ct., at 2688, n.
19. 'There is a basic difference
between direct state interference
with a protected activity and
state encouragement of an
alternative activity consonant
with legislative policy.' Maher,
432 U.S., at 475, 97 S.Ct., at
2383.

     The challenged regulations
implement the statutory
prohibition by prohibiting
counseling, referral, and the
provision of information regarding
abortion as a method of family
planning. They are designed to
ensure that the limits of the
federal program are observed. The
Title X program is designed not
for prenatal care, but to
encourage family planning. A
doctor who wished to offer
prenatal care to a project patient
who became pregnant could properly
be prohibited from doing so
because such service is outside
the scope of the federally funded
program. The regulations
prohibiting abortion counseling
and referral are of the same ilk;
'no funds appropriated for the
project may be used in programs
where abortion is a method of

family planning,' and a doctor employed by the project may be prohibited in the course of his project duties from counseling abortion or referring for abortion. This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of its scope.

To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous government programs constitutionally suspect. When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, 22 U.S.C. § 4411(b), it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as Communism and Fascism. Petitioners' assertions ultimately boil down to the position that if the government chooses to subsidize one protected right, it must subsidize analogous counterpart rights. But the Court has soundly rejected that proposition. Regan v. Taxation With Representation of Wash., supra; Maher v. Roe, supra; Harris v. McRae, supra. Within far broader limits than petitioners are willing to concede, when the government appropriates public funds to establish a program it is entitled to define the limits of that program.

-49-

We believe that petitioners'
reliance upon our decision in
Arkansas Writers Project, supra,
is misplaced.  That case involved
a state sales tax which
discriminated between magazines on
the basis of their content.
Relying on this fact, and on the
fact that the tax 'targets a small
group within the press,' contrary
to our decision in Minneapolis
Star & Tribune Co. v. Minnesota
Comm'r of Revenue, 460 U.S. 575,
103 S.Ct. 1365, 75 L.Ed.2d 295
(1983), the Court held the tax
invalid.  But we have here not the
case of a general law singling out
a disfavored group on the basis of
speech content, but a case of the
Government refusing to fund
activities, including speech,
which are specifically excluded
from the scope of the project
funded."

111 S.Ct. 1771-1773.

Applying the foregoing principles, this Honorable

Court should have no difficulty in holding that §16-1-28

amounts to nothing more than viewpoint neutral means for

ensuring that government funds and government facilities

are used only for the purposes for which they are granted.

Why should the taxpayers of Alabama be required to provide

funds and educational facilities for the GLBA's potential

promotion of sodomy, which constitutes criminal sexual

misconduct under the laws of this State?  Funds and

facilities that are available to public schools and

colleges were not appropriated and constructed to provide a

-50-

forum for persons of <u>any</u> specific sexual orientation, much
less for persons whose sexual practices by their very
definition are criminal!   Section 16-1-28 does not prevent
the GLBA from being officially charted, from receiving SGA
funds and from using campus facilities; GLBA and its
members need only refrain from promoting sodomy, a sexual
criminal offense.

## IV. THE STATUTE IN QUESTION CLEARLY SEEKS TO REGULATE CONDUCT WHICH IS INCIDENTAL TO SPEECH AND IT DOES NOT FORBID THE COMMUNICATION OF SPECIFIC IDEAS.

While it is axiomatic that all speech is conveyed through physical action (e.g., talking, writing, distributing pamphlets, etc.), and that the freedom of belief is absolute, the freedom to convey beliefs cannot be. Konigsburg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961), rehearing denied 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961). Accord, Calash v. City of Bridgeport, 788 F.2d 80 (2d Cir. 1986) (protected speech is not equally permissible in all places at all times). The government may reasonably regulate speech related conduct through content neutral time, place, and manner regulations. Thus, generally speaking, speech in public places may be regulated by reasonable time, place, and manner restrictions. Madison School District v. Wisconsin Employment Relations Commission, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); Linmark Associates, Inc. v. Township of Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). See generally, 3 R. Rotunda, J. Nowak, and J. Young, Treatise on Constitutional Law: Substance and Procedure §20.47 (1986).

The Supreme Court of the Unites States has articulated two analytical methods for review of time, place, or manner

restrictions. Under the first test, (1) government regulation is sufficiently justified if it is within the constitutional power of the government; (2) if it furthers an important or substantial governmental interest; (3) if the government interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), rehearing denied 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968).

To be valid under the second method of analysis, government regulations on speech and assembly in public places must be: (1) content neutral (i.e., subject matter neutral and viewpoint neutral); (2) narrowly tailored to serve a significant government interest; and (3) leave open alternative channels of communication. United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed. 736 (1983). We respectfully submit that the former of these two tests is the one that should be applied by this Honorable Court in reviewing the constitutionality of §16-1-28, Code of Alabama 1975, as amended.

A.    Conduct.

Applying the O'Brien test, there can be no doubt that
§16-1-28, Code of Alabama 1975, seeks to regulate conduct
which is incidental to speech and it does not forbid the
communication of specific ideas.  First, the law is quite
clear that the State of Alabama has the constitutional
power to regulate homosexual misconduct.  Bowers v.
Hardwick, supra.  Second, the statute furthers an important
or substantial government interest in regulating homosexual
misconduct because it cannot be disputed that the State of
Alabama does indeed have an interest in promoting lawful
marriage and in fostering the procreation of children, two
vital interests which can never be legally or biologically
achieved where individuals engage in sodomy.  Third, the
government interest served by enactment of §16-1-28 is
unrelated to the suppression of free expression.  If the
State of Alabama were perchance looking for sources of
friction with the homosexual community it would not need
§16-1-28 for that.  The legislature could have simply
enacted a wide array of legislation designed to punish
homosexuality for the sake of punishment, or it could have
enacted legislation which through its very enforcement
would harass and intimidate persons of homosexual
orientation.  This the Alabama legislature has not done.
The language of statute itself leaves no room for doubt

-54-

that it is not intended as a "prior restraint of the first amendment protected speech," and that it is inapplicable to "any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state." And fourth, any incidental restrictions imposed by §16-1-28 are outweighed by the interests of the State of Alabama in proscribing homosexual misconduct and in promoting marriage and fostering the procreation of children.

B.   Content.

Even should this Honorable Court be inclined to apply the Grace test, we respectfully submit that §16-1-28, Code of Alabama 1975, as amended, may still withstand the Plaintiff's constitutional challenge. First, the statute does not seek to regulate the content of speech. It merely denies public funds and public facilities to any group or organization that, in its publicly-funded activities upon public facilities, would foster or promote criminal violations of the state's sodomy and sexual misconduct laws. If the state is under no obligation to fund the exercise of constitutional rights at all, Tipton v. University of Hawaii, supra, then it is certainly not required under the Constitution to fund the speech and assembly activities of any individual or group who/which

-55-

openly advocates sodomy and sexual misconduct in clear violation of state law. Second, the statute is narrowly tailored to serve two separate and distinct significant governmental interests, the prevention of violation(s) of criminal sodomy laws and the advancement of the concept of legal marriages and the fostering of procreation of children. And third, the statute in question clearly and unambiguously leaves open alternative channels of communication. The statute does not blanketly prevent or prohibit homosexual groups from assembling and conducting activities on college campuses. The statute does not prevent such groups from receiving official recognition or funding. The statute does not prevent generalized discussion(s) of homosexuality. THE STATUTE MERELY STIPULATES THAT IN ORDER FOR SUCH GROUPS TO RECEIVE OFFICIAL RECOGNITION AND FUNDING, THEY MUST REFRAIN FROM PROMOTING UNLAWFUL ACTIVITIES WHICH ARE PROSCRIBED BY THE SODOMY AND SEXUAL MISCONDUCT LAWS OF THE STATE OF ALABAMA. The object or goal of the statute is as simple as that, and Plaintiff's arguments to the contrary are fallacious in their reasoning and doomed to fail. At no point in these proceedings has the Plaintiff even bothered to take notice of the fact that the statute at issue seeks to regulate only those groups or organizations which are publicly funded and which utilize public facilities. Thus,

-56-

alternative channels of communication are clearly "open,"
as required under Grace, supra, because the statute applies
to the GLBA (or any similar group) only when that group is
engaged in speech and association activities funded by the
taxpayers and which occur in a taxpayer-funded facility,
such as an auditorium. Surely the Plaintiff has never
seriously entertained the notion that the statute seeks to
bar USA students who are members of the GLBA from
assembling and engaging in any and all speech of a
homosexual nature while on campus. The statute does no
such thing. Again, it merely provides that if the GLBA (or
any similar group) is going to engage in assembly and
speech supported by taxpayer funds and which formally takes
place in a taxpayer facility, then it or any other group
must refrain from speech or activities promoting homosexual
misconduct as proscribed by the criminal sodomy laws of the
State of Alabama. "[S]uch utterances are no essential
part of any exposition of ideas, and are of such slight
social value as a step to truth that any benefit that may
be derived from them is clearly outweighed by the social
interest in order and morality." Chaplinsky v. New
Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

It must again be emphasized that what we have here is
not a blanket prohibition of speech and assembly, but
rather a prohibition directed at any person or group who,

-57-

aided by the support of public funds and the use of public
facilities, would use public funds and the availability of
public facilities to advocate, promote, and abet conduct
which the public, by and through its duly-elected
legislature, has declared to be unlawful. Clearly, the
enactment by the Alabama legislature of §16-1-28 is not
wholly unreasonable.

Such a conclusion is clearly supported by the language
of the holding of the Supreme Court of the United States in
R.A.V. v. St. Paul:

> "The concurrences describe us
> as setting forth a new First
> Amendment principle that
> prohibition of constitutionally
> proscribable speech cannot be
> 'under-inclusiv[e],' post, at
> _____ 120 L.Ed.2d, at 330 (White,
> Jr., concurring in judgment) -- a
> First Amendment 'absolutism'
> whereby 'within a particular
> 'proscribable' category of
> expression, . . . a government
> must either proscribe all speech
> or no speech at all,' post, at
> _____, 120 L.Ed.2d, at 341
> (Stevens, J., concurring in
> judgment). That easy target is of
> the concurrences' own invention.
> In our view, the First Amendment
> imposes not an
> 'under-inclusiveness' limitation
> but a 'content discrimination'
> limitation upon a State's
> prohibition of proscribable
> speech. There is no problem
> whatever, for example, with a
> State's prohibiting obscenity (and
> other forms of proscribable

-58-

expression) only in certain media
or markets, for although that
prohibition would be
'under-inclusive,' it would not
discriminate on the basis of
content.   [citations omitted]

"Even the prohibition against
content discrimination that we
assert the First Amendment
requires is not absolute.   It
applies differently in the context
of proscribable speech than in the
area of fully protected speech.
The rationale of the general
prohibition, after all, is that
content discrimination
'rais[es] the specter that the
Government may effectively drive
certain ideas or viewpoints from
the marketplace,'   Simon &
Schuster, 502 U.S., at _____, 116
L.Ed.2d 476, 112 S.Ct. 501;
Leathers v. Medlock, 499 U.S.
_____, _____, 113 L.Ed.2d 494, 111
S.Ct. 1438 (1991); FCC v. League
of Women Voters of California, 468
U.S. 364, 383-384, 82 L.Ed.2d 278,
104 S.Ct. 3106 (1984);
Consolidated Edison Co., 447 U.S.,
at 536, 65 L.Ed.2d 319, 100 S.Ct.
2326; Police Dept. of Chicago v.
Mosley, 408 U.S. at 95-98, 33
L.Ed.2d 212, 92 S.Ct. 2286.   But
content discrimination among
various instances of a class of
proscribable speech often does not
pose this threat.

"When the basis for the
content discrimination consists
entirely of the very reason the
entire class of speech at issue is
proscribable, no significant
danger or idea of viewpoint
discrimination exists.   Such a
reason, having been adjudged
neutral enought to support
exclusion of the entire class of

-59-

speech from First Amendment
protection, is also neutral enough
to form the basis of distinction
within the class.  To illustrate:
A State might choose to prohibit
only that obscenity which is the
most patently offense in its
prurience -- i.e., that which
involves the most lascivious
displays of sexual activity.  But
it may not prohibit, for example,
only that obscenity which includes
offensive political messages.  See
Kucharek v. Hanaway, 902 F.2d 513,
517 (CA7 1990), cert. denied, 498
U.S. ____, 112 L.Ed.2d 702, 111
S.Ct. 713 (1991).  And the Federal
Government can criminalize only
those threats of violence that are
directed against the President,
see 18 USC §871 [18 USCS
§871] -- since the reasons why
threats of violence are outside
the First Amendment (protecting
individuals from the fear of
violence, from the disruption that
fear engenders, and from the
possibility that the threatened
violence will occur) have special
force when applied to the person
of the President.  See Watts v.
United States, 394 U.S. 705, 707,
22 L.Ed.2d 664, 89 S.Ct. 1399
(1979) (upholding the facial
validity of §871 because of the
'overwhelmin[g] interest in
protecting the safety of [the]
Chief Executive and in allowing
him to perform his duties without
interference from threats of
physical violence').  But the
Federal Government may not
criminalize only those threats
against the President that mention
his policy on aid to inner
cities.  And to take a final
example (one mentioned by Justice
Stevens, post, at ____ __ ____,
120 L.Ed.2d, at 343), a State may

-60-

choose to regulate price
advertising in one industry but
not in others, because the risk of
fraud (one of the characteristics
of commercial speech that
justifies depriving it of full
First Amendment protection, see
<u>Virginia Pharmacy Bd. v. Virginia
Citizens Consumer Council, Inc.</u>,
425 U.S. 748, 771-772, 48 L.Ed.2d
346, 96 S.Ct. 1817 (1976)) is in
its view greater there. Cf.
<u>Morales v. Trans World Airlines,
Inc.</u>, 504 U.S. ____, 119 L.Ed.2d
157, 112 S.Ct. ____ (1992) (state
regulation of airline
advertising); <u>Ohralik v. Ohio
State Bar Assn.</u>, 436 U.S. 447, 56
L.Ed.2d 444, 98 S.Ct. 1912 (1978)
(state regulation of lawyer
advertising). But a State may not
prohibit only that commercial
advertising that depicts men in a
demeaning fashion, see, e.g., L.
A. Times, August 8, 1989, section
4, p 6, col 1.

     "Another valid basis for
according differential treatment
to even a content-defined subclass
of proscribable speech is that the
subclass happens to be associated
with particular 'secondary
effects' of the speech, so that
the regulation is 'justified
without reference to the content
of the . . . speech,' <u>Renton v.
Playtime Theatres, Inc.</u>, 475 U.S.
41, 48, 89 L.Ed.2d 29, 106 S.Ct.
925 (1986) (quoting, with
emphasis, <u>Virginia Pharmacy Bd.</u>,
supra, at 771, 48 L.Ed.2d 346, 96
S.Ct. 1817); see also <u>Young v.
American Mini Theatres, Inc.</u>, 427
U.S. 50, 71, n. 34, 49 L.Ed.2d
310, 96 S.Ct. 2440 (1976)
(plurality); id., at 80-82, 49
L.Ed.2d 310, 96 S.Ct. 2440
(Powell, J., concurring); <u>Barnes</u>,

-61-

501 U.S., at \_\_\_\_ \_\_ \_\_\_\_, 115
L.Ed.2d 504, 111 S.Ct. 2456
(Souter, J., concurring in
judgment).  A State could, for
example, permit all obscene live
performances except those
involving minors.  <u>Moreover, since
words can in some circumstances
violate laws directed not against
speech but against conduct</u> (a law
against treason, for example, is
violated by telling the enemy the
nation's defense secrets), <u>a
particular content-based
subcategory of a proscribable
class of speech can be swept up
incidentally within the reach of a
statute directed at conduct rather
than speech.</u>  See id., at \_\_\_\_,
115 L.Ed.2d 504, 111 S.Ct. 2456
(plurality); id., at \_\_\_\_ _____,
115 L.Ed.2d 504, 111 S.Ct. 2456
(Scalia, J., \_\_\_\_ \_\_ \_\_\_\_, 115
L.Ed.2d 504, 111 S.Ct. 2456
(Souter, J., concurring in
judgment); <u>FTC v. Superior Court
Trial Lawyers Assn.</u>, 493 U.S. 411,
425-432, 107 L.Ed.2d 851, 110
S.Ct. 768 (1990); <u>O'Brien</u>, 391
U.S., at 376-377, 20 L.Ed.2d 672,
88 S.Ct. 1673.  Thus, for example,
sexually derogatory 'fighting
words,' among other words, may
produce a violation of Title VII's
general prohibition against sexual
discrimination in employment
practices, 42 USC §2000e-2 [42
USCS §2000e-2]; 29 CFR
§1604.11 (1991).  See also 18
USC §242 [18 USCS §242];
42 USC §§ 1981, 1982 [42
USCS §§ 1981, 1982].  Where
the government does not target
conduct on the basis of its
expressive content, acts are not
shielded from regulation merely
because they express a
discriminatory idea or philosophy.

[4b, 15]   These bases for
distinction refute the proposition
that the selectivity of the
restriction is 'even arguably
'conditioned upon the sovereign's
agreement with what a speaker may
intend to say.'' Metromedia, Inc.
v. San Diego, 453 U.S. 490, 555,
69 L.Ed.2d 800, 101 S.Ct. 2882
(1981) (Stevens, J., dissenting in
part( (citation omitted).   There
may be other such bases as well.
Indeed, to validate such
selectivity (where totally
proscribable speech is at issue)
it may not even be necessary to
identify any particular 'neutral'
basis, so long as the nature of
the content discrimination is such
that there is no realistic
possibility that official
suppression of ideas is afoot.
(We cannot think of any First
Amendment interest that would
stand in the way of a State's
prohibiting only those obscene
motion pictures with blue-eyed
actresses.)  Save for the
limitation, the regulation of
'fighting words,' like the
regulation of noisy speech, may
address some offensive instances
and leave other, equally
offensive, instances alone.  See
Posadas de Puerto Rico, 478 U.S.,
at 342-343, 92 L.Ed.2d 266, 106
S.Ct. 2968."  (footnote omitted;
emphasis supplied)

120 L.Ed.2d 305, 320-322 (1992).

     Although the statue at issue in this case, a city

ordinance banning display of symbols, such as a burning

cross, that arouse anger in others on the basis of race,

color, creed, religion or gender was held to be invalid, we

respectfully submit that the above-quoted language is
authoritatively instructive in the matter at bar.

V.   THE STATUTE IN QUESTION IS A REASONABLE
     REGULATION PROMULGATED BY THE STATE OF ALABAMA
     UNDER ITS POLICE POWER FOR THE PROTECTION OF THE
     PUBLIC HEALTH, SAFETY, AND MORALS.


A.   §16-1-28, Code of Alabama 1975, is Not
     Overbroad and Does Not Bar a Broad Range of
     Speech at a Particular Location or Under a
     Particular Circumstance.

The proposition is well understood that since the purpose of the freedoms of speech and assembly is to encourage the free flow of ideas, a regulation is most often not upheld if it is "overbroad," that is, if it prohibits substantially more speech than is necessary. Thus, if a regulation bans a broad range of speech at a particular location or under a particular circumstance, it may be held invalid for overbreadth. See, e.g., Houston v. Hill, 482 U.S. 451 (1987); Board of Airport Commissioners v. Jews for Jesus, 482 U.S. 569 (1987); Martin v. City of Struthers, 319 U.S. 141 (1943); Lewis v. City of New Orleans, 415 U.S. 130 (1974); NAACP v. Alabama, 377 U.S. 288 (1964); Terminiello v. City of Chicago, 337 U.S. (1949); and Schaumburg v. Citizens for a Better Environment, 444 U.S. 620 (1980).

We respectfully submit that §16-1-28 is not overbroad, does not bar a broad range of speech at a particular location or under a particular circumstance, and it can therefore be reconciled with the above-referenced

-65-

authorities. The only category of speech which the statute
seeks to bar is that which fosters, promotes, or encourages
the commission of criminal sexual offenses. Thus, it
cannot be said here that the government is targeting
conduct on the basis of expressive content because the acts
themselves (i.e., sodomy) are not shielded from
regulation. Therefore, members of the GLBA, in order to
continue to receive official recognition, funding, and a
forum on school property, need only refrain from engaging
in one narrow category of unprotected speech: speech which
fosters, promotes, or encourages the commission of a
criminal sexual offense. All other protected speech is
clearly and unequivocally permissible under the statute.

B. §16-1-28, Code of Alabama 1975, is Not Void for
   Vagueness Because it Gives Reasonable Notice as
   to What is Prohibited and is Clear as to What
   Speech is Prohibited.

Of course, if a law fails to give persons reasonable
notice as to what is prohibited, it is said to violate
substantive due process. This principle is often applied
strictly when first amendment activity is involved to avoid
the "chilling effect" a vague law might have on speech.
That is, if it is unclear what speech is regulated, people
might refrain from speech that is permissible for fear that
they will be violating the law. See, e.g., Papachristou v.

-66-

City of Jacksonville, 405 U.S. 156 (1972); Gentile v. State Bar, 111 S.Ct. 2770 (1991); and NAACP v. Burton, 371 U.S. 415 (1963).

For the reasons set forth immediately hereinabove, we respectfully submit that §16-1-28 gives reasonable notice as to what is prohibited and it is clear as to what speech is prohibited. It has thus been drawn with "narrow specificity" and is not void for vagueness.

C.   §16-1-28, Code of Alabama 1975, Does Not Give State Officials Broad and Unfettered Discretion for Applying the Law and Contains Defined, Fixed, and Ascertainable Standards for It's Application.

It is axiomatic that a regulation cannot give officials broad discretion over speech issues; there must be defined standards for applying the law. The fear, of course, is that the officials will use their discretionary power to prohibit dissemination of ideas that they do not agree with. See, e.g., Forsyth County, Georgia v. Nationalist Movement, 112 S.Ct. 2395 (1992); Lovell v. City of Griffin, 303 U.S. 444 (1938); Shuttlesworth v. Birmingham, 394 U.S. 147 (1969); City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750 (1988); and Saia v. New York, 334 U.S. 558 (1948).

We respectfully submit that §16-1-28 is not repugnant to First Amendment principles or the

-67-

above-referenced authorities because it does not give state officials broad and unfeltered discretion for its application, and because it contains defined, fixed, and ascertainable standards for its application. By its very language the statute only applies to organizations or groups which promote sodomy and homosexual misconduct. And certainly no reasonable person would contend that a group which goes by the name of the "Gay Lesbian Bisexual Alliance" might not put a reasonable public official on notice that the group has the potential to promote sodomy and homosexual misconduct, and that the official should therefore take steps to ascertain the scope of the group's activities. If the GLBA refrains from committing any of the acts enumerated in the statute, then the statute does not even apply.

## VI. NOT ALL REGULATION OF SYMBOLIC CONDUCT WHICH IS UNDERTAKEN AS PART OF VERBAL COMMUNICATION, SUCH AS THAT PROSCRIBED BY THE STATUTE IN QUESTION, IS PROHIBITED BY THE UNITED STATES CONSTITUTION.

Speech includes not only verbal communication, but also conduct that is undertaken to communicate an idea. Of course, not all regulation of symbolic conduct is prohibited. United States v. O'Brien, supra. Accord, Barnes v. Glen Theatres, Inc., 111 S.Ct. 2456 (1991); Wayte v. United States, 470 U.S. 598 (1985); and Clark v. Community for Creative Nonviolence, 486 U.S. 288 (1984).

Again, the O'Brien Court set out a four-part test for determining when a government interest sufficiently justifies the regulation of expressive conduct: a governmental regulation is sufficiently justified (1) if it is within the constitutional power of the government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. O'Brien, supra, 391 U.S. at 377, 88 S.Ct. at 1679.

For the same reasons as those set forth hereinabove at Argument IV, we respectfully submit that the State of

Alabama may constitutionally regulate the conduct of the GLBA on the campus of the University of South Alabama.

VII. THE STATUTE IN QUESTION DOES NOT CONSTITUTE A PRIOR RESTRAINT; HOWEVER, IN THE ALTERNATIVE, IF THE COURT DOES SO CONSTRUE THE STATUTE, THEN IT CAN STILL SUSTAIN THE STATUTE BECAUSE IT IS NARROWLY TAILORED TO ACHIEVE A COMPELLING AND SIGNIFICANT GOVERNMENTAL INTEREST.

A "prior restraint" is said to be any governmental action that would prevent a communication from reaching the public. Prior restraints, of course, are not favored in our political system as the Supreme Court has indicated that it would rather allow speech and then punish it if it is unprotected. However, the Court has expressed a willingness to uphold prior restraints if some special harm would otherwise result. See generally, e.g., Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

Our position, which we hereby reserve, is that §16-1-28, Code of Alabama 1975, as amended, does not constitute a prior restraint. However, in the alternative, if the Court does so construe the statute as a prior restraint, then it can still sustain the statute because it is narrowly tailored to achieve a compelling and significant government interest.

-71-

The Plaintiff does not seem to realize that current events have outstripped efforts to prevent sodomy with criminal proscriptions alone. The chief difficulty lies in the fact that gays and lesbians, by their very definition,[14] engage in homosexual conduct which is prohibited by law. The failure of the Plaintiff to make the slightest endeavor to address this fact should be highly objectionable to this Honorable Court, and it is certainly objectionable to this writer.

The State of Alabama, under its police powers clearly has an interest, and a very compelling one at that, in the prevention of sexually transmitted and other communicable diseases which are undeniably associated not only with homosexual misconduct, but also with heterosexual misconduct (i.e., prostitution). This governmental interest, along with the interests of the State in promoting marriage and fostering the procreation of

---

[14]Gay ("homosexual"); lesbianism ("homosexual relations between women"), The Random House College Dictionary at 547, 768 (Rev.Ed. 1980); gay ("a homosexual"); lesbian ("a woman who is a homosexual"), The American Heritage Dictionary, at 551, 724 (2nd College Ed. 1985); gay ("attracted to the same sex, homosexual, homophile, lesbian"); lesbian ("a female who is attracted to other females, 'butch,' 'dyke,' 'sapphist'"), West's Legal Thesaurus/Dictionary at 346, 454 (1st Ed. 1985).

-72-

children, discussed _infra_, are certainly compelling enough reasons for this Honorable Court to sustain the statute.

VIII. THE STATUTE IN QUESTION DOES NOT CONSTITUTE AN
INFRINGEMENT UPON FREEDOM OF ASSOCIATION AND
BELIEF; HOWEVER, IN THE ALTERNATIVE, IF THE COURT
DOES SO CONSTRUE THE STATUTE, THEN IT CAN STILL
SUSTAIN THE STATUTE AS SERVING A COMPELLING STATE
INTEREST BECAUSE THE RIGHT TO ASSOCIATE FOR
EXPRESSIVE PURPOSES IS NOT ABSOLUTE UNDER THE
UNITED STATES CONSTITUTION.

Although the First Amendment does not explicitly

mention a right of freedom of association, it is the

settled jurisprudence of the Supreme Court of the United

States that the right to join together with other persons

for expressive or political activity is protected by the

First Amendment. However, the right to associate for

expressive purposes is not absolute. Infringements on the

right may be justified by compelling state interests,

unrelated to the suppression of ideas, that cannot be

achieved through means significantly less restrictive of

associational freedoms. See generally, New York State Club

Association, Inc. v. New York City, 487 U.S. 1 (1988);

Board of Directors of Rotary Club International v. Rotary

Club of Duarte, 481 U.S. 537 (1987); Roberts v. United

States Jaycees, 468 U.S. 609 (1984); and Dallas v.

Stranglin, 490 U.S. 19 (1989).

Our position, which we hereby reserve, is that

§16-1-8, Code of Alabama 1975, as amended, does not

constitute an infringement upon the freedom of association

and belief. However, in the alternative, if the Court does

-74-

so construe the statute then the statute can still be
sustained because the right to associate for expressive
purposes is not absolute under the United State
Constitution and the statute serves a compelling state
interest.  Indeed, "'[e]ven protected speech is not
equally permissible in all places and at all times." Calash
v. City of Bridgeport, 788 F.2d 80, 82 (2d Cir. 1986),
quoting Cornelius v. NAACP Legal Defense and Education
Fund, 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567
(1985).

        The compelling interests advanced by the State of
Alabama to support enactment of the statute in question
have been fully discussed, infra.

-75-

## IX. DEFENDANTS' RESPONSE TO AUTHORITIES CITED IN TEXT OF PLAINTIFF'S BRIEF ON THE MERITS.

This brief is intended to serve as the Defendants' brief on the merits to advance the substantive legal grounds upon which this Honorable Court may sustain the constitutionality of the statute in question. Therefore, for the sake of brevity here, the Defendants will address the cases cited in the Plaintiff's brief on the merits at the oral argument(s) of this cause on June 17, 1994, or, to the extent allowed by the Court, in a supplemental brief if necessary.

## CONCLUSION

With all due respect, the Defendants wish to again emphasize their equitable prayer that this Honorable Court not be impervious to the self-serving factual and procedural summary which has been advanced by the Plaintiff in its Brief on the Merits. That portion of their brief is self-opinionated and rigidly adheres to preconceived ideas. It pours out meaningless veiled declarations and prevarications of the history of the GLBA at USA in unbelievable numbers, of formidable length, and repeating over and over the same ill-founded views and ideas.

The Defendants reciprocate with the Plaintiff's desire for improved relations with the student body and the ability to conduct lawful activities as a recognized student group upon the campus of the University of South Alabama, but, however, they cannot sacrifice the constitutionality recognized interests of the People of Alabama in order to obtain those goals. As more fully set forth hereinabove, those interests include the prevention of homosexual criminal misconduct, the promotion of legal marriage, and the fostering of the procreation of children.

This entire matter of lengthy and protracted litigation could be avoided if the members of the GLBA would make a simple, good-faith pledge to the

administration of the University of South Alabama: "We
shall refrain, when receiving public funds and meeting in
public facilities, from promoting violations of Alabama's
criminal sodomy and sexual misconduct laws, and we shall
refrain from encouraging individuals to engage in such
criminal acts and refrain from providing information or
materials that explain how such acts may be committed."
Such a pledge would in no wise require the members of the
GLBA to surrender one constitutional right (ostensibly
sodomy in the view of the ACLU) in order to assert another
(the right of free speech) because, as more fully set forth
hereinabove, sodomy and sexual misconduct are not
activities that fall within the protection of the First
Amendment.

    Displaying a customary ignorance of Alabama's
political affairs, the counsel for Plaintiffs have
attempted to distort the underlying facts to this
litigation in an effort to inflame the passions of this
Honorable Court. Again, the record is utterly devoid of
any evidence whatsoever that an atmosphere of "homophobia"
exists on the campus of the University of South Alabama, or
in the halls of the legislative and executive branches of
state government. Again, we respectfully submit that the
statute in question is simply a viewpoint neutral means for
ensuring that government funds and government facilities

are used only for the purposes for which they were granted, and it is not unreasonable for the State of Alabama to enact legislation to accomplish this constitutionally recognized public goal. We also submit that the statute in question clearly seeks to regulate conduct which is incidental to speech, and that it constitutes a reasonable regulation promulgated by the State of Alabama under its police powers for the protection of the public health, safety, morals, and the promotion of the public convenience.

Based on all of the foregoing, this Honorable Court should have no difficulty in holding as a matter of law that §16-1-28, Code of Alabama 1975, is a permissible legislative enactment under the police powers of the State and that it is not repugnant or violative of the Constitution of the United States.

Respectfully submitted this $24th$ day of May, 1994.

GEORGE E. JONES, III
DEPUTY ATTORNEY GENERAL
STATE OF ALABAMA
Attorney for Defendant
James H. Evans

-79-

_Angela C. Turner_

ANGELA C. TURNER
DEPUTY ATTORNEY GENERAL
STATE OF ALABAMA
Attorney for Defendant
James H. Evans

ADDRESS OF COUNSEL:

Office of the Attorney General
Civil Litigation Division
Alabama State House
11 South Union Street
Montgomery, Alabama   36130
(205) 242-7418
(205) 242-7458 (fax)

_J. Fairley McDonald_

J. FAIRLEY MCDONALD, III
Attorney for Defendants
Frederick P. Whiddon and
Dale T. Adams

_George W. Walker, III_

GEORGE W. WALKER, III
Attorney for Defendants
Frederick P. Whiddon and
Dale T. Adams

ADDRESS OF COUNSEL:

Copeland, Franco, Screws
  & Gill, P.A.
444 South Perry Street
P. O. Box 347
Montgomery, Alabama   36101
(205) 834-1180

and thus is a "homosexual," and since homosexual conduct is not a fundamental right and it may constitutionally be classified as criminal misconduct, why is the Plaintiff attempting to put its members "above the law" by trying to convince this Honorable Court that they should somehow be immune from the enforcement of an inchoate statute which is corollary to the criminal sodomy statutes?