

**LESBIAN AND GAY RIGHTS PROJECT**

Matthew Coles  
*Director*

Ruth E. Harlow  
*Associate Director*

Marc E. Elovitz  
*Staff Counsel*

H. Alexander Robinson  
*Legislative Representative*

Lisa G. Bordeau  
*Staff Assistant*

William B. Rubenstein  
*Of Counsel*

RE CE IVE D

95   JUL 14   PM 1: 36

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Please Respond To: **New York** 132 West 43rd Street  New York, N.Y. 10036  
1663 Mission Street  San Francisco, Ca. 94103

(212) 944-9800 Ext. 545   Fax (212) 869-9061  
(415) 621-2493   Fax (415) 255-8436

U.S. D.S. : .T COURT
MIDDLE DISTRICT ALA

FILED

July 11, 1995                                    JUL 14 1995

Clerk of the Court  
United States District Court  
Middle District of Alabama  
15 Lee Street  
Montgomery, Alabama  36104

Re: <u>Gay Lesbian Bisexual Alliance v. Evans [now Sessions] (No. 93-T-1178-N)</u>

Dear Sir or Madam:

This matter was fully submitted to Judge Myron H. Thompson for decision on June 17, 1994. As Judge Thompson has not yet ruled, the plaintiff wished to call to the Court's attention subsequent authority from the U.S. Supreme Court that supports plaintiff's position.

On June 29, 1995, the Supreme Court issued its opinion in <u>Rosenberger v. Rector and Visitors of the University of Virginia</u>, No. 94-329, 63 U.S.L.W. 4702, a case in which a student publication with a religious viewpoint at the University of Virginia challenged its lack of equal access to student activities funding. After reviewing past First Amendment precedent relevant to the question before it, <u>see</u> 63 U.S.L.W. at 475-07, including many of the cases discussed in the parties' briefs in this matter, the Court concluded:

> For the University, by regulation, to cast disapproval on particular viewpoints of it students risks the suppression of free speech and creative inquiry in one of the vital centers for the nation's intellectual life, its college and university campuses.
>
> The Guideline invoked by the University to deny third-party contractor payments on behalf of WAP effects a sweeping restriction on student thought and student inquiry in the context of University sponsored publications. The prohibition on funding on behalf of publications that "primarily promot[e] or manifes[t] a particular belie[f] in or about a deity or an ultimate reality," in its ordinary and commonsense meaning, has a vast potential reach. ...
>
> Based on the principles we have discussed, we hold that the

Nadine Strossen *President*     Ira Glasser *Executive Director*     Kenneth B. Clark *Chair, National Advisory Council*     James C. Calaway *Treasurer*

> regulation invoked to deny SAF support, both in its terms and in
> its application to these petitioners, is a denial of their right of free
> speech guaranteed by the First Amendment.

63 U.S.L.W. at 4707. Similarly, the denial of both public funding and public facilities on
Alabama university campuses to certain groups, based upon their viewpoint, that section 16-1-28
of the Alabama Education Code mandates should be struck down as a First Amendment violation,
on its face and as applied to plaintiff. See Plaintiff's Brief on the Merits at 45-67, 74-79. The
complete text of Rosenberger is enclosed.

A copy of this letter, with enclosure, has been served on all counsel for defendants. In
addition, courtesy copies of the letter and enclosure have been sent directly to Judge Thompson.

Thank you for your attention to this matter.

Sincerely,

Ruth E. Harlow
Co-counsel for Plaintiff Gay Lesbian
Bisexual Alliance

cc:     Hon. Myron H. Thompson
        Civil Litigation Division,
          Office of the Attorney General
        J. Fairley McDonald, III, Esq.

opinion, or perspective—which is presumed impermissible when directed against speech otherwise within the forum's limitations, see *id.*, at 46. The most recent and most apposite case in this area is *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. ___, ___, in which the Court held that permitting school property to be used for the presentation of all views on an issue except those dealing with it from a religious standpoint constitutes prohibited viewpoint discrimination. Here, as in that case, the State's actions are properly interpreted as unconstitutional viewpoint discrimination rather than permissible line-drawing based on content: By the very terms of the SAF prohibition, the University does not exclude religion as a subject matter, but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints.

(b) The University's attempt to escape the consequences of *Lamb's Chapel* by urging that this case involves the provision of funds rather than access to facilities is unavailing. Although it may regulate the content of expression when it is the speaker or when it enlists private entities to convey its own message, *Rust* v. *Sullivan*, 500 U. S. 173; *Widmar* v. *Vincent*, 454 U. S. 263, 276, the University may not discriminate based on the viewpoint of private persons whose speech it subsidizes, *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540, 548. Its argument that the scarcity of public money may justify otherwise impermissible viewpoint discrimination among private speakers is simply wrong.

(c) Vital First Amendment speech principles are at stake here. The Guideline at issue has a vast potential reach: The term "promotes" as used there would comprehend any writing advocating a philosophic position that rests upon a belief (or nonbelief) in a deity or ultimate reality, while the term "manifests" would bring within the prohibition any writing resting upon a premise presupposing the existence (or nonexistence) of a deity or ultimate reality. It is difficult to name renowned thinkers whose writings would be accepted, save perhaps for articles disclaiming all connection to their ultimate philosophy.

2. The violation following from the University's denial of SAF support to petitioners is not excused by the necessity of complying with the Establishment Clause. .

(a) The governmental program at issue is neutral toward religion. Such neutrality is a significant factor in upholding programs in the face of Establishment Clause attack, and the guarantee of neutrality is not offended where, as here, the government follows neutral criteria and even-handed policies to extend benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse, *Board of Ed. of Kiryas Joel* v. *Grumet*, 512 U. S. ___, ___. There is no suggestion that the University created its program to advance religion or aid a religious cause. The SAF's purpose is to open a forum for speech and to support various student enterprises, including the publication of newspapers, in recognition of the diversity and creativity of student life. The SAF Guidelines have a separate classification for, and do not make third-party payments on behalf of, "religious organizations," and WAP did not seek a subsidy because of its Christian editorial viewpoint; it sought funding under the Guidelines as a "student . . . communications . . . group()." Neutrality is also apparent in the fact that the University has taken pains to disassociate itself from the private speech involved in this case. The program's neutrality distinguishes the student fees here from a tax levied for the direct support of a church or group of churches, which would violate the Establishment Clause.

(b) This case is not controlled by the principle that special Establishment Clause dangers exist where the government makes direct money payments to sectarian institutions, see, *e.g.*, *Roemer* v. *Board of Public Works*, 426 U. S. 736, 747, since it is undisputed that no public funds flow directly into WAP's coffers under the program at issue. A public university does not violate the Establishment Clause when it grants access to its facilities on a religion-neutral basis to a wide spectrum of student groups, even if some of those groups would use the facilities for devotional exercises. See *e.g.*, *Widmar*, 474 U. S., at 269. This is so even where the upkeep, maintenance, and repair of those facilities is paid out of a student activities fund to which students are required to contribute. *Id.*, at 265. There is no difference in logic or principle, and certainly no difference of constitutional significance, between using such funds to operate a facility to which students have access, and paying a third-party contractor to operate the facility on its behalf. That is all that is involved here: The University provides printing services to a broad spectrum of student newspapers. Were the contrary view to become law, the University could only avoid a constitutional violation by scrutinizing the content of student speech, lest it contain too

great a religious message. Such censorship would be far more inconsistent with the Establishment Clause's dictates than would governmental provision of secular printing services on a religion-blind basis.

18 F. 3d 269, reversed.

KENNEDY, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. O'CON-NOR, J., and THOMAS, J., filed concurring opinions. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined.

JUSTICE KENNEDY delivered the opinion of the Court.

The University of Virginia, an instrumentality of the Commonwealth for which it is named and thus bound by the First and Fourteenth Amendments, authorizes the payment of outside contractors for the printing costs of a variety of student publications. It withheld any authorization for payments on behalf of petitioners for the sole reason that their student paper "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." That the paper did promote or manifest views within the defined exclusion seems plain enough. The challenge is to the University's regulation and its denial of authorization, the case raising issues under the Speech and Establishment Clauses of the First Amendment.

I

The public corporation we refer to as the "University" is denominated by state law as "the Rector and Visitors of the University of Virginia," Va. Code Ann. §23–69 (1993), and it is responsible for governing the school, see §§23–69 to 23–80. Founded by Thomas Jefferson in 1819, and ranked by him, together with the authorship of the Declaration of Independence and of the Virginia Act for Religious Freedom, Va. Code Ann. §57–1, as one of his proudest achievements, the University is among the Nation's oldest and most respected seats of higher learning. It has more than 11,000 undergraduate students, and 6,000 graduate and professional students. An understanding of the case requires a somewhat detailed description of the program the University created to support extracurricular student activities on its campus.

Before a student group is eligible to submit bills from its outside contractors for payment by the fund described below, it must become a "Contracted Independent Organization" (CIO). CIO status is available to any group the majority of whose members are students, whose managing officers are fulltime students, and that complies with certain procedural requirements. App. to Pet. for Cert. 2a. A CIO must file its constitution with the University; must pledge not to discriminate in its membership; and must include in dealings with third parties and in all written materials a disclaimer, stating that the CIO is independent of the University and that the University is not responsible for the CIO. App. 27–28. CIOs enjoy access to University facilities, including meeting rooms and computer terminals. *Id.*, at 30. A standard agreement signed between each CIO and the University provides that the benefits and opportunities afforded to CIOs "should not be misinterpreted as meaning that those organizations are part of or controlled by the University, that the University is responsible for the organizations' contracts or other acts or omissions, or that the University approves of the organizations' goals or activities." *Id.*, at 26.

All CIOs may exist and operate at the University, but

some are also entitled to apply for funds from the Student Activities Fund (SAF). Established and governed by University Guidelines, the purpose of the SAF is to support a broad range of extracurricular student activities that "are related to the educational purpose of the University." App. to Pet. for Cert. 61a. The SAF is based on the University's "recogni[tion] that the availability of a wide range of opportunities" for its students "tends to enhance the University environment." App. 26. The Guidelines require that it be administered "in a manner consistent with the educational purpose of the University as well as with state and federal law." App. to Pet. for Cert. 61a. The SAF receives its money from a mandatory fee of $14 per semester assessed to each full-time student. The Student Council, elected by the students, has the initial authority to disburse the funds, but its actions are subject to review by a faculty body chaired by a designee of the Vice President for Student Affairs. Cf. *id.*, at 63a–64a.

Some, but not all, CIOs may submit disbursement requests to the SAF. The Guidelines recognize 11 categories of student groups that may seek payment to third-party contractors because they "are related to the educational purpose of the University of Virginia." *Id.*, at 61a–62a. One of these is "student news, information, opinion, entertainment, or academic communications media groups." *Id.*, at 61a. The Guidelines also specify, however, that the costs of certain activities of CIOs that are otherwise eligible for funding will not be reimbursed by the SAF. The student activities which are excluded from SAF support are religious activities, philanthropic contributions and activities, political activities, activities that would jeopardize the University's tax exempt status, those which involve payment of honoraria or similar fees, or social entertainment or related expenses. *Id.*, at 62a–63a. The prohibition on "political activities" is defined so that it is limited to electioneering and lobbying. The Guidelines provide that "[t]hese restrictions on funding political activities are not intended to preclude funding of any otherwise eligible student organization which . . . espouses particular positions or ideological viewpoints, including those that may be unpopular or are not generally accepted." *Id.*, at 65a–66a. A "religious activity," by contrast, is defined as any activity that "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." *Id.*, at 66a.

The Guidelines prescribe these criteria for determining the amounts of third-party disbursements that will be allowed on behalf of each eligible student organization: the size of the group, its financial self-sufficiency, and the University-wide benefit of its activities. If an organization seeks SAF support, it must submit its bills to the Student Council, which pays the organization's creditors upon determining that the expenses are appropriate. No direct payments are made to the student groups. During the 1990–1991 academic year, 343 student groups qualified as CIOs. One hundred thirty-five of them applied for support from the SAF, and 118 received funding. Fifteen of the groups were funded as "student news, information, opinion, entertainment, or academic communications media groups."

Petitioners' organization, Wide Awake Productions (WAP), qualified as a CIO. Formed by petitioner Ronald Rosenberger and other undergraduates in 1990, WAP was established "[t]o publish a magazine of philosophical and religious expression," "[t]o facilitate discussion which fosters an atmosphere of sensitivity to and tolerance of

Christian viewpoints," and "[t]o provide a unifying focus for Christians of multicultural backgrounds." App. 67. WAP publishes Wide Awake: A Christian Perspective at the University of Virginia. The paper's Christian viewpoint was evident from the first issue, in which its editors wrote that the journal "offers a Christian perspective on both personal and community issues, especially those relevant to college students at the University of Virginia." App. 45. The editors committed the paper to a two-fold mission: "to challenge Christians to live, in word and deed, according to the faith they proclaim and to encourage students to consider what a personal relationship with Jesus Christ means." *Ibid.* The first issue had articles about racism, crisis pregnancy, stress, prayer, C. S. Lewis' ideas about evil and free will, and reviews of religious music. In the next two issues, Wide Awake featured stories about homosexuality, Christian missionary work, and eating disorders, as well as music reviews and interviews with University professors. Each page of Wide Awake, and the end of each article or review, is marked by a cross. The advertisements carried in Wide Awake also reveal the Christian perspective of the journal. For the most part, the advertisers are churches, centers for Christian study, or Christian bookstores. By June 1992, WAP had distributed about 5,000 copies of Wide Awake to University students, free of charge.

WAP had acquired CIO status soon after it was organized. This is an important consideration in this case, for had it been a "religious organization," WAP would not have been accorded CIO status. As defined by the Guidelines, a "religious organization" is "an organization whose purpose is to practice a devotion to an acknowledged ultimate reality or deity." App. to Pet. for Cert. 66a. At no stage in this controversy has the University contended that WAP is such an organization.

A few months after being given CIO status, WAP requested the SAF to pay its printer $5,862 for the costs of printing its newspaper. The Appropriations Committee of the Student Council denied WAP's request on the ground that Wide Awake was a "religious activity" within the meaning of the Guidelines, *i.e.*, that the newspaper "promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." *Ibid.* It made its determination after examining the first issue. App. 54. WAP appealed the denial to the full Student Council, contending that WAP met all the applicable Guidelines and that denial of SAF support on the basis of the magazine's religious perspective violated the Constitution. The appeal was denied without further comment, and WAP appealed to the next level, the Student Activities Committee. In a letter signed by the Dean of Students, the committee sustained the denial of funding. App. 55.

Having no further recourse within the University structure, WAP, Wide Awake, and three of its editors and members filed suit in the United States District Court for the Western District of Virginia, challenging the SAF's action as violative of Rev. Stat. §1979, 42 U. S. C. §1983. They alleged that refusal to authorize payment of the printing costs of the publication, solely on the basis of its religious editorial viewpoint, violated their rights to freedom of speech and press, to the free exercise of religion, and to equal protection of the law. They relied also upon Article I of the Virginia Constitution and the Virginia Act for Religious Freedom, Va. Code Ann. §§57–1, 57–2 (1986 and Supp. 1994), but did not pursue those theories on appeal. The suit sought



damages for the costs of printing the paper, injunctive and declaratory relief, and attorney's fees.

On cross-motions for summary judgment, the District Court ruled for the University, holding that denial of SAF support was not an impermissible content or viewpoint discrimination against petitioners' speech, and that the University's Establishment Clause concern over its "religious activities" was a sufficient justification for denying payment to third-party contractors. The court did not issue a definitive ruling on whether reimbursement, had it been made here, would or would not have violated the Establishment Clause. 795 F. Supp. 175, 181–182 (WD Va. 1992).

The United States Court of Appeals for the Fourth Circuit, in disagreement with the District Court, held that the Guidelines did discriminate on the basis of content. It ruled that, while the State need not underwrite speech, there was a presumptive violation of the Speech Clause when viewpoint discrimination was invoked to deny third-party payment otherwise available to CIOs. 18 F. 3d 269, 279–281 (1994). The Court of Appeals affirmed the judgment of the District Court nonetheless, concluding that the discrimination by the University was justified by the "compelling interest in maintaining strict separation of church and state." *Id.*, at 281.

II

It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972). Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984). Discrimination against speech because of its message is presumed to be unconstitutional. See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. __, __ (1994) (slip op., at 16–19). These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression. *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 115 (1991). When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 391 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction. See *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 46 (1983).

These principles provide the framework forbidding the State from exercising viewpoint discrimination, even when the limited public forum is one of its own creation. In a case involving a school district's provision of school facilities for private uses, we declared that "[t]here is no question that the District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. __, __ (slip op., at 5–7) (1993). The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics. See, *e.g.*, *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 806 (1985); *Perry Ed. Assn.*, *supra*, at 49. Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not "reasonable in light of the purpose served by the forum," *Cornelius, supra*, at 804–806; see also *Perry Ed. Assn.*, *supra*, at 46, 49, nor may it discriminate against speech on the basis of its viewpoint, *Lamb's Chapel, supra*, at __ (slip op., at 6–7); see also *Perry Ed. Assn.*, *supra*, at 46; *R. A. V., supra*, at 386–388, 391–393; cf. *Texas* v. *Johnson*, 491 U. S. 397, 414–415 (1989). Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations. See *Perry Ed. Assn.*, *supra*, at 46.

The SAF is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable. See, *e.g.*, *Perry Ed. Assn.*, *supra*, at 46–47 (forum analysis of a school mail system); *Cornelius, supra*, at 801 (forum analysis of charitable contribution program). The most recent and most apposite case is our decision in *Lamb's Chapel, supra*. There, a school district had opened school facilities for use after school hours by community groups for a wide variety of social, civic, and recreational purposes. The district, however, had enacted a formal policy against opening facilities to groups for religious purposes. Invoking its policy, the district rejected a request from a group desiring to show a film series addressing various child-rearing questions from a "Christian perspective." There was no indication in the record in *Lamb's Chapel* that the request to use the school facilities was "denied for any reason other than the fact that the presentation would have been from a religious perspective." 508 U. S., at __ (slip op., at 8–9). Our conclusion was unanimous: "[I]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child-rearing except those dealing with the subject matter from a religious standpoint." *Ibid.*

The University does acknowledge (as it must in light of our precedents) that "ideologically driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts," but insists that this case does not present that issue because the Guidelines draw lines based on content, not viewpoint. Brief for Respondents 17, n. 10. As we have noted, discrimination against one set of views or ideas is but a subset or particular instance of the more general phenomenon of content discrimination. See, *e.g.*, *R. A. V., supra*, at 391. And, it must be acknowledged, the distinction is not a precise one. It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought. The nature of our origins and destiny and their dependence upon the existence of a divine being have been subjects of philosophic inquiry throughout human history. We conclude, nonetheless, that here, as in *Lamb's Chapel*, viewpoint discrimination is the proper way to interpret the University's objections to Wide Awake. By the very terms of the SAF prohibition, the University does not exclude

religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered. The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed were otherwise within the approved category of publications.

The dissent's assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint. The dissent's declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways.

The University's denial of WAP's request for thirdparty payments in the present case is based upon viewpoint discrimination not unlike the discrimination the school district relied upon in *Lamb's Chapel* and that we found invalid. The church group in *Lamb's Chapel* would have been qualified as a social or civic organization, save for its religious purposes. Furthermore, just as the school district in *Lamb's Chapel* pointed to nothing but the religious views of the group as the rationale for excluding its message, so in this case the University justifies its denial of SAF participation to WAP on the ground that the contents of Wide Awake reveal an avowed religious perspective. See *supra*, at 5. It bears only passing mention that the dissent's attempt to distinguish *Lamb's Chapel* is entirely without support in the law. Relying on the transcript of oral argument, the dissent seems to argue that we found viewpoint discrimination in that case because the government excluded Christian, but not atheistic, viewpoints from being expressed in the forum there. *Post*, at 37–38, and n. 13. The Court relied on no such distinction in holding that discriminating against religious speech was discriminating on the basis of viewpoint. There is no indication in the opinion of the Court (which, unlike an advocate's statements at oral argument, is the law) that exclusion or inclusion of other religious or antireligious voices from that forum had any bearing on its decision.

The University tries to escape the consequences of our holding in *Lamb's Chapel* by urging that this case involves the provision of funds rather than access to facilities. The University begins with the unremarkable proposition that the State must have substantial discretion in determining how to allocate scarce resources to accomplish its educational mission. Citing our decisions in *Rust* v. *Sullivan*, 500 U. S. 173 (1991), *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540 (1983), and *Widmar* v. *Vincent*, 454 U. S. 263 (1981), the University argues that content-based funding decisions are both inevitable and lawful. Were the reasoning of *Lamb's Chapel* to apply to funding decisions as

well as to those involving access to facilities, it is urged, its holding "would become a judicial juggernaut, constitutionalizing the ubiquitous content-based decisions that schools, colleges, and other government entities routinely make in the allocation of public funds." Brief for Respondents 16.

To this end the University relies on our assurance in *Widmar* v. *Vincent, supra*. There, in the course of striking down a public university's exclusion of religious groups from use of school facilities made available to all other student groups, we stated: "Nor do we question the right of the University to make academic judgments as to how best to allocate scarce resources." 454 U. S., at 276. The quoted language in *Widmar* was but a proper recognition of the principle that when the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. In the same vein, in *Rust* v. *Sullivan, supra*, we upheld the government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling. There, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. 500 U. S., at 194. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee. See *id.*, at 196–200.

It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers. A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles. See, *e.g.*, *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 250 (1990); *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 270–272 (1988). For that reason, the University's reliance on *Regan* v. *Taxation with Representation of Wash.*, *supra*, is inapposite as well. *Regan* involved a challenge to Congress' choice to grant tax deductions for contributions made to veterans' groups engaged in lobbying, while denying that favorable status to other charities which pursued lobbying efforts. Although acknowledging that the Government is not required to subsidize the exercise of fundamental rights, see 461 U. S., at 545–546, we reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas,'" see *id.*, at 548 (quoting *Cammarano v. United States*, 358 U. S. 498, 513 (1959), in turn quoting *Speiser v. Randall*, 357 U. S. 513, 519 (1958). *Regan* relied on a distinction based on preferential treatment of certain speakers—veterans organizations—and not a distinction based on the content or

messages of those groups' speech. 461 U. S., at 548; cf. *Perry Ed. Assn.*, 460 U. S., at 49. The University's regulation now before us, however, has a speech-based restriction as its sole rationale and operative principle.

The distinction between the University's own favored message and the private speech of students is evident in the case before us. The University itself has taken steps to ensure the distinction in the agreement each CIO must sign. See *supra*, at 2. The University declares that the student groups eligible for SAF support are not the University's agents, are not subject to its control, and are not its responsibility. Having offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the University may not silence the expression of selected viewpoints.

The University urges that, from a constitutional standpoint, funding of speech differs from provision of access to facilities because money is scarce and physical facilities are not. Beyond the fact that in any given case this proposition might not be true as an empirical matter, the underlying premise that the University could discriminate based on viewpoint if demand for space exceeded its availability is wrong as well. The government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity. Had the meeting rooms in *Lamb's Chapel* been scarce, had the demand been greater than the supply, our decision would have been no different. It would have been incumbent on the State, of course, to ration or allocate the scarce resources on some acceptable neutral principle; but nothing in our decision indicated that scarcity would give the State the right to exercise viewpoint discrimination that is otherwise impermissible.

Vital First Amendment speech principles are at stake here. The first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and if so for the State to classify them. The second, and corollary, danger is to speech from the chilling of individual thought and expression. That danger is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition. See *Healy* v. *James*, 408 U. S. 169, 180–181 (1972); *Keyishian* v. *Board of Regents, State Univ. of N. Y.*, 385 U. S. 589, 603 (1967); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 250 (1957). In ancient Athens, and, as Europe entered into a new period of intellectual awakening, in places like Bologna, Oxford, and Paris, universities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn. See generally R. Palmer & J. Colton, A History of the Modern World 39 (7th ed. 1992). The quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment. For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the nation's intellectual life, its college and university campuses.

The Guideline invoked by the University to deny third-party contractor payments on behalf of WAP effects a sweeping restriction on student thought and student inquiry in the context of University sponsored publications. The prohibition on funding on behalf of publications that "primarily promot[e] or manifes[t] a

particular belie[f] in or about a deity or an ultimate reality," in its ordinary and commonsense meaning, has a vast potential reach. The term "promotes" as used here would comprehend any writing advocating a philosophic position that rests upon a belief in a deity or ultimate reality. See Webster's Third New International Dictionary 1815 (1961) (defining "promote" as "to contribute to the growth, enlargement, or prosperity of: further, encourage"). And the term "manifests" would bring within the scope of the prohibition any writing that is explicable as resting upon a premise which presupposes the existence of a deity or ultimate reality. See *id.*, at 1375 (defining "manifest" as "to show plainly: make palpably evident or certain by showing or displaying"). Were the prohibition applied with much vigor at all, it would bar funding of essays by hypothetical student contributors named Plato, Spinoza, and Descartes. And if the regulation covers, as the University says it does, see Tr. of Oral Arg. 18–19, those student journalistic efforts which primarily manifest or promote a belief that there is no deity and no ultimate reality, then undergraduates named Karl Marx, Bertrand Russell, and Jean-Paul Sartre would likewise have some of their major essays excluded from student publications. If any manifestation of beliefs in first principles disqualifies the writing, as seems to be the case, it is indeed difficult to name renowned thinkers whose writings would be accepted, save perhaps for articles disclaiming all connection to their ultimate philosophy. Plato could contrive perhaps to submit an acceptable essay on making pasta or peanut butter cookies, provided he did not point out their (necessary) imperfections.

Based on the principles we have discussed, we hold that the regulation invoked to deny SAF support, both in its terms and in its application to these petitioners, is a denial of their right of free speech guaranteed by the First Amendment. It remains to be considered whether the violation following from the University's action is excused by the necessity of complying with the Constitution's prohibition against state establishment of religion. We turn to that question.

III

Before its brief on the merits in this Court, the University had argued at all stages of the litigation that inclusion of WAP's contractors in SAF funding authorization would violate the Establishment Clause. Indeed, that is the ground on which the University prevailed in the Court of Appeals. We granted certiorari on this question: "Whether the Establishment Clause compels a state university to exclude an otherwise eligible student publication from participation in the student activities fund, solely on the basis of its religious viewpoint, where such exclusion would violate the Speech and Press Clauses if the viewpoint of the publication were nonreligious." Pet. for Cert. i. The University now seems to have abandoned this position, contending that "[t]he fundamental objection to petitioners' argument is not that it implicates the Establishment Clause but that it would defeat the ability of public education at all levels to control the use of public funds." Brief for Respondents 29; see *id.*, at 27–29, and n. 17; Tr. of Oral Arg. 14. That the University itself no longer presses the Establishment Clause claim is some indication that it lacks force; but as the Court of Appeals rested its judgment on the point and our dissenting colleagues would find it determinative, it must be addressed.

The Court of Appeals ruled that withholding SAF

support from Wide Awake contravened the Speech Clause of the First Amendment, but proceeded to hold that the University's action was justified by the necessity of avoiding a violation of the Establishment Clause, an interest it found compelling. 18 F. 3d, at 281. Recognizing that this Court has regularly "sanctioned awards of direct nonmonetary benefits to religious groups where the government has created open fora to which all similarly situated organizations are invited," 18 F. 3d, at 286 (citing *Widmar*, 454 U. S., at 277), the Fourth Circuit asserted that direct monetary subsidization of religious organizations and projects is "a beast of an entirely different color," 18 F. 3d, at 286. The court declared that the Establishment Clause would not permit the use of public funds to support "'a specifically religious activity in an otherwise substantially secular setting.'" *Id.*, at 285 (quoting *Hunt v. McNair*, 413 U. S. 734, 743 (1973) (emphasis deleted)). It reasoned that because Wide Awake is "a journal pervasively devoted to the discussion and advancement of an avowedly Christian theological and personal philosophy," the University's provision of SAF funds for its publication would "send an unmistakably clear signal that the University of Virginia supports Christian values and wishes to promote the wide promulgation of such values." 18 F. 3d, at 286.

If there is to be assurance that the Establishment Clause retains its force in guarding against those governmental actions it was intended to prohibit, we must in each case inquire first into the purpose and object of the governmental action in question and then into the practical details of the program's operation. Before turning to these matters, however, we can set forth certain general principles that must bear upon our determination.

A central lesson of our decisions is that a significant factor in upholding governmental programs in the face of Establishment Clause attack is their neutrality towards religion. We have decided a series of cases addressing the receipt of government benefits where religion or religious views are implicated in some degree. The first case in our modern Establishment Clause jurisprudence was *Everson v. Board of Ed. of Ewing*, 330 U. S. 1 (1947). There we cautioned that in enforcing the prohibition against laws respecting establishment of religion, we must "be sure that we do not inadvertently prohibit [the government] from extending its general state law benefits to all its citizens without regard to their religious belief." *Id.*, at 16. We have held that the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse. See *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet*, 512 U. S. __, __ (1994) (slip op., at 16) (SOUTER, J.) ("[T]he principle is well grounded in our case law [and] we have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges"); *Witters v. Washington Dept. of Services for Blind*, 474 U. S. 481, 487–488 (1986); *Mueller v. Allen*, 463 U. S. 388, 398–399 (1983); *Widmar*, 454 U. S., at 274–275. More than once have we rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in

design. See *Lamb's Chapel*, 508 U. S., at __; *Mergens*, 496 U. S., at 248, 252; *Widmar, supra*, at 274–275.

The governmental program here is neutral toward religion. There is no suggestion that the University created it to advance religion or adopted some ingenious device with the purpose of aiding a religious cause. The object of the SAF is to open a forum for speech and to support various student enterprises, including the publication of newspapers, in recognition of the diversity and creativity of student life. The University's SAF Guidelines have a separate classification for, and do not make third-party payments on behalf of, "religious organizations," which are those "whose purpose is to practice a devotion to an acknowledged ultimate reality or deity." Pet. for Cert. 66a. The category of support here is for "student news, information, opinion, entertainment, or academic communications media groups," of which Wide Awake was 1 of 15 in the 1990 school year. WAP did not seek a subsidy because of its Christian editorial viewpoint; it sought funding as a student journal, which it was.

The neutrality of the program distinguishes the student fees from a tax levied for the direct support of a church or group of churches. A tax of that sort, of course, would run contrary to Establishment Clause concerns dating from the earliest days of the Republic. The apprehensions of our predecessors involved the levying of taxes upon the public for the sole and exclusive purpose of establishing and supporting specific sects. The exaction here, by contrast, is a student activity fee designed to reflect the reality that student life in its many dimensions includes the necessity of wide-ranging speech and inquiry and that student expression is an integral part of the University's educational mission. The fee is mandatory, and we do not have before us the question whether an objecting student has the First Amendment right to demand a pro rata return to the extent the fee is expended for speech to which he or she does not subscribe. See *Keller v. State Bar of California*, 496 U. S. 1, 15–16 (1990); *Abood v. Detroit Board of Ed.*, 431 U. S. 209, 235–236 (1977). We must treat it, then, as an exaction upon the students. But the $14 paid each semester by the students is not a general tax designed to raise revenue for the University. See *United States v. Butler*, 297 U. S. 1, 61 (1936) ("A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the support of the Government"); see also *Head Money Cases*, 112 U. S. 580, 595–596 (1884). The SAF cannot be used for unlimited purposes, much less the illegitimate purpose of supporting one religion. Much like the arrangement in *Widmar*, the money goes to a special fund from which any group of students with CIO status can draw for purposes consistent with the University's educational mission; and to the extent the student is interested in speech, withdrawal is permitted to cover the whole spectrum of speech, whether it manifests a religious view, an antireligious view, or neither. Our decision, then, cannot be read as addressing an expenditure from a general tax fund. Here, the disbursements from the fund go to private contractors for the cost of printing that which is protected under the Speech Clause of the First Amendment. This is a far cry from a general public assessment designed and effected to provide financial support for a church.

Government neutrality is apparent in the State's overall scheme in a further meaningful respect. The pro-

gram respects the critical difference "between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Mergens, supra,* at 250 (opinion of O'CONNOR, J.). In this case, "the government has not willfully fostered or encouraged" any mistaken impression that the student newspapers speak for the University. *Capitol Square Review and Advisory Bd.* v. *Pinette, ante,* at __ (slip op., at 10). The University has taken pains to disassociate itself from the private speech involved in this case. The Court of Appeals' apparent concern that Wide Awake's religious orientation would be attributed to the University is not a plausible fear, and there is no real likelihood that the speech in question is being either endorsed or coerced by the State, see *Lee* v. *Weisman,* 505 U. S. 577, ___ (1992); *Witters, supra,* at 489 (citing *Lynch* v. *Donnelly,* 465 U. S. 668, 688 (1984) (O'CONNOR, J., concurring)); see also *Witters, supra,* at 493 (O'CONNOR, J., concurring in part and concurring in judgment) (citing *Lynch, supra,* at 690 (O'CONNOR, J., concurring)).

The Court of Appeals (and the dissent) are correct to extract from our decisions the principle that we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions, citing *Roemer* v. *Board of Pub. Works of Md.,* 426 U. S. 736, 747 (1976); *Bowen* v. *Kendrick,* 487 U. S. 589, 614–615 (1988); *Hunt* v. *McNair,* 413 U. S., at 742; *Tilton,* 403 U. S., at 679–680; *Board of Ed. of Central School Dist. No. 1* v. *Allen,* 392 U. S. 236 (1968). The error is not in identifying the principle but in believing that it controls this case. Even assuming that WAP is no different from a church and that its speech is the same as the religious exercises conducted in *Widmar* (two points much in doubt), the Court of Appeals decided a case that was. in essence, not before it, and the dissent would have us do the same. We do not confront a case where, even under a neutral program that includes nonsectarian recipients. the government is making direct money payments to an institution or group that is engaged in religious activity. Neither the Court of Appeals nor the dissent, we believe, takes sufficient cognizance of the undisputed fact that no public funds flow directly to WAP's coffers.

It does not violate the Establishment Clause for a public university to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, including groups which use meeting rooms for sectarian activities, accompanied by some devotional exercises. See *Widmar,* 454 U. S., at 269; *Mergens,* 496 U. S., at 252. This is so even where the upkeep, maintenance, and repair of the facilities attributed to those uses is paid from a student activities fund to which students are required to contribute. *Widmar, supra,* at 265. The government usually acts by spending money. Even the provision of a meeting room, as in *Mergens* and *Widmar,* involved governmental expenditure, if only in the form of electricity and heating or cooling costs. The error made by the Court of Appeals, as well as by the dissent, lies in focusing on the money that is undoubtedly expended by the government, rather than on the nature of the benefit received by the recipient. If the expenditure of governmental funds is prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes, then *Widmar, Mergens,*

and *Lamb's Chapel* would have to be overruled. Given our holdings in these cases, it follows that a public university may maintain its own computer facility and give student groups access to that facility, including the use of the printers, on a religion neutral, say first-come-first-served, basis. If a religious student organization obtained access on that religion-neutral basis and used a computer to compose or a printer or copy machine to print speech with a religious content or viewpoint, the State's action in providing the group with access would no more violate the Establishment Clause than would giving those groups access to an assembly hall. See *Lamb's Chapel* v. *Center Moriches School Dist.,* 508 U. S. __ (1993); *Widmar, supra; Mergens, supra.* There is no difference in logic or principle, and no difference of constitutional significance, between a school using its funds to operate a facility to which students have access, and a school paying a third-party contractor to operate the facility on its behalf. The latter occurs here. The University provides printing services to a broad spectrum of student newspapers qualified as CIOs by reason of their officers and membership. Any benefit to religion is incidental to the government's provision of secular services for secular purposes on a religion-neutral basis. Printing is a routine, secular, and recurring attribute of student life.

By paying outside printers, the University in fact attains a further degree of separation from the student publication, for it avoids the duties of supervision, escapes the costs of upkeep, repair, and replacement attributable to student use, and has a clear record of costs. As a result, and as in *Widmar,* the University can charge the SAF, and not the taxpayers as a whole, for the discrete activity in question. It would be formalistic for us to say that the University must forfeit these advantages and provide the services itself in order to comply with the Establishment Clause. It is, of course, true that if the State pays a church's bills it is subsidizing it, and we must guard against this abuse. That is not a danger here, based on the considerations we have advanced and for the additional reason that the student publication is not a religious institution, at least in the usual sense of that term as used in our case law, and it is not a religious organization as used in the University's own regulations. It is instead a publication involved in a pure forum for the expression of ideas, ideas that would be both incomplete and chilled were the Constitution to be interpreted to require that state officials and courts scan the publication to ferret out views that principally manifest a belief in a divine being.

Were the dissent's view to become law, it would require the University, in order to avoid a constitutional violation, to scrutinize the content of student speech, lest the expression in question—speech otherwise protected by the Constitution—contain too great a religious content. The dissent, in fact, anticipates such censorship as "crucial" in distinguishing between "works characterized by the evangelism of Wide Awake and writing that merely happens to express views that a given religion might approve." *Post,* at 36. That eventuality raises the specter of governmental censorship, to ensure that all student writings and publications meet some baseline standard of secular orthodoxy. To impose that standard on student speech at a university is to imperil the very sources of free speech and expression. As we recognized in *Widmar,* official censorship would be far more incon-

sistent with the Establishment Clause's dictates than would governmental provision of secular printing services on a religion-blind basis.

"[T]he dissent fails to establish that the distinction [between 'religious' speech and speech 'about' religion] has intelligible content. There is no indication when 'singing hymns, reading scripture, and teaching biblical principles' cease to be 'singing, teaching, and reading'—all apparently forms of 'speech,' despite their religious subject matter—and become unprotected 'worship.' . . .

"[E]ven if the distinction drew an arguably principled line, it is highly doubtful that it would lie within the judicial competence to administer. Merely to draw the distinction would require the university—and ultimately the courts—to inquire into the significance of words and practices to different religious faiths, and in varying circumstances by the same faith. Such inquiries would tend inevitably to entangle the State with religion in a manner forbidden by our cases. *E.g.*, *Walz* [v. *Tax Comm'n of New York City*, 397 U. S. 664 (1970)]." 454 U. S., at 269-270, n. 6 (citations omitted).

\* \* \*

To obey the Establishment Clause, it was not necessary for the University to deny eligibility to student publications because of their viewpoint. The neutrality commanded of the State by the separate Clauses of the First Amendment was compromised by the University's course of action. The viewpoint discrimination inherent in the University's regulation required public officials to scan and interpret student publications to discern their underlying philosophic assumptions respecting religious theory and belief. That course of action was a denial of the right of free speech and would risk fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires. There is no Establishment Clause violation in the University's honoring its duties under the Free Speech Clause.

The judgment of the Court of Appeals must be, and is, reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

"We have time and again held that the government generally may not treat people differently based on the God or gods they worship, or don't worship." *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet*, 512 U. S. ___, ___ (1994) (slip op., at 4) (O'CONNOR, J., concurring in part and concurring in judgment). This insistence on government neutrality toward religion explains why we have held that schools may not discriminate against religious groups by denying them equal access to facilities that the schools make available to all. See *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U. S. ___ (1993); *Widmar v. Vincent*, 454 U. S. 263 (1981). Withholding access would leave an impermissible perception that religious activities are disfavored: "the message is one of neutrality rather than endorsement; if a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion." *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*, 496 U. S. 226, 248 (1990) (plural-

ity opinion). "The Religion Clauses prohibit the government from favoring religion, but they provide no warrant for discriminating *against* religion." *Kiryas Joel, supra*, at ___ (slip op., at 7) (O'CONNOR, J.). Neutrality, in both form and effect, is one hallmark of the Establishment Clause.

As JUSTICE SOUTER demonstrates, however, *post*, at 6-10, there exists another axiom in the history and precedent of the Establishment Clause. "Public funds may not be used to endorse the religious message." *Bowen v. Kendrick*, 487 U. S. 589, 642 (1988) (Blackmun, J., dissenting); see also *id.*, at 622 (O'CONNOR, J., concurring). Our cases have permitted some government funding of secular functions performed by sectarian organizations. See, *e. g.*, *id.*, at 617 (funding for sex education); *Roemer v. Board of Pub. Works of Md.*, 426 U. S. 736, 741 (1976) (cash grant to colleges not to be used for "sectarian purposes"); *Bradfield v. Roberts*, 175 U. S. 291, 299-300 (1899) (funding of health care for indigent patients). These decisions, however, provide no precedent for the use of public funds to finance religious activities.

This case lies at the intersection of the principle of government neutrality and the prohibition on state funding of religious activities. It is clear that the University has established a generally applicable program to encourage the free exchange of ideas by its students, an expressive marketplace that includes some 15 student publications with predictably divergent viewpoints. It is equally clear that petitioners' viewpoint is religious and that publication of Wide Awake is a religious activity, under both the University's regulation and a fair reading of our precedents. Not to finance Wide Awake, according to petitioners, violates the principle of neutrality by sending a message of hostility toward religion. To finance Wide Awake, argues the University, violates the prohibition on direct state funding of religious activities.

When two bedrock principles so conflict, understandably neither can provide the definitive answer. Reliance on categorical platitudes is unavailing. Resolution instead depends on the hard task of judging—sifting through the details and determining whether the challenged program offends the Establishment Clause. Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case. See *Lee v. Weisman*, 505 U. S. 577, 598 (1992) ("Our jurisprudence in this area is of necessity one of line-drawing"). As Justice Holmes observed in a different context: "Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law. Day and night, youth and age are only types." *Irwin v. Gavit*, 268 U. S. 161, 168 (1925) (citation omitted).

In *Witters v. Washington Dept. of Services for Blind*, 474 U. S. 481 (1986), for example, we unanimously held that the State may, through a generally applicable financial aid program, pay a blind student's tuition at a sectarian theological institution. The Court so held, however, only after emphasizing that "vocational assistance provided under the Washington program is paid directly to the student, who transmits it to the educational institution of his or her choice." *Id.*, at 487. The benefit to religion under the program, therefore, is akin to a public servant contributing her government paycheck to the church. *Ibid.* We thus resolved the conflict between the neutrality principle and the funding

prohibition, not by permitting one to trump the other, but by relying on the elements of choice peculiar to the facts of that case: "The aid to religion at issue here is the result of petitioner's private choice. No reasonable observer is likely to draw from the facts before us an inference that the State itself is endorsing a religious practice or belief." *Id.*, at 493 (O'CONNOR, J., concurring in part and concurring in judgment). See also *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1, ___ (1993) (slip op., at 7–8).

The need for careful judgment and fine distinctions presents itself even in extreme cases. *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947), provided perhaps the strongest exposition of the no-funding principle: "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Id.*, at 16. Yet the Court approved the use of public funds, in a general program, to reimburse parents for their children's bus fares to attend Catholic schools. *Id.*, at 17–18. Although some would cynically dismiss the Court's disposition as inconsistent with its protestations, see *id.*, at 19 (Jackson, J., dissenting) ("the most fitting precedent is that of Julia who, according to Byron's reports, 'whispering "I will ne'er consent,"—consented'"), the decision reflected the need to rely on careful judgment—not simple categories—when two principles, of equal historical and jurisprudential pedigree, come into unavoidable conflict.

So it is in this case. The nature of the dispute does not admit of categorical answers, nor should any be inferred from the Court's decision today, see *ante*, at 18. Instead, certain considerations specific to the program at issue lead me to conclude that by providing the same assistance to Wide Awake that it does to other publications, the University would not be endorsing the magazine's religious perspective.

First, the student organizations, at the University's insistence, remain strictly independent of the University. The University's agreement with the Contracted Independent Organizations (CIO)—*i. e.*, student groups—provides:

"The University is a Virginia public corporation and the CIO is not part of that corporation, but rather exists and operates independently of the University. . . . The parties understand and agree that this Agreement is the only source of any control the University may have over the CIO or its activities . . . ." App. 27.

And the agreement requires that student organizations include in every letter, contract, publication, or other written materials the following disclaimer:

"Although this organization has members who are University of Virginia students (faculty) (employees), the organization is independent of the corporation which is the University and which is not responsible for the organization's contracts, acts or omissions." *Id.*, at 28.

Any reader of Wide Awake would be on notice of the publication's independence from the University. Cf. *Widmar* v. *Vincent*, 454 U. S., at 274, n. 14.

Second, financial assistance is distributed in a manner that ensures its use only for permissible purposes. A student organization seeking assistance must submit disbursement requests; if approved, the funds are paid directly to the third-party vendor and do not pass through the organization's coffers. This safeguard accompanying the University's financial assistance, when provided to a publication with a religious viewpoint such as Wide Awake, ensures that the funds are used only to further the University's purpose in maintaining a free and robust marketplace of ideas, from whatever perspective. This feature also makes this case analogous to a school providing equal access to a generally available printing press (or other physical facilities), *ante*, at 23, and unlike a block grant to religious organizations.

Third, assistance is provided to the religious publication in a context that makes improbable any perception of government endorsement of the religious message. Wide Awake does not exist in a vacuum. It competes with 15 other magazines and newspapers for advertising and readership. The widely divergent viewpoints of these many purveyors of opinion, all supported on an equal basis by the University, significantly diminishes the danger that the message of any one publication is perceived as endorsed by the University. Besides the general news publications, for example, the University has provided support to The Yellow Journal, a humor magazine that has targeted Christianity as a subject of satire, and Al-Salam, a publication to "promote a better understanding of Islam to the University Community," App. 92. Given this wide array of non-religious, antireligious and competing religious viewpoints in the forum supported by the University, any perception that the University endorses one particular viewpoint would be illogical. This is not the harder case where religious speech threatens to dominate the forum. Cf. *Capitol Square Review and Advisory Bd.* v. *Pinette*, *ante*, at ___ (O'CONNOR, J., concurring in part and concurring in judgment); *Mergens*, 496 U. S., at 275.

Finally, although the question is not presented here, I note the possibility that the student fee is susceptible to a Free Speech Clause challenge by an objecting student that she should not be compelled to pay for speech with which she disagrees. See, *e. g.*, *Keller* v. *State Bar of California*, 496 U. S. 1, 15 (1990); *Abood* v. *Detroit Board of Education*, 431 U. S. 209, 236 (1977). There currently exists a split in the lower courts as to whether such a challenge would be successful. Compare *Hays County Guardian* v. *Supple*, 969 F. 2d 111, 123 (CA5 1992), cert. denied 506 U. S. ___ (1993); *Kania* v. *Fordham*, 702 F. 2d 475, 480 (CA4 1983); *Good* v. *Associated Students of Univ. of Wash.*, 86 Wash. 2d 94, 105–106, 542 P. 2d 762, 769 (1975) (en banc), with *Smith* v. *Regents of Univ. of Cal.*, 4 Cal. 4th 843, 863–864, 844 P. 2d 500, 513–514, cert. denied, 510 U. S. ___ (1993). While the Court does not resolve the question here, see *ante*, at 20, the existence of such an opt-out possibility not available to citizens generally, see *Abood*, *supra*, at 259, n. 13 (Powell, J., concurring in judgment), provides a potential basis for distinguishing proceeds of the student fees in this case from proceeds of the general assessments in support of religion that lie at the core of the prohibition against religious funding, see *ante*, at 19–20; *post*, at 1–3 (THOMAS, J., concurring); *post*, at 6–10 (SOUTER, J., dissenting), and from government funds generally. Unlike monies dispensed from state or federal treasuries, the Student Activities Fund is collected from students who themselves administer the fund and select qualifying recipients only from among those who originally paid the fee. The government neither pays into nor draws from this common pool, and

a fee of this sort appears cot̲ ̲ ̲tive to granting individual students proportional refunds. The Student Activities Fund, then, represents not government resources, whether derived from tax revenue, sales of assets, or otherwise, but a fund that simply belongs to the students.

The Court's decision today therefore neither trumpets the supremacy of the neutrality principle nor signals the demise of the funding prohibition in Establishment Clause jurisprudence. As I observed last Term, "[e]xperience proves that the Establishment Clause, like the Free Speech Clause, cannot easily be reduced to a single test." *Kiryas Joel*, 512 U. S., at ___ (slip op., at 10) (O'CONNOR, J., concurring in part and concurring in judgment). When bedrock principles collide, they test the limits of categorical obstinacy and expose the flaws and dangers of a Grand Unified Theory that may turn out to be neither grand nor unified. The Court today does only what courts must do in many Establishment Clause cases—focus on specific features of a particular government action to ensure that it does not violate the Constitution. By withholding from Wide Awake assistance that the University provides generally to all other student publications, the University has discriminated on the basis of the magazine's religious viewpoint in violation of the Free Speech Clause. And particular features of the University's program—such as the explicit disclaimer, the disbursement of funds directly to third-party vendors, the vigorous nature of the forum at issue, and the possibility for objecting students to opt out—convince me that providing such assistance in this case would not carry the danger of impermissible use of public funds to endorse Wide Awake's religious message.

Subject to these comments, I join the opinion of the Court.

---

JUSTICE THOMAS, concurring.

I agree with the Court's opinion and join in it in full, but I write separately to express my disagreement with the historical analysis put forward by the dissent. Although the dissent starts down the right path in consulting the original meaning of the Establishment Clause, its misleading application of history yields a principle that is inconsistent with our Nation's long tradition of allowing religious adherents to participate on equal terms in neutral government programs.

Even assuming that the Virginia debate on the so-called "Assessment Controversy" was indicative of the principles embodied in the Establishment Clause, this incident hardly compels the dissent's conclusion that government must actively discriminate against religion. The dissent's historical discussion glosses over the fundamental characteristic of the Virginia assessment bill that sparked the controversy: The assessment was to be imposed for the support of clergy in the performance of their function of teaching religion. Thus, the "Bill Establishing a Provision for Teachers of the Christian Religion" provided for the collection of a specific tax, the proceeds of which were to be appropriated "by the Vestries, Elders, or Directors of each religious society . . . to a provision for a Minister or Teacher of the Gospel of their denomination, or the providing places of divine worship, and to none other use whatsoever." See *Everson* v. *Board of Ed. of Ewing*,

330 U. S. 1, 74 (1947) (appendix to dissent of Rutledge, J.).[1]

James Madison's Memorial and Remonstrance Against Religious Assessments (hereinafter Madison's Remonstrance) must be understood in this context. Contrary to the dissent's suggestion, Madison's objection to the assessment bill did not rest on the premise that religious entities may never participate on equal terms in neutral government programs. Nor did Madison embrace the argument that forms the linchpin of the dissent: that monetary subsidies are constitutionally different from other neutral benefits programs. Instead, Madison's comments are more consistent with the neutrality principle that the dissent inexplicably discards. According to Madison, the Virginia assessment was flawed because it "violate[d] that equality which ought to be the basis of every law." Madison's Remonstrance ¶4, reprinted in *Everson*, *supra*, at 66 (appendix to dissent of Rutledge, J.). The assessment violated the "equality" principle not because it allowed religious groups to participate in a generally available government program, but because the bill singled out religious entities for special benefits. See *ibid.* (arguing that the assessment violated the equality principle "by subjecting some to peculiar burdens" and "by granting to others peculiar exemptions").

Legal commentators have disagreed about the historical lesson to take from the Assessment Controversy. For some, the experience in Virginia is consistent with the view that the Framers saw the Establishment

---

[1]The dissent suggests that the assessment bill would have created a "generally available subsidy program" comparable to respondent's Student Activities Fund (SAF). See *post*, at 7, n. 1. The dissent's characterization of the bill, however, is squarely at odds with the bill's clear purpose and effect to provide "for the support of Christian teachers." *Everson*, 330 U. S., at 72. Moreover, the section of the bill cited by the dissent, see *post*, at 7, n. 1, simply indicated that funds would be "disposed of under the direction of the General Assembly, for the encouragement of seminaries of learning within the Counties whence such sums shall arise," *Everson*, *supra*, at 74. This provision disposing of undesignated funds hardly transformed the "Bill Establishing a Provision for Teachers of the Christian Religion" into a truly neutral program that would benefit religious adherents as part of a large class of beneficiaries defined without reference to religion. Indeed, the only appropriation of money made by the bill would have been to promote "the general diffusion of Christian knowledge," *id.*, at 72; any possible appropriation for "seminaries of learning" depended entirely on future legislative action.

Even assuming that future legislators would adhere to the bill's directive in appropriating the undesignated tax revenues, nothing in the bill would prevent use of those funds solely for sectarian educational institutions. To the contrary, most schools at the time of the founding were affiliated with some religious organization, see C. Antieau, A. Downey, & E. Roberts, Freedom From Federal Establishment, Formation and Early History of the First Amendment Religion Clauses 163 (1964), and in fact there was no system of public education in Virginia until several decades after the assessment bill was proposed, see A. Morrison, The Beginnings of Public Education in Virginia, 1776–1860, p. 9 (1917); see also A. Johnson, The Legal Status of Church-State Relationships in the United States 4 (1982) ("In Virginia the parish institutions transported from England were the earliest educational agencies. Although much of the teaching took place in the home and with the aid of tutors, every minister had a school, and it was the duty of the vestry to see that all the poor children were taught to read and write") (footnote omitted). Further, the clearly religious tenor of the Virginia assessment would seem to point toward appropriation of residual funds to sectarian "seminaries of learning." Finally, although modern historians have focused on the opt-out provision, the dissent provides no indication that Madison viewed the Virginia assessment as an evenhanded program; in fact, several of the objections expressed in Madison's Memorial and Remonstrance Against Religious Assessments, reprinted in *Everson*, *supra*, at 63, focus clearly on the bill's violation of the principle of "equality," or evenhandedness. See *infra*, at 3–5.

Clause simply as a prohibition on governmental preferences for some religious faiths over others. See R. Cord, Separation of Church and State: Historical Fact and Current Fiction 20–23 (1982); Smith, Getting Off on the Wrong Foot and Back on Again: A Reexamination of the History of the Framing of the Religion Clauses of the First Amendment and a Critique of the *Reynolds* and *Everson* Decisions, 20 Wake Forest L. Rev. 569, 590–591 (1984). Other commentators have rejected this view, concluding that the Establishment Clause forbids not only government preferences for some religious sects over others, but also government preferences for religion over irreligion. See, *e.g.*, Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 875 (1986).

I find much to commend the former view. Madison's focus on the preferential nature of the assessment was not restricted to the fourth paragraph of the Remonstrance discussed above. The funding provided by the Virginia assessment was to be extended only to Christian sects, and the Remonstrance seized on this defect:

"Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects." Madison's Remonstrance ¶3, reprinted in *Everson*, *supra*, at 65.

In addition to the third and fourth paragraphs of the Remonstrance, "Madison's seventh, ninth, eleventh, and twelfth arguments all speak, in some way, to the same intolerance, bigotry, unenlightenment, and persecution that had generally resulted from previous exclusive religious establishments." Cord, *supra*, at 21. The conclusion that Madison saw the principle of nonestablishment as barring governmental preferences for *particular* religious faiths seems especially clear in light of statements he made in the more-relevant context of the House debates on the First Amendment. See *Wallace v. Jaffree*, 472 U. S. 38, 98 (1985) (REHNQUIST, J., dissenting) (Madison's views "as reflected by actions on the floor of the House in 1789, [indicate] that he saw the [First] Amendment as designed to prohibit the establishment of a national religion, and perhaps to prevent discrimination among sects," but not "as requiring neutrality on the part of government between religion and irreligion"). Moreover, even if more extreme notions of the separation of church and state can be attributed to Madison, many of them clearly stem from "arguments reflecting the concepts of natural law, natural rights, and the social contract between government and a civil society," Cord, *supra*, at 22, rather than the principle of nonestablishment in the Constitution. In any event, the views of one man do not establish the original understanding of the First Amendment.

But resolution of this debate is not necessary to decide this case. Under any understanding of the Assessment Controversy, the history cited by the dissent cannot support the conclusion that the Establishment Clause "categorically condemn[s] state programs directly aiding religious activity" when that aid is part of a neutral program available to a wide array of beneficiaries. *Post*, at 13. Even if Madison believed that the principle of nonestablishment of religion precluded government financial support for religion *per se* (in the sense of government benefits specifically targeting religion), there is no indication that at the time of the framing he took the dissent's extreme view that the government must

discriminate against religious adherents by excluding them from more generally available financial subsidies.[2]

In fact, Madison's own early legislative proposals cut against the dissent's suggestion. In 1776, when Virginia's Revolutionary Convention was drafting its Declaration of Rights, Madison prepared an amendment that would have disestablished the Anglican Church. This amendment (which went too far for the Convention and was not adopted) is not nearly as sweeping as the dissent's version of disestablishment; Madison merely wanted the Convention to declare that "no man or class of men ought, on account of religion[,] to be invested with *peculiar* emoluments or privileges . . . ." Madison's Amendments to the Declaration of Rights (May 29–June 12, 1776), in 1 Papers of James Madison 174 (W. Hutchinson & W. Rachal eds. 1962) (emphasis added). Likewise, Madison's Remonstrance stressed that "just government" is "best supported by protecting every citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another." Madison's Remonstrance ¶8, reprinted in *Everson*, *supra*, at 68; cf. *Terrett v. Taylor*, 9 Cranch 43, 49 (1815) (holding that the Virginia constitution did not prevent the government from "aiding the votaries of every sect to . . . perform their own religious duties," or from "establishing funds for the support of ministers, for public charities, for the endowment of churches, or for the sepulture of the dead").

Stripped of its flawed historical premise, the dissent's argument is reduced to the claim that our Establishment Clause jurisprudence permits neutrality in the context of access to government *facilities* but requires discrimination in access to government *funds*. The dissent purports to locate the prohibition against "direct public funding" at the "heart" of the Establishment Clause, see *post*, at 17, but this conclusion fails to confront historical examples of funding that date back to the time of the founding. To take but one famous example, both Houses of the First Congress elected chaplains, see S. Jour., 1st Cong., 1st Sess., 10 (1820 ed.); H. R. Jour., 1st Cong., 1st Sess., 26 (1826 ed.), and that Congress enacted legislation providing for an annual salary of $500 to be paid out of the Treasury, ;e Act of Sept. 22, 1789, ch. 17, §4, 1 Stat. 70, 71. Madison himself was a member of the committee that recommended the chaplain system in the House. See H. R. Jour., at 11–12; 1 Annals of Cong. 891 (1789); Cord, *supra*, at 25. This same system of "direct public funding" of congressional chaplains has "continued without interruption ever since that early session of Congress." *Marsh v. Chambers*, 463 U. S. 783, 788 (1983).[3]

---

[2] To the contrary, Madison's Remonstrance decried the fact that the assessment bill would require civil society to take "cognizance" of religion. Madison's Remonstrance ¶1, reprinted in *Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 64 (1947). Respondent's exclusion of religious activities from SAF funding creates this very problem. It requires University officials to classify publications as "religious activities," and to discriminate against the publications that fall into that category. Such a policy also contravenes the principles expressed in Madison's Remonstrance by encouraging religious adherents to cleanse their speech of religious overtones, thus "degrad[ing] from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority." *Id.* ¶9, reprinted in *Everson*, *supra*, at 69.

[3] A number of other, less familiar examples of what amount to direct funding appear in early Acts of Congress. See, *e.g.* Act of Feb. 20, 1833, ch. 42, 4 Stat. 618–619 (authorizing the State of Ohio

The historical evidence of government support for religious entities through property tax exemptions is also overwhelming. As the dissent concedes, property tax exemptions for religious bodies "have been in place for over 200 years without disruption to the interests represented by the Establishment Clause." *Post*, at 20, n. 7 (citing *Walz* v. *Tax Comm'n of New York City*, 397 U. S. 664, 676–680 (1970)).[4] In my view, the dissent's acceptance of this tradition puts to rest the notion that the Establishment Clause bars monetary aid to religious groups even when the aid is equally available to other groups. A tax exemption in many cases is economically and functionally indistinguishable from a direct monetary subsidy.[5] In one instance, the government relieves

---

to sell "all or any part of the lands heretofore reserved and appropriated by Congress for the support of religion within the Ohio Company's . . . purchases . . . and to invest the money arising from the sale thereof, in some productive fund; the proceeds of which shall be for ever annually applied . . . for the support of religion within the several townships for which said lands were originally reserved and set apart, and for no other use or purpose whatsoever"); Act of Mar. 2, 1833, ch. 86, §§1, 3, 6 Stat. 538 (granting to Georgetown College —a Jesuit institution—"lots in the city of Washington, to the amount, in value, of twenty-five thousand dollars," and directing the College to sell the lots and invest the proceeds, thereafter using the dividends to establish and endow such professorships as it saw fit); see also *Wallace* v. *Jaffree*, 472 U. S. 38, 103 (1985) (REHNQUIST, J., dissenting) ("As the United States moved from the 18th into the 19th century, Congress appropriated time and again public moneys in support of sectarian Indian education carried on by religious organizations").

[4]The Virginia experience during the period of the Assessment Controversy itself is inconsistent with the rigid "no-aid" principle embraced by the dissent. Since at least 1777, the Virginia legislature authorized tax exemptions for property belonging to the "commonwealth, or to any county, town, college, houses for divine worship, or seminary of learning." Act of Jan. 23, 1800, ch.2, §1, 1800 Va. Acts. And even Thomas Jefferson, respondent's founder and a champion of disestablishment in Virginia, advocated the use of public funds in Virginia for a department of theology in conjunction with other professional schools. See S. Padover, The Complete Jefferson 1067 (1943); see also *id.*, at 958 (noting that Jefferson advocated giving "to the sectarian schools of divinity the full benefit [of] the public provisions made for instruction in the other branches of science").

[5]In the tax literature, this identity is called a "tax expenditure," a concept "based upon recognition of the fact that a government can appropriate money to a particular person or group by using a special, narrowly directed tax deduction or exclusion, instead of by using its ordinary direct spending mechanisms. For example, a government with a general income tax, wanting to add $7,000 to the spendable income of a preacher whose top tax rate is 30%, has two ways of subsidizing him. The government can send the preacher a check for $10,000 and tax him on all of his income, or it can authorize him to reduce his taxable income by $23,333.33 [resulting in a tax saving of $7,000]. If the direct payment were itself taxable and did not alter his tax bracket, the preacher would receive the same benefit from the tax deduction as he would from the direct payment." Wolfman, Tax Expenditures: From Idea to Ideology, 99 Harv. L. Rev. 491, 491–492 (1985). In fact, Congress has provided a similar "tax expenditure" in §107 of the Internal Revenue Code by granting a "'minister of the gospel'" an unlimited exclusion for the rental value of any home furnished as part of his pay or for the rental allowance paid to him. See *id.*, at 492, n. 6.

Although Professor Bittker is certainly a leading scholar in the tax field, the dissent's reliance on Bittker, see *post*, at 20, n. 7, is misplaced in this context. See Adler, The Internal Revenue Code, The Constitution, and the Courts: The Use of Tax Expenditure Analysis in Judicial Decision Making, 28 Wake Forest L. Rev. 855, 862, n. 30 (1993):

"Early criticism of the tax expenditure concept focused on the difficulty of drawing a dividing line between what is or is not a special provision. Professor Boris Bittker, for example, argued that since no tax is all inclusive, exemptions from any tax could not be described as the equivalent of subsidies. Boris I. Bittker, *Churches,*

---

religious entities (along with others) of a generally applicable tax; in the other, it relieves religious entities (along with others) of some or all of the burden of that tax by returning it in the form of a cash subsidy. Whether the benefit is provided at the front or back end of the taxation process, the financial aid to religious groups is undeniable. The analysis under the Establishment Clause must also be the same: "Few concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise . . . ." *Walz*, *supra*, at 676–677.

Consistent application of the dissent's "no-aid" principle would require that "'a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair.'" *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. __, __ (1993) (slip op., at 6) (quoting *Widmar* v. *Vincent*, 454 U. S. 263, 274–275 (1981)). The dissent admits that "evenhandedness may become important to ensuring that religious interests are not inhibited." *Post*, at 18, n. 5. Surely the dissent must concede, however, that the same result should obtain whether the government provides the populace with fire protection by reimbursing the costs of smoke detectors and overhead sprinkler systems or by establishing a public fire department. If churches may benefit on equal terms with other groups in the latter program—that is, if a public fire department may extinguish fires at churches—then they may also benefit on equal terms in the former program.

Though our Establishment Clause jurisprudence is in hopeless disarray, this case provides an opportunity to reaffirm one basic principle that has enjoyed an uncharacteristic degree of consensus: The Clause does not compel the exclusion of religious groups from government benefits programs that are generally available to a broad class of participants. See *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. __ (1993); *Zobrest*, *supra*; *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226 (1990); *Texas Monthly, Inc.* v. *Bullock*, 489 U. S. 1 (1989); *Witters* v. *Washington Dept. of Services for Blind*, 474 U. S. 481 (1986); *Mueller v. Allen*, 463 U. S. 388 (1983); *Widmar*, *supra*. Under the dissent's view, however, the University of Virginia may provide neutral access to the University's own printing press, but it may not provide the same service when the press is owned by a third party. Not surprisingly, the dissent offers no logical justification for this conclusion, and none is evident in the text or original meaning of the First Amendment.

If the Establishment Clause is offended when religious adherents benefit from neutral programs such as the University of Virginia's Student Activities Fund, it must also be offended when they receive the same benefits in the form of in-kind subsidies. The constitutional demands of the Establishment Clause may be judged against either a baseline of "neutrality" or a baseline of

---

*Taxes and the Constitution,* 78 Yale L. J. 1285 (1969). This wholesale rejection of tax expenditure analysis was short-lived and attracted few supporters. Rather, the large body of literature about tax expenditures accepts the basic concept that special exemptions from tax function as subsidies. The current debate focuses on whether particular items are correctly identified as tax expenditures and whether incentive provisions are more efficient when structured as tax expenditures rather than direct spending programs. *See generally* [numerous authorities]."

"no aid to religion," but the appropriate baseline surely cannot depend on the fortuitous circumstances surrounding the *form* of aid. The contrary rule would lead to absurd results that would jettison centuries of practice respecting the right of religious adherents to participate on neutral terms in a wide variety of government-funded programs.

Our Nation's tradition of allowing religious adherents to participate in evenhanded government programs is hardly limited to the class of "essential public benefits" identified by the dissent. See *post*, at 18, n. 5. A broader tradition can be traced at least as far back as the First Congress, which ratified the Northwest Ordinance of 1787. See Act of Aug. 7, 1789, ch. 8, 1 Stat. 50. Article III of that famous enactment of the Confederation Congress had provided: "Religion, morality, and knowledge . . . being necessary to good government and the happiness of mankind, schools and the means of learning shall forever be encouraged." *Id.*, at 52, n. (a). Congress subsequently set aside federal lands in the Northwest Territory and other territories for the use of schools. See, *e.g.*, Act of Mar. 3, 1803, ch. 21, §1, 2 Stat. 225–226; Act of Mar. 26, 1804, ch. 35, §5, 2 Stat. 279; Act of Feb. 15, 1811, ch. 14, §10, 2 Stat. 621; Act of Apr. 18, 1818, ch. 67, §6, 3 Stat. 430; Act of Apr. 20, 1818, ch. 126, §2, 3 Stat. 467. Many of the schools that enjoyed the benefits of these land grants undoubtedly were church-affiliated sectarian institutions as there was no requirement that the schools be "public." See C. Antieau, A. Downey, & E. Roberts, Freedom From Federal Establishment, Formation and Early History of the First Amendment Religion Clauses 163 (1964). Nevertheless, early Congresses found no problem with the provision of such neutral benefits. See also *id.*, at 174 (noting that "almost universally[,] Americans from 1789 to 1825 accepted and practiced governmental aid to religion and religiously oriented educational institutions").

Numerous other government benefits traditionally have been available to religious adherents on neutral terms. Several examples may be found in the work of early Congresses, including copyright protection for "the author and authors of any map, chart, book or books," Act of May 31, 1790, ch. 15, §1, 1 Stat. 124, 124, and a privilege allowing "every printer of newspapers [to] send one paper to each and every other printer of newspapers within the United States, free of postage," Act of Feb. 20, 1792, ch. 7, §21, 1 Stat. 232, 238. Neither of these laws made any exclusion for the numerous authors or printers who manifested a belief in or about a deity.

Thus, history provides an answer for the constitutional question posed by this case, but it is not the one given by the dissent. The dissent identifies no evidence that the Framers intended to disable religious entities from participating on neutral terms in evenhanded government programs. The evidence that does exist points in the opposite direction and provides ample support for today's decision.

---

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

The Court today, for the first time, approves direct funding of core religious activities by an arm of the State. It does so, however, only after erroneous treatment of some familiar principles of law implementing the First Amendment's Establishment and Speech Clauses, and by viewing the very funds in question as beyond the reach of the Establishment Clause's funding restrictions as such. Because there is no warrant for distinguishing among public funding sources for purposes of applying the First Amendment's prohibition of religious establishment, I would hold that the University's refusal to support petitioners' religious activities is compelled by the Establishment Clause. I would therefore affirm.

I

The central question in this case is whether a grant from the Student Activities Fund to pay Wide Awake's printing expenses would violate the Establishment Clause. Although the Court does not dwell on the details of Wide Awake's message, it recognizes something sufficiently religious in the publication to demand Establishment Clause scrutiny. Although the Court places great stress on the eligibility of secular as well as religious activities for grants from the Student Activities Fund, it recognizes that such evenhanded availability is not by itself enough to satisfy constitutional requirements for any aid scheme that results in a benefit to religion. *Ante*, at 18; see also *ante*, at 1–3 (O'CONNOR, J., concurring). Something more is necessary to justify any religious aid. Some members of the Court, at least, may think the funding permissible on a view that it is indirect, since the money goes to Wide Awake's printer, not through Wide Awake's own checking account. The Court's principal reliance, however, is on an argument that providing religion with economically valuable services is permissible on the theory that services are economically indistinguishable from religious access to governmental speech forums, which sometimes is permissible. But this reasoning would commit the Court to approving direct religious aid beyond anything justifiable for the sake of access to speaking forums. The Court implicitly recognizes this in its further attempt to circumvent the clear bar to direct governmental aid to religion. Different members of the Court seek to avoid this bar in different ways. The opinion of the Court makes the novel assumption that only direct aid financed with tax revenue is barred, and draws the erroneous conclusion that the involuntary Student Activities Fee is not a tax. I do not read JUSTICE O'CONNOR's opinion as sharing that assumption; she places this Student Activities Fund in a category of student funding enterprises from which religious activities in public universities may benefit, so long as there is no consequent endorsement of religion. The resulting decision is in unmistakable tension with the accepted law that the Court continues to avow.

A

The Court's difficulties will be all the more clear after a closer look at Wide Awake than the majority opinion affords. The character of the magazine is candidly disclosed on the opening page of the first issue, where the editor-in-chief announces Wide Awake's mission in a letter to the readership signed, "Love in Christ": it is "to challenge Christians to live, in word and deed, according to the faith they proclaim and to encourage students to consider what a personal relationship with Jesus Christ means." App. 45. The masthead of every issue bears St. Paul's exhortation, that "[t]he hour has come for you to awake from your slumber, because our salvation is nearer now than when we first believed. Romans 13:11."

Each issue of Wide Awake contained in the record makes good on the editor's promise and echoes the Apostle's call to accept salvation:

"The only way to salvation through Him is by confessing and repenting of sin. It is the Christian's duty to make sinners aware of their need for salvation. Thus, Christians must confront and condemn sin, or else they fail in their duty of love." Mourad & Prince, A Love/Hate Relationship, November/December 1990, p. 3.

"When you get to the final gate, the Lord will be handing out boarding passes, and He will examine your ticket. If, in your lifetime, you did not request a seat on His Friendly Skies Flyer by trusting Him and asking Him to be your pilot, then you will not be on His list of reserved seats (and the Lord will know you not). You will not be able to buy a ticket then; no amount of money or desire will do the trick. You will be met by your chosen pilot and flown straight to Hell on an express jet (without air conditioning or toilets, of course)." Ace, The Plane Truth, *id.*, at 3.

"'Go into all the world and preach the good news to all creation.' (Mark 16:15) The Great Commission is the prime-directive for our lives as Christians . . . ." Liu, Christianity and the Five-legged Stool, September/October 1991, p. 3.

"The Spirit provides access to an intimate relationship with the Lord of the Universe, awakens our minds to comprehend spiritual truth and empowers us to serve as effective ambassadors for the Lord Jesus in our earthly lives." Buterbaugh, A Spiritual Advantage, March/April 1991, p. 21.

There is no need to quote further from articles of like tenor, but one could examine such other examples as religious poetry, see Macpherson, I Have Started Searching for Angels, November/December 1990, p. 18; religious textual analysis and commentary, see Buterbaugh, Colossians 1:1–14: Abundant Life, *id.*, at 20; Buterbaugh, John 14–16: A Spiritual Advantage, March/April, pp. 20–21; and instruction on religious practice, see Early, Thanksgiving and Prayer, November/December 1990, p. 21 (providing readers with suggested prayers and posing contemplative questions about biblical texts); Early, Hope and Spirit, March/April 1991, p. 21 (similar).

Even featured essays on facially secular topics become platforms from which to call readers to fulfill the tenets of Christianity in their lives. Although a piece on racism has some general discussion on the subject, it proceeds beyond even the analysis and interpretation of biblical texts to conclude with the counsel to take action because that is the Christian thing to do:

"God calls us to take the risks of voluntarily stepping out of our comfort zones and to take joy in the whole richness of our inheritance in the body of Christ. We must take the love we receive from God and share it with all peoples of the world.

"Racism is a disease of the heart, soul, and mind, and only when it is extirpated from the individual consciousness and replaced with the love and peace of God will true personal and communal healing begin." Liu, et al., "Eracing" Mistakes, November/December 1990, p. 14.

The same progression occurs in an article on eating disorders, which begins with descriptions of anorexia and bulimia and ends with this religious message:

"As thinking people who profess a belief in God, we must grasp firmly the truth, the reality of who we are because of Christ. Christ is the Bread of Life (John 6:35). Through Him, we are full. He alone can provide the ultimate source of spiritual fulfillment which permeates the emotional, psychological, and physical dimensions of our lives." Ferguson & Lassiter, From Calorie to Calvary, September/October 1991, p. 14.

This writing is no merely descriptive examination of religious doctrine or even of ideal Christian practice in confronting life's social and personal problems. Nor is it merely the expression of editorial opinion that incidentally coincides with Christian ethics and reflects a Christian view of human obligation. It is straightforward exhortation to enter into a relationship with God as revealed in Jesus Christ, and to satisfy a series of moral obligations derived from the teachings of Jesus Christ. These are not the words of "student news, information, opinion, entertainment, or academic communicatio[n] . . ." (in the language of the University's funding criterion, App. to Pet. for Cert. 61a), but the words of "challenge [to] Christians to live, in word and deed, according to the faith they proclaim and . . . to consider what a personal relationship with Jesus Christ means" (in the language of Wide Awake's founder, App. 45). The subject is not the discourse of the scholar's study or the seminar room, but of the evangelist's mission station and the pulpit. It is nothing other than the preaching of the word, which (along with the sacraments) is what most branches of Christianity offer those called to the religious life.

Using public funds for the direct subsidization of preaching the word is categorically forbidden under the Establishment Clause, and if the Clause was meant to accomplish nothing else, it was meant to bar this use of public money. Evidence on the subject antedates even the Bill of Rights itself, as may be seen in the writings of Madison, whose authority on questions about the meaning of the Establishment Clause is well settled, *e.g.*, *Committee for Public Ed. & Religious Liberty v. Nyquist*, 413 U. S. 756, 770, n. 28 (1973); *Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 13 (1947). Four years before the First Congress proposed the First Amendment, Madison gave his opinion on the legitimacy of using public funds for religious purposes, in the Memorial and Remonstrance Against Religious Assessments, which played the central role in ensuring the defeat of the Virginia tax assessment bill in 1786 and framed the debate upon which the Religion Clauses stand:

"Who does not see that . . . the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" James Madison, Memorial and Remonstrance Against Religious Assessments ¶3 (hereinafter Madison's Remonstrance), reprinted in *Everson, supra*, at 65–66 (appendix to dissent of Rutledge, J.).

Madison wrote against a background in which nearly every Colony had exacted a tax for church support, *Everson, supra*, at 10, n. 8, the practice having become

"so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence," 330 U. S., at 11 (footnote omitted). Madison's Remonstrance captured the colonists' "conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group." *Ibid.*[1] Their

sentiment as expressed by Madison in Virginia, led not only to the defeat of Virginia's tax assessment bill, but also directly to passage of the Virginia Bill for Establishing Religious Freedom, written by Thomas Jefferson. That bill's preamble declared that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical," Jefferson, A Bill for Establishing Religious Freedom, reprinted in 5 The Founder's Constitution 84–85 (P. Kurland & R. Lerner eds. 1987), and its text provided "[t]hat no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever . . . .," *ibid.* See generally *Everson, supra,* at 13. We have "previously recognized that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute." *Ibid.*; see also Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 921, 923 (1986) ("[I]f the debates of the 1780's support any proposition, it is that the Framers opposed government financial support for religion. . . . They did not substitute small taxes for large taxes; three pence was as bad as any larger sum. The principle was what mattered. With respect to money, religion was to be wholly voluntary. Churches either would support themselves or they would not, but the government would neither help nor interfere") (footnote omitted); T. Curry, The First Freedoms 217 (1986) (At the time of the framing of the Bill of Rights, "[t]he belief that government assistance to religion, especially in the form of taxes, violated religious liberty had a long history"); J. Choper, Securing Religious Liberty 16 (1995) ("There is broad consensus that a central threat to the religious freedom of individuals and groups—indeed, in the judgment of many the most serious infringement upon religious liberty—is posed by forcing them to pay taxes in support of a religious establishment or religious activities") (footnotes omitted; internal quotation marks omitted).[2]

---

[1]JUSTICE THOMAS suggests that Madison would have approved of the assessment bill if only it had satisfied the principle of evenhandedness. Nowhere in the Remonstrance, however, did Madison advance the view that Virginia should be able to provide financial support for religion as part of a generally available subsidy program. Indeed, while JUSTICE THOMAS claims that the "funding provided by the Virginia assessment was to be extended only to Christian sects," *ante,* at 4, it is clear that the bill was more general in scope than this. While the bill, which is reprinted in *Everson* v. *Board of Ed. of Ewing,* 330 U. S. 1, 72–74 (1947), provided that each taxpayer could designate a religious society to which he wanted his levy paid, *id.,* at 73, it would also have allowed a taxpayer to refuse to appropriate his levy to any religious society, in which case the legislature was to use these unappropriated sums to fund "seminaries of learning." *Id.,* at 74 (contrary to JUSTICE THOMAS's unsupported assertion, this portion of the bill was no less obligatory than any other). While some of these seminaries undoubtedly would have been religious in character, others would not have been, as a seminary was generally understood at the time to be "any school, academy, college or university, in which young persons are instructed in the several branches of learning which may qualify them for their future employments." N. Webster, An American Dictionary of the English Language (1st ed. 1828); see also 14 The Oxford English Dictionary 956 (2d ed. 1989). Not surprisingly, then, scholars have generally agreed that the bill would have provided funding for nonreligious schools. See, *e.g.,* Laycock, "Nonpreferential" Aid to Religion: A False Claim About Original Intent, 27 Wm. & Mary L. Rev. 875, 897 (1986) ("Any taxpayer could refuse to designate a church, withdesignated church taxes going to a fund for schools . . . The bill used the phrase 'seminaries of learning,' which almost certainly meant schools generally and not just schools for the training of ministers"); T. Buckley, Church and State in Revolutionary Virginia, 1776–1787, p. 133 (1977) ("The assessment had been carefully drafted to permit those who preferred to support education rather than religion to do so"); T. Curry, The First Freedoms 141 (1986) ("[T]hose taxes not designated for any specific denomination [were] allocated to education"). It is beside the point that "there was no system of public education in Virginia until several decades after the assessment bill was proposed," *ante,* at 2, n. 1 (THOMAS, J., concurring); because the bill was never passed, the funds that it would have made available for secular, public schools never materialized. The fact that the bill, if passed, would have funded secular as well as religious instruction did nothing to soften Madison's opposition to it.

Nor is it fair to argue that Madison opposed the bill only because it treated religious groups unequally. *Ante,* at 3 (THOMAS, J., concurring). In various paragraphs of the Remonstrance, Madison did complain about the bill's peculiar burdens and exemptions, *Everson, supra,* at 66, but to identify this factor as the sole point of Madison's opposition to the bill is unfaithful to the Remonstrance's text. Madison strongly inveighed against the proposed aid for religion for a host of reasons (the Remonstrance numbers 15 paragraphs, each containing at least one point in opposition), and crucial here is the fact that many of those reasons would have applied whether or not the state aid was being distributed equally among sects, and whether or not the aid was going to those sects in the context of an evenhanded government program. See, *e.g.,* Madison's Remonstrance, reprinted in *Everson,* 330 U. S., at 64, ¶1 ("[I]n matters of Religion, no man's right is abridged by the institution of Civil Society, and . . . Religion is wholly exempt from its cognizance"); *id.,* at 67, ¶6 (arguing that State support of religion "is a contradiction to the Christian Religion itself; for every page of it disavows a dependence on the powers of this world"); *ibid.,* ¶7 ("[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation"). Madison's objections were supplemented by numerous other petitions in opposition to the bill that likewise do not suggest that the lack of evenhandedness was its dispositive flaw. L. Levy, The Establishment Clause 63–67 (2d ed. 1994). For example, the petition that received the largest number of signatories was motivated by the view that religion should only be supported voluntarily. *Id.,* at 63–64. Indeed, Madison's Remonstrance did not argue for a bill distributing aid to all sects and religions on an equal basis, and the outgrowth of the Remonstrance and the defeat of the

Virginia assessment was not such a bill; rather, it was the Virginia Bill for Establishing Religious Freedom, which, as discussed in the text, proscribed the use of tax dollars for religious purposes.

In attempting to recast Madison's opposition as having principally been targeted against "governmental preferences for *particular* religious faiths," *ante,* at 4 (emphasis in original), JUSTICE THOMAS wishes to wage a battle that was lost long ago, for "this Court has rejected unequivocally the contention that the Establishment Clause forbids only governmental preference of one religion over another," *School Dist. of Abington* v. *Schempp,* 374 U. S. 203, 216 (1963); see also *Texas Monthly, Inc.* v. *Bullock,* 489 U. S. 1, 17 (1989) (plurality opinion); *id.,* at 28 (Blackmun, J., concurring in judgment); *Wallace* v. *Jaffree,* 472 U. S. 38, 52–53 (1985); *Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961); *Engel* v. *Vitale,* 370 U. S. 421, 430 (1962); *Everson, supra,* at 15; see generally *Lee* v. *Weisman,* 505 U. S. 577, 609–616 (1992) (SOUTER, J., concurring).

[2]JUSTICE THOMAS attempts to cast doubt on this accepted version of Establishment Clause history by reference to historical facts that are largely inapposite. *Ante,* at 5–7, 11–12 (concurring opinion). As I have said elsewhere, individual Acts of Congress, especially when they are few and far between, scarcely serve as an authoritative guide to the meaning of the religion clauses, for "like other politicians, [members of the early Congresses] could raise constitutional ideals one day and turn their backs on them the next. [For example,] . . . [t]en years after proposing the First Amendment, Congress passed the Alien and Sedition Acts, measures patently unconstitutional by modern standards. If the early Congress's political actions were determinative, and not merely relevant, evidence of constitutional meaning, we would have to gut our current First Amendment doctrine to make room for political censorship." *Lee* v. *Weisman,*

The principle against direct funding with public money is patently violated by the contested use of today's student activity fee.[3] Like today's taxes generally, the fee is Madison's threepence. The University exercises the power of the State to compel a student to pay it, see Jefferson's Preamble, *supra*, and the use of any part of it for the direct support of religious activity thus strikes at what we have repeatedly held to be the heart of the prohibition on establishment. *Everson*, 330 U. S., at 15-16 ("The 'establishment of religion clause' . . . means at least this . . . . No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion"); see *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 385 (1985) ("Although Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith"); *Committee for Public Education* v. *Nyquist*, 413 U. S., at 780 ("In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid"); *id.*, at 772 ("Primary among those evils" against which the Estab-

505 U. S. 577, 626 (1992) (concurring opinion). The legislation cited by JUSTICE THOMAS, including the Northwest Ordinance, is no more dispositive than the Alien and Sedition Acts in interpreting the First Amendment. Even less persuasive, then, are citations to constitutionally untested Acts dating from the mid-19th century, for without some rather innovative argument, they cannot be offered as providing an authoritative gloss on the Framers' intent.

JUSTICE THOMAS's references to Madison's actions as a legislator also provide little support for his cause. JUSTICE THOMAS seeks to draw a significant lesson out of the fact that, in seeking to disestablish the Anglican Church in Virginia in 1776, Madison did not inveigh against state funding of religious activities. *Ante*, at 6 (concurring opinion). That was not the task at hand, however. Madison was acting with the specific goal of eliminating the special privileges enjoyed by Virginia Anglicans, and he made no effort to lay out the broader views of church and state that came to bear in his drafting of the First Amendment some 13 years later. That Madison did not speak in more expansive terms than necessary in 1776 was hardly surprising for, as it was, his proposal was defeated by the Virginia Convention as having gone too far. *Ibid.*

Similarly, the invocation of Madison's tenure on the congressional committee that approved funding for legislative chaplains provides no support for more general principles that run counter to settled Establishment Clause jurisprudence. As I have previously pointed out, Madison, upon retirement, "insisted that 'it was not with my approbation, that the deviation from [the immunity of religion from civil jurisdiction] took place in Congs., when they appointed Chaplains, to be paid from the Natl. Treasury.'" *Lee*, *supra*, at 625, n. 6, quoting Letter from J. Madison to E. Livingston (July 10, 1822), in 5 The Founders' Constitution, at 105. And when we turned our attention to deciding whether funding of legislative chaplains posed an establishment problem, we did not address the practice as one instance of a larger class of permissible government funding of religious activities. Instead, *Marsh* v. *Chambers*, 463 U. S. 783, 791 (1983), explicitly relied on the singular, 200-year pedigree of legislative chaplains, noting that "[t]his unique history" justified carving out an exception for the specific practice in question. Given that the decision upholding this practice was expressly limited to its facts, then, it would stand the Establishment Clause on its head to extract from it a broad rule permitting the funding of religious activities.

[3] In the District Court, the parties agreed to the following facts: "The University of Virginia has charged at all times relevant herein and currently charges each full-time student a compulsory student activity fee of $14.00 per semester. There is no procedural or other mechanism by which a student may decline to pay the fee." App. 37; see also App. 9, 21.

lishment Clause guards "have been sponsorship, financial support, and active involvement of the sovereign in religious activity") (citations and internal quotation marks omitted); see also *Lee* v. *Weisman*, 505 U. S. 577, 640 (1992) (SCALIA, J., dissenting) ("The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty") (emphasis omitted); cf. *Flast* v. *Cohen*, 392 U. S. 83, 103-104 (1968) (holding that taxpayers have an adequate stake in the outcome of Establishment Clause litigation to satisfy Article III standing requirements, after stating that "[o]ur history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general").

The Court, accordingly, has never before upheld direct state funding of the sort of proselytizing published in Wide Awake and, in fact, has categorically condemned state programs directly aiding religious activity, *School Dist.* v. *Ball*, *supra*, at 395 (striking programs providing secular instruction to nonpublic school students on nonpublic school premises because they are "indistinguishable from the provision of a direct cash subsidy to the religious school that is most clearly prohibited under the Establishment Clause"); *Wolman* v. *Walter*, 433 U. S. 229, 254 (1977) (striking field trip aid program because it constituted "an impermissible direct aid to sectarian education"); *Meek* v. *Pittenger*, 421 U. S. 349, 365 (1975) (striking material and equipment loan program to nonpublic schools because of the inability to "channe[l] aid to the secular without providing direct aid to the sectarian"); *Committee for Public Education* v. *Nyquist*, *supra*, at 774 (striking aid to nonpublic schools for maintenance and repair of facilities because "[n]o attempt is made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes"); *Levitt* v. *Committee for Public Ed. & Religious Liberty*, 413 U. S. 472, 480 (1973) (striking aid to nonpublic schools for state-mandated tests because the state had failed to "assure that the state-supported activity is not being used for religious indoctrination"); *Tilton* v. *Richardson*, 403 U. S. 672, 683 (1971) (plurality opinion) (striking as insufficient a 20-year limit on prohibition for religious use in federal construction program for university facilities because unrestricted use even after 20 years "is in effect a contribution of some value to a religious body"); *id.*, at 689 (Douglas, Black, and Marshall, JJ., concurring in part and dissenting in part).

Even when the Court has upheld aid to an institution performing both secular and sectarian functions, it has always made a searching enquiry to ensure that the institution kept the secular activities separate from its sectarian ones, with any direct aid flowing only to the former and never the latter. *Bowen* v. *Kendrick*, 487 U. S. 589, 614-615 (1988) (upholding grant program for services related to premarital adolescent sexual relations on ground that funds cannot be "used by the grantees in such a way as to advance religion"); *Roemer* v. *Board of Pub. Works of Md.*, 426 U. S. 736, 746-748, 755, 759-761 (1976) (plurality opinion) (upholding general aid program restricting uses of funds to secular activities only); *Hunt* v. *McNair*, 413 U. S. 734, 742-745 (1973) (upholding general revenue bond program excluding from participation facilities used for religious purposes); *Tilton*

v. *Richardson*, *supra*, at 679–682 (plurality opinion) (upholding general aid program for construction of academic facilities as "[t]here is no evidence that religion seeps into the use of any of these facilities"); see *Board of Ed. of Central School Dist No. 1 v. Allen*, 392 U. S. 236, 244–248 (1968) (upholding textbook loan program limited to secular books requested by individual students for secular educational purposes).

Reasonable minds may differ over whether the Court reached the correct result in each of these cases, but their common principle has never been questioned or repudiated. "Although Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed . . . indoctrination into the beliefs of a particular religious faith." *School Dist.* v. *Ball*, 473 U. S., at 385.

B

Why does the Court not apply this clear law to these clear facts and conclude, as I do, that the funding scheme here is a clear constitutional violation? The answer must be in part that the Court fails to confront the evidence set out in the preceding section. Throughout its opinion, the Court refers uninformatively to Wide Awake's "Christian viewpoint," *ante*, at 4, or its "religious perspective," *ante*, at 11, and in distinguishing funding of Wide Awake from the funding of a church, the Court maintains that "[Wide Awake] is not a religious institution, at least in the usual sense," *ante*, at 24;[4] see also *ante*, at 5. The Court does not quote the magazine's adoption of Saint Paul's exhortation to awaken to the nearness of salvation, or any of its articles enjoining readers to accept Jesus Christ, or the religious verses, or the religious textual analyses, or the suggested prayers. And so it is easy for the Court to lose sight of what the University students and the Court of Appeals found so obvious, and to blanch the patently and frankly evangelistic character of the magazine by unrevealing allusions to religious points of view.

Nevertheless, even without the encumbrance of detail from Wide Awake's actual pages, the Court finds something sufficiently religious about the magazine to require examination under the Establishment Clause, and one may therefore ask why the unequivocal prohibition on direct funding does not lead the Court to conclude that funding would be unconstitutional. The answer is that the Court focuses on a subsidiary body of law, which it correctly states but ultimately misapplies. That subsidiary body of law accounts for the Court's substantial attention to the fact that the University's funding scheme is "neutral," in the formal sense that it makes funds available on an evenhanded basis to secular and sectarian applicants alike. *Ante*, at 18–20. While this is indeed true and relevant under our cases, it does not alone satisfy the requirements of the Establishment Clause, as the Court recognizes when it says that evenhandedness is only a "significant factor" in certain Establishment Clause analysis, not a dispositive one. *Ante*, at 18; see *ante*, at 19–20; see also *ante*, at 1–3 (O'CONNOR, J., concurring); *id.*, at 2 ("Neutrality, in both form and effect, is one hallmark of the Establishment Clause"); *Capitol Square Review and Advisory*

---

[4]To the extent the Court perceives some distinction between the printing and dissemination of evangelism and proselytization, and core religious activity "in [its] usual sense," *ante*, at 24, this distinction goes entirely unexplained in the Court's opinion.

*Board v. Pinette*, ___ U. S. ___, ___ (slip op., at 6) (O'CONNOR, J., concurring in part and concurring in the judgment) ("the Establishment Clause forbids a State from hiding behind the application of formally neutral criteria and remaining studiously oblivious to the effects of its actions. . . . [N]ot all State policies are permissible under the Religion Clauses simply because they are neutral in form"). This recognition reflects the Court's appreciation of two general rules: that whenever affirmative government aid ultimately benefits religion, the Establishment Clause requires some justification beyond evenhandedness on the government's part; and that direct public funding of core sectarian activities, even if accomplished pursuant to an evenhanded program, would be entirely inconsistent with the Establishment Clause and would strike at the very heart of the Clause's protection. See *ante*, at 22 ("We do not confront a case where, even under a neutral program that includes nonsectarian recipients, the government is making direct money payments to an institution or group that is engaged in religious activity"); *ante*, at 19–20, 23–24; see also *ante*, at 2 (O'CONNOR, J., concurring) ("[Our] decisions . . . provide no precedent for the use of public funds to finance religious activities").

In order to understand how the Court thus begins with sound rules but ends with an unsound result, it is necessary to explore those rules in greater detail than the Court does. As the foregoing quotations from the Court's opinion indicate, the relationship between the prohibition on direct aid and the requirement of evenhandedness when affirmative government aid does result in some benefit to religion reflects the relationship between basic rule and marginal criterion. At the heart of the Establishment Clause stands the prohibition against direct public funding, but that prohibition does not answer the questions that occur at the margins of the Clause's application. Is any government activity that provides any incidental benefit to religion likewise unconstitutional? Would it be wrong to put out fires in burning churches, wrong to pay the bus fares of students on the way to parochial schools, wrong to allow a grantee of special education funds to spend them at a religious college? These are the questions that call for drawing lines, and it is in drawing them that evenhandedness becomes important. However the Court may in the past have phrased its line-drawing test, the question whether such benefits are provided on an evenhanded basis has been relevant, for the question addresses one aspect of the issue whether a law is truly neutral with respect to religion (that is, whether the law either "advance[s] [or] inhibit[s] religion," *Allegheny County v. Greater Pittsburgh Chapter, American Civil Liberties Union*, 492 U. S. 573, 592 (1989)). In *Widmar v. Vincent*, 454 U. S. 263, 274 (1981), for example, we noted that "[t]he provision of benefits to [a] broad . . . spectrum of [religious and nonreligious] groups is an important index of secular effect." See also *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. ___, ___ (slip op., at 14–17) (1994). In the doubtful cases (those not involving direct public funding, where there is initially room for argument about a law's effect, evenhandedness serves to weed out those laws that impermissibly advance religion by channelling aid to it exclusively. Evenhandedness is therefore a prerequisite to further enquiry into the constitutionality of a doubtful law,[5] but evenhandedness goes no further. It does not

---

[5]In a narrow band of cases at the polar extreme from direct funding cases, those involving essential public benefits commonly associated with

guarantee success under Establishment Clause scrutiny.

Three cases permitting indirect aid to religion, *Mueller v. Allen*, 463 U. S. 388 (1983), *Witters v. Washington Dept. of Services for Blind*, 474 U. S. 481 (1986), and *Zobrest v. Catalina Foothills School Dist.*, 509 U. S. 1 (1993), are among the latest of those to illustrate this relevance of evenhandedness when advancement is not so obvious as to be patently unconstitutional. Each case involved a program in which benefits given to individuals on a religion-neutral basis ultimately were used by the individuals, in one way or another, to support religious institutions.[6] In each, the fact that aid was distributed generally and on a neutral basis was a necessary condition for upholding the program at issue. *Witters, supra*, at 487–488; *Mueller, supra*, at 397–399; *Zobrest, supra*, at ___ (slip op., at 7–8). But the significance of evenhandedness stopped there. We did not, in any of these cases, hold that satisfying the condition was sufficient, or dispositive. Even more importantly, we never held that evenhandedness might be sufficient to render direct aid to religion constitutional. Quite the contrary. Critical to our decisions in these cases was the fact that the aid was indirect; it reached religious institutions "only as a result of the genuinely independent and private choices of aid recipients," *Witters, supra*, at 487; see also *Mueller, supra*, at 399–400; *Zobrest, supra*, at ___-___ (slip op., at 7–12). In noting and relying on this particular feature of each of the programs at issue, we in fact reaffirmed the core prohibition on direct funding of religious activities. See *Zobrest, supra*, at ___-___ (slip op., at 9–12); *Witters, supra*, at 487; see also *Mueller, supra*, at 399–400. Thus, our holdings in these cases were little more than extensions of the unremarkable proposition that "a State may issue a paycheck to one of its employees, who may then donate all or part of that paycheck to a religious institution, all without constitutional barrier . . . ." *Witters, supra*, at 486–487. Such "attenuated financial benefit[s], ultimately controlled by the private choices of individual[s]," we have found, are simply not within the contemplation of the Establishment Clause's broad prohibition. *Mueller, supra*, at 400; see also *Witters, supra*, at 493 (opinion of O'CONNOR, J.).[7]

Evenhandedness as one element of a permissibly attenuated benefit is, of course, a far cry from evenhandedness as a sufficient condition of constitutionality for direct financial support of religious proselytization, and our cases have unsurprisingly repudiated any such attempt to cut the Establishment Clause down to a mere prohibition against unequal direct aid. See, *e.g., Tilton v. Richardson*, 403 U. S., at 682–684 (striking portion of general aid program providing grants for construction of college and university facilities to the extent program made possible the use of funds for sectarian activities);[8] *Wolman v. Walter*, 433 U. S., at 252–255 (striking funding of field trips for nonpublic school students, such as are "provided to public school students in the district," because of unacceptable danger that state funds would be used to foster religion). And nowhere has the Court's adherence to the preeminence of the no-direct-funding principle over the principle of evenhandedness been as clear as in *Bowen v. Kendrick*, 487 U. S. 589.

*Bowen* involved consideration of the Adolescent Family Life Act (AFLA), a federal grant program providing funds to institutions for counseling and educational services related to adolescent sexuality and pregnancy. At the time of the litigation, 141 grants had been awarded under the AFLA to a broad array of both secular and religiously affiliated institutions. *Id.*, at 597. In an Establishment Clause challenge to the Act brought by taxpayers and other interested parties, the District Court resolved the case on a pre-trial motion for summary judgment, holding the AFLA program unconstitutional both on its face and also insofar as religious institutions were involved in receiving grants under the Act. When this Court reversed on the issue of facial

---

living in an organized society (like police and fire protection, for example), evenhandedness may become important to ensuring that religious interests are not inhibited.

[6] In *Zobrest*, a deaf student sought to have an interpreter, provided under a state Act aiding individuals with disabilities, accompany him to a Roman Catholic high school. In *Witters*, a blind student sought to use aid, provided under a state program for assistance to handicapped persons, to attend a private Christian college. In *Mueller*, parents sought to take a tax deduction, available for parents of both public and nonpublic schoolchildren, for certain expenses incurred in connection with providing education for their children in private religious schools.

[7] *Walz v. Tax Comm'n of New York City*, 397 U. S. 664 (1970), is yet another example of a case in which the Court treated the general availability of a government benefit as a significant condition defining compliance with the Establishment Clause, but did not deem that condition sufficient. In upholding state property tax exemptions given to religious organizations in *Walz*, we noted that the law at issue was applicable to "a broad class of property owned by nonprofit [and] quasi-public corporations," *id.*, at 673, but did not rest on that factor alone. Critical to our decision was the central principle that direct funding of religious activities is prohibited under the Establishment Clause. "It is sufficient to note that for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity." *Id.*, at 668. We emphasized that the tax exemptions did not involve the expenditure of government funds in support of religious

activities. "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Id.*, at 675. Moreover, we noted that in the property taxation context, "exemption[s] creat[e] only a minimal and remote involvement between church and state and far less than taxation of churches," and in operation "ten[d] to complement and reinforce the desired separation insulating" church and state, *id.*, at 676; and that religious property tax exemptions have been in place for over 200 years without disruption to the interests represented by the Establishment Clause, *id.*, at 676–680.

JUSTICE THOMAS's assertion, that "[a] tax exemption in many cases is economically and functionally indistinguishable from a direct monetary subsidy," *ante*, at 8 (concurring opinion) (footnote omitted), assumes that the "natural" or "correct" tax base is so self-evident that any provision excusing a person or institution from taxes to which others are subjected must be a departure from the natural tax base rather than part of the definition of the tax base itself. The equivalence (asserted by JUSTICE THOMAS, *ante*, at 8) between a direct money subsidy and the tax liability avoided by an institution (because it is part of the class of institutions that defines the relevant tax base by its exclusion) was tested and dispatched long ago by Professor Bittker in Churches, Taxes and the Constitution, 78 Yale L. J. 1285 (1969). JUSTICE THOMAS's suggestion that my "reliance on Bittker . . . is misplaced in this context," *ante*, at 9, n. 5, is not on point. Even granting that JUSTICE THOMAS's assertion of equivalence is reasonable, he cannot and does not deny the fact that the Court in *Walz* explicitly distinguished tax exemptions from direct money subsidies, 397 U. S., at 675, and rested its decision on that distinction. If JUSTICE THOMAS's assertion of equivalence should prevail then the *Walz* Court necessarily was wrong about a distinction critical to its holding. JUSTICE THOMAS can hardly use *Walz* coherently for support after removing the basis on which it relies.

[8] Although the main opinion in *Tilton* was a plurality, the entire Court was unanimous on this point. See 403 U. S., at 682–684 (plurality opinion); *id.*, at 692 (Douglas, J., joined by Black and Marshall, JJ., concurring in part and dissenting in part); *Lemon v. Kurtzman*, 403 U. S. 602, 659–661 (1971) (opinion of Brennan, J.); *id.*, at 665, n. 1 (opinion of White, J.).

constitutionality under the Establishment Clause, *id.*, at 602–618, we said that there was "no intimation in the statute that at some point, or for some grantees, religious uses are permitted." *Id.*, at 614. On the contrary, after looking at the legislative history and applicable regulations, we found safeguards adequate to ensure that grants would not be "used by . . . grantees in such a way as to advance religion." *Id.*, at 615.

With respect to the claim that the program was unconstitutional as applied, we remanded the case to the District Court "for consideration of the evidence presented by appellees insofar as it sheds light on the manner in which the statute is presently being administered." *Id.*, at 621. Specifically, we told the District Court, on remand, to "consider . . . whether in particular cases AFLA aid has been used to fund 'specifically religious activit[ies] in an otherwise substantially secular setting.'" *Ibid.*, quoting *Hunt* v. *McNair*, 413 U. S., at 743. In giving additional guidance to the District Court, we suggested that application of the Act would be unconstitutional if it turned out that aid recipients were using materials "that have an explicitly religious content or are designed to inculcate the views of a particular religious faith." *Ibid.* At no point in our opinion did we suggest that the breadth of potential recipients, or distribution on an evenhanded basis, could have justified the use of federal funds for religious activities, a position that would have made no sense after we had pegged the Act's facial constitutionality to our conclusion that advancement of religion was not inevitable. JUSTICE O'CONNOR's separate opinion in the case underscored just this point: "I fully agree . . . that '[p]ublic funds may not be used to endorse the religious message.' *Post*, at 642 [(Blackmun, J., dissenting)]. . . . [A]*ny* use of public funds to promote religious doctrines violates the Establishment Clause." *Id.*, at 622–623 (concurring opinion) (emphasis in original).

*Bowen* was no sport; its pedigree was the line of *Everson* v. *Board of Ed.*, 330 U. S., at 16–18, *Board of Ed.* v. *Allen*, 392 U. S., at 243–249, *Tilton* v. *Richardson*, 403 U. S., at 678–682, *Hunt* v. *McNair*, 413 U. S., at 742–745, and *Roemer* v. *Board of Pub. Works of Md.*, 426 U. S., at 759–761. Each of these cases involved a general aid program that provided benefits to a broad array of secular and sectarian institutions on an evenhanded basis, but in none of them was that fact dispositive. The plurality opinion in *Roemer* made this point exactly:

> "The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity. The State may not, for example, pay for what is actually a religious education, even though it purports to be paying for a secular one, and even though it makes its aid available to secular and religious institutions alike." 426 U. S., at 747 (opinion of Blackmun, J.).

Instead, the central enquiry in each of these general aid cases, as in *Bowen*, was whether secular activities could be separated from the sectarian ones sufficiently to ensure that aid would flow to the secular alone.

*Witters*, *Mueller*, and *Zobrest* expressly preserve the standard thus exhibited so often. Each of these cases explicitly distinguished the indirect aid in issue from contrasting examples in the line of cases striking down direct aid, and each thereby expressly preserved the core constitutional principle that direct aid to religion is impermissible. See *Zobrest*, *supra*, at ___ (slip op., at 9–12) (distinguishing *Meek* v. *Pittenger*, 421 U. S. 349, and *School Dist.* v. *Ball*, 473 U. S. 373, and noting that "'[t]he state may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is that of a direct subsidy to the religious school'") (quoting *Witters*, 474 U. S., at 487); see also *ibid.*; *Mueller*, 463 U. S., at 399. It appears that the University perfectly understood the primacy of the no-direct-funding rule over the evenhandedness principle when it drew the line short of funding "any activity which primarily promotes or manifests a particular belief(s) in or about a deity or an ultimate reality."[9] App. to Pet. for Cert. 66a.

### C

Since conformity with the marginal or limiting principle of evenhandedness is insufficient of itself to demonstrate the constitutionality of providing a government benefit that reaches religion, the Court must identify some further element in the funding scheme that does demonstrate its permissibility. For one reason or another, the Court's chosen element appears to be the fact that under the University's Guidelines, funds are sent to the printer chosen by Wide Awake, rather than to Wide Awake itself. *Ante*, at 22–24.

#### 1

If the Court's suggestion is that this feature of the funding program brings this case into line with *Witters*, *Mueller*, and *Zobrest* (discussed *supra*, at 18–19), the Court has misread those cases, which turned on the fact that the choice to benefit religion was made by a non-

---

[9] Congress apparently also reads our cases as the University did, for it routinely excludes religious activities from general funding programs. See, *e.g.*, 20 U. S. C. §1062(b) (federal grant program for institutions of higher education; "[n]o grant may be made under this chapter for any educational program, activity, or service related to sectarian instruction or religious worship, or provided by a school or department of divinity"); 20 U. S. C. §1069c (certain grants to higher education institutions "may not be used . . . for a school or department of divinity or any religious worship or sectarian activity . . ."); 20 U. S. C. §1132c-3(c) (1988 ed., Supp. V) (federal assistance for renovation of certain academic facilities; "[n]o loan may be made under this part for any educational program, activity or service related to sectarian instruction or religious worship or provided by a school or department of divinity or to an institution in which a substantial portion of its functions is subsumed in a religious mission"); 20 U. S. C. §1132i(c) (grant program for educational facilities; "no project assisted with funds under this subchapter shall ever be used for religious worship or a sectarian activity or for a school or department of divinity"); 20 U. S. C. §1213d ("No grant may be made under this chapter for any educational program, activity, or service related to sectarian instruction or religious worship, or provided by a school or department of divinity"); 25 U. S. C. §3306(a) (1988 ed., Supp. V) (funding for Indian higher education programs; "[n]one of the funds made available under this subchapter may be used for study at any school or department of divinity or for any religious worship or sectarian activity"); 29 U. S. C. §776(g) (grants for projects and activities for rehabilitation of handicapped persons; "[n]o funds provided under this subchapter may be used to assist in the construction of any facility which is or will be used for religious worship or any sectarian activity"; 42 U. S. C. §3027(a)(14)(A)(iv) (requiring states seeking federal aid for construction of centers for the elderly to submit plans providing assurances that "the facilit[ies] will not be used and [are] not intended to be used for sectarian instruction or as . . . place[s] for religious worship"); 42 U. S. C. §5001(a)(2) (1988 ed., Supp. V) (federal grants to support volunteer projects for the elderly, but not including "projects involving the construction, operation, or maintenance of so much of any facility used or to be used for sectarian instruction or as a place for religious worship"; 42 U. S. C. §9858k(a) (1988 ed., Supp. V) (no child care and development block grants "shall be expended for any sectarian purpose or activity, including sectarian worship or instruction").

religious third party standing between the government and a religious institution. See *Witters,* 474 U. S., at 487; see also *Mueller,* 463 U. S., at 399–400; *Zobrest,* 509 U. S., at ___-___ (slip op., at 7–12). Here there is no third party standing between the government and the ultimate religious beneficiary to break the circuit by its independent discretion to put state money to religious use. The printer, of course, has no option to take the money and use it to print a secular journal instead of Wide Awake. It only gets the money because of its contract to print a message of religious evangelism at the direction of Wide Awake, and it will receive payment only for doing precisely that. The formalism of distinguishing between payment to Wide Awake so it can pay an approved bill and payment of the approved bill itself cannot be the basis of a decision of Constitutional law. If this indeed were a critical distinction, the Constitution would permit a State to pay all the bills of any religious institution;[10] in fact, despite the Court's purported adherence to the no-direct-funding principle, the State could simply hand out credit cards to religious institutions and honor the monthly statements (so long as someone could devise an evenhanded umbrella to cover the whole scheme). *Witters* and the other cases cannot be distinguished out of existence this way.

### 2

It is more probable, however, that the Court's reference to the printer goes to a different attempt to justify the payment. On this purported justification, the payment to the printer is significant only as the last step in an argument resting on the assumption that a public university may give a religious group the use of any of its equipment or facilities so long as secular groups are likewise eligible. The Court starts with the cases of *Widmar* v. *Vincent,* 454 U. S. 263 (1981), *Board of Ed. of Westside Community Schools* v. *Mergens,* 496 U. S. 226 (1990), and *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. ___ (1993), in which religious groups were held to be entitled to access for speaking in government buildings open generally for that purpose. The Court reasons that the availability of a forum has economic value (the government built and maintained the building, while the speakers saved the rent for a hall); and that economically there is no difference between the University's provision of the value of the room and the value, say, of the University's printing equipment; and that therefore the University must be able to provide the use of the latter. Since it may do that, the argument goes, it would be unduly formalistic to draw the line at paying for an outside printer, who simply does what the magazine's publishers could have done with the University's own printing equipment. *Ante,* at 23–24.

The argument is as unsound as it is simple, and the first of its troubles emerges from an examination of the

cases relied upon to support it. The common factual thread running through *Widmar, Mergens,* and *Lamb's Chapel,* is that a governmental institution created a limited forum for the use of students in a school or college, or for the public at large, but sought to exclude speakers with religious messages. See generally *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 45–46 (1983) (forum analysis). In each case the restriction was struck down either as an impermissible attempt to regulate the content of speech in an open forum (as in *Widmar* and *Mergens*) or to suppress a particular religious viewpoint (as in *Lamb's Chapel,* see *infra,* at 37–38). In each case, to be sure, the religious speaker's use of the room passed muster as an incident of a plan to facilitate speech generally for a secular purpose, entailing neither secular entanglement with religion nor risk that the religious speech would be taken to be the speech of the government or that the government's endorsement of a religious message would be inferred. But each case drew ultimately on unexceptionable Speech Clause doctrine treating the evangelist, the Salvation Army, the millennialist or the Hare Krishna like any other speaker in a public forum. It was the preservation of free speech on the model of the street corner that supplied the justification going beyond the requirement of evenhandedness.

The Court's claim of support from these forum-access cases is ruled out by the very scope of their holdings. While they do indeed allow a limited benefit to religious speakers, they rest on the recognition that all speakers are entitled to use the street corner (even though the State paves the roads and provides police protection to everyone on the street) and on the analogy between the public street corner and open classroom space. Thus, the Court found it significant that the classroom speakers would engage in traditional speech activities in these forums, too, even though the rooms (like street corners) require some incidental state spending to maintain them. The analogy breaks down entirely, however, if the cases are read more broadly than the Court wrote them, to cover more than forums for literal speaking. There is no traditional street corner printing provided by the government on equal terms to all comers, and the forum cases cannot be lifted to a higher plane of generalization without admitting that new economic benefits are being extended directly to religion in clear violation of the principle barring direct aid. The argument from economic equivalence thus breaks down on recognizing that the direct state aid it would support is not mitigated by the street corner analogy in the service of free speech. Absent that, the rule against direct aid stands as a bar to printing services as well as printers.

### 3

It must, indeed, be a recognition of just this point that leads the Court to take a third tack, not in coming up with yet a third attempt at justification within the rules of existing case law, but in recasting the scope of the Establishment Clause in ways that make further affirmative justification unnecessary. JUSTICE O'CONNOR makes a comprehensive analysis of the manner in which the activity fee is assessed and distributed. She concludes that the funding differs so sharply from religious funding out of governmental treasuries generally that it falls outside Establishment Clause's purview in the absence of a message of religious endorsement (which she finds not to be present).

---

[10]The Court acknowledges that "if the State pays a church's bills it is subsidizing it," and concedes that "we must guard against this abuse." *Ante,* at 24. These concerns are not present here, the Court contends, because Wide Awake "is not a religious institution, at least in the usual sense of that term as used in our case law." *Ibid.* The Court's concession suggests that its distinction between paying a religious institution and paying a religious institution's bills is not really significant. But if the Court is relying on its characterization of Wide Awake as not a religious institution, "at least in the usual sense," the Court could presumably stop right there.

*Ante*, at 4–8 (O'CONNOR, J., concurring). The opinion of the Court concludes more expansively that the activity fee is not a tax, and then proceeds to find the aid permissible on the legal assumption that the bar against direct aid applies only to aid derived from tax revenue. I have already indicated why it is fanciful to treat the fee as anything but a tax, *supra*, at 11–12, and n. 3; see also *ante*, at 20 (noting mandatory nature of the fee), and will not repeat the point again. The novelty of the assumption that the direct aid bar only extends to aid derived from taxation, however, requires some response.

Although it was a taxation scheme that moved Madison to write in the first instance, the Court has never held that government resources obtained without taxation could be used for direct religious support, and our cases on direct government aid have frequently spoken in terms in no way limited to tax revenues. *E.g.*, *School Dist.* v. *Ball*, 473 U. S., at 385 ("Although Establishment Clause jurisprudence is characterized by few absolutes, the Clause does absolutely prohibit government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith"); *Nyquist*, 413 U. S., at 780 ("In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid"); *id.*, at 772 ("Primary among those evils" against which the Establishment Clause guards "have been sponsorship, financial support, and active involvement of the sovereign in religious activity") (citations and internal quotation marks omitted); see also T. Curry, The First Freedoms 217 (1986) (At the time of the framing of the Bill of Rights, "[t]he belief that government assistance to religion, especially in the form of taxes, violated religious liberty had a long history").

Allowing non-tax funds to be spent on religion would, in fact, fly in the face of clear principle. Leaving entirely aside the question whether public non-tax revenues could ever be used to finance religion without violating the endorsement test, see *Allegheny County* v. *American Civil Liberties Union*, 492 U. S., at 593–594, any such use of them would ignore one the dual objectives of the Establishment Clause, which was meant not only to protect individuals and their republics from the destructive consequences of mixing government and religion, but to protect religion from a corrupting dependence on support from the Government. *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962) (the Establishment Clause's "first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion"); *Everson*, 330 U. S., at 53 (Rutledge, J., dissenting) ("The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences, by the state. For when it comes to rest upon that secular foundation it vanishes with the resting") (citing Madison's Remonstrance ¶¶7, 8, reprinted in *Everson*, *supra*, at 63–72 (appendix to dissent of Rutledge, J.)); *School Dist. of Abington* v. *Schempp*, 374 U. S. 203, 259 (1963) (Brennan, J., concurring) ("It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government") (footnote omitted); Jefferson, A Bill for Establishing Religious Freedom, reprinted in 5 The Founder's Constitution, at 84–85.

Since the corrupting effect of government support does not turn on whether the Government's own money comes from taxation or gift or the sale of public lands, the Establishment Clause could hardly relax its vigilance simply because tax revenue was not implicated. Accordingly, in the absence of a forthright disavowal, one can only assume that the Court does not mean to eliminate one half of the Establishment Clause's justification.

### D

Nothing in the Court's opinion would lead me to end this enquiry into the application of the Establishment Clause any differently from the way I began it. The Court is ordering an instrumentality of the State to support religious evangelism with direct funding. This is a flat violation of the Establishment Clause.

### II

Given the dispositive effect of the Establishment Clause's bar to funding the magazine, there should be no need to decide whether in the absence of this bar the University would violate the Free Speech Clause by limiting funding as it has done. *Widmar*, 454 U. S., at 271 (university's compliance with its Establishment Clause obligations can be a compelling interest justifying speech restriction). But the Court's speech analysis may have independent application, and its flaws should not pass unremarked.

The Court acknowledges, *ante*, at 11, the necessity for a university to make judgments based on the content of what may be said or taught when it decides, in the absence of unlimited amounts of money or other resources, how to honor its educational responsibilities. *Widmar*, *supra*, at 276; cf. *Perry*, 460 U. S., at 49 (subject matter and speaker identity distinctions "are inherent and inescapable in the process of limiting a non-public forum to activities compatible with the intended purpose of the property"). Nor does the Court generally question that in allocating public funds a state university enjoys spacious discretion. Cf. *Rust* v. *Sullivan*, 500 U. S. 173, 194 (1991) ("[W]hen the government appropriates public funds to establish a program it is entitled to define the limits of that program"); *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540 (1983) (upholding government subsidization decision partial to one class of speaker).[11] Accordingly, the Court recognizes that the relevant enquiry in this case is not merely whether the University bases its funding decisions on the subject matter of student speech; if there is an infirmity in the basis for the

---

[11]The Court draws a distinction between a State's use of public funds to advance its own speech and the State's funding of private speech, suggesting that authority to make content-related choices is at its most powerful when the State undertakes the former. *Ante*, at 12–14. I would not argue otherwise, see *Hazelwood School Dist.* v. *Kuhlmeier*, 484 U. S. 260, 270–273 (1988), but I do suggest that this case reveals the difficulties that can be encountered in drawing this distinction. There is a communicative element inherent in the very act of funding itself, cf. *Buckley* v. *Valeo*, 424 U. S. 1, 15–19 (1976) *(per curiam)*, and although it is the student speakers who choose which particular messages to advance in the forum created by the University, the initial act of defining the boundaries of the forum is a decision attributable to the University, not the students. In any event, even assuming that private and state speech always may be separated by clean lines and that this case involves only the former, I believe the distinction is irrelevant here because, as is discussed *infra*, this case does not involve viewpoint discrimination.

University's funding decision, it must be that the University is impermissibly distinguishing among competing viewpoints, *ante,* at 8–9, citing, *inter alia, Perry, supra,* at 46; see also *Lamb's Chapel,* 508 U. S. at, ___ (slip op., at 8–9) (subject matter distinctions permissible in controlling access to limited public forum if reasonable and viewpoint neutral); *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U. S. 788, 806 (1985) (similar); *Regan, supra,* at 548.[12]

The issue whether a distinction is based on viewpoint does not turn simply on whether a government regulation happens to be applied to a speaker who seeks to advance a particular viewpoint; the issue, of course, turns on whether the burden on speech is explained by reference to viewpoint. See *Cornelius, supra,* at 806 ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). As when deciding whether a speech restriction is content-based or content-neutral, "[t]he government's purpose is the controlling consideration." *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989); see also *ibid.* (content neutrality turns on, *inter alia,* whether a speech restriction is "justified without reference to the content of the regulated speech") (internal quotation marks and citations omitted). So, for example, a city that enforces its excessive noise ordinance by pulling the plug on a rock band using a forbidden amplification system is not guilty of viewpoint discrimination simply because the band wishes to use that equipment to espouse antiracist views. Accord, *Rock Against Racism, supra.* Nor does a municipality's decision to prohibit political advertising on bus placards amount to viewpoint discrimination when in the course of applying this policy it denies space to a person who wishes to speak in favor of a particular political candidate. Accord, *Lehman* v. *Shaker Heights,* 418 U. S. 298, 304 (1974) (plurality opinion).

Accordingly, the prohibition on viewpoint discrimination serves that important purpose of the Free Speech Clause, which is to bar the government from skewing public debate. Other things being equal, viewpoint discrimination occurs when government allows one message while prohibiting the messages of those who can reasonably be expected to respond. See *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765, 785–786 (1978) ("Especially where . . . the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended") (footnote omitted); *Madison Joint School Dist. No. 8* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 175–176 (1976) ("To permit one side of a debatable public question to have a monopoly in expressing its views . . . is the antithesis of constitutional guarantees") (footnote omitted); *United States* v.

*Kokinda,* 497 U. S. 720, 736 (1990) (viewpoint discrimination involves an "inten[t] to discourage one viewpoint and advance another") (plurality opinion) (citations and internal quotation marks omitted). It is precisely this element of taking sides in a public debate that identifies viewpoint discrimination and makes it the most pernicious of all distinctions based on content. Thus, if government assists those espousing one point of view, neutrality requires it to assist those espousing opposing points of view, as well.

There is no viewpoint discrimination in the University's application of its Guidelines to deny funding to Wide Awake. Under those Guidelines, a "religious activit[y]," which is not eligible for funding, App. to Pet. for Cert. 62a, is "an activity which primarily promotes or manifests a particular belief(s) in or about a deity or an ultimate reality," App. to Pet. for Cert. 66a. It is clear that this is the basis on which Wide Awake Productions was denied funding. Letter from Student Council to Ronald W. Rosenberger. App. 54 ("In reviewing the request by Wide Awake Productions, the Appropriations Committee determined your organization's request could not be funded as it is a religious activity"). The discussion of Wide Awake's content, *supra,* at 3–6, shows beyond any question that it "primarily promotes or manifests a particular belief(s) in or about a deity . . . ," in the very specific sense that its manifest function is to call students to repentance, to commitment to Jesus Christ, and to particular moral action because of its Christian character.

If the Guidelines were written or applied so as to limit only such Christian advocacy and no other evangelical efforts that might compete with it, the discrimination would be based on viewpoint. But that is not what the regulation authorizes; it applies to Muslim and Jewish and Buddhist advocacy as well as to Christian. And since it limits funding to activities promoting or manifesting a particular belief not only "in" but "about" a deity or ultimate reality, it applies to agnostics and atheists as well as it does to deists and theists (as the University maintained at oral argument, Tr. of Oral Arg. 18–19, and as the Court recognizes, see *ante,* at 15–16). The Guidelines, and their application to Wide Awake, thus do not skew debate by funding one position but not its competitors. As understood by their application to Wide Awake, they simply deny funding for hortatory speech that "primarily promotes or manifests" any view on the merits of religion; they deny funding for the entire subject matter of religious apologetics.

The Court, of course, reads the Guidelines differently, but while I believe the Court is wrong in construing their breadth, the important point is that even on the Court's own construction the Guidelines impose no viewpoint discrimination. In attempting to demonstrate the potentially chilling effect such funding restrictions might have on learning in our nation's universities, the Court describes the Guidelines as "a sweeping restriction on student thought and student inquiry," disentitling a vast array of topics to funding. *Ante,* at 15–16. As the Court reads the Guidelines to exclude "any writing that is explicable as resting upon a premise which presupposes the existence of a deity or ultimate reality," as well as "those student journalistic efforts which primarily manifest or promote a belief that there is no deity and no ultimate reality," the Court concludes that the major works of writers from Descartes to Sartre would be barred from the funding forum. *Ante,* at 15–16. The Court goes so far as to suggest that the Guidelines,

---

[12] I do not decide that all viewpoint discrimination in a public university's funding determinations would violate the Free Speech Clause. If, however, the determinations are made on the basis of a reasonable subject-matter distinction, but not on a viewpoint distinction, there is no violation. In a limited-access forum, a speech restriction must be "reasonable in light of the purpose served by the forum" as well as viewpoint-neutral. *E.g., Lamb's Chapel,* 508 U. S., at ___ (slip op., at 8), quoting *Cornelius,* 473 U. S., at 806. Because petitioners have not challenged the University's Guideline as unreasonable, I express no opinion on that or on the question whether the reasonableness criterion applies in speech funding cases in the same manner that it applies in limited-access forum cases.

properly interpreted, tolerate nothing much more than essays on "making pasta or peanut butter cookies . . . ." *Ante*, at 16.

Now, the regulation is not so categorically broad as the Court protests. The Court reads the word "primarily" ("primarily promotes or manifests a particular belief(s) in or about a deity or an ultimate reality") right out of the Guidelines, whereas it is obviously crucial in distinguishing between works characterized by the evangelism of Wide Awake and writing that merely happens to express views that a given religion might approve, or simply descriptive writing informing a reader about the position of a given religion. But, as I said, that is not the important point. Even if the Court were indeed correct about the funding restriction's categorical breadth, the stringency of the restriction would most certainly not work any impermissible viewpoint discrimination under any prior understanding of that species of content discrimination. If a University wished to fund no speech beyond the subjects of pasta and cookie preparation, it surely would not be discriminating on the basis of someone's viewpoint, at least absent some controversial claim that pasta and cookies did not exist. The upshot would be an instructional universe without higher education, but not a universe where one viewpoint was enriched above its competitors.

The Guidelines are thus substantially different from the access restriction considered in *Lamb's Chapel*, the case upon which the Court heavily relies in finding a viewpoint distinction here, *ante*, at 9–11. *Lamb's Chapel* addressed a school board's regulation prohibiting the after-hours use of school premises "by any group for religious purposes," even though the forum otherwise was open for a variety of social, civic, and recreational purposes. 508 U. S., at ___ (slip op., at 2) (citation and internal quotation marks omitted). "Religious" was understood to refer to the viewpoint of a believer, and the regulation did not purport to deny access to any speaker wishing to express a non-religious or expressly antireligious point of view on any subject, see *ibid.* ("The issue in this case is whether . . . it violates the Free Speech Clause of the First Amendment . . . to deny a church access to school premises to exhibit for public viewing and for assertedly religious purposes, a film dealing with family and child-rearing issues"); *id.*, at ___ (slip op., at 8–9), citing *May v. Evansville-Vanderburgh School Corp.*, 787 F. 2d 1105, 1114 (CA7 1986).[13]

---

[13]See also Tr. of Oral Arg. in *Lamb's Chapel v. Center Moriches Union Free School Dist.*, O. T. 1992, No. 91–2024, where counsel for the school district charged with enforcing the restriction unequivocally admitted that anyone with an atheistic or antireligious message would be permitted to use school property under the rules of the forum. *Id.*, at 47, 57–58. The complete exchange during the oral argument in *Lamb's Chapel* went as follows:

"QUESTION: But do I understand your statement you made earlier that supposing you had a communist group that wanted to address the subject of family values and they thought there was a value in not having children waste their time going to Sunday school or church and therefore they had a point of view that was definitely antireligious, they would be permitted, under your policy, to discuss family values in that context?

"[COUNSEL]: Yes. Yes, Your Honor, that's correct.

     •     •     •

"QUESTION: Counsel, in your earlier discussions with [the Court] you indicated that communists would be able to give their perspective on family. I—I assume from that that atheists would be able to give theirs under your rules.

"[COUNSEL]: Yes, Your Honor."

With this understanding, it was unremarkable that in *Lamb's Chapel* we unanimously determined that the access restriction, as applied to a speaker wishing to discuss family values from a Christian perspective, impermissibly distinguished between speakers on the basis of viewpoint. See *Lamb's Chapel*, *supra*, at ___ (slip op., at 8–9) (considering as-applied challenge only). Equally obvious is the distinction between that case and this one, where the regulation is being applied, not to deny funding for those who discuss issues in general from a religious viewpoint, but to those engaged in promoting or opposing religious conversion and religious observances as such. If this amounts to viewpoint discrimination, the Court has all but eviscerated the line between viewpoint and content.

To put the point another way, the Court's decision equating a categorical exclusion of both sides of the religious debate with viewpoint discrimination suggests the Court has concluded that primarily religious and antireligious speech, grouped together, always provides an opposing (and not merely a related) viewpoint to any speech about any secular topic. Thus, the Court's reasoning requires a university that funds private publications about any primarily nonreligious topic also to fund publications primarily espousing adherence to or rejection of religion. But a university's decision to fund a magazine about racism, and not to fund publications aimed at urging repentance before God does not skew the debate either about racism or the desirability of religious conversion. The Court's contrary holding amounts to a significant reformulation of our viewpoint discrimination precedents and will significantly expand access to limited-access forums. See *Greer v. Spock*, 424 U. S. 828 (1976) (upholding regulation prohibiting political speeches on military base); *Cornelius*, 473 U. S., at 812 (exclusion from fundraising drive of political activity or advocacy groups is facially viewpoint neutral despite inclusion of charitable, health and welfare agencies); *Perry*, 460 U. S., at 49–50, and n. 9 (ability of teachers' bargaining representative to use internal school mail system does not require that access be provided to "any other citizen's group or community organization with a message for school personnel"); *Lehman*, 418 U. S., at 304 (exclusion of political messages from forum permissible despite ability of nonpolitical speakers to use the forum) (plurality opinion).

### III

Since I cannot see the future I cannot tell whether today's decision portends much more than making a shambles out of student activity fees in public colleges. Still, my apprehension is whetted by Chief Justice Burger's warning in *Lemon v. Kurtzman*, 403 U. S. 602, 624 (1971): "in constitutional adjudication some steps, which when taken were thought to approach 'the verge,' have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a 'downhill thrust' easily set in motion but difficult to retard or stop."

I respectfully dissent.

MICHAEL W. MCCONNELL, Chicago, Ill. (ALAN E. UNTEREINER, MAYER, BROWN & PLATT, MICHAEL P. MCDONALD, and CENTER FOR INDIVIDUAL RIGHTS, on the briefs) for petitioners; JOHN C. JEFFRIES JR., Charlottesville, Va. (JAMES J. MINGLE and C. LYNN LAWSON, on the briefs) for respondents.