IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

JAN 29 1996

CLERK
U.S. DIST. COURT
MIDDLE DIST. OF AL

| | |
|---|---|
| GAY LESBIAN BISEXUAL ALLIANCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  CIVIL ACTION NO. 93-T-1178-N |
| | ) |
| JEFF SESSIONS, in his official | ) |
| capacity as Attorney General | ) |
| of the state of Alabama, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

The Alabama public funds and facilities statute, § 16-1-28 of
the Alabama Code 1975 (Michie 1995), as summarized in its preamble,
"prohibit[s] any college or university from spending public funds
or using facilities, directly or indirectly, to sanction, recognize
or support any group that promotes a lifestyle or actions
prohibited by the sodomy and sexual misconduct laws" and
"prohibit[s] any group from permitting or encouraging its members
or others to engage in or provide materials on how to engage in the
lifestyle or actions."[1]  Plaintiff Gay Lesbian Bisexual Alliance
(GLBA), a student organization at the University of South Alabama,
challenges the constitutionality of this statute, both facially and
as applied to it by the university, under the first and fourteenth
amendments to the United States Constitution, as enforced through

---

1.    Joint Record, volume one (hereinafter JRI) at 0043 (the
statute uncodified).

42 U.S.C.A. § 1983 (West 1994). GLBA seeks declaratory and injunctive relief and has named as defendants the Attorney General of the State of Alabama and the President and the Dean of Students of the University of South Alabama. The jurisdiction of the court has been properly invoked pursuant to 28 U.S.C.A. §§ 1331 (West 1994), 1343(a)(3) (West 1994). For the reasons that follow, the court holds that § 16-1-28, facially and as applied to GLBA, violates the first and fourteenth amendments.

I.

A.

Subsection (a) to § 16-1-28 provides that "No public funds or public facilities shall be used by any college or university to, directly or indirectly, sanction, recognize, or support the activities or existence of any organization or group that fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws."[2]    Subsection (b) provides that "No

---

2.    The sodomy and sexual misconduct laws referred to are §§ 13A-6-63, 13A-6-64 and 13A-6-65 of the Code of Alabama 1975 (Michie 1994). Generally, they make "deviate sexual intercourse" illegal. "Deviate sexual intercourse" is defined as "Any act of sexual gratification between persons not married to each other involving the sex organs of one person and the mouth or anus of another." § 13A-6-60(2) of the Code of Alabama 1975 (Michie 1994). These sections outlaw, among other things, forcible acts of "deviate sexual intercourse" (§ 13A-6-65 (a)(1); such acts with a minor or someone incapable of consent (§§ 13A-6-63 & 13A-6-64); vaginal intercourse under certain circumstances, including where the consent of a female is obtained through fraud or artifice by the male (§ 13A-6-65(a)(1)); and consensual oral or anal intercourse between any two unmarried persons--of the same or of

2

organization or group that receives public funds or uses public facilities, directly or indirectly, at any college or university shall permit or encourage its members or encourage other persons to engage in any such unlawful acts or provide information or materials that explain how such acts may be engaged in or performed." And Subsection (c) attempts to save the statute from constitutional invalidity by providing that it "shall not be construed to be a prior restraint of the first amendment protected speech" and "shall not apply to any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state."

B.

In the fall of 1991, the Student Government Association at Auburn University (Auburn SGA) voted to deny the Auburn Gay and Lesbian Association permanent status as an officially recognized campus organization.[3] In explaining its action, the Auburn SGA stated that the "group does not meet the idea[l]s entrusted to the Student Senate on behalf of the students at Auburn" and specifically referred to the laws "prohibiting sodomy and sexual

_____

different genders (§ 13A-6-65(a)(3)). According to the commentary to § 13A-6-65, subsection (a)(3) "make[s] all homosexual conduct criminal, and consent is no defense." § 13A-6-65 of the Code of Alabama 1975 (Michie 1994) (commentary at p. 374).

3. JRI at 0082.

3

misconduct."[4]   The Auburn administration overruled the decision and recognized the Gay and Lesbian Association as a chartered student organization and, despite further appeals from alumni and other groups, reaffirmed its decision.[5]

In response to these events, which had become the subject of much public discussion across the state, the Alabama House passed a resolution supporting the Auburn SGA and denouncing the university's official recognition of the Gay and Lesbian Association.   The resolution stated, in part, "That the House of Representatives of Alabama does not condone violations of the laws of the State of Alabama, nor does it recognize a homosexual life style as an acceptable or legal alternative life style, but rather acknowledges that the State of Alabama is and resolves that it shall remain, historically traditional in its view of the family, and that the State of Alabama is a place where families can live and grow without being debased or immoralized."[6]   The Alabama Senate passed a similar resolution.[7]   The Alabama legislature later passed § 16-1-28.

According to press accounts and statements of representatives, the legislature's intent was to suppress the official presence and

---

4.   Id. at 0082-83.

5.   Id. at 0080-85.

6.   Id. at 0048.

7.   Id. at 0046.

4

voice of gay and lesbian groups at state supported colleges and university campuses.[8]   Members of the Auburn Student Government Association lobbied for the bill, and one state representative went so far as to use an effeminate voice, imitating the "stereotypical image" of a gay man, when he joked with his colleagues to vote no.[9] A representative's press release stated: "who in their right mind would put [homosexuals] in any position within our educational system where they might become role models of the young[;] ... can anything destroy the possibility of happiness for a young person more than turning him or her away from traditional marriage and family life, to the dismal sewers of sodomy and lesbianism."[10] While the statute was pending before the Legislature, the State Attorney General issued an opinion advising a representative that "an organization that professes to be comprised of homosexuals and/or lesbians may not receive state funding or use state-supported facilities to foster or promote those illegal, sexually deviate activities defined in the sodomy and sexual misconduct laws."[11]

C.

---

8.   Id. at 0192-97.

9.   Id. at 0196.

10.   Id. at 0062.

11.   Id. at 0060.

5

The University of South Alabama encourages a wide variety of student groups to be active on its campus.[12] The university believes that the activity of student groups "enhances the life on campus."[13] It is also committed to freedom of expression and, in particular, academic freedom.[14] Based on these precepts, the university has set up a procedure for the formation and registration of student organizations.[15] Once registered, a student group enjoys various benefits at the school, including use of the meeting rooms in the school recreation center, on-campus banking services, and direct university funding through the Student Government Association (USA-SGA).[16] There are over 100 registered student organizations at the university.[17]

The GLBA at the University of South Alabama is an officially recognized student organization whose purpose, according to its constitution, is to provide support for the university's homosexual students and to educate the public on homophobia.[18] The GLBA does

---

12. Adams's dep. at 12 (filed March 18, 1994).

13. Id.

14. JRII at 0510.

15. Id. at 0483.

16. Id. at 0484-85, 0506.

17. Id. at 0518-26, 0562.

18. The GLBA's constitution provides that the group's purpose is "to provide a foundation for unification for homosexual and nonhomosexual people of the student population, in order to draw support to further our efforts in educating all members of the

6

not advocate the violation of the sodomy statutes.[19] And as far as the Dean of Students Dale T. Adams is aware, the group's members have not violated Alabama's sodomy and sexual misconduct statutes, nor has the group interfered with the university's educational mission.[20] In fact, according to Dean Adams, the GLBA has made a contribution to the university in the areas of HIV awareness and AIDS education, support for gay, lesbian, and bisexual students, and in educating other students, faculty, and staff about issues pertaining to homosexual life.[21]

In the spring of 1992, when § 16-1-28 was before the State Legislature, Dean Adams attended a GLBA meeting and suggested that the group lay low in light of the Auburn controversy and cancel a planned dance celebrating its first year of existence.[22]   Adams advised GLBA to wait until the Legislature had concluded its deliberations on the statute.  Because the group wanted to maintain

---

university community on the fears and dangers of homophobia and to provide a support system for the University of South Alabama's homosexual students."  JRII at 311.

19.   The GLBA has never lobbied for nor advocated repeal of Alabama's sodomy laws, nor is violating these laws one of its purposes or goals.  JRI at 215.

20.   Adams's dep. at 26-27 (filed March 18, 1994).

21.   Id.

22.   Id. at 42; JRI at 0219.

7

good relations with the dean and the school, it agreed to cancel the dance.[23]

In June of 1992, after § 16-1-28 had become law, GLBA requested a university bank account.[24] The group wanted to take advantage of the USA-SGA funding process and to avoid commercial banking fees. The university advised GLBA that any funds could be frozen under the school's interpretation of § 16-1-28, and thus the university effectively denied GLBA an on-campus bank account.[25]

GLBA has also been denied funding. In the fall quarter of 1992, GLBA requested $100 to cover publicity costs for World AIDS Day events.[26] Dean Adams advised the group that the USA-SGA could not fund the GLBA until he received an opinion from the State Attorney General on § 16-1-28's application; instead, he arranged for the USA-SGA to pay directly for the printing of campus posters.[27] During the winter quarter of 1993, GLBA requested $884 from the USA-SGA, $625 of which was to bring a guest speaker to

---

23. JRI at 0219.

24. JRII at 0327.

25. The defendants disagree with GLBA's characterization of Adams's advice. The defendants contend that Adams advises all groups that their funds may be subject to government action once deposited on campus. Upon independent review of Adams's deposition, the court finds that Adams's advice to GLBA that all of its funds might be frozen was unique to them and was motivated by his interpretation of § 16-1-28.

26. JRII at 0333-34.

27. JRI at 0221.

8

campus.   The USA-SGA executive council approved $651 for the group, but the USA-SGA senate never voted on this request because Dean Adams instructed the USA-SGA to table the request.   Dean Adams informed the group once more that he could not allow any funding of the GLBA until he received an opinion from the Attorney General.[28] This lack of funding forced GLBA to cancel its planned speaker, who was scheduled to make a presentation on gay and AIDS-related legal issues.[29]

In the spring of 1993, GLBA submitted another funding request for $720 to the USA-SGA.   The USA-SGA senate, despite Dean Adams's prior advice, voted to approve $570 in order to bring a speaker to campus because it believed that GLBA's planned educational program had merit and deserved funding.   Dean Adams refused to approve the final payment of this money.[30]   During the summer of 1993, GLBA submitted a dramatically scaled down budget of $198.85.   GLBA received only $16.31 to cover the costs of printing award certificates.[31]

Finally, in July 1993, the Attorney General issued a "letter opinion" regarding GLBA's receipt of USA-SGA funds under § 16-1-28. The letter opinion, without specifying how or why the GLBA and its

---

28.  Id. at 0222-23.

29.  Id. at 0224.

30.  JRII at 0433, 448; JRI at 0224-25.

31.  JRI at 0227.

9

activities violated § 16-1-28, stated that the group could not receive any funds.[32] Because the Attorney General had failed to provide any definition or guidance on what the words "foster" and "promote" in § 16-1-28 meant and how or why funding GLBA would violate the statute, the university initiated an independent fact-finding process. Dean Adams selected a group of faculty, staff, and students to determine if and how GLBA and its members violated § 16-1-28 by "fostering" or "promoting" a life-style or actions prohibited by the sodomy and sexual misconduct laws.[33] This investigation into the lives of group members affected GLBA's ability to maintain and increase its membership.[34] Furthermore, the USA-SGA will no longer approve GLBA funding requests because many of its members are afraid that they may be breaking the law.[35] These actions have hindered GLBA's ability to function as a student group, to sponsor events and speakers, and to attract new and maintain old members.[36]

In conclusion, as a result of the enforcement of § 16-1-28, GLBA has been denied on-campus banking facilities, disqualified from receiving funding, and subjected to an intrusive and highly

---

32. Id. at 0210.

33. JRII at 0456.

34. JRI at 0216-17,

35. JRI at 0231-32.

36. JRI at 0228,

personal fact-finding investigation. In addition, although the university has not prevented GLBA from meeting in campus facilities or from being recognized as an official student group, the group is still considered by the Attorney General and university officials as falling within the prohibitions of § 16-1-28 and thus not entitled to use university facilities.

II.

The first amendment provides that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. Const. amend. I. (West 1987). This amendment is applicable to the states through the fourteenth amendment. Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 630 (1925). GLBA claims that § 16-1-28, facially and as it has been applied to GLBA, violates the first amendment.

A.

The outcome of this case is significantly guided, if not determined, by the recent opinion of the Supreme Court in Rosenberger v. Rector & Visitors of Univ. of Va., ___ U.S. ___, 115 S.Ct. 2510 (1995). There, the University of Virginia had denied disbursal of money from a student activities fund to a student group which published a newspaper with a Christian editorial viewpoint. The student organization claimed that the denial of funds amounted to viewpoint discrimination in violation of the

11

first amendment. In upholding the claim, Justice Kennedy, writing for the Court, reaffirmed certain broad principles: "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. ... Other principles follow from this precept. In the realm of private speech or expression, government regulation may not favor one speaker over another. ... Discrimination against speech because of its message is presumed to be unconstitutional. ... When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. ... Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger, ___ U.S. at ___, 115 S.Ct. at 2516.

The Rosenberger Court then narrowed its focus and wrote: "These principles provide the framework forbidding the State from exercising viewpoint discrimination, even when the limited public forum is one of its own creation. ... Once it has opened a limited forum the State ... may not ... discriminate against speech on the basis of its viewpoint." Id. at ___, 115 S.Ct. at 2517. Moreover, the danger to free speech which these principles seek to contain "is especially real in the University setting, where the State acts against a background and tradition of thought and

experiment that is at the center of our intellectual and philosophic tradition. ... For the University, by regulation, to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the nation's intellectual life, its college and university campuses." Id. at ___, 115 S.Ct. at 2520. The Court concluded that, having made funds available to varied and differing student organizations "to convey their own messages, the University may not silence the expression of selected viewpoints." Id. at ___, 115 S.Ct. at 2519.

Section 16-1-28 similarly violates the first amendment. It provides that State colleges and universities, although making their facilities and funds available to various and differing student organizations to convey their own messages, must silence the expression of one, and only one, viewpoint. This is self-evident from the plain language of the statute. The statute prohibits only those groups that "foster" and "promote" a "lifestyle or actions prohibited by the sodomy and misconduct laws" from using public funds and facilities; groups that "oppose" such "lifestyle or actions" would not fall within its prohibition. Thus, a student organization that sought to sponsor a debate on the morality of various types of sexual conduct could risk being barred from using campus facilities because the debate could include the view that certain sexual conduct, including conduct prohibited by the State's sexual misconduct laws, is moral. On the other hand,

13

a group that sought to invite someone to speak solely on the immorality of such conduct would not run that risk. The statute is therefore limited in application to restricting only the viewpoint of those who foster and promote the prohibited "lifestyle or actions." This is naked viewpoint discrimination.[37]

The statute further states that "No organization or group that receives public funds or uses public facilities, directly or indirectly, at any college or university shall permit or encourage its members or encourage other persons to engage in any such unlawful acts or provide information or materials that explain how such [unlawful] acts may be engaged in or performed." The statute therefore attempts to impose on a group that receives public funds or uses public facilities the State's viewpoint regarding certain lifestyles and actions and to require that that group and its members conform their speech to this viewpoint.[38] The statute

---

37. From this facial perspective, § 16-1-28 could be read to apply to speech touching on issues of heterosexuality as well as homosexuality. However, as explained later, it is undisputed that the statute is intended to target only speech concerning issues of homosexuality.

38. This provision, which essentially requires that groups that receive public funds or use public facilities must exclude members who violate § 16-1-28 or the State sodomy and sexual misconduct laws, violates associational rights as well. In other words, under § 16-1-28, a group that fails to exclude such a member would be guilty of violation of the statute merely by association with that member. "[I]t has been established that 'guilt by association alone, without [establishing] that an individual's association alone poses the threat feared by the Government,' is an impermissible basis upon which to deny First Amendment rights." Healy v. James, 408 U.S. 169, 186, 92 S.Ct. 1338, 1348 (1972) (quoting United States v. Robel, 389 U.S. 258, 265, 88 S.Ct. 419,

14

further attempts to dictate the information, and even the actual words, that may not be used to convey an idea or belief. This too is viewpoint discrimination. A viewpoint may include not only what a person says but how she says it. For example, as the defendants admitted at oral argument, the State does not seek to ban discussion about sexually transmitted diseases; rather, it only seeks to limit how such diseases may be discussed. In other words, the State seeks to impose its viewpoint on how the discussion may proceed.[39]

And finally, the statute states that its prohibitions "shall not apply to any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state." It thus attempts, remarkably, to define an area of permissible speech, thought, and belief. This subsection, read in conjunction with the preceding subsections, leaves no doubt that the statute constitutes viewpoint discrimination.

This conclusion is reinforced by the history of § 16-1-28. The statute was passed in the wake of the State Legislature's displeasure with the decision of Auburn University to allow a group addressing homosexual issues to be formed on campus. Public

_____

424 (1967)).

39. Surely, the State, in an effort to curtail crime, could not pass a law banning from public facilities groups that sought to put on plays and readings that included descriptions of how to commit murders or robberies.

15

statements made by legislators reflect that the intent behind the statute was to prohibit and discourage the formation of such groups on college and university campuses.[40] And the "lifestyle" condemned in the statute clearly refers to the "homosexual lifestyle" condemned in the resolution passed by the State House just before the introduction of the legislation that would become the statute.[41] Finally, that the State Attorney General and officials at the University of South Alabama have limited the statute's application at the university to only GLBA, an organization that addresses homosexual issues, removes any doubt about the statute's intent. This history reflects an open effort by the State Legislature to limit the sexuality discussion in institutions of higher learning to only one viewpoint:   that of heterosexual people.   This viewpoint limitation violates the first amendment.   See, e.g., Gay Students Servs. v. Texas A & M Univ., 737 F.2d 1317 (5th Cir. 1984) (denying homosexual group official recognition at state university

---

40.   Indeed, in the joint brief filed by the Attorney General and the South Alabama officials, they state that "USA [University of South Alabama] concurs that the law appears to have been intended by the Alabama Legislature to address gay and lesbian student organizations" at Alabama's public colleges and universities," and thus the defendants do "not deal with the underlying circumstances which may have precipitated passage of the challenged statute."  Defendants' brief at 14.

41.   Although the statute by implication and legislative resolutions expressly refer to a "homosexual lifestyle," the court should not be understood to imply that there is in fact such a thing as a "homosexual lifestyle."   There is nothing before the court, and the court is not otherwise aware of any study or evidence, that would indicate that homosexual people manifest any different range of lifestyles from that of heterosexual people.

16

violated group's first amendment rights), cert. denied, 471 U.S. 1001, 105 S.Ct. 1860 (1985); Gay Lib v. Univ. of Missouri, 558 F.2d 848 (8th Cir. 1977) (denying gay group formal recognition on same basis as other campus groups violated group's first amendment associational rights), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276 (1978); Gay Alliance of Students v. Matthews, 544 F.2d 162 (4th Cir. 1976) (denying gay association's registration and resulting privileges violated group's first and fourteenth amendment rights); Gay Students Organization of the Univ. of New Hampshire v. Bonner, 509 F.2d 652 (1st Cir. 1974) (prohibiting gay group from holding social events on campus violated group's associational rights); Department of Educ. v. Lewis, 416 So. 2d 455 (Fla. 1982) (striking down as unconstitutional statute similar to § 16-1-28).

B.

The defendants contend that the State should not be required to support, and in particular to fund, the viewpoint of an organization. They rely primarily on Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759 (1991), where the Supreme Court held that the government could prohibit health care providers who received funds from a specific government program from discussing abortion with their patients.

In Rosenberger, a similar argument was advanced.  The University of Virginia urged that the "case involves the provision of funds rather than access to facilities"; that "the State must

17

have substantial discretion in determining how to allocate scarce resources to accomplish its educational mission"; and that "content-based funding decisions are both inevitable and lawful." ___ U.S. at ___, 115 S.Ct. at 2518. The Court expressly rejected this argument. It acknowledged that "when the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message." Rosenberger, ___ U.S. at ___, 115 S.Ct. at 2518. The Court emphasized, however, that viewpoint-based restrictions are not "proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers. A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech ...." Id. at ___, 115 S.Ct. at 2519.

The Court also refused to accept "that, from a constitutional standpoint, funding of speech differs from provision of access to facilities because money is scarce and physical facilities are not." Id. "Beyond the fact that in any given case this proposition might not be true as an empirical matter, the underlying premise that the University could discriminate based on viewpoint if demand for space exceeded its availability is wrong as

18

well. The government cannot justify viewpoint discrimination among private speakers on the economic fact of scarcity." Id. Instead, it would be "incumbent on the State ... to ration or allocate the scarce resources on some acceptable neutral principle ...." Id. Otherwise, "scarcity would give the State the right to exercise viewpoint discrimination that is otherwise impermissible." Id. A fund "is a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." Id. at ___, 115 S.Ct. at 2517.

Finally, the Rosenberger Court distinguished Rust with the observation that "There, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program." Id. at ___, 115 S.Ct. at 2519. "We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. ... When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." Id. However, as stated previously, if the government makes funds available to various and differing private groups "to convey their own messages, [it] may not silence the expression of selected viewpoints." Id. at ___, 115 S.Ct. at 2519.

The fact that the State finds the ideas advanced by a group to be unpopular or offensive does not warrant an exception. "If there

19

is a bedrock principle underlying the first amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 2545 (1989). See also FCC v. League of Women Voters of California, 468 U.S. 364, 383-84, 104 S.Ct. 3106, 3119 (1984) ("A regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a law ... abridging the freedom of speech, or of the press") (internal quotation omitted); Papish v. Board of Curators of Univ. of Missouri, 410 U.S. 667, 670, 93 S.Ct. 1197, 1199 (1973) (per curiam) ("the mere dissemination of ideas--no matter how offensive to good taste--on a state university campus may not be shut off in the name alone of 'conventions of decency'").

### C.

The defendants contend that the State has the right to enact laws that prohibit "aiding, furthering, or abetting" violation of State sodomy and sexual misconduct laws.[42]   They contend that because there is no fundamental right to engage in sodomy or sexual misconduct, Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841 (1986), advocating such conduct may be prohibited by state law.

---

42.  Defendants' brief at 43.

20

The defendants seek to equate § 16-1-28 with inchoate criminal statutes--for example, Alabama Code 1975 § 13A-4-1 (Michie 1994) (criminal solicitation), § 13A-4-2 (attempt), § 13A-4-3 (criminal conspiracy). They argue that "If a person whose sexual orientation is admittedly 'gay' or 'lesbian'' and thus is 'homosexual,' and since homosexual conduct is not a fundamental right and it may constitutionally be classified as criminal misconduct, why is the plaintiff trying to put its members 'above the law' by trying to convince this Honorable Court that they should somehow be immune from the enforcement of an inchoate statute which is corollary to the criminal sodomy statutes?"[43]

If § 16-1-28 is a inchoate criminal statute, it goes too far in prohibiting mere advocacy--that is, the mere verbal fostering or promoting--of criminal conduct. In Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827 (1969) (per curiam), the Supreme Court overturned the conviction of a member of the Ku Klux Klan for merely advocating the propriety of violence and other unlawful means to accomplish social reform. The Court wrote that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Brandenburg, 395 U.S. at 447, 89

---

43. Id. at 43-44, 72.

21

S.Ct. at 1829.   See also Noto v. United States, 367 U.S. 290,

297-298, 81 S.Ct. 1517, 1521 (1961) ("the mere abstract teaching

... of the moral propriety or even moral necessity for a resort to

force and violence, is not the same as preparing a group for

violent action and steeling it to such action.")   Similarly and

more to the point, in Healy v. James, 408 U.S. 169, 180-81, 92

S.Ct. 2338, 2345-45 (1972), the Court rejected an attempt by a

university to deny recognition to a student organization, Students

for a Democratic Society, because its parent organization allegedly

advocated disruptive and illegal actions.   The Court wrote that

"The   critical   line   heretofore   drawn   for   determining   the

permissibility of regulation is the line between mere advocacy and

advocacy 'directed to inciting or producing imminent lawless action

and ... likely to incite or produce such action.'"   Healy, 408 U.S.

at 188, 92 S.Ct. at 2350 (quoting Brandenburg, 395 U.S. at 447, 89

S.Ct. at 1829).

"A statute which fails to draw this distinction impermissibly

intrudes upon the freedoms guaranteed by the First and Fourteenth

Amendments.   It sweeps within its condemnation speech which our

Constitution   has   immunized   from   governmental   control."

Brandenburg, 395 U.S. at 448, 89 S.Ct. at 1830.   Section   16-1-28

does not draw this distinction.   It is not limited to advocacy

"directed to inciting or producing imminent lawless action and ...

likely to incite or produce such action."   Brandenburg, 395 U.S. at

447, 89 S.Ct. at 1829.   Indeed, it attempts to draw within its

22

reach even a "lifestyle," which in some instances could require little more than a frame of mind.

In any event, GLBA has not fostered or promoted the violation of state sodomy and sexual misconduct laws. And yet § 16-1-28 has been applied to the group to deny it full benefits as a student organization at the University of South Alabama. The application of the statute to the group is undoubtedly illegal.

D.

The defendants contend that the government has a compelling interest in promoting marriage and the procreation of children, in enforcing Alabama's sexual misconduct statutes, and in prohibiting the transmission of sexual diseases.[44] Although this may be true, these arguments, even taken together, do not justify § 16-1-28. Even when the State has a compelling interest in an idea, it still may not exclude viewpoints with which it disagrees from the debate about the idea. In Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. ___, 113 S.Ct. 2141 (1993), a school district had opened school facilities for use after school hours by community groups for a wide variety of social, civic, and recreational purposes. The district, however, had enacted a formal policy against opening facilities to groups for religious purposes. The Supreme Court condemned this policy, stating:    "[I]t

_____

44. Defendants' brief at 54.

23

discriminates on the basis of viewpoint to permit school property
to be used for the presentation of all views about family issues
and child-rearing except those dealing with the subject matter from
a religious standpoint." 508 U.S., at ___, 113 S.Ct., at 2145.
Similarly, in this case, § 16-1-28 discriminates on the basis of
viewpoint to permit universities and colleges to allow themselves
to be used for the presentation of all views about social, sexual,
and family issues except those dealing with the subject-matter from
the standpoint of those who are homosexual or are concerned about
issues having to do with homosexual people.

The defendants further argue that "a speech or presentation
... promoting or fostering homosexual misconduct" would be "_very_
elaborately, _very_ graphically, and _very_ explicitly vulgar and lewd"
and the State has an interest in prohibiting speech that is "vulgar
and lewd."[45] However, arguably a speech or presentation opposing,
or simply discussing, what the defendants call "homosexual
misconduct" could be equally "_very_ elaborately, _very_ graphically,
and _very_ explicitly vulgar and lewd," and yet it would not be
prohibited by § 16-1-28. Section 16-1-28 is not aimed at vulgar
and lewd speech, but rather at the promotion or fostering of a type
of speech. In any event, defendants have not provided an
evidentiary basis to support its contention that speech about
"homosexual misconduct" would necessarily be lewd and vulgar,

_____

45. Defendants' brief at 38.

24

regardless of whether the speech is fostering, opposing, or simply discussing such conduct.

### III.

In conclusion, the court holds that § 16-1-28, facially and as applied to GLBA, violates the first amendment.[46]   Although GLBA seeks both injunctive and declaratory relief, only declaratory relief will be entered.   The court has no reason to believe that defendants will enforce the statute in violation of a declaration of invalidity.   However, jurisdiction will be retained should an injunction or other supplemental relief become necessary.

An appropriate judgment will be entered.

DONE, this the 29th day of January, 1996.

UNITED STATES DISTRICT JUDGE

---

46.   GLBA   further   claims   that   the   statute   is unconstitutionally vague and overbroad.  Although the court agrees with GLBA, it need not reach these claims.  The court also need not reach the group's claim that the statute has been discriminatorily applied to it in violation of its members' right to equal protection of the law.