FILED

JUN 2 1 1994

THOMAS C. CAVER, CLERK
BY
DEPUTY CLERK

1    *IN THE UNITED STATES DISTRICT COURT*

2    *FOR THE MIDDLE DISTRICT OF ALABAMA*

3    *NORTHERN DIVISION*

4

5    *GAY LESBIAN BISEXUAL ALLIANCE     CIVIL ACTION 93-T-1178-N*

6    *Montgomery, Alabama*

   *June 17, 1994*

7

   *vs*

8

*JIMMY EVANS; et al*

9

   *  *  *  *  *  *  *  *  *  **

10

   *BEFORE THE HONORABLE MYRON M. THOMPSON*

11   *UNITED STATES DISTRICT JUDGE*

12   *  *  *  *  *  *  *  *  *  **

13             *APPEARANCES*

1    THE COURT: The Court calls the case of Gay
2  Lesiban Bisexual Alliance versus Jimmy Evans and the
3  University of South Alabama, Civil Action 93-T-1178-N.
4    Is the plaintiff proceed ready to proceed?
5    MS. HARLOW: We are, Your Honor.
6    THE COURT: And will you introduce yourself?
7    MS. HARLOW: I am Ruth Harlow from the American
8  Civil Liberties Union.  This is Fern Singer and Elizabeth
9  Hubert from our office, as well.  And in the middle is George
10  Hyatt Wilson who is the president of the plaintiff
11  organization.
12    THE COURT: Thank you.
13    And for the defendants?
14    MR. JONES: Good afternoon, Your Honor.
15    George Jones, III, deputy attorney general for the
16  State of Alabama for defendant Jimmy Evans.
17    MR. McDONALD: Fairley McDonald, Your Honor, for
18  defendants Whiddon and Adams.
19    THE COURT: I will hear from the plaintiff
20  first.
21    MS. HARLOW: Good afternoon, Your Honor.
22    As you know, the plaintiff in this case contends that
23  Section 16-128 of the Alabama Code violates the First
24  Amendment, both on its face and as applied.  We have
25  extensively briefed several independent bases on which this

1 statute runs afoul of the federal constitutional rights to
2 free speech and free association. This afternoon, Your
3 Honor, I will not repeat all of those arguments. But I do
4 want--

5 THE COURT: What do you consider your strongest
6 and most narrow argument?

7 MS. HARLOW: Your Honor, I think our strongest
8 and our most narrow arguments are two different arguments. I
9 think our strongest argument is that this statute is
10 presumptively unconstitutional because on its face it
11 differentiates among association and expression on the basis
12 of content and viewpoint. I think--

13 THE COURT: How can I tell that from the face of
14 the statute?

15 MS. HARLOW: Your Honor, turning to the statute,
16 you can tell that from the face of it because it is phrased
17 to limit particular organizations. And those organizations
18 are described in terms of what their activities do. And what
19 it says about their activities is that they foster or promote
20 a life-style or actions prohibited by certain laws.

21 And, Your Honor, this singles out, therefore, the
22 associational activity of particular groups based upon the
23 content of their activities. And not only based upon the
24 content, but also upon the viewpoint that it fosters and that
25 it promotes rather than it discourages or seeks not to

1  promote.

2  So, on the face of the law, Your Honor, it makes
3  differentiations among groups based upon their message.  The
4  Supreme Court has repeatedly stated that this type of law is
5  presumptively unconstitutional.

6  THE COURT: What about the defendant's argument
7  though, here that the statute only prohibits those groups
8  that foster or promote violation of a state law?

9  MS. HARLOW: Well, Your Honor, the Supreme Court
10 in Brandenberg versus Ohio has clearly looked at this
11 question of how far the first amendment goes when we are
12 talking about potential advocacy of violations of the
13 criminal law.  And in Brandenberg the court specifically held
14 that the only instances where it is appropriate to limit free
15 speech and free association is where the group is inciting
16 imminent lawless action and its activities are likely to
17 produce that imminent lawless action.  And that is a much
18 narrower phrasing and much narrower exception to the first
19 amendment than we have in Section 16-128.

20 THE COURT: Let me get a clarification of one
21 factual issue.

22 Now, the attorney general informed the University of
23 South Alabama that the organization down there, the Gay
24 Lesiban Bisexual Organization down there, could not receive
25 funds nor use of school facilities.  Is that correct?

1        MS. HARLOW: The opinion only dealt with funding,
2    Your Honor.  But given the phrasing of this statute, it makes
3    no distinction.

4        THE COURT: Very good.

5        Does the record reflect in any way what the decision
6    of the attorney general was based upon?

7        MS. HARLOW: No, Your Honor.

8        THE COURT: Did the attorney general find that
9    the Gay Lesiban Bisexual organization at the University of
10   South Alabama had in any way encouraged any violation of
11   state law?

12       MS. HARLOW: No, Your Honor, the attorney general
13   did not find that.  And the only evidence in the record,
14   which is in Mr. Wilson's declaration, is, in fact, that they
15   have never encouraged or promoted or fostered the violation
16   of any criminal statute in Alabama.

17       THE COURT: Go ahead.  You were going on to...
18   You were talking about your strongest argument.  You hadn't
19   gotten to your narrowest argument.

20       MS. HARLOW: Right, Your Honor.

21       Well, there is a narrow argument on the as-applied
22   claim, Your Honor.  And that would be...

23       I am sorry.  There is a narrower argument on the
24   facial claim than on the as-applied claim.  The more narrow
25   basis that you may wish to approach this law from on its face

1  is the argument of unconstitutional vagueness.  All of the
2  defendants, in talking about this statute, have been unable
3  to state exactly what type of group is covered by it, exactly
4  what type of activity is a proscribed.  No one has been able
5  to tell our client what it can or cannot do under this law.
6  And the defendants at the University of South Alabama have
7  not been able to determine what they need to do in order to
8  enforce this law.

9  So, without getting to the substantive first
10  amendment issue, Your Honor, you could still strike down the
11  statute on its face on the ground of unconstitutional
12  vagueness.

13  And, finally, Your Honor, in response to your
14  question, the most narrow basis on which you could rule here
15  would be to simply rule on the as-applied claim; that as
16  applied to the plaintiff organization, this statute has been
17  used in an unconstitutional manner.  And, again, that is
18  because--

19  THE COURT: Why should I not follow the narrower
20  argument and not reach what you consider your strongest?

21  MS. HARLOW: Because, Your Honor, the danger
22  posed by a law like this is that it would be repeatedly used
23  to infringe the first amendment right of groups like my
24  client here today and of all kinds of other groups.  The
25  Supreme Court has said that when a statute on its face

1  differentiates on the basis of content, the danger of
2  censorship is so strong that that law should be struck down;
3  that it shouldn't stay on the statute books for potential
4  other applications in a discriminatory manner, unless the
5  state can come forward with a compelling state interest and
6  show that the statute is narrowly tailored to fit that
7  interest.

8       THE COURT: Now, if I adopt your narrower
9  argument, I would merely be saying that the University of
10  South Alabama would have to provide funding and facilities to
11  the plaintiff?

12      MS. HARLOW: I think it would have to say, Your
13  Honor, that this law... there is no basis in this record to
14  apply this law against the plaintiff, so it could not be
15  applied to the plaintiff in any manner, whether it is through
16  funding, facilities or any kind of indirect support which the
17  law also covers.

18      And also going, Your Honor, as to why the statute
19  should be struck down on is face. As I have said, content-
20  based regulations are presumptively unconstitutional. Also,
21  with regard to the vagueness claim, the Supreme Court has
22  said that where no one covered by the law can ascertain what
23  is permitted and what is not, that kind of law should not be
24  allowed to stay on the statute books and should not be able
25  to continually exert a chilling effect and require all those

1   who wish to participate in first amendment activities to come
2   before the court each time that their rights are threatened.
3                THE COURT: What is the current status of
4   plaintiff at the University of South Alabama?
5                MS. HARLOW: The current status, Your Honor, is
6   that the plaintiff organization is still a registered student
7   organization.
8                THE COURT: What does that mean?  The defendants
9   make that argument.  What does it mean to be a registered
10  student organization?
11               MS. HARLOW: It should mean, Your Honor, that the
12  group has the ability to take advantage of certain privileges
13  and facilities and other things that the university makes
14  available to registered student organizations.  But while our
15  client is still a registered organization, certain rights
16  that go along with that have been denied to the group.
17               THE COURT: Now, you said that the attorney
18  general said that the university could not provide funding.
19  But the university has denied both funding and facilities.
20  Is that correct?
21               MS. HARLOW: What the university has done is
22  directly deny funding on two separate occasions, as we have
23  outlined in our brief.  They have also told the group that
24  they are not able to take advantage of on-campus banking
25  facilities, and they have also--

1               THE COURT: Go ahead.

2               MS. HARLOW: They have also told the group that

3 if this lawsuit does not bring about some other result, this

4 organization will be uniquely subjected to a fact-finding

5 investigation about its activities. So, I don't know if you

6 would call those facilities, but they are non-funding--

7               THE COURT: Has the organization been able to use

8 the school's facilities?

9               MS. HARLOW: The organization is still able to

10 use the school's facilities. But they are fearful that they

11 will not be able to do that much longer because, again, if

12 they are covered by the law, it makes no differentiation.

13               THE COURT: Thank you.

14       Mr. Jones?

15               MR. JONES: May it please the Court.

16               THE COURT: Why did the attorney general deny the

17 plaintiff or find that the plaintiff... that the university

18 could not give funding to the plaintiff? What was the basis

19 for that conclusion?

20               MR. JONES: Is Your Honor referring to the

21 attorney general's opinion?

22               THE COURT: Yes.

23               MR. JONES: Your Honor, while I am looking for

24 it, to the best of my recollection, the opinion was issued to

25 Frederick Whiddon...

1    THE COURT: I can't hear you.

2    MR. JONES: I am sorry, Your Honor.

3    While I am looking for the actual opinion, to the

4    best of my recollection...

5    THE COURT: Well, we know, number one, there was

6    no investigation of the organization by the attorney general.

7    MR. JONES: That is correct.

8    THE COURT: All the attorney general had before

9    him was some outline of the organization's purposes and so

10   forth that had been furnished to the president of the

11   university; is that correct?

12   MR. JONES: It is my understanding that is

13   correct.

14   THE COURT: So, based on those two factors, the

15   attorney general concluded that this organization fell within

16   the prohibition of this statute, Section 16-128; right?

17   MR. JONES: Yes, Your Honor.

18   THE COURT: So, those issues are not in dispute.

19   So, the attorney general concluded, just a based on

20   that, that this statute applied to that organization?

21   MR. JONES: Sir, in the two-page opinion, which

22   is in the record at page 0210 and 0211, Doctor Whiddon did

23   send a letter requesting an opinion from the attorney general

24   with respect to whether or not he could fund this group and

25   make facilities available for them.

1          The opinions division of the attorney general's

2     office received the letter and responded to it in the

3     two-page opinion and basically answered his question in the

4     negative based on the--

5          THE COURT: You say negative.  Everybody uses

6     that phrase in brief.  That means, No, you cannot fund this

7     organization.

8          MR. JONES: That is correct.

9          THE COURT: What did the attorney general know

10    about this organization that led him to conclude that this

11    organization fell with the prohibition of Section 16-128,

12    other than the fact of what was in that memo and the fact

13    that their name, the Gay Lesiban Bisexual Alliance?

14         MR. JONES: Because the statute, which is at

15    issue in this case, Your Honor, makes specific reference to

16    the criminal sodomy and misconduct laws of the State of

17    Alabama.  Which, of course, have been affirmed under Bowyers

18    versus Hardwick.  I did not write the opinion, so I can only

19    speculate.  But I will say to the Court--

20         THE COURT: You didn't write what opinion?

21         MR. JONES: I did not write the attorney general

22    opinion.  So, I can only speculate to the Court that--

23         THE COURT: What does it say?  Does it say

24    anything as to why he made that conclusion?

25         MR. JONES: Your Honor, it has the question on

1 | page 1, that is 0210 of the record, where Doctor Whiddon
2 | asked if the University may provide funding and facilities to
3 | them without violating this statute under the education
4 | code. Under the facts, law and analysis of the attorney
5 | general - Again, I didn't write it, so all I can do is
6 | speculate--

7 | THE COURT: Could I just conclude, then, that any
8 | organization, no matter where it is in the state, that bears
9 | a name similar to this organization's name and states its
10 | purposes to be similar the purposes of this organization is
11 | banned from using any college facility or receiving any
12 | funding from a university, without any question as to who the
13 | members are, whether they are homosexual or lesiban? And
14 | even if they are homosexual or lesiban, whether they are
15 | engaging in that activity?

16 | MR. JONES: Your Honor, with all due respect, I
17 | think that... I would respectfully disagree with your
18 | analysis.

19 | THE COURT: Okay. Where is my analysis wrong?
20 | MR. JONES: Your analysis... I would never say to
21 | you that it is wrong. I would say--

22 | THE COURT: Well, where do you respectfully
23 | disagree with it?

24 | MR. JONES: Okay. Where I disagree with your
25 | analysis, Your Honor, is this. Is that the statute in

1  question does not make it a crime to be a homosexual. It
2  does not make it illegal for someone to... for homosexuals to
3  gather and discuss homosexual activities.

4         The statute does what, in our opinion in our
5  position, are two very narrowly defined things. And that--

6         THE COURT: We will get to that in a minute. But
7  I want to know what happened in this case. In this case the
8  attorney general said negative; right?

9         MR. JONES: Yes, Your Honor.

10        THE COURT: So, we know that in this case this
11 organization is illegal at the University of South Alabama.

12        MR. JONES: No, Your Honor, it is not illegal.

13        THE COURT: I thought the attorney general said
14 negative.

15        Tell me where I am mistaken.

16        MR. JONES: Your Honor, what the attorney general
17 said is this. Is that in order for this organization to
18 receive SGA funds, which are public funds once they go
19 through the bank account of the university. In order for
20 them, number one, to receive funding and in order, number
21 two, to meet in public, university publicly funded
22 facilities, all they have to do is comply with the statute.
23 Which says two things--

24        THE COURT: Why does this organization have to
25 comply with the statute like that? Does other... Do the

1  fraternities down there have to comply with the statute like
2  that?

3          What is significant about this organization that
4  requires this organization to have to jump through those
5  loopholes that all those fraternities and sororities don't
6  have to jump through?  What what makes it different?
7                  MR. JONES: In a nutshell, Your Honor?
8                  THE COURT: In a nutshell.
9                  MR. JONES: In a nutshell, it is because our
10 position is that because the United States Supreme Court has
11 held that consensual homosexual activity is not a fundamental
12 right--
13                 THE COURT: How do you know that this
14 organization... the members of this organization engage in
15 homosexual activity?
16                 MR. JONES: Your Honor, in the brief... Again
17 what... what has to be remembered here--
18                 THE COURT: Answer that question.  Is there
19 anything in the record here that says that any member of this
20 organization has ever engaged in homosexual activity or
21 conduct?
22                 MR. JONES: Mr. Hyatt Wilson, in his declaration,
23 affirmatively states, and I quote, I am a practicing
24 homosexual, end quote.
25          Is the word practicing wrong?

1    I am homosexual, end quote.

2           THE COURT: That may be true. But has he ever

3    said he engaged in homosexual activity or conduct, or has any

4    member of organization said that?

5           MR. JONES: Not to my knowledge. No.

6           THE COURT: Why do you single out this

7    organization from the fraternities if no one in the

8    organization has ever said they engaged in homosexual

9    conduct?

10          MR. JONES: We dispute the assertion that the

11   group is being singled out for the simple reason... And I

12   guess you will have to find it in my brief, and that it is,

13   by its very definition a group which goes by the name of the

14   Gay Lesiban Bisexual Alliance, activities which, if they

15   commit them... And we are not saying that anybody in the

16   group has ever committed them--

17          THE COURT: Go ahead. I think you are answering

18   my question.

19          MR. JONES: That any group that goes by that name

20   would put a reasonable public official on notice, who knows

21   about this statute, that, "Hey, this group may foster and

22   promote actions and may aid and abet actions that are

23   violations of the criminal sodomy laws of the State of

24   Alabama".

25          THE COURT: You have answered that question.

1          MR. JONES: I am sorry I took so long to do it.

2          THE COURT: Let's move on to another question.

3     How do you comply with this statute?

4          MR. JONES: Your Honor, compliance is simple.

5     The group, when it is meeting... And here, again, lies the

6     problem.  Because the suit was commenced before there was

7     really a... what we believe a full set of facts for Your

8     Honor to make a declaration.

9          The group complies with the statute by simply obeying

10    its plain and unambiguous terms.  The cases are not dearth

11    that say that words in statutes, be they penal or otherwise,

12    are to be given their plain and ordinary meaning.  And the

13    plain and ordinary meaning of "foster and promote a

14    life-style or actions which are prohibited by the criminal

15    sodomy laws of the State of Alabama" means that you don't do

16    anything while you are in that meeting hall that would fall

17    under any of the inchoate statutes, such as conspiracy,

18    attempt, criminal solicitation, or that you don't do anything

19    to aid or abet the commission of a homosexual criminal

20    offense.

21         If I may, Your Honor... And this is the gist of our

22    argument.  If I may.

23         THE COURT: Go ahead.

24         MR. JONES: There is absolutely nothing in this

25    statute that would prevent these people from gathering in an

1  auditorium on the campus at the University of South Alabama
2  and discussing homosexual problems; discussing the problems
3  that homosexuals face.

4  THE COURT: What if they explain that in order to
5  prevent certain sexually transmitted diseases, certain...
6  describe certain homosexual acts? Or heterosexual acts?
7  Would that fall within the prohibition of this statute?

8  MR. JONES: That would be a question of fact and
9  it would determine on what they did.

10  THE COURT: What if they just explicitly
11  explained how one commits sodomy and how, in order to prevent
12  one's self from catching certain sexually transmitted
13  diseases, what should you do? Would that fall within the
14  prohibition of this statute?

15  MR. JONES: It may well and it may not. And that
16  is part of our position here is that there was not a
17  sufficient factual basis developed prior to the time this
18  suit was filed.

19  THE COURT: But it may well and it may not is
20  what you are saying?

21  MR. JONES: Yes, Your Honor. Because we believe
22  that would be a question of fact.

23  For instance... I think I can answer your question,
24  but it may have to be rather graphic.

25  THE COURT: -- materials that explain how such

1   actions may be engaged in or performed?

2              MR. JONES: For instance, if the group--

3              THE COURT: What if the group over here, women

4   concerned about rape, wanted to meet there and show what you

5   should do to make sure that you are in a position, on a date

6   or whatever, that you don't catch a sexually transmitted

7   disease? And they talk about certain sodomy acts in some

8   detail?

9        I am not talking about homosexuals. This could be

10  heterosexuals, anybody.

11             MR. JONES: But it is not a crime to be raped.

12             THE COURT: I think you miss my point.

13             MR. JONES: On the part of the victim.

14             THE COURT: But go ahead.

15             MR. JONES: Let me say this, Your Honor. And I

16  think I understand your question. And, again, it goes to--

17             THE COURT: I am concerned about the part that

18  says is that no organization shall permit its members to

19  encourage other persons to engage in acts or to provide

20  information or materials that explain how such acts may be

21  engaged in.

22             MR. JONES: Let me hypothesis. And I will be as

23  least graphic as possible. And I will understand if the

24  Court wants to cut me off at any time.

25             THE COURT: Go ahead.

1    MR. JONES: Let's say that a member of

2    organization stands up on the platform during a meeting and

3    says that condoms help reduce the risk of AIDS if used

4    properly, and then explains properly how to use a condom.

5         If that speaker goes a step further and then starts

6    talking about the proper way for a man to insert a condom on

7    his sex organ into the mouth or anus of another man, therein

8    lies the violation of the statute.

9         THE COURT: You have answered that question.

10   That is what I thought, actually.

11        Now, what about life-style?  What does that mean in

12   the statute?

13        MR. JONES: Judge, our position is this.  Perhaps

14   in some parts of the statute, as in any statute, the

15   legislature did not use the best of terms, at times.

16        The law is this:

17        Measures affecting first amendment rights must be

18   drafted with a greater degree of specificity than other

19   measures.  But the law is that the Court cannot expect

20   mathematical certain from language.

21        Now, as far as your question what does life-style

22   mean, I think to the extent that is overage, or it may be

23   considered overage, I don't think it affects the

24   constitutionality of the statute.  Because the key operative

25   words are foster and promote.

1          THE COURT: That may be.  But what does
2   life-style mean?  That was my question.

3          MR. JONES: There again, Your Honor, I think you
4   have to look at the intent of what the legislative intent
5   was, and does the State of Alabama under its police powers
6   have the authority to refuse to fund certain types of
7   expression.

8          Under Russ v Sullivan, we say that they do, cited in
9   brief, and also Tipton versus University of Hawaii.  Is the
10  State of Alabama, if it excludes... If the statute has the
11  effect of the excluding one idea or one notion, the fact that
12  other ideas and other notions are carried on--

13         THE COURT: I am not as concerned about whether
14  it is constitutional right now.  I just want to know what
15  does life-style mean.

16         MR. JONES: Your Honor, there again--

17         THE COURT: I think you are telling me something
18  but you are not telling me directly.  You say the state
19  doesn't have a right to support certain ideas.  That may be
20  true.  I will have to look at the law on that.  How does that
21  relate to my question about what is life-style?  What
22  life-style are we talking about here that I am assuming you
23  are saying the state has a right not to support?

24         MR. JONES: I think in the context of the entire
25  statute, life-style would mean a life-style that consists of

1    violations of the Alabama criminal sodomy statute.
2                THE COURT: A life-style that would consists of
3    violations, such as what?
4                MR. JONES: Such as engaging in male on male
5    sexual intercourse or female with female sexual intercourse.
6                THE COURT: So, a homosexual life-style is what
7    you are talking about?
8                MR. JONES: Yes, sir.
9                THE COURT: When they are talking about
10   life-style, that is really what they are talking about here
11   is basically homosexual or lesiban life-style?
12               MR. JONES: That is correct, Your Honor.
13               THE COURT: All right.  Go ahead and complete
14   your argument.
15               MR. JONES: Thank you, Your Honor.
16         We would like for the Court to focus on a very narrow
17   constitutional issue here.  And we submit that the test that
18   this court should apply is found in a case cited in the
19   plaintiff's brief, Cleanup '84 versus Hienrick.  And that
20   is.  That we submit that their first amendment challenge
21   under this test is as follows:
22         Number one, we submit that Your Honor has to
23   determine if the speech or conduct at issue is protected by
24   the constitution.  Number two, if so, then Your Honor must
25   consider whether the statute is unconstitutional on its face,

1  and, number three, if the statute as applied is

2  unconstitutional as applied to the plaintiff.  And we submit

3  in the negative on all three.  Or no.  No on all three.

4  And basically, Your Honor, our position is grounded

5  on two factors.

6  Number one, there are a plethora of cases that the

7  plaintiffs have cited in their brief which do, in fact, hold

8  that homosexual groups on university campuses could not be

9  denied a charter, simply on the basis of the fact that the

10 members of those groups were practicing homosexuals.

11 We would point out in rebuttal that those cases were

12 decided before Bowers versus Hardwick; they were decided

13 before Russ v Sullivan, which holds that the states may chose

14 not to fund a specific viewpoint even though other viewpoints

15 benefit from state funding.  And, also, Tipton versus

16 University of Hawaii, which was a university case which says

17 that the states are under no obligation to fund the exercise

18 of constitutional rights.

19 So, our basic position is this, Your Honor, is that

20 the... What we have here is not a statute which seeks to

21 regulate speech.  It seeks to restrict conduct which is

22 incidental to speech.  That is our position in a nutshell.

23 By way of illustration that I gave a few moments

24 ago--

25 THE COURT: Let me clarify something here.  I

1      want to get back to something that Mrs. Harlow said.

2              Now, the attorney general has informed the University

3      of South Alabama that this organization cannot receive

4      funding. Is that correct? Or am I incorrect?

5              MR. JONES: You are correct, Your Honor.

6              THE COURT: Okay. Now, she said that the

7      university was going to hold an inquiry, investigation into

8      the activities of the organization. Is that correct, too?

9              MR. JONES: I don't know that that is the proper

10     terminology. Let me relate this to Your Honor, and Mr.

11     McDonald who represents those defendants may want to respond

12     to that, but it is my understanding that after the University

13     of South Alabama received the attorney general's opinion,

14     that at that point, because no one down there is trying to

15     mistreat this people and they are trying to find a way to

16     help them if they can, at that point they decided to appoint

17     a fact-finding committee to make... to sort of evaluate some

18     of these things and make those determinations. It may be--

19             THE COURT: Why is the fact-finding committee

20     relevant in light of the attorney general's opinion?

21             MR. JONES: Because, to be candid with Your

22     Honor, the codefendants take the position that they don't

23     understand the statute, in their lay opinion.

24             THE COURT: But in the opinion of the attorney

25     general, you have already told them what the answer is,

1  haven't you?

2  MR. JONES: That is correct, Your Honor.

3  THE COURT: Okay.  That is what I thought.

4  What is your next argument?

5  MR. JONES: Judge, we would like for the Court to

6  focus specifically on two matters.  And those matters are as

7  set forth in our argument beginning at page 36 of our brief--

8  THE COURT: Page 36?

9  MR. JONES: Yes, sir.  Defendant Jimmy Evans'

10  brief.

11  THE COURT: What about that?

12  MR. JONES: The plaintiff, waving the sword of

13  the first and fourteenth amendments, is urging this Court

14  that some sort of greater and heightened judicial scrutiny

15  should be applied because this statute deals with a

16  university environment.

17  As we discuss beginning at page 36, a very recent

18  Ninth Circuit case, Tipton versus University of Hawaii states

19  that the Government can, without violating the constitution,

20  elect to fund a program to encourage certain activities that

21  it believes to be in the public interest, without at the same

22  time funding an alternate program which seeks to deal with

23  the problem in another way.

24  Actually, we are not even to that point.  We are not

25  funding heterosexual programs.  We are not funding asexual

1  programs to the exclusion of homosexual programs. The
2  legislature under its police powers simply deemed that, as a
3  matter of public policy, that campus facilities and campus
4  funds should only be used for the purposes for which they
5  were intended.  And that is the second part of our argument
6  under Russ v Sullivan, which I am fixing to get to in a
7  moment.

8        So, we say that there is to be no great, high, high,
9  high fence that we should have to hurdle for this statute to
10 pass constitutional muster.

11       Because, number one, as I said a few minutes ago, all
12 of their cases involving university environment were decided
13 before Bowers versus Hardwick, Tipton v University of Hawaii,
14 Russ v Sullivan.

15       And, number two, we are not... We don't even get to
16 the point where we are funding other groups to the exclusion
17 of them.  Everybody is being treated the same with respect to
18 this type of group.

19       Now, yes, there are different types of groups at the
20 University of South Alabama.  There is men's volleyball,
21 fraternities and sororities.  But this is a narrow issue.
22 And we submit that the statute was drafted to address a very
23 narrow issue.  And that is, anything that promotes, aids or
24 abets the commission of criminal offenses.  Now--

25            THE COURT: Not all criminal offenses, though.

1        MR. JONES: Sir?

2        THE COURT: Not all criminal offenses.

3        MR. JONES: Only criminal offenses under Title 13

4   of the criminal misconduct laws, which we submit is a

5   corollary statute. Although this statute is not penal in

6   nature, it goes with that statute.

7        Our second position which we would like for Your

8   Honor to focus on begins at page 45 of our brief. And that

9   is that this statute is simply a viewpoint-neutral means of

10  assuring government funds and government facilities are used

11  only for the purposes for which they were granted.

12       When we were hypothesizing a few moments ago, one of

13  the things that I wanted to explain Your Honor - and I got

14  off the track and apologize for that - is this:

15       Again, there is nothing to prevent this group from

16  receiving SGA funds and from receiving the right to meet in a

17  university facility as long as they don't violate the

18  proscriptions of the statute.

19       THE COURT: How are you they supposed to keep

20  their members from doing what is said in subsection (d)?

21       MR. JONES: Because all we are concerned about is

22  what happens in the public facility or when they are

23  receiving public funds.

24       THE COURT: As long as they don't permit it to

25  happen in the facility itself is all this statute is talking

1  about?

2  MR. JONES: No, sir. Not only that, not only can

3  they not permit it to happen in the facility itself, they can

4  cannot do anything that constitutes aiding or abetting under

5  the criminal code.

6  THE COURT: Well, maybe this is the question:

7  If a member of this group, while not in the public

8  facility but just before it attends the public facility or

9  after it attends the public facility, engages in the

10  proscribed conduct in subsection (d), that is the encouraging

11  or the dispensation of information, would the organization,

12  if it failed to prohibit that member from engaging in that

13  conduct, fall within the prohibition of this statute?

14  MR. JONES: I would say no, Your Honor. Not as

15  long as it didn't happen in the facility. It is not a crime

16  to be homosexual, just like it is not a crime to be a drug

17  addict. So, I would say no.

18  THE COURT: You are reading this as saying only

19  in the facility itself?

20  MR. JONES: In the facility that public funds are

21  being used.

22  THE COURT: Go ahead. Anything else?

23  MR. JONES: Yes, Your Honor.

24  Not meaning to belabor the point, because it is cited

25  in brief with respect to the law as it... where we submit

1  that we have met the... assuming we have to meet a compelling
2  governmental interest.  We don't concede that we do.  But
3  assuming that Your Honor determines that--

4           THE COURT: Well, I think... I have read the
5  briefs.  I have a pretty good idea about the law and
6  compelling governmental interest.  I am more concerned about
7  the more practical implications here at oral argument; what
8  the various parts of the statute mean, and so forth.  I can
9  read the cases.  Maybe not as well as you all can, but I will
10 try to.

11           I think I will hear from the university now.  Thank
12 you, very much.

13           MR. JONES: Thank you, Your Honor.

14           MR. McDONALD: May it please the Court.

15           With all due respect, I had not planned to say
16 anything to Your Honor.  As you know, the attorney general
17 assumed control of this case--

18           THE COURT: That is true.  If I have put you on
19 the spot, then you can decline.  I understand the attorney
20 general has decided to write the brief and so forth.

21           MR. JONES: I was just going to say that I would
22 be happy to a try to address whatever factual--

23           THE COURT: You may be able to address factual
24 issues.

25           Actually I think they have been answered.  Thank you,

1  very much.

2          MR. McDONALD: For record purposes, we do join

3  the legal arguments that have been made.

4          Thank you, sir.

5          THE COURT: Fine.

6          Anything else from the plaintiff?

7          MS. HARLOW: If I could just touch on a few

8  things that Mr. Jones has said.

9          I do want to attempt to help clarify some of these

10 factual issues.  And I will be brief here.

11         I think that the literal language of the statute is

12 as Your Honor posited:  It is not limited to while the group

13 is using public funds.

14         THE COURT: I didn't posit that.  I just asked

15 him if that was true.  Why don't you tell me why it is not

16 true?

17         MS. HARLOW: Why it is true.

18         THE COURT: You say that is the literal reading

19 of statute.  Why is it so literal?

20         MS. HARLOW: Because, Your Honor... We will go

21 section by section here.  In (a), what part (a) says is that

22 that the college or university cannot do various things,

23 including giving funds or using facilities to sanction,

24 recognize or support the activities or existence of any

25 organization or group that fosters or promotes a life-style

1 | or actions prohibited by certain laws.

2 | The group is identified by whether it fosters or
3 | promotes a life-style or actions. It is not limited here to
4 | whether it does that in the public facilities or with public
5 | funds. It is simply whether the group does it at all. And,
6 | in fact, that is the way the attorney general and the
7 | university have interpreted this law with respect to GLBA.

8 | And I say that because there is no allegation here
9 | that they have ever done anything to foster or promote a
10 | life-style or actions. But the group has been disallowed
11 | funding for certain events, including a speech by a man John
12 | Howard. When this group--

13 | THE COURT: They take issue with you on that, I
14 | believe, don't they?

15 | MS. HARLOW: They do, Your Honor. But I believe
16 | the record documents--

17 | THE COURT: I will look at the record more
18 | closely. I think they contend that the request was withdrawn
19 | or something to that effect. At least it is ambiguous, they
20 | say.

21 | MS. HARLOW: They do contend that, Your Honor.
22 | But they don't dispute that the way this law has been
23 | interpreted, both by the attorney general and by the
24 | university, is that the group rises or falls depending upon
25 | the nature of the group. Not based upon what it does with

1  the particular public funds or what it does in the public
2  university facilities. Because the attorney general's
3  opinion, as you pointed out, is based on the identity, the
4  name of the group, the basic facts about the group; not based
5  on any particular proposal about how they were going to use
6  university funds or university facilities. And their
7  proposal was to have a speech by Mr. Howard. They were not
8  funded--

9          THE COURT: Who is this Mr. Howard?

10         MS. HARLOW: He is a man who gave a speech on the
11 history--

12         THE COURT: I remember now.

13         MS. HARLOW: When this group wanted to sponsor
14 that speech they were blocked. When the university and
15 Jaguar Productions, another student organization, took steps
16 and did bring Mr. Howard to the university campus, he was
17 paid with public funds and used public facilities.

18      So, we contend it is the nature of the group that
19 determines whether you are covered by part (a) and by part
20 (b).

21      In part (b) the criteria are different. But again,
22 Your Honor, it is you are allowed to use public funds or
23 public facilities if your group never allows or encourages
24 its members to do certain things. And that, Your Honor, is a
25 very material difference between this situation and the

1 situation in <u>Russ versus Sullivan</u>. There the court made very
2 clear that what the government can do in some limited
3 circumstances--

4 THE COURT: Would you say that is probably the
5 most problematic area of the law of all the arguments you are
6 presenting?

7 MS. HARLOW: I don't think it is problematic,
8 Your Honor. Because there are four material differences here
9 between this situation and the situation in <u>Russ</u>. And I
10 think the <u>Russ</u> opinion itself dictates that here the state
11 has gone too far, whereas in <u>Russ</u> the limitations were
12 permissible. And we have outlined those differences in our
13 brief.

14 Finally, Your Honor, as another factual matter in
15 terms of what this statute literally means and how the
16 defendants are reading it, what the defendants have failed to
17 say here today and failed to acknowledge is that the statutes
18 in Title 13(a) that have to do with forcible sodomy and
19 consensual sodomy cover heterosexuals and homosexuals. There
20 is no basis in those criminal laws to make differentiation
21 between heterosexuals and homosexuals. They cover couples
22 who are male and female who are--

23 THE COURT: What is the significance of what you
24 are saying?

25 MS. HARLOW: Your Honor, their reading of things,

1  such as the word life-style, makes no sense from the
2  references to those criminal laws.  Also, their reading of
3  which groups are covered by this law makes no sense in
4  reference to those criminal laws.

5         THE COURT: What do you mean their reading makes
6  no sense?

7         MS. HARLOW: Your Honor, what I believe the
8  defendants said was that any group that was identified as
9  being gay or lesiban would put the state on notice that they
10 are covered by this law, whereas a group that was identified
11 such as the example of a fraternity would it.

12        THE COURT: Certainly.  I understand.

13        Anything else?

14        MS. HARLOW: That is all.  Thank you very much.

15        MR. JONES: May I respond very briefly?

16        THE COURT: Yes.

17        MR. JONES: Your Honor, in conclusion, I would
18 simply like to say, with respect to... that the wording of
19 the statute, any problems that Your Honor may have, the
20 International Christmas case, which was cited in their
21 brief... And all though I know Your Honor does have the
22 briefs, I do want to emphasize this.

23        Whatever problems that Your Honor may have under a
24 constitutional analysis, you can still refrain from
25 invalidating the statute in several ways:

1    Number one, you could abstain and allow a state court
2  to interpret it in a way that corrects any constitutional
3  defects that Your Honor may have with the statute.
4    And, again, what we have here is a case where a
5  lawsuit was filed before there was ever a chance to see
6  what... you know, what sort of activities this group would be
7  involved in after the passage of the statute.
8    THE COURT: Don't I have a plaintiff that is
9  being denied funding right now?
10    MR. JONES: Sir?
11    THE COURT: Don't I have a plaintiff that is
12  being denied funding right now?
13    MR. JONES: Yes, sir.  And you also have Russ
14  versus Sullivan and Tipton versus--
15    THE COURT: I am not concerned about
16  necessarily--
17    MR. JONES: We say we don't have to give--
18    THE COURT: -- they prevail or not.  But your
19  suggestion that I stay... If they do prevail, aren't they
20  suffering injury, is my concern.
21    MR. JONES: Yes, sir.
22    The second prong is that Your Honor may be able to
23  construe the statute itself, if there is some sort of
24  plausible savings construction.  And we submit that the
25  statute can be sustained--

1  THE COURT: That is actually why I was asking you
2  about what life-style meant. I was trying to get an idea.
3  And my understanding is it means basically a homosexual or
4  lesiban life-style. That is what I was trying to do was to
5  get an understanding. And you are...

6  And I am gathering from that, you mean a homosexual
7  and lesbian life-style and not a heterosexual life-style. Is
8  that correct?

9  MR. JONES: That is correct, Your Honor.

10  THE COURT: That is what I thought you meant. Go
11  ahead.

12  MR. JONES: Or third, Your Honor, of course,
13  under the case law, can anticipate what a state court would
14  do by extrapolating from decisions in related or analogous
15  cases.

16  Two more points I just want to stress and then I will
17  be through. And I don't mean to try the Court's patience.

18  Under the law, this statute is unconstitutionally
19  vague only if people of common intelligence must necessarily
20  guess at its meaning and differ as to its application.

21  We respectfully submit that the terms "foster and
22  promote" are clearly understandable, particularly by someone
23  who has met the admission requirements to gain admission to a
24  major state university.

25  And, again, Your Honor, the same case that I cited to

1  you states that a statute, when it is to be applied by a
2  relatively small number of people upon a small number of
3  people, the court will permit slightly more imprecision with
4  the ordnance.

5          THE COURT: Well, let's talk about that.  I had
6  forgotten that.

7          Who are these small number of people?

8          MR. JONES: This small number of people would be
9  any group of individuals who advocate... I am sorry.  Strike
10  that.

11          Any group of individuals who promote, aid, abet or
12  foster the violation of Alabama's criminal sodomy laws--

13          THE COURT: I thought you were saying there was a
14  small number group within that group.

15          MR. JONES: No, sir.

16          THE COURT: The small number group argument--

17          MR. JONES: Is the homosexual community.

18          THE COURT: If you are talking about pornography
19  and you are talking about child pornography, it would seem we
20  have... The courts have recognized when you are talking
21  obscenity and you are talking about pornography for children,
22  you have a smaller group within that universe.

23          So, here I thought we are talking about people who
24  engaged in acts that would violate the sodomy laws--

25          MR. JONES: On university campuses.

1          THE COURT: And then you were talking about a

2    small group within small group.  That is what I thought you

3    were--

4               MR. JONES: No, sir.

5               THE COURT: That is what I wanted to ask you.

6               MR. JONES: No, sir.  This entire statute is

7    restricted only to the university environment.  That is

8    strictly it.

9         Thank you.

10              THE COURT: Okay.  Thank you.  Anything else?

11              MS. HARLOW: No, Your Honor.

12              THE COURT: Thank you.  Anything else from Mr.

13   McDonald?

14              MR. McDONALD: No, sir.

15              THE COURT: Court is in recess.

16                   *  *  *  *  *  *  *  *  *  *  *

17                        REPORTER'S CERTIFICATE
     UNITED STATES DISTRICT COURT
18   MIDDLE DISTRICT OF ALABAMA
          I, Lewis F. Wimberley, Official Court Reporter for
19   the United States District Court for the Middle District of
     Alabama, do hereby certify that the foregoing 36 computer
20   printed pages represent a true and correct transcription of
     the proceedings on June 17, 1994, in the heretofore captioned
21   cause, Civil Action 93-T-1178-N, heard in the United States
     District Court for the Middle District of Alabama, Northern
22   Division.
          DATED, this the 21st day of June, 1994.
23
24                        LEWIS F. WIMBERLEY
                          Official Court Reporter
25