RECEIVED

94 MAR 18 AM 10 25

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA
     U.S. DISTRICT COURT
3    MIDDLE DISTRICT NORTHERN DIVISION

4

5    CASE NUMBER:   CV-93-T-1178-N

6    GAY LESBIAN BISEXUAL ALLIANCE,

7              Plaintiff,

8              vs.

9    JIMMY EVANS, in his official capacity as Attorney

10   General of the State of Alabama; et al.,

11             Defendants.

12

13             S T I P U L A T I O N

14             IT IS STIPULATED AND AGREED by and

15   between the parties through their respective

16   counsel, that the deposition of Jimmy Evans may be

17   taken before Anita Thebo, Commissioner, at the

18   offices of Attorney General, State of Alabama, at

19   5720 Carmichael Road, Montgomery, Alabama 36116,

20   on the 10th day of February, 1994.

21

22             DEPOSITION OF JIMMY EVANS

23

1           IT IS FURTHER STIPULATED AND AGREED that

2   the signature to and the reading of the deposition

3   by the witness is waived, the deposition to have

4   the same force and effect as if full compliance

5   had been had with all laws and rules of Court

6   relating to the taking of depositions.

7           IT IS FURTHER STIPULATED AND AGREED that

8   it shall not be necessary for any objections to be

9   made by counsel to any questions except as to form

10   or leading questions, and that counsel for the

11   parties may make objections and assign grounds at

12   the time of the trial, or at the time said

13   deposition is offered in evidence, or prior

14   thereto.

15           IT IS FURTHER STIPULATED AND AGREED that

16   the notice of filing of the deposition by the

17   Commissioner is waived.

18

19

20

21

22

23

```
 1                    I N D E X

 2                  EXAMINATION

 3                                    Page

 4    By Ms. Harlow ....................... 5

 5              PLAINTIFF'S EXHIBITS

 6                                    Page

 7    Exhibit 1 - Resolutions from

 8        the Senate and House of

 9        Repres .......................... 8

10    Exhibit 2 - Section 16-1-28,

11        Alabama Education Code ........... 9

12    Exhibit 3 - Letter from Perry

13        O. Hooper, Jr. .................. 20

14    Exhibit 4 - Letter to

15        Dr. Whiddon and answer

16        from J. Evans .................. 20

17    Exhibit 5 - Exhibit D to

18        request for production

19        responses ...................... 36

20

21

22

23
```

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5    CASE NUMBER:  CV-93-T-1178-N

6    GAY LESBIAN BISEXUAL ALLIANCE,

7              Plaintiff,

8              vs.

9    JIMMY EVANS, in his official capacity as Attorney

10   General of the State of Alabama; et al.,

11             Defendants.

12

13   BEFORE:

14             Anita Thebo, Commissioner.

15   APPEARANCES:

16             RUTH E. HARLOW, ESQUIRE, of American

17   Civil Liberties Union Foundation, 132 West 43rd

18   Street, New York, New York, 10036, appearing on

19   behalf of the Plaintiff.

20             HOWARD A. MANDELL, ESQUIRE, Attorney at

21   Law, 25 South Court Street, Montgomery, Alabama

22   36104, appearing on behalf of the Defendant Jimmy

23   Evans.

1    J. FAIRLEY MCDONALD, III, ESQUIRE,

2  Copeland, Franco, Screws & Gill, 444 South Perry

3  Street, Montgomery, Alabama 36104, appearing on

4  behalf of the Defendants Frederick P. Whiddon and

5  Dale T. Adams.

6                    * * * * * *

7

8    I, Anita Thebo, a Court Reporter of

9  Montgomery, Alabama, acting as Commissioner,

10  certify that on this date, as provided by the

11  Alabama Rules of Civil Procedure and the foregoing

12  stipulation of counsel, there came before me at

13  the offices of Attorney General, State of Alabama,

14  5720 Carmichael Road, Montgomery, Alabama 36116,

15  beginning at 3:45 p.m., Jimmy Evans, witness in

16  the above cause, for oral examination, whereupon

17  the following proceedings were had:

18                JIMMY EVANS,

19  being first duly sworn, was examined and testified

20  as follows:

21                **EXAMINATION**

22  **BY MS. HARLOW:**

23          MS. HARLOW:  Usual stipulations?

1           MR. MANDELL:  Yes.

2           Q.    Good afternoon, Mr. Evans.  Thank you

3    for making time for us here today.  I hope we'll

4    be fairly brief.

5                 If you could, please begin by telling

6    me how long you've been attorney general of the

7    state of Alabama?

8           A.    Since 1991 when I was inaugurated,

9    February.  But the term is four years:  Elected in

10   '90 to begin the following year in '91.

11          Q.    So your current term would expire in

12   1995?

13          A.    Yes.

14          Q.    Prior to becoming the attorney

15   general, how were you employed?

16          A.    I was district attorney in the state

17   Capitol for seventeen years and three months

18   immediately prior to being sworn in as attorney

19   general.

20          Q.    In early 1992 did you become a

21   defendant in a lawsuit brought by Auburn

22   University involving that school's gay and lesbian

23   group?

1        A.    No.

2        Q.    You don't recall becoming a defendant

3 in that suit?

4        A.    I don't recall. I may have, but this

5 is a big office with a lot of things, and I have a

6 staff. I'm not saying I didn't, I just didn't

7 recall.

8        Q.    Do you recall having any knowledge in

9 1992 of a lawsuit brought by Auburn University in

10 federal district court regarding their lesbian and

11 gay student group?

12        A.    Yes. I have a recollection of that.

13        Q.    Do you have a recollection of what

14 that lawsuit was about?

15        A.    No.

16        Q.    Do you have any recollection of

17 that -- Let me rephrase that.

18               Aside from the lawsuit, do you have

19 any recollection of a dispute at Auburn in or

20 around 1992 that had to do with the recognition of

21 their lesbian and gay student group on campus?

22        A.    That was a press item in the local

23 papers, and I have a recollection of that.

1          Q.    Do you recall whether the controversy

2     at Auburn generated any activity in the Alabama

3     state legislature?

4          A.    I don't know what precipitated the

5     activity in the legislature, if you're referring

6     to the Hooper legislation.  But after that I

7     understand, Representative Perry Hooper, Jr.,

8     introduced legislation which was ultimately

9     passed.

10         Q.    Let me show you a document that we'll

11    mark Plaintiff's No. 1.  This is actually two

12    documents, two resolutions:  one from the Senate

13    of the Alabama legislature and one from the House

14    of Representatives of the legislature.

15                         (Whereupon, Plaintiff's

16                          Exhibit No. 1 was marked

17                          for identification.)

18         Q.    If you could, take a look at those two

19    documents.

20         A.    I have briefly read this document.

21         Q.    Do you recall, Mr. Evans, ever having

22    seen these resolutions before?

23         A.    I may have, I don't recall.  This is

1   the first time -- I think they were press items

2   also.

3         Q.    Do you recall ever having discussed

4   these resolutions with anyone?

5         A.    I don't recall a single conversation

6   with anyone concerning these resolutions.

7         Q.    This document, unfortunately, I only

8   have two copies of, but it is the statute.

9               MS. HARLOW:  Could you mark this

10  Plaintiff's Exhibit 2, please?

11                    (Whereupon, Plaintiff's

12                     Exhibit No. 2 was marked

13                     for identification.)

14        Q.    Mr. Evans, I'm showing you another

15  document, which is Section 16-1-28 of the Alabama

16  Education Code.

17        A.    Yes, ma'am.

18        Q.    Is it your understanding that this

19  legislation was an outgrowth of the debate about

20  the gay student group at Auburn?

21        A.    I really don't know.  But, you know,

22  if you're asking me to speculate, perhaps it was.

23  I mean, my vague recollection is that the press

1    items were in the paper and then -- I don't know

2    what date and time the resolutions were passed,

3    but it might well have been.

4         Q.    Since the passage of Section 16-1-28,

5    has your office taken any steps to enforce its

6    provisions?

7         A.    No.  Only to the extent that -- Well,

8    first of all, we have not been asked to; number 2,

9    I don't know that there is any empowering sections

10   in the act which would empower us to do anything

11   other than give opinions on it and respond to

12   situations that may come up.  And we did receive a

13   request for opinions on the act.

14        Q.    At this time does your office have any

15   plans to take any steps in the future to enforce

16   this provision?

17        A.    Well, everything that -- We have not

18   been asked to enforce it.  I assume what you mean

19   by enforcement, would we be filing some lawsuit in

20   court to bar some university from dispersing

21   funds.  Now, my response to that is simply this:

22   If the president of the university or a university

23   board called upon me to take some action, then I

1  would consider that.

2  There is no empowering section in this

3  law which either requires or mandates that I take

4  any independent action outside some requests. And

5  the only action that we have taken has been when

6  someone wrote us and asked us for an opinion.

7  Certainly I'm interested in the

8  outcome of the lawsuit being a party litigant -- I

9  mean a defendant. I certainly would not, in the

10  middle of this lawsuit, launch off on some

11  activity -- enforcement activity.

12  Q. So if I understand your answer,

13  barring some question from a university official,

14  you yourself have no plans to take any action to

15  enforce this provision at this time?

16  A. I'm not the university's policeman,

17  you understand. I don't police these

18  universities. They're autonomous in nature. All

19  the universities in Alabama, I think, are

20  autonomous under the Constitution. They do not

21  require input from the attorney general and the

22  hiring and selection, their hiring practices, the

23  people they employ. They employ their own counsel

1    who are not deputy attorney generals. They are

2    autonomously run and intended to be autonomous

3    under the Constitution of Alabama.

4            Therefore, I really don't have

5    policing powers to police all the colleges and

6    universities in Alabama, and I don't intend to

7    assume that I do have that without a statute --

8    statutory authorization. However absent -- If we

9    have a college president who wants to call up and

10   get the aid of the attorney general and our legal

11   staff, which I think that would be remote because

12   they're autonomous and have their own counsel, but

13   nobody knows what's going to come down the pike in

14   the future. I'm just telling you that we have

15   taken no action and don't intend to take any

16   action certainly during the pendency of this

17   lawsuit. And I want to see what the courts say

18   about the statute.

19       Q.    Mr. Evans, in your view, what

20   interests of the state of Alabama does this

21   statute attempt to advance?

22       A.    Well, if you're asking me for my

23   personal views on the matter, I'll be glad to give

1    those to you, but they're personal in nature.

2                I think that the purpose --

3                MR. MANDELL:  Are you giving your

4    personal views?

5                THE WITNESS:  I don't have any views

6    about what this statute is deciding to do other

7    than what it says; it's self-explanatory as to --

8    I assume, as to what its purposes are in Section B

9    of the statute.

10        Q.    If you could answer my question.

11   What --

12        A.    I would assume in Section B of this

13   act would apply to -- as it is written, would

14   apply to any organization or group that receives

15   public funds or uses public facilities, encourage

16   its members to engage in any unlawful acts or

17   provide information or materials, explain how

18   unlawful acts may be engaged in or performed.

19               I think that's the iterals of the

20   legislation, Section B.

21        Q.    That's the language of the

22   legislation.  What I'm asking you is what

23   interests of the state of Alabama are advanced by

1    having legislation like this?

2        A.    Well, the State, I think -- You know,

3    you probably ought to direct that -- I'm not

4    telling you how to direct the question.

5               As an attorney general with

6    constitutional responsibilities of arguing for the

7    constitutionality of all of our statutes, that's a

8    burden placed on us.  Then the interest of the

9    State of Alabama is served in the sense that the

10   legislature has passed a law, that I would assume,

11   would bar anyone who encourages its members to

12   violate any of its criminal laws from violating

13   those criminal laws.  And it certainly has the

14   police power, and it certainly has an interest in

15   taking steps through the civil law or the criminal

16   law, to prevent violations of the law.  And

17   financing those violations in view of this

18   statute, it seems to me the statute is directed

19   toward the financing of a group who would advocate

20   a violation of the law.

21       Q.    Aside from what you've just told me

22   about preventing violations of the law, can you

23   think of any other interests of the state of

1   Alabama that are being advanced by this

2   legislation?

3       A.   I guess not.  I can't think of any

4   right now.

5       Q.   Are you aware of any facts that

6   support the need for such a statute in the state

7   of Alabama?

8       A.   I don't recall being furnished with

9   any fact sheets in regard to that legislation.

10  That's a legislative responsibility.

11      Q.   But you, sitting here today, are not

12  aware of any facts that would support the need for

13  this piece of legislation in the state of Alabama?

14      A.   Well, I don't know what universities

15  are doing with their funds in regard to the

16  student associations that they are funding; I'm

17  just totally without that knowledge.

18      Q.   So you don't have knowledge of a

19  particular problem that exists in the state of

20  Alabama that this legislation might ameliorate?

21      A.   No.  Other than the controversy which

22  was the press item which surrounded, I assume, the

23  passage of this legislation.

1              MS. HARLOW:  No coaching of the

2    witness, please, Mr. Mandell.

3              MR. MANDELL:  I'm not coaching.  Pep

4    talks.

5              MS. HARLOW:  No pep talks either.

6         Q.    Mr. Evans, taking a look at Part A of

7    the statute, can you give me an example of an

8    organization or group that you believe would be

9    covered by the restrictions in this statute

10   because that group, quote--as it says in Part

11   A--fosters or promotes a lifestyle or actions

12   prohibited by the sodomy and sexual misconduct

13   laws, end quote.

14        A.    Repeat your question, ma'am.

15        Q.    Can you give me an example of an

16   organization or group that you believe would be

17   covered by the restrictions of this statute?

18        A.    Well, you know, I don't know anything

19   about the organizations, but if you want me to

20   cite perhaps one that I've read about in the media

21   and the press:  Man Love Boy Association might be

22   -- whatever that is, okay?  Based on what I read

23   in the newspaper, they advocate the violation of

1    sexual misconduct laws in regard to men and boys.

2           I don't know that, that's just what

3    I've read. But if there is such an organization

4    that despises (sic) that and it does exist and

5    similar organizations exist, and they actually

6    engage in those practices, advocate those

7    practices, then I would think they would be

8    covered.

9         Q.    Is it your understanding that to

10   advocate those practices is the same thing as to

11   foster or promote?

12        A.    No.

13        Q.    If you could take a look at the third

14   line in Part A.  What is, quote, a lifestyle

15   prohibited by the sodomy and sexual misconduct

16   laws of the state of Alabama?

17        A.    Well, I did not draft this statute.

18   Having construed those -- the words "lifestyle"

19   within the context of the statute would be, I

20   assume, a lifestyle of encouraging, soliciting --

21   See, the term "criminal solicitation" would be a

22   term I would use rather than lifestyle; the term

23   aiding and abetting; the terms that are used in

1   traditional criminal law definitions are the terms

2   that I would have used.  I did not use it.

3              I would interpret lifestyle or actions

4   to mean that engaging in criminal solicitation as

5   defined by the Code of Alabama in Title 13A or

6   aiding and abetting and according to the Code of

7   Alabama, Criminal Code of Alabama, Title 13, or

8   conspiracy.

9        Q.    One of the criminal statutes that's

10  referred in 16-1-28 -- that's referred to in

11  Section 16-1-28 is Section 13A-6-653, which is the

12  provision of Alabama criminal law that covers

13  consentual deviate sexual intercourse.  Mr. Evans,

14  have there been any criminal prosecutions to your

15  knowledge under Section 13A-6-653 --

16       A.    Let me get those code sections if you

17  would.

18              MS. HARLOW:  I just have one copy.

19  We'll make a copy.

20       Q.    The definition is in a separate

21  section.

22       A.    Are you asking me whether or not there

23  have been prosecutions of deviate -- of --

1    Q.    My question is whether there have been

2    prosecutions under Section 13A-6-653, whether you

3    know of any prosecutions since that provision

4    became law in 1977.

5         A.    Seems like there was, in Montgomery

6    County, an outbreak of jail violence, and we

7    prosecuted some of the inmates who were convicted.

8    And I don't recall that this particular section

9    was used; it may have been. And I would only have

10   knowledge of what I did as a district attorney.  I

11   couldn't speak for others.

12              But in Montgomery County in the jail

13   we had a terrible episode of outright torture and

14   violence on prisoners -- committing on other

15   prisoners.  And seems to me there might have been

16   a prosecution under that section in order to -- We

17   might have wanted to bring a higher charge, and

18   the evidence only fit that section, and we might

19   have brought the charge there.  That was in the

20   '80s, 1980s.  And whatever those prosecutions were

21   are available at the Montgomery County Circuit

22   Clerk's office.

23         Q.    That was during your time as a

1    district attorney?

2           A.    Right.

3           Q.    Aside from the incidents that took

4    place at the Montgomery County jail, do you have

5    any other knowledge of any other prosecutions

6    under this provisions?

7           A.    I don't recall any, no.  Not right

8    now.

9                 MS. HARLOW:  Let's mark another here.

10                        (Whereupon, Plaintiff's

11                        Exhibit No. 3 was marked

12                        for identification.)

13          Q.    Mr. Evans, Plaintiff's Exhibit 3 is a

14    letter that you received from Representative

15    Hooper --

16          A.    Yes, ma'am.

17          Q.    -- in 1992.  In addition to that --

18    I'm sorry.  I gave you the wrong document.  We

19    don't need that one.

20                MS. HARLOW:  I want to mark this, the

21    request from Dr. Whiddon and then your opinion

22    back to him.  So this will be Plaintiff's 4.

23                        (Whereupon, Plaintiff's

1               Exhibit No. 4 was marked

2                   for identification.)

3           MS. HARLOW:  And Plaintiff's 5, I

4   don't have extra copies of.  It's Exhibit D to the

5   request for production responses.  It is

6   Dr. Whiddon's letter.

7           MR. MANDELL:  What I just gave Jimmy

8   is a copy of Dr. Whiddon's letter.

9       Q.   So Plaintiff's 4 is your office's

10  response to Dr. Whiddon of the University of South

11  Alabama.  And on the first page of that document

12  -- On the first page there, the question given is,

13  quote, May the University of South Alabama Student

14  Government Association provide funding to the Gay,

15  Lesbian, and Bisexual Alliance without violating

16  Section 16-1-28.

17          And on the second page, if I'm reading

18  this correctly, in the second paragraph there,

19  your office answered that question in the

20  negative; is that correct?

21      A.   That's right.

22      Q.   You've also been given as -- what

23  we'll mark Plaintiff's Exhibit 5 as the original

1    request to your office from Dr. Whiddon.

2           A.    Right.

3           Q.    What facts that were contained in the

4    information provided by Dr. Whiddon do you believe

5    support the opinion that your office issued?

6           A.    Well, first of all, I have to tell you

7    how these opinion requests are handled, okay?

8           Q.    Okay.

9           A.    We get them on a daily basis from all

10   sorts of departments in the state of Alabama.

11   There is a -- It comes in.  The staff takes those

12   requests and prepares an immediate form letter in

13   response to them and mails out a form letter,

14   which I believe you may have copies of, I don't

15   know.

16          Q.    Right.

17          A.    Those form letters go out.  They're

18   immediately assigned to the Opinion Division of

19   the attorney general's office.  This is a

20   procedure which is, other than the form letter --

21   I think I instituted a form letter when I came in

22   because I felt like people who were looking for an

23   answer or opinion might want to know who's

1    handling them, who's using them; and to give them

2    an immediate point of contact.

3           So other than that, the form letter --

4    the procedure has been in place, is my

5    understanding, for a very long time. I don't get

6    involved in the day-to-day operations of the

7    opinion thing. What I do is I take the opinion as

8    it comes in, and I either approve the opinion or I

9    do not approve the opinion. If there is an

10   opinion which I feel should go out on a particular

11   matter, and I am at odds with the staff, I usually

12   assign it to myself, take them off the hook.

13   That's usually what happens. And I don't think

14   I've done that but maybe once or twice. So, I

15   routinely follow what they present.

16          But now, to answer your specific

17   question, what facts were contained?

18      Q.    What facts in the information your

19   office had that was provided by Dr. Whiddon with

20   his letter, what facts in that information

21   supported the finding that funding could not go to

22   the Gay, Lesbian, and Bisexual Alliance at the

23   University of South Alabama without violating this

1   statute?

2           A.      I would assume that the statute covers

3   the University of South Alabama; that the statute

4   speaks -- Where is that statute?

5                   University of South Alabama is a

6   college or university, fact one.  The law says

7   they shall not sanction, recognize, or support the

8   activities directly or indirectly.  I would assume

9   that funding those -- this particular organization

10  which is referred to in Mr. Whiddon's letter, the

11  Gay, Lesbian, and Bisexual Alliance, there would

12  be an indirect sanction of that organization.

13  Thirdly, the factual -- I assume then that the

14  organization would foster or promote a lifestyle

15  or actions prohibited by the sodomy and sexual

16  misconducts of the statute.  I would assume that

17  that is the basis on which the Opinion Division

18  came up with the opinion I approved.

19          Q.      What about the Gay, Lesbian, and

20  Bisexual Alliance at the University of South

21  Alabama?  What facts led to the conclusion that it

22  was a group that fostered or promotes a lifestyle

23  or actions prohibited by the sodomy and sexual

1   misconduct laws?

2        A.    I think Mr. Whiddon noted in his

3   letter, which was immediately referred to

4   Mr. Solomon, that the charter of the organization

5   did not promote a lifestyle prohibited by the

6   sodomy and sexual misconduct laws of Alabama.  I

7   really don't know the facts involved at the

8   University of South Alabama.

9        Q.    Do you have any other knowledge about

10  how your office came to the contrary conclusion?

11            You're correct that Dr. Whiddon

12  indicates that he believes that this organization

13  does not, quote, promote a lifestyle prohibited by

14  the sodomy and sexual misconduct laws, end quote.

15            Do you know any other facts upon which

16  your office relied to come to the conclusion that

17  this group could not get funding without violating

18  Section 16-1-28?

19            MR. HARLOW:  Don't --

20       A.    Is this the witness letter?  That's

21  all I want to know.

22       Q.    Right.  That's Exhibit 5, right.

23            MS. HARLOW:  Please don't instruct

1    the witness on how to answer the question.

2                    MR. MANDELL:   I haven't instructed or

3    counseled the witness at all.  I'm giving him a

4    copy of the letter.

5                    MS. HARLOW:   That's fine.

6                    THE WITNESS:   All I want is the

7    Whiddon letter.

8                    MR. MANDELL:   I want the Record clear

9    that there has been no counseling or coaching of

10   Jimmy Evans.  He's a far more superior lawyer than

11   I'll ever be.

12        A.    I don't have and did not have at the

13   time I approved this opinion a command of the

14   facts at the University of South Alabama.

15                    Now, I noted in Mr. Whiddon's letter

16   that he says that the charter of the organization

17   does not promote a lifestyle prohibited by the

18   sodomy and misconduct laws.  There must have been

19   some consideration at the staff level that perhaps

20   they did.  I don't know.

21        Q.    Can you take a look right now at the

22   attachments to Dr. Whiddon's letter, as well as

23   the letter itself, which follow there in that

1  exhibit that you're looking at, and tell me

2  whether you see anything in either the letter that

3  Dr. Whiddon sent or those attachments that would

4  indicate to you that the Gay Lesbian Bisexual

5  Alliance is an organization that could not get

6  funding without violating this legislation?

7      A.    You mean reading the attachments?

8      Q.    Yes.

9           MR. MANDELL:  Have you ever seen

10  those before?

11           THE WITNESS:  No.

12           MR. MANDELL:  I want to make that

13  clear for the Record.

14           Just so we're straight for the

15  Record, you're asking him to read these documents

16  at this time and give an opinion at this time

17  based on his current reading, not on what went on

18  at the time that opinion was issued back a year

19  ago?

20           MS. HARLOW:  That's correct.  He said

21  he doesn't have knowledge of what went on when the

22  opinion was issued.  So I'm asking him to take a

23  look at those documents now.

1           A.     (Witness complies.)  I'm reading the

2   Constitution.  Is that part of the documents you

3   want me to read?

4           Q.     I want you to read all of the

5   documents there for purposes of letting me know

6   whether there are any facts there that support a

7   finding that this group could not get funding

8   without violating Section 16-1-28.

9           A.     I would have to study at length -- to

10  form a legal opinion study at length these

11  documents.  I can -- Those that I don't have to

12  study, I can give you an opinion on this right

13  now.

14              Gay and Lesbian Student Alliance, I

15  assume I'll call this Page 1 right here

16  (indicating); this is a cover sheet.

17              In response to your question, no, I

18  don't see anything in that page.

19              Page 2, Gay and Lesbian Student

20  Alliance.  To provide a foundation for unification

21  of homosexual and nonhomosexual people of the

22  student population, in order to draw support -- I

23  have no idea what that means, therefore I cannot

1    comment on it.

2              Page 3.  Memorandum to Sally Cobb from

3    Lawrence R. Schehr.  I don't see anything on that

4    particular page.

5              On this particular page (indicating)

6    I'd have to understand what is meant by:  The

7    primary goal of the GLSA is to further basic human

8    rights.  I am at some disadvantage here because I

9    do not equate sexual preference with civil rights.

10   And I am -- As far as I'm concerned, if the

11   basic -- We're talking basic human rights here.

12   You've got a broad spectrum across the board

13   victimization of crime victims, even sodomy

14   victims.  You're talking about victimization in

15   civil rights abuse, denial of equal housing,

16   across the gamut all the socially issues that have

17   been crystallized into the Civil Rights Act and

18   Voter Registration Act of 1964.  So it depends on

19   what is meant by all of those things.  And I have

20   no way of knowing what that means, but assuming it

21   means -- it does not mean the violations of those

22   laws then I see nothing wrong with it.

23        Q.   And by "those laws," do you mean the

1  sodomy and sexual misconduct laws?

2      A.    Yes, ma'am.

3      Q.    What about the remainder?

4      A.    I could not, without going through and

5  making a study of the constitution and bylaws, be

6  able to do that. It would take some time to do

7  that.

8      Q.    Prior to the constitution and bylaws,

9  do you have another page -- keep going backwards.

10 I think -- That's the last one you spoke about.

11     A.    Right. Human rights.

12     Q.    What about the page that's titled --

13     A.    Again, you know, you're asking me to

14 comment on definitions that have been prepared for

15 me. I have no -- I don't know what is meant by

16 focusing in the emotional. I know what political

17 means. And certainly we all have a right to

18 engage in political activity and advocate whatever

19 politics we want to advocate.

20           I find the Nazi party extremely

21 distasteful, but under our Constitution I assume

22 they have a right to advocate that. So I know

23 what political means. I have no idea what the

1    "emotional and psychological awareness of the
2    homosexual student" means, and I have no idea -- I
3    don't know what these words "will work fervently
4    to combat homophobia" mean.  I have no idea what
5    that means.  And I do not know what the "fostering
6    and understanding of the dangers of homophobia on
7    university campus," I have no idea what that
8    means.

9            However, if you're talking about the
10   advocation, the right of a person to advocate
11   one's personal opinion or political activity or
12   political opinion, and under your definitions you
13   contend that that's all this does, then I can't
14   find anything wrong with it.

15           Q.    Okay.  The only remaining document
16   there is the constitution.

17           A.    And that would take me a little while.
18           Q.    Okay.  So if I understand what you've
19   said about the documents prior to the constitution
20   here, you've stated you don't understand some of
21   the words that are used here.

22           A.    See, these documents are obviously
23   prepared by someone on behalf of or for the GLSA.

1    Q.    GLBA.

2    A.    GLBA.    Obviously prepared.    They know

3    what those definitions -- In their minds they have

4    a subjective view of what those definitions mean.

5    I do not know what those definitions mean nor did

6    I have any input into drawing up those definitions

7    nor do I have any interpretation of those

8    definitions.

9            What I'm saying to you is, it's very,

10   very difficulty for me to sit here and not know

11   what those definitions mean in terms of daily

12   working activity of this organization.    It's

13   difficult for me to sit here and make judgments in

14   regard to it.

15           Now, if those definitions that I

16   mentioned in the deposition, if you contend -- not

17   you, but if the GLBA contends that all of those

18   definitions are intended to allow them to advocate

19   for the eradication of a law or to advocate the

20   passage of a law or to engage in political

21   activity, if that's what those definitions mean,

22   and I have no way of knowing that, then assuming

23   that, I don't see anything prohibitive that would

1    prohibit it.

2         Q.    Do you know whether your office, in

3    the course of considering Dr. Whiddon's request

4    for an opinion, did anything to investigate the

5    Gay Lesbian Bisexual Alliance at the University of

6    South Alabama?

7         A.    I would imagine -- I don't know that,

8    but I would imagine they did not.  I don't know.

9    I just don't know the answer to that question.

10             MR. MANDELL:  Ruth, we answered those

11   under the interrogatories.  And the attorney

12   general has made it clear that he delegates his

13   responsibilities to the other section.  But I did

14   speak with people in that section.  And I think I

15   can say that Jimmy's answer is correct, that they

16   did not do any investigation.

17        A.    And I also use the term investigation,

18   as a career prosecutor, as taking a person with

19   arrest powers and police powers and seasoned

20   detectives, and sending them out to investigate

21   the situation.  There may have been some questions

22   asked, some interchange of information or

23   something; I doubt it.  But there certainly wasn't

1   an investigator dispatched from the attorney

2   general's office to the University of South

3   Alabama to perform any fact-gathering. We don't

4   do that in the Opinion Section.

5       Q.    Mr. Mandell is correct that your

6   answer to interrogatory No. 9 states, quote, the

7   only information Defendant Evans had available to

8   him at the time, the July 29, 1993, opinion, was

9   issued to President Whiddon with the information

10  contained in President Whiddon's February 12,

11  1993, letter and attachments thereto. So that

12  would seem to indicate there was both no formal

13  and no informal investigation done.

14      A.    Yes.

15            MR. MANDELL:  I said that because I

16  wanted to make clear that we weren't playing any

17  games.  We're not saying, you know, you're taking

18  the Attorney General's deposition and somebody

19  else did all of that.  What I was trying to do in

20  the interrogatories there was include the offices.

21            MS. HARLOW:  I appreciate that.  I

22  just want to make sure we were all understanding

23  each other.

1          Q.     Prior to your office receiving

2     Dr. Whiddon's letter, had you had any phone

3     conversations with anyone from the University of

4     South Alabama about Section 16-1-28?

5          A.     I don't recall a single conversation.

6          Q.     Do you have any knowledge about

7     whether any of your staff members had any phone

8     conversations with the university prior to

9     Dr. Whiddon's letter?

10         A.     I do not know.

11         Q.     Mr. Evans, is it your position that

12    Section 16-1-28 is constitutional under the United

13    States Constitution?

14         A.     Yes.

15               MS. HARLOW:   I don't have any further

16    questions for you at this time.  The only problem

17    in saying that I'm completely finished is that we

18    haven't yet received your answer in this lawsuit.

19               THE WITNESS:   Are we through?  And

20    I'll talk answer.

21               MS. HARLOW:   That will be fine as

22    long as I can reserve the right to come back in

23    case your answer provokes the need for us to do

1 that.

2                   THE WITNESS:  Sure.

3                   MR. MCDONALD:  No questions.

4                         (Whereupon, Plaintiff's

5                         Exhibit No. 5 was marked

6                         for identification.)

7 (The deposition of Jimmy Evans was concluded at

8 4:35 p.m. on February 10, 1994.)

9

1 0

1 1

1 2

1 3

1 4

1 5

1 6

1 7

1 8

1 9

2 0

2 1

2 2

2 3

1               REPORTER'S CERTIFICATE

2    STATE OF ALABAMA,

3    AUTAUGA COUNTY,

4            I, Anita Thebo, Certified Shorthand

5    Reporter and Commissioner for the State of Alabama

6    at Large, do hereby certify that I reported the

7    deposition of Jimmy Evans, who was first duly

8    sworn by me to speak the truth, the whole truth,

9    and nothing but the truth, in the aforementioned

10   matter on February 10, 1994.

11           The foregoing 36 computer printed pages

12   contain a true and correct transcript of the

13   examination of said witness by counsel for the

14   parties set out herein.  The reading and signing

15   of same is hereby waived.

16           I further certify that I am neither of kin

17   nor of counsel to the parties to said cause, nor

18   in any manner interested in the results thereof.

19           This 17th day of February, 1994.

20

21                          Anita Thebo, Certified
                            Shorthand Reporter and
22                          Commissioner for the
                            State of Alabama at
23                          Large.

```
1
2
3
4    EXPRESSING SUPPORT OF THE STUDENT SENATE OF THE STUDENT
5    GOVERNMENT ASSOCIATION OF AUBURN UNIVERSITY.
6
7    By Senators Dial, Amari, Waggoner, Lipscomb, Barron, Preuitt,
8    Foshee, Dixon and Owens
9
10            WHEREAS, the State of Alabama has criminal laws
11   which prohibit certain acts (see Section 13A-6-65 and 13A-5-
12   12, Code of Alabama, 1975); and
13            WHEREAS, the Senate of Alabama believes that the
14   majority of the students in the universities and colleges of
15   this state share the same values and beliefs of the majority
16   of the citizens of this state; and
17            WHEREAS, the Senate of Alabama recognizes that the
18   students in the universities and colleges of this state are
19   the future leaders of the state; now therefore
20            BE IT RESOLVED BY THE SENATE OF THE LEGISLATURE OF
21   ALABAMA, That this body commends Student Government
22   Associations, the Student Senates, and their leaders, and
23   indeed students when they take courageous stands against
24   positions and actions that are not only prohibited by laws of
25   the State of Alabama but are contrary to the values and
26   beliefs of the people of this state.
27            BE IT FURTHER RESOLVED:
28            1.   That the Senate of Alabama commends future
29   leaders of this state for standing against the threats and
30   pressures of campus organizations which may desire to be
31   chartered but which indeed advocate the violation of any law
32   of this state.
```

PLAINTIFF'S
EXHIBIT

Ex. L

1           2.   That the Senate of Alabama recognizes that, as
2    an example, the Student Government Association, the Student
3    Senate, and numerous students at Auburn University took
4    courageous stands, when on November 25, 1991 and January 7,
5    1992 they boldly objected to what is or may be considered the
6    "politically correct" position prevalent on many college
7    campuses across this country in the acceptance of erotic life
8    styles.

9           3.   That the Senate of Alabama does not condone
10   violations of the laws of the State of Alabama, nor does it
11   recognize an erotic life style as an acceptable alternative
12   life style, but rather acknowledges that the State of Alabama
13   is and resolves that it shall remain, historically traditional
14   in its views of the family, and that the State of Alabama is a
15   place where families can live and grow without being debased
16   or immoralized.

17          4.   That copies of this resolution be sent to all
18   Board of Trustee members, all university and college
19   Presidents, and all Presidents of Student Senates for the
20   respective universities and colleges in this state.

21
22                          I hereby certify that the
23                          above is a true, correct
24                          and accurate copy of
25                          Resolution No. 92-005 by
26                          Senator Dial, et al, filed
27                          with the Senate of Alabama
28                          on February 1, 1992.
29
30
31
32
33                          McDowell Lee
34                          Secretary of Senate


Page 2

1  •

2

3

4

5

6      :

. 7

8      HR _|||_  EXPRESSING SUPPORT OF THE STUDENT SENATE OF THE

9              STUDENT GOVERNMENT ASSOCIATION OF AUBURN UNIVERSITY.

10

11             WHEREAS, the Auburn Gay and Lesbian Association

12     requested approval of a charter as an on-campus student

13     association by the Student Senate of the Student Government

14     Association of Auburn University and on November 25, 1991, the

15     Student Senate denied the request; and

16             WHEREAS, on January 7, 1992, Dr. Pat Barnes,

17     Vice-President of Student Affairs, acting on behalf of

18     President James Martin, granted the charter to the Auburn Gay

19     and Lesbian Association notwithstanding the prior decision of

20     the Student Senate; and

21             WHEREAS, the Student Senate by Resolution of January

22     13, 1992, expressed dissatisfaction with the ruling of the

23     administration; stated that the Auburn Gay and Lesbian

24     Association did not meet the ideas entrusted to the Student

25     Senate on behalf of the students of Auburn University; and

26     respectfully requested the administration to reconsider and

27     reverse its decision, which request the administration denied;

28     and

29             WHEREAS, the State of Alabama has criminal laws,

30     which prohibit sodomy, sexual perversion, and otherwise

31     unnatural sex acts; and

32             WHEREAS, the House of Representatives of Alabama

33     recognizes that the students in the universities and colleges

Page 1

Ex.  N

1    of this great state are the future leaders of the state; now
2    therefore,

3             BE IT RESOLVED BY THE HOUSE OF REPRESENTATIVES OF
4    THE LEGISLATURE OF ALABAMA, That this body commends the
5    Student Government Association, the Student Senate, and its
6    leaders, and the students of Auburn University for their
7    courageous stand against positions and actions that are not
8    only prohibited by laws of the State of Alabama but that are
9    contrary to the values and beliefs of the people of this
10   state.

11           BE IT FURTHER RESOLVED:

12           1. That the House of Representatives of Alabama
13   commends these future leaders of this state for standing
14   against the threats and pressures of the Auburn Gay and
15   Lesbian Association and the American Civil Liberties Union.

16           2. That the House of Representatives of Alabama
17   recognizes that the Student Government Association, Student
18   Senate, and the students of Auburn University have done the
19   right thing, regardless of what is considered the "politically
20   correct" position prevalent on college campuses across this
21   country of accepting the homosexual life style.

22           3. That the House of Representatives of Alabama
23   does not condone violations of the laws of the State of
24   Alabama, nor does it recognize the homosexual life style as an
25   acceptable or legal alternative life style, but rather
26   acknowledges that the State of Alabama is and resolves that it
27   shall remain, historically traditional in its view of the
28   family, and that the State of Alabama is a place where
29   families can live and grow without being debased or
30   immoralized.

31           4. That the House of Representatives of Alabama
32   requests all interested parties to recognize the correctness
33   of the position of the Auburn Student Senate and to support
34   that position in every way.

1          5.   That the House of Representatives of Alabama
2   calls upon the Board of Trustees of Auburn University to
3   reverse the position of the Auburn University administration
4   and to support the Student Senate of the Student Government
5   Association of Auburn University to deny a charter to the
6   Auburn Gay and Lesbian Association.

7          6.   That copies of this resolution be sent to the
8   Board of Trustees of Auburn University, the President of
9   Auburn University, and the Student Senate of the Student
10   Government Association of Auburn University.

### § 16-1-28. No public funds or public facilities to be used to promote lifestyle or activities prohibited by sodomy and sexual misconduct laws.

(a) No public funds or public facilities shall be used by any college or university to, directly or indirectly, sanction, recognize, or support the activities or existence of any organization or group that fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws of Sections 13A-6-63 to 13A-6-65, inclusive.

(b) No organization or group that receives public funds or uses public facilities, directly or indirectly, at any college or university shall permit or encourage its members or encourage other persons to engage in any such unlawful acts or provide information or materials that explain how such acts may be engaged in or performed.

(c) This section shall not be construed to be a prior restraint of the first amendment protected speech. It shall not apply to any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state. (Acts 1992, No. 92-439, §§ 1-3.)

Effective date. — The act which added this section became effective May 14, 1992.

PLAINTIFF'S
EXHIBIT

2

104    W4+2190  06-70-62



# HOUSE OF REPRESENTATIVES

### ALABAMA STATE HOUSE
### MONTGOMERY, ALABAMA 36130

DISTRICT NO. 73
MONTGOMERY COUNTY

PERRY O. HOOPER, JR.
4121 CARMICHAEL ROAD
MONTGOMERY, ALABAMA
36106-3640
OFFICE 205/270-0108
MONTGOMERY 205/242-7683

COMMITTEES:
CHAIRPERSON, COMMERCE, UTILITIES
AND TRANSPORTATION
INDUSTRIAL DEVELOPMENT AND
ECONOMIC GROWTH
TOURISM, ENTERTAINMENT
AND SPORTS
LOCAL LEGISLATION NO. 8
MONTGOMERY

February 18, 1992

The Honorable James H. Evans
Attorney General
State of Alabama
Montgomery, Alabama   36130

> RE:  Sections 13A-6-63,
> 13A-6-64, and 13A-6-65,
> Code of Alabama 1975, –
> Crimes of Sodomy and
> Sexual Misconduct.
> #LRS92-783

Dear Mr. Evans:

Sections 13A-6-63 and 13A-6-64 of the Code of Alabama
1975, prohibit the crime of sodomy. Section 13A-6-65 of the
Code of Alabama 1975, likewise prohibits deviate sexual
intercourse also making such crime of sexual misconduct a
criminal offense.

I would appreciate your opinion as to whether an
organization that professes to be homosexual or lesbian may
use state funding or state supported facilities to foster or
promote those illegal, sexually deviate activities as defined
in the sodomy and sexual misconduct laws under Sections
13A-6-63, 13A-6-64, and 13A-6-65 of the Code of Alabama 1975,
copies of which are enclosed herein.

I would appreciate your advice at the earliest possible
date.

Thank you for your assistance.

Sincerely,

Perry O Hooper, Jr.
District 73

POH/bb

Enclosure


PLAINTIFF'S
EXHIBIT
3



**JIMMY EVANS**
ATTORNEY GENERAL
STATE OF ALABAMA

**JUL 2 9 1993**

ALABAMA STATE HOUSE
11 SOUTH UNION STREET
MONTGOMERY, ALABAMA 36130
AREA (205) 242-7300

Honorable Frederick P. Whiddon
Office of the President
University of South Alabama
Mobile, AL 36688

> Colleges and Universities -
> State Funds - Sexual
> Misconduct
>
> University Student Govern-
> ment Association subject to
> § 16-1-28, Code.

Dear Dr. Whiddon:

This opinion is issued in response to your request for
an opinion from the Attorney General.

### QUESTION

> May the University of South Alabama
> Student Government Association provide
> funding to the Gay, Lesbian and Bi-Sexual
> Alliance without violating § 16-1-28,
> Code of Alabama 1975, concerning the
> provision of funds to any group that
> promotes a lifestyle prohibited by the
> sodomy and sexual misconduct laws?

### FACTS, LAW AND ANALYSIS

On February 19, 1992, the Office of the Attorney General
issued an opinion addressed to the Honorable Perry O. Hooper,
A.G. No. 92-00212, that concluded:

> "It is our opinion that an organization
> that professes to be comprised of homo-
> sexuals and/or lesbians may not receive
> state funding or use state-supported
> facilities to foster or promote those



PLAINTIFF'S
EXHIBIT

*4*

> illegal, sexually deviate activities
> defined in the sodomy and sexual
> misconduct laws under §§ 13A-6-63,
> 13A-6-64, and 13A-6-65 of the Code of
> Alabama 1975."

Subsequent to that opinion, the Alabama Legislature
enacted Act No. 92-439 which is codified as § 16-1-28, Code
of Alabama 1975. Subsection (a) of this statute provides:

> "No public funds or public facil-
> ities shall be used by any college or
> university to, directly or indirectly,
> sanction, recognize, or support the
> activities or existence of any organi-
> zation or group that fosters or promotes
> a lifestyle or actions prohibited by the
> sodomy and sexual misconduct laws of
> Sections 13A-6-63 to 13A-6-65, inclusive."

In view of our previous opinion and the legislature's
action, we are constrained to answer your question in the
negative. Student Government Associations are subject to the
provisions of § 16-1-28, Code, supra.

## CONCLUSION

The Student Government Association may not provide funds
to any organization that fosters or promotes a lifestyle or
actions prohibited by §§ 13A-6-63 to 13A-6-65, inclusive,
Code of Alabama 1975.

I hope this sufficiently answers your question. If our
office can be of further assistance, please do not hesitate
to contact us.

Sincerely,

JIMMY EVANS
Attorney General
By:

James R. Solomon

JAMES R. SOLOMON, JR.
Chief, Opinions Division

JE/PCD/dn
W3.93/OP

TELEPHONE (205) 460-6111
N. 122 • MOBILE, ALABAMA 36688

OFFICE OF THE PRESIDENT

February 12, 1993

Honorable James Evans
Attorney General, State of Alabama
11 South Union Street
Montgomery, Alabama 36104

Dear Attorney General Evans:

An association recognized by the Student Government Association, known as the Gay, Lesbian and Bisexual Alliance, has requested a certain budget appropriation request to the Student Government Association. As noted in a copy of the charter of the organization, the organization does not promote a lifestyle prohibited by the Sodomy and Sexual Misconduct laws of Section 13(a)-6-63 to 13(a)-6-65 of the Code of Alabama 1975. Please see attached charter relating to the Gay, Lesbians and Bisexual Alliance.

The student organization has requested of the Student Government Association total funds of $698.00, which will be for the purpose of the social support committee, the public relations committee, the finance and administration committee (for banking fees), and especially for the speaker's bureau and forum committee. The major request is to provide moneys for a guest speaker, an attorney and director of the ACLU's Gay and Lesbian Rights Project.

An opinion is respectfully requested as to whether the University of South Alabama, and specifically its Student Government Association, can provide such funding, in view of Act No. 439, Acts of Alabama, 1992, Regular Session, passed into law on May 14, 1992, which prohibits any college or university from spending public funds to sanction any group that promotes a lifestyle prohibited by the sodomy and sexual misconduct laws.

Your response to this matter is greatly appreciated.

Sincerely,

Frederick P. Whiddon

/jm

Attachment

PLAINTIFF'S
EXHIBIT

5

## GAY AND LESBIAN STUDENT ALLIANCE

of the

University of South Alabama


Advisor:  Dr. Larry Schehr

President:  Terri F. Elliott

Vice President:  James Verdier

Secretary:  Caron Crooke

Treasurer:  Daniel Fisher

## PURPOSE OF THE GAY AND LESBIAN STUDENT ALLIANCE

To provide a foundation for unification for homosexual and non-homosexual people of the student population, in order to draw support to further our efforts in educating all members of the university community on the fears and dangers of homophobia and to provide a support system for South Alabama's homosexual students.

18 December 1991

M E M O R A N D U M

To:    Ms. Sally Cobb
       Student Activities

From:  Lawrence R. Schehr
       Professor of French

Re:    Gay and Lesbian Student Alliance

I have been asked to be the official faculty adviser for the Gay
and Lesbian Student Alliance (GLSA).    I  have  accepted  this
invitation and will serve in this capacity.

## REQUEST TO FORM AN ORGANIZATION

To Whom it may concern:

We, the undersigned (see membership list), wish to form
the Gay and Lesbian Student Alliance (GLSA) at the University
of South Alabama. We formally request that we be recognized
as an organization on the campus of South Alabama. The
primary goal of GLSA is to further basic human rights and
awareness within the university, among the students, and
in the community-at-large.

Thank you for your time and cooperation.

With Respect,

Terri F. Elliott, president
And the charter members of
GLSA

## JUSTIFICATION FOR NEED

Whereas the needs of gay and lesbian students have
not been met in the past at the University of South Alabama,
this organization will attempt to address these needs by
focusing in emotional, political, and psychological awareness
of the homosexual student.

The organization will serve as an open forum where
current political issues can be discussed. Through its
activities, fora, and discussions, the Gay and Lesbian
Student Alliance (GLSA) will help heighten the awareness of the
student body to the needs of its large gay and lesbian
population and will work fervently to combat homophobia and
to foster understanding of the dangers of homophobia on
a university campus.

We will also invite gay and lesbian individuals in the
community who are successful and who can therefore provide
positive role models to students.

This organization will provide information and assistance
on issues that consern the general health and well-being
of its members and the university community as a whole.
The organization will be a support system for its members
and an information source for the entire university community.

## STATEMENT OF COMPLIANCE WITH UNIVERSITY

### RULES AND REGULATIONS

We, the members of the Gay and Lesbian Student Alliance do, hereby, agree to conform and respect all university rules and regulations in meetings, on and off campus; and during all GLSA functions.

## University of South Alabama
### GAY AND LESBIAN STUDENT ALLIANCE (GLSA)
#### Constitution

PURPOSE:

> The purpose of Glsa is to provide a foundation for
> unification for homosexual and nonhomosexual people of
> the student population, in order to draw support to
> further our efforts in educating all members of the
> university community on the fears and dangers of homo-
> phobia and to provide a support system for the Univer-
> sity of South Alabama's homosexual students.

ARTICLE ONE: TERMS OF OFFICE FOR OFFICERS

> Elections of the officers of this organization will be
> held at hte next to last meeting in May. Terms of
> office will be for one year. A candidate for office
> must be a student in good standing (2.00 GPA) at USA
> and must be a member in good standing in GLSA.

ARTICLE TWO: MEETING TIMES

- A. Meetings will be held every Wednesday.
- B. The meeting times will be from 5 pm- 7pm on the
  first and third Wednesdays of every month and from
  7 pm- 9 pm on the second and fourth wednesdays.
- C. Officer's meetings will be held weekly or as deemed
  necessary by an officer.
- D. This article may be amended by a majority vote of
  all members.

ARTICLE THREE: OFFICES AND COMMITTEES

- A. President
  1. The president will preside at all general and
     officer's meetings.
  2. The president will determine the agenda for
     both meetings.
  3. The president will be the official spokesperson
     in all situations concerning GLSA.
  4. The president may delegate these and other
     duties to the vice-president and/or committees
     as need be in conformance with the constitutional
     powers of the other offices.
  5. The president will call for committees when
     appropriate and approved by a majority vote
     of members present.
  6. If the president is unable to complete the term
     of office, the vice-president will assume the
     presidency.
- B. Vice-President
  1. The VP will preside at any time the president cannot.
  2. The VP will accompany the president to all
     official meetings involving faculty, press, counsel,etc
  3. The VP will oversee all committees and collect
     all reports to be submitted to the president,
     except for the Executive Committee.
  4. If the VP is unable to complete the term of
     office, a special election will be called to

     fill the office for the remainder of the term.

C.  Secretary
    1.  The secretary will record all minutes of regular
        and officer meetings and submit a record to the
        president.
    2.  The secretary will be responsible for all correspondence.
    3.  Any published announcements will and must be
        approved by a majority of members present.
    4.  If the secretary is unable to complete the term
        of office, the remaining four officers will
        appoint a new secretary , subject to the appro‹
D.  TReasurer
    1.  The treasurer will be responsible for the collection
        of dues from the members.
    2.  The treasurer will keep current records and give
        a financial report at each regular meeting.
    3.  The treasurer will confer with the president
        regarding all finances of GLSA and implement
        all financial transactions.
    4.  In order to avoid the misuse of GLSA funds,
        the president and the vice-president will be
        required to approve all expenditures after their
        presentation by the treasurer.
    5.  At least two officer's signatures will be required
        on all checks.
    6.  If the treasurer is unable to complete the term
        of office, the remaining four officers will appoint
        a new treasurer.
E.  Parliamentarian
    1.  This position will be appointed by the Officers.
    2.  The parliamentarian will be responsible for
        maintaining order during meetings and will
        determine the order of who is to speak.
    3.  May delegate responsibility if he/she cannot
        attend a meeting, only with presidential approval.
    4.  If the parliamentarian cannot complete the term
        of office, the remaining officers will delegate
        a new parliamentarian.
F.  Executive Committee
    The executive committee includes all officers and
    four to six members at large who volunteer for the
    position and who will attend at least two committee
    meetings per month.  If more than six members
    volunteer, a majority vote of members present will
    select at least four members in good standing to
    represent the members at large.
G.  Committees can be formed with presidential approval
    and/or majority vote if the need arises.
ARTICLE FOUR:  DUES
    A.  Dues are $5.00 per quarter or $10.00 per year(3 quarters).
    B.  No prorations will be made for those joining the
        group during the term or for those paying dues late.
    C.  Persons of limited means may obtain presidential
        approval in order to qualify for a reduced rate
        of $1.00 per quarter.
    D.  MEMBERSHIP IS CONTINGENT ON THE PAYMENT OF DUES.
        NO EXCEPTIONS!!!!

ARTICLE FIVE: QUALIFICATIONS FOR MEMBERSHIP
- A. Membership in this organization is limited to those persons over the age of majority (18).
- B. Membership in GLSA is open to all persons regardless of race, creed, gender, religion, national origin, physical challenges, or sexual orientation. Membership in GLSA is not indicative of any sexual orientation but of    personal philosophical convictions.
- C. Persons seeking membership in GLSA should understand the philosophy and purpose of GLSA and express a basic agreement with those beliefs.
- D. There are two levels of membership In GLSA: Members and Associates.
  1. Members
     - a. Membership is defined by the payment of dues as defined in Article 4 and active participation (attendance of at least two general meetings per month) in the group's functions.
     - b. ONLY PERSONS MEETING THE MEMBERSHIP REQUIREMENTS WILL BE ELIGIBLE TO VOTE.
  2. Associates
     - a. Associates are persons who meet one but not both membership requirements.
     - b. Associates are welcome to participate in any general or committee functions of GLSA but are not eligible to vote.
     - c. Associates are not eligible to hold office or to chair committees but may serve on a committee.

ARTICLE SIX: REPRIMAND AND EXPULSION OF A MEMBER OR ASSOCIATE
- A. To endanger the integrity and/or emotional or physical well-being of any member or associate or faculty member warrants reprimand or expulsion from GLSA, subject to a majority vote of members present.
- B. A written notice of this action will be given to the person in question two weeks prior to the vote. At the time of the notice, the member or associate will be advised to bring forth materials and/or persons that may assist in defense against the charges. This evidence will be reviewed by the members before the vote is taken.
- C. A reprimand consists of a written statement which includes a description of the offense, and will be given in cases of lesser offenses than those which warrant expulsion. Reprimanded members will become associates for one calendar year.
- D. Expulsion will be the required punishment for major offenses such as: publication of the members' and associates' names, phone numbers, and addresses; deliberate slander of any person involved in or with GLSA or any faculty member; or any comparable offense.
- E. Reprimands will only be given once, a second offense will be subject to expulsion.

F.  Any person who has been expelled may petition for
            readmittance into GLSA after one calendar year,
            subject to a majority vote by all members.
ARTICLE SEVEN:  SELECTION OF A FACULTY ADVISOR
        A.  Any potential advisor will be contacted by the president.
        B.  A meeting will be set up between the potential
            advisor, the president, the vice-president, and
            any interested members. A faculty agreeing to become
            an advisor to GLSA will then meet with the general
            membership.  A mojority vote of the members present
            will be required to approve the selection of the newe
            advisor.
        C.  ᵦThe faculty advisor will be present at all elections
            ,and voting procedures for reprimands or expulsions.
        D.  The advisor will be responsible for parliamentary
            procedure during the elections and confirm the
            results of the vote.
ARTICLE EIGHT:  ELECTION PROCEDURES
        A.  Elections will be held at the next to last meeting in may.
            Terms of office will be one year beginning at the last mee
            in May.  This last meeting will be a "formal" meeting
            where the offices are turned over to their successors.
        B.  A list of the members will be published two weeks
            prior to the election.  Only persons on the voting
            list will be eligible to vote.
        C.  Nominations will be taken one week prior to the elections.
            All nominations must be heard and seconded.  Nominees
            need not be present to be placed on the ballot;
            however, they may decline nomination before the vote
            is taken.  No nominations will be taken the night of the
            elections.
        D.  The advisor will be responsible for parliamentary
            procedure during the elections.
        E.  Candidates will be allowed three minutes to speak
            Before the election of their respective office in
            order to make any statements concerning intent,
and         and ability for the office.
        F.  All elections will be conducted by secret ballot
            unless changed by a majority vote of members present.
        G.  Members unable to attend the elections may submit, in
            advance, a written, signed ballot to the advisor.
            This must include the members student ID number and
            turned in, in person.
        H.  A simple majority vote will be sufficient for the
            election of an officer.
        I.  In the event that a single nominee declines the
            nomination on election night a write in vote will
            be allowed.
ARTICLE NINE:  IMPEACHMENT OF OFFICERS
        A.  Any officerswho becomes an associate will be immediately
            removed from office.  The office will be filled
            by the provisions stated in Article 3.

B.  Any officer who fails to perform the specific duties
    assigned to the office will be removed from office
    subject to approval of a two-thirds majority of all
    members.
C.  Any officer who is reprimanded is subject to removal from
    office by the consenting vote of a two-thirds majority
    of all members.  An officer who is expelled will be
    removed from office.

ARTICLE TEN:  AMENDING THE CONSTITUTION.

A.  A request for an amendment to the constitution may
    be made by any member.
B.  The addition of an amendment will be decided by a
    majority vote of two-thirds of all members.

Each Probate Judge, Sheriff, District Court Clerk, the Clerk and Register of the Circuit Court, County Commission Chairman and Municipal Clerk is required by law to preserve this slip or pamphlet in a book kept in his office until the Act is published in permanent form.

# ALABAMA LAW

(Regular Session, 1992)

Act No. 92-439

H. 454 – Reps. Turnham, Sanderson, Fuller, Burke, Gaines, Flowers, White, Knight, Higginbotham, Carothers, Starkey, Bowling, Lindsey, Beasley, Anderson, Williams, Letson, Cosby, Morrow, Carter, Ford, Walker, Harvey, Biddle, Payne, Carns, Hawkins, Hammett, Hooper, Cullins, Warren, Hall, Johnson, Laird, Haynes, Dolbare, Black (L), Blakeney, Petelos, Mikell, Turner, McMillan, McKee, Cagle, Crow, Hogan, Mathis, Newton (C), Poole, Holladay, Layson, Clay, Rockhold, Gullatt, Sanderford, Parker (T), Smith (C), Powell, McDaniel, Hill, Collins, Richardson, Smith (R), Haney, Millican, Venable, Gaston, Curry, Willis, Morton, Rogers (F), Rich, Newton (D), Butler

## AN ACT

To prohibit any college or university from spending public funds or using public facilities, directly or indirectly, to sanction, recognize, or support any group that promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws; to prohibit any group from permitting or encouraging its members or others to engage in or provide materials on how to engage in the lifestyle or actions.

*Be It Enacted by the Legislature of Alabama:*

**Section 1.** No public funds or public facilities shall be used by any college or university to, directly or indirectly, sanction, recognize, or support the activities or existence of any organization or group that fosters or promotes a lifestyle or actions prohibited by

the sodomy and sexual misconduct laws of Sections 13A-6-63 to 13A-6-65, inclusive, of the Code of Alabama 1975.

**Section 2.** No organization or group that receives public funds or uses public facilities, directly or indirectly, at any college or university shall permit or encourage its members or encourage other persons to engage in any such unlawful acts or provide information or materials that explain how such acts may be engaged in or performed.

**Section 3.** This act shall not be construed to be a prior restraint of the first amendment protected speech. It shall not apply to any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state.

**Section 4.** This act shall become effective immediately upon its passage and approval by the Governor, or upon its otherwise becoming a law.

Approved May 14, 1992

Time: 11:48 A.M.

I hereby certify that the foregoing copy of an Act of the Legislature of Alabama has been compared with the enrolled Act and it is a true and correct copy thereof.

Given under my hand this 19th day of May, 1992.

GREG PAPPAS
Clerk of the House