R 𝐎𝐑𝐈𝐆𝐈𝐍𝐀𝐋

94 MAR 18 AM 10:23

THOMAS C. CAVER, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

1  UNITED STATES DISTRICT COURT FOR

2  THE MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  CASE NUMBER:  93-T-1178-N

6  GAY LESBIAN AND BISEXUAL ALLIANCE,

7      Plaintiff,

8        vs.

9  JIMMY EVANS, in his official

10  capacity as Attorney General

11  of the State of Alabama;

12  FREDERICK P. WHIDDON, in his

13  official capacity as President

14  of the University of South

15  Alabama; and DALE T. ADAMS,

16  in his official capacity as

17  Dean of Students of the

18  University of South Alabama,

19      Defendants.

20

21        S T I P U L A T I O N

22        IT IS STIPULATED AND AGREED by and

23  between the parties through their respective

1  counsel, that the deposition of DALE T. ADAMS

2  may be taken before ROBIN L. HAMMOND,

3  Commissioner, at University of South Alabama

4  Administration Building, Mobile, Alabama, on

5  the 9th day of February, 1994.

6  IT IS FURTHER STIPULATED AND AGREED

7  that the signature to and the reading of the

8  deposition by the witness is waived, the

9  deposition to have the same force and effect as

10  if full compliance had been had with all laws

11  and rules of Court relating to the taking of

12  depositions.

13  IT IS FURTHER STIPULATED AND AGREED

14  that it shall not be necessary for any

15  objections to be made by counsel to any

16  questions except as to form or leading

17  questions, and that counsel for the parties may

18  make objections and assign grounds at the time

19  of the trial, or at the time said deposition is

20  offered in evidence, or prior thereto.

21  IT IS FURTHER STIPULATED AND AGREED

22  that the notice of filing of the deposition by

23  the Commissioner is waived.

1                          INDEX

2      EXAMINATION BY:                    PAGE NUMBER:

3      Ms. Harlow                              8

4

5

6

7

8      EXHIBITS:

9      Plaintiff's Exhibit No. 1

10         (Bill)                              29

11     Plaintiff's Exhibit No. 2

12         (Bill)                              29

13     Plaintiff's Exhibit No. 3

14         (Letter: From Carol Story

15            to Dean of Students)           50

16     Plaintiff's Exhibit No. 4

17         (Memorandum: July 31, 1992

18            From Dale T. Adams

19            to Maxey Roberts)              51

20     Plaintiff's Exhibit No. 5

21         (Student Services Staff

22            Meeting Minutes 10/6/92)       57

23

```
 1    EXHIBITS (cont'd.):
 2    Plaintiff's Exhibit No. 6
 3         (Public Relations and
 4          Advertising Committee
 5          Funding WORLD AIDS DAY,
 6          1992)                        62
 7    Plaintiff's Exhibit No. 7
 8         (Letter: From Mike Mitchell
 9          to Maxey Roberts 1/29/93)    63
10    Plaintiff's Exhibit No. 8
11         (Letter: From Dale Adams
12          to George Hite Wilson
13          1/7/93)                      63
14    Plaintiff's Exhibit No. 9
15         (SGA Proposed Budget
16          Winter 1993)                 68
17    Plaintiff's Exhibit No. 10
18         (SGA Proposed Budget
19          Winter 1993)                 68
20    Plaintiff's Exhibit No. 11
21         (Section 16-1-28
22          General Provisions)          74
23
```

```
 1    EXHIBITS (cont'd.):
 2    Plaintiff's Exhibit No. 12
 3         (Student Services Staff
 4          Meeting Minutes 4/20/93)      78
 5    Plaintiff's Exhibit No. 13
 6         (Responses to
 7          Interrogatories)            86
 8
 9                    *   *   *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

1                    A P P E A R A N C E S

2

3               WILLIAM B. RUBENSTEIN AMERICAN CIVIL

4       LIBERTIES UNION FOUNDATION, by Ms. Ruth Harlow,

5       132 W. 43rd Street, New York, New York 10036,

6       appearing on behalf of the plaintiff, Gay

7       Lesbian and Bisexual Alliance.

8

9               COPELAND, FRANCO, SCREWS & GILL, by

10      Mr. J. Fairley McDonald, III, Post Office Box

11      347, Montgomery, Alabama 36101-0437, appearing

12      on behalf of the defendants, Frederick P.

13      Whiddon and Dale T. Adams.

14

15          Also Present for the UNIVERSITY OF SOUTH

16      ALABAMA, Ms. Maxey J. Roberts, University

17      Attorney, Administration Building, Room 131,

18      Mobile, Alabama 36688.

19

20

21

22

23

**Foshee & Turner**

1           I, ROBIN L. HAMMOND, a Court

2     Reporter of Mobile, Alabama, and Notary Public

3     for the State of Alabama at Large, acting as

4     Commissioner, certify that on this date,

5     February 9, 1994, as provided by the Alabama

6     Rules of Civil Procedure and the foregoing

7     stipulation of counsel, there came before me at

8     the University of South Alabama, Administration

9     Building, Mobile, Alabama, beginning at 10:00

10    a.m., DALE T. ADAMS, witness in the above

11    cause, for oral examination, whereupon the

12    following proceedings were had:

13                DALE T. ADAMS,

14    the witness, having been first duly sworn by

15    the court reporter, was examined and testified

16    as follows:

17                MS. HARLOW:  Usual stipulations?

18                MR. McDONALD:  Yes.

19                MS. HARLOW:  Good morning, Dean

20    Adams.  As you know, my name is Ruth Harlow and

21    I'm one of the attorneys representing the Gay

22    Lesbian Bisexual Alliance in this case.

23                I want to make clear to you that

1    I'll assume that you understand my questions

2    unless you let me know otherwise. And if you

3    don't understand, I'm happy to try and rephrase

4    it or make sure you do understand in some other

5    way.

6          Also, if you need any breaks during

7    the deposition just please let me know and we

8    can take a break whenever you'd like, as long

9    as there's no question pending.

10              EXAMINATION

11   BY MS. HARLOW:

12      Q    Have you ever given a deposition

13   before?

14      A    Yes, I have.

15      Q    So you're familiar with these

16   procedures?

17      A    Yes.

18      Q    How long have you been employed by

19   the University of South Alabama?

20      A    Approximately four and a half years.

21      Q    And when did you become Dean of

22   Student Services?

23      A    September of '89.

1    Q    Was that the position that you came

2    here to take on?

3    A    Yes, that's correct.

4    Q    How would you describe your job

5    duties as Dean of Student Services?

6    A    I guess, broadly, to supervise the

7    activities of programs related to students

8    outside of the classroom.

9    Q    Do you have any particular duties

10   with regard to registered student organizations

11   here?

12   A    Yes, we have an Office of Campus

13   Involvement; and their responsibility is to

14   register organizations who want to be on our

15   campus.

16   Q    Is that Office of Campus Involvement

17   under your supervision?

18   A    That's correct.

19   Q    In addition to registering student

20   organizations does that office perform any

21   other functions?

22   A    It may.  It's also in charge of

23   Greek affairs, working as an adviser to our

1     interfraternity and council and panel. It also

2     has responsibilities for leadership development

3     courses and activities.

4         Q     What are the leadership development

5     courses and activities?

6         A     We would -- we provide training for

7     our students regardless of their organizational

8     background for leadership development and to

9     assume leadership positions, either in their

10     organization here on campus or externally.

11     It's our way of trying to augment what they may

12     receive academically in preparation for

13     leading, wherever that might be. Hopefully it

14     will be on our campus as well as off campus.

15     That consists of seminars, workshops. Nothing

16     for credit at this point but seminars and

17     workshops that are offered, both by our staff

18     and by people that we might bring from outside.

19     For instance, ADL is coming in to do a workshop

20     on diversity through ADL.

21         Q     Is there a position that is known as

22     the Coordinator of Student Activities and

23     Organizations?

1    A    Yes. That office has been changed.

2   That was the previous title. But that would be

3   campus involvement now. Yes, there is a

4   position, a person in that position.

5        Q    Who is that person right now?

6        A    Right now it's Melinda Louis.

7        Q    Would you say that you and Melinda

8   Louis are the university officials that have

9   the most involvement with the various U.S.A.

10   student organizations?

11        A    That's correct. More her than me

12   but, yes.

13        Q    Does U.S.A. try to encourage the

14   activities of student groups on campus?

15        A    Uh-huh.

16        Q    You'll have to just make sure that

17   you do answer verbally. I know you did on that

18   occasion.

19        A    Yes.

20        Q    In addition to encouraging the

21   activities, does the university assist student

22   groups with their specific programming goals?

23        A    Sometimes we do. We have a

1    programming board called Jaguar Productions.

2    And more than likely they would be the people

3    to assist them.  But yes, from time to time

4    that group will come in and ask for some help

5    in getting an activity or program accomplished.

6         Q    Why does the University of South

7    Alabama encourage the activities of student

8    groups on campus?

9         A    Well, because an organization or a

10   group that comes to our campus has certain

11   goals or objectives they want to accomplish.

12   And as long as they are within legal limit --

13   you know, within the law and within the rules

14   and regulations of the university we want to

15   help them do that.  We think that enhances the

16   life on campus of the students.

17        Q    Does the school try to encourage a

18   wide variety of groups here on the campus?

19        A    Yes, it does.

20        Q    You said that having the student

21   groups on campus -- and I don't remember your

22   word now -- enhances --

23        A    Enhances.

1    Q    -- the life of students here on

2    campus.  In what way does it enhance the life

3    of students here on campus?

4    A    Well, I think we would hope that

5    outside of the classroom activities that occur

6    that students have an opportunity to see all of

7    life as it exists, you know, from a practical

8    and applied sense.  And it's an opportunity for

9    our students to encounter different viewpoints,

10   ideas, perspectives.  And we think that's

11   important because we are committed, as our

12   mission statement says, "to the education of

13   the whole person."

14   Q    And I gather from your answer that

15   you believe that the activities of student

16   groups have an educational function here?

17   A    Yes, I do.

18   Q    Is there any rule at U.S.A. that

19   addresses discrimination in the membership

20   practices of registered student groups?

21   A    Yes, there is.

22   Q    And what does that rule provide?

23   A    It essentially provides for the same

1    that the constitution of this country provides

2    for:    That we do not discriminate on the basis

3    of race, creed or ethnic origin.    And in our

4    particular case, also, for sexual orientation,

5    when sexual orientation would not be a decision

6    that a group could make.

7          Q      When you say sexual orientation

8    wouldn't be a decision the group could make, do

9    you mean in deciding who could be a member in

10   that group?

11         A      Be a member, right.

12         Q      Does the University of South Alabama

13   try to encourage the activities of its

14   fraternities and sororities on campus?

15         A      Well, I don't know exactly what you

16   mean by the word "encourage."    Do we support

17   the activities?    Yes.    I mean, there are some

18   activities of all groups we would not

19   encourage.

20              But if you mean as a whole, yes.

21   We are interested in their growth and

22   development, as long as we presume that it was

23   within the philosophy of the university.

1  Q  And what role do you feel the

2 fraternities and sororities play in university

3 life?

4  A  Well, I think it creates a community

5 for a certain segment of the people who are

6 interested in that particular type of

7 community. It's not for everyone, so some

8 join, some don't.

9    But I think it does provide

10 opportunity through community and growth and

11 development for certain groups.

12  Q  Are the fraternities and sororities

13 at U.S.A. residential fraternities and

14 sororities?

15  A  Well, we have some that are and some

16 that aren't. None of our sororities are

17 residential in the sense that they have houses,

18 if that's what you mean.

19  Q  Uh-huh.

20  A  No. None of the sororities have

21 houses where they have live-in situations. We

22 have some fraternities that have live-in; some

23 that don't.

1        Q        At the University of South Alabama

2    is the Student Government Association given a

3    budget, I gather each quarter, to fund its

4    activities; is that correct?

5        A        That's correct.  Uh-huh.

6        Q        And is part of this Student

7    Government Association budget distributed to

8    registered student organizations?

9        A        It's available for distribution,

10    yes, upon request.

11        Q        Are all registered student groups

12    eligible to request monies from the Student

13    Government Association?

14        A        No.

15        Q        Which groups would not be eligible?

16        A        Political organizations for the

17    purpose of, you know, lobbying or religious

18    groups.

19        Q        When you say political

20    organizations, is that solely for the purpose

21    of lobbying they are ineligible to request

22    monies?

23        A        It depends upon what they were --

1    yes, I would think, as far as we are concerned

2    here, it's a blanket situation.  I don't know

3    of any instance where we have ever funded a

4    political organization like the Young Democrats

5    or the Republicans or something like that on

6    our campus for any activity.

7         Q        And when you say political

8    organizations, are you referring to partisan

9    political groups?

10        A        If they were a lobbying group that

11   was formed on campus for a particular issue; is

12   that what you mean?

13        Q        You gave as an example the Young

14   Democrats or the Young Republicans.  I am just

15   trying to get a sense of what you mean by a

16   political organization.

17        A        Those are the two that come to my

18   mind.  I wouldn't have any knowledge of any

19   others that would have been formed just for

20   political purposes that I'm aware of.

21        Q        When you say "political purposes,"

22   can you give me an idea of what you mean by

23   that?

1      A      I'm talking about partisan politics.

2      Q      And the other group you mentioned

3  that would not be eligible for funding is any

4  kind of religious group?

5      A      That's correct.

6      Q      So all other registered student

7  groups aside from political organizations or

8  religious groups can apply to the SGA for

9  funding?

10      A      Uh-huh, that's correct.

11      Q      Where does the money that the SGA

12  has in its budget to give to registered student

13  organizations come from?

14      A      It comes entirely from the student

15  activity fee that the students pay each

16  quarter.

17      Q      Is that student activity fee

18  something that the students pay when they pay

19  their tuition?

20      A      That's correct.

21      Q      And how much is that for each

22  student each quarter?

23      A      Well, there's a scale on it.  It is

1   $30 per quarter. Half of that money, I think,
2   is allocated to the athletic department. The
3   other half comes to the student services.
4           If you are less than twelve hours,
5   it's less. I think it's $16. And if you are
6   less than seven hours, it's $8. So it's a
7   sliding scale depending upon the number of
8   hours you take.
9           Q    And if I gather correctly, every
10  student that registers for classes has to pay
11  some kind of student activity fee?
12          A    Yes.
13          Q    What purpose is served by the
14  Student Government Association making these
15  grants of money to various registered student
16  groups?
17          A    I think their constitution states it
18  pretty succinctly that the money is there for
19  the purpose of enhancing student life as a
20  whole and, you know, promoting the welfare of
21  the student body, whatever the activity might
22  be.
23          Q    Do you attend the Student Government

1    Association meetings?

2        A    Uh-huh, most of them.

3        Q    So you would typically be present

4    when the Student Government Association made

5    decisions about which organizations to fund?

6        A    Uh-huh.

7        Q    Does the Student Government

8    Association make funding decisions at all of

9    its meetings or at only designated meetings

10   throughout the year?

11       A    Well, they have a meeting the first

12   of the year, but they can make an appropriation

13   decision at any time, at any meeting.

14       Q    When the Student Government

15   Association makes a decision regarding funding,

16   is that decision final or does -- is there any

17   other review process that the funding decision

18   must go through?

19       A    Formally, the only other review

20   might be whether I sign a requisition on it.

21   And that has more to do with accounting

22   principles of the university and what the

23   university can or cannot fund.  I mean,

1    although I think our student government does a

2    pretty decent job of ferreting all that out.

3            I don't know of any funding request

4    that was made by the SGA that I've ever not

5    signed off on.

6        Q    And by "signed off on," do you mean

7    signed the requisition paperwork?

8        A    Sure, uh-huh.

9        Q    What do you do physically when you

10   sign off on a requisition?

11       A    Put my signature on it.  I mean,

12   what do I do in terms of any kind of fact

13   finding or something of that nature?

14       Q    No, I meant more on the signature.

15   What do you put your signature on?

16       A    It's a requisition, a piece of

17   paper.  They'll usually have a description of

18   what they want to spend the money on -- for.

19       Q    And do you keep those forms here at

20   the university in any file, any accounting file

21   or anything like that?

22       A    The university keeps them, yes.  I

23   don't know how long we keep them, but we keep

1    them.

2         Q       So other than signing the

3    requisition forms there would be no review or

4    activity that you would undertake once the SGA

5    decides to fund a registered student group.  Is

6    that the typical process?

7         A       That's unless I felt that by

8    reviewing, by seeing the requisition, that

9    there was some problem that we needed to deal

10   with related to the requisition.

11        Q       And when does the requisition

12   happen?  Is that before the group spends the

13   money or when the group submits receipts for

14   the money or does it vary?

15        A       Well, hopefully it's before they

16   spend the money that we have a requisition.

17   They probably are not going to be able to spend

18   the money without the requisition, that's for

19   sure.

20             There are some situations where

21   people are reimbursed for certain activities

22   they may have participated in which the SGA

23   then agrees to reimburse.  So in that case they

1     may have spent the money and the SGA agrees to

2     reimburse them later.

3     Q    I see. So if a student group makes

4     a request to the SGA for funding and the SGA

5     decides they will fund a particular event, then

6     that student group could put the paperwork

7     through and get the funding prior to the event

8     taking place?

9     A    Yes, unless it was a reimbursement

10     circumstance. Sometimes they are very, very

11     close. I mean by that the SGA may agree to an

12     event and it may be the next day or the next

13     night. So, I mean, the timing. But

14     essentially the way you described it is the

15     case.

16     Q    And does that procedure vary

17     according to whether the group has an on-campus

18     bank account or not?

19     A    No. Well, the only thing that would

20     vary would be that the dispersal of the money

21     would have to come through the university. If

22     they have an off-campus account it's probably a

23     reimbursement circumstance. In other words,

1    they would spend the money out of their account

2    and then we would write a check to the group to

3    put back in their account.

4        Q    So for groups with off-campus

5    accounts the typical process would be a

6    reimbursement process?

7        A    Yes.

8        Q    And why is that?  Is that because

9    you need some documentation about the way the

10   money has been spent?

11       A    Yeah.  I think the -- I may not be

12   exactly right on this, but I'll tell you the

13   best -- I think the SGA requires, their

14   treasury requires, that you have to submit.

15   They will, they will allocate you the money as

16   an organization, but they will not reimburse

17   you until you bring in all of your receipts and

18   everything, and all those have to be submitted.

19               And then if in some way you have

20   violated their constitutional.  That's the way

21   to sort of protect them constitutionally so

22   that they don't give out the money, then the

23   group goes and spends it on something that they

1    did not authorize.  So they require that all

2    the receipts come in before they disburse.

3         Q    Do you know, Dean Adams, whether the

4    Gay Lesbian Bisexual Alliance previously had a

5    different name?

6         A    No, I don't.  I don't know whether

7    they did or not.

8         Q    I believe that they were initially

9    called the Gay and Lesbian Student Alliance.

10       A    Well, yes, I do know that they did

11   ask -- they did put in the bisexual.  I thought

12   you meant substantially different.  But I am

13   aware that they did add the bisexual to it.

14       Q    I just wanted to make sure that you

15   understand when I do ask you questions about

16   SGBA or the Gay Lesbian Bisexual Alliance I am

17   going to be referring to the whole history,

18   even though they did make that slight change in

19   their name.

20            Do you know when that group was

21   initially formed on campus?

22       A    No, but I imagine you can tell me.

23   I'm vague on the exact date but it was sometime

1    in '92, I think, or maybe late '91.  I'm not

2    sure exactly when it was, when they first

3    registered with us.  I think we submitted the

4    initial registration to you so that would have

5    the exact date on it.

6         Q    Right.  I think it was in late '91.

7         A    Okay.

8         Q    Since the GLA -- I'm sorry.  Since

9    the GLBA formed, do you feel that that group

10   has made positive contributions to the

11   university community?

12        A    Yes.

13        Q    What type of contribution or

14   contributions has that group made to the

15   university community?

16        A    I think they are working in trying

17   to promote AIDS awareness and AIDS education.

18   I think they have provided the support of the

19   community for students who are gay, lesbian or

20   bisexual.  I think they have educated other

21   students and faculty and staff on our campus

22   about the issues related to gay life.

23        Q    Has the GLBA ever done anything that

1    you feel has interfered with the educational

2    mission of the university?

3         A    No.

4         Q    To your knowledge, has the GLBA or

5    any of its members ever violated an Alabama

6    criminal statute?

7         A    Not that I know of.  Not in my

8    person.

9         Q    Do you have any reason to believe

10   that the GLBA or any of its members has ever

11   violated an Alabama criminal statute?

12        A    No.

13        Q    Dean Adams, would you say that in

14   the last five years the University of South

15   Alabama has had any significant problem with

16   any kind of criminal activity on campus?

17        A    Could you be more specific?

18        Q    I'm just trying to get a sense of

19   whether there's any kind of criminal activity

20   on campus that has been a problem for the

21   university in the last few years.

22        A    We have, as all universities do,

23   petty theft and cars broken into and that type

1  of thing, if that's what you're talking about.

2        Q      I'm just trying to get a sense of

3  your experience.

4        A      Sure, we've had that.

5        Q      Is there anything else related to

6  criminal activity on campus that's been a

7  problem?

8        A      No, not beyond what you would

9  assume that you might have in a community of

10  this size.

11       Q      Dean Adams, as you know, this

12  lawsuit has to do with a piece of legislation

13  that was passed by the Alabama Legislature that

14  relates to the use of public funds and

15  facilities on college campuses.  When did you

16  first become aware that the Alabama Legislature

17  was considering such a piece of legislation?

18       A      Our lobbyist, or our representative

19  to the -- who works with the legislature here

20  sent me a copy of the proposed bill in the --

21  during the '92 session, I think, when it was

22  passed.  When it was proposed.  For my review.

23       Q      Was that sent for your review while

1    it was still under consideration?

2         A    Yes.

3         Q    I'm going to show you a couple of

4    documents here so that we can see which version

5    of the bill was given to you for your review.

6              MS. HARLOW:  Could you mark these as

7    Plaintiff's Exhibit 1 and 2, please?

8              (Whereupon, Plaintiff's Exhibit Nos.

9    1 and 2 were marked for identification.)

10        Q    (BY MS. HARLOW:)  Plaintiff's 1,

11   which is the shorter document, was produced to

12   us with some documents from the University of

13   South Alabama.  It's a shorter version of the

14   bill than was actually enacted.

15             Plaintiff's 2 is the longer version

16   of the bill.  Do you recall in looking at these

17   documents whether you saw one or both of these

18   versions?

19        A    I really do not remember which one I

20   saw.  I mean, it was too long ago.  I just

21   don't remember.  My best guess would be that I

22   saw the Exhibit 2.  I don't remember the

23   shorter version.  The one I -- that would be my

1    guess, and that's a pure guess.

2         Q    Who is the university lobbyist that

3    referred this bill to you for your review?

4         A    He probably wouldn't like to be

5    termed a lobbyist.  That's not his title.

6              MS. ROBERTS:  Legislative liaison.

7              THE WITNESS:  Legislative whatever.

8         That's Mr. Fulford, F-U-L-F-O-R-D.

9         Q    (BY MS. HARLOW:)  And did you review

10   the bill and subsequently speak to Mr. Fulford?

11        A    Yes, I think I talked to him about

12   it and gave the point of view, at the time as I

13   remember, that I hoped this wouldn't be passed.

14        Q    In your experience here at the

15   University of South Alabama did you see the

16   need to legislate like this?

17        A    No.

18        Q    When you spoke to Mr. Fulford did

19   you refer to any particular groups that are

20   present on the University of South Alabama

21   campus?

22        A    I may have.  I may have mentioned

23   that we did have a Gay Lesbian Bisexual

1    Alliance group on our campus.  But that would

2    not have been my motivation to say no to the

3    legislation.

4         Q    What was your motivation to say no

5    to the legislation?

6         A    I just thought the law as it was --

7    as I read it, and I'm not an attorney, was just

8    vague and not -- you know, possibly

9    unconstitutional.

10        Q    Was there any particular reason why

11   when you did review this legislation that the

12   Gay Lesbian Bisexual Alliance might have come

13   up in your consideration of it?

14        A    Well, because I think the way it is

15   worded, at least the way I read it -- well,

16   there was more reason than that.  The whole

17   issue had arisen at Auburn.  And I think that

18   was the purpose for the law and why it was

19   written.

20             There had been some effort to stop

21   their registration at Auburn and this law grew

22   out of, I think, of that controversy, as I

23   understood.

1          Q       Do you have any recollection of any

2    more details about what that controversy at

3    Auburn was?

4          A       Well, their student government

5    attempted to block the registration of the Gay

6    Lesbian Bisexual Alliance there.  And did until

7    it was -- until my counterpart, I think,

8    stepped in and then had the group registered on

9    the campus.

10         Q       Do you recall anything else about

11   your discussion with Mr. Fulford about this

12   proposed legislation?

13         A       No, I sure don't.

14         Q       Did you also discuss this bill with

15   Representative Ken Kvalheim?

16         A       Kvalheim.

17                 I had just asked him about whether

18   he thought the bill would pass.  And I think it

19   was in passing at either a board meeting or an

20   event.  And I just said that Mr. Fulford had

21   given me the bill and what were the chances

22   that this bill would pass?

23                 And his feeling at the time,

```
 1    obviously inaccurately so, was he didn't think
 2    it would pass.
 3              So I never thought any more about it
 4    until I had heard that it was passed.
 5         Q    Did you discuss the
 6    constitutionality of the bill with
 7    Representative Kvalheim?
 8         A    I may have made the statement that I
 9    just wondered whether it was constitutional.
10    But we didn't have any long discussion about
11    it, no.  It was a passing conversation.
12         Q    Do you know how he eventually voted
13    on the bill?
14         A    No, I was just looking to see.  I
15    don't think he did vote.  I don't see his name
16    on it.  Is he on there?
17              MR. McDONALD:  Those are the
18    sponsors.
19              THE WITNESS: Oh, these are the
20    sponsors.  No, I have no idea how he voted.
21         Q    (BY MS. HARLOW:)  Do you recall
22    discussing the proposed bill with the president
23    of the Student Government Association?
```

1         A      I might have in passing, yes.  I

2    might have even given him a copy of it.

3         Q      And do you recall anything about

4    that conversation as to what you may have said

5    to him?

6         A      I think I probably just recounted

7    what I had done, which was to respond to Mr.

8    Fulford with my concern about it.  But as to

9    anything beyond that, no, I did nothing else.

10        Q      What is the Student Services staff?

11        A      That would be the people who report

12   directly to me who have line responsibility.

13        Q      And does the Student Services staff

14   meet regularly?

15        A      Yes.

16        Q      How often do you meet?

17        A      Two to three times per month.

18        Q      And I gather from the documents that

19   you have provided to me that you take minutes

20   at those meetings?

21        A      Yes.

22        Q      Who actually prepares the minutes of

23   those meetings?

1          A          My assistant, Sharon McDougal.

2          Q          Do you review the content of those

3     minutes before they are completed?

4          A          Uh-huh.

5          Q          Do you recall discussing the

6     proposed bill at the Student Services staff

7     meeting at any point?

8          A          I think probably from an

9     informational point of view I had said that the

10    bill was pending, yes.  I don't know whether it

11    was recorded in the minutes or not, but I'm

12    sure I would have.

13         Q          So you would have reported to the

14    staff on the fact that the bill was being

15    considered --

16         A          Yes.

17         Q          -- and anything else you knew about

18    it?

19         A          Yes.

20         Q          Do you recall whether during that

21    discussion you specifically mentioned any

22    particular student groups?

23         A          I probably mentioned that this would

1    have some impact on GLBA if it were passed,

2    yes.  I'm sure I would have mentioned that.

3         Q    Do you recall what you said about

4    the impact that it would have on GLBA?

5         A    No, I don't know.  Obviously it

6    would have had some impact, but I don't

7    remember what I said exactly.

8         Q    When you say it obviously would have

9    had some impact, what is the basis for your

10   statement to that effect?

11        A    The wording of the bill saying that,

12   you know, if, if it were enacted it could have

13   some impact on their ability to either meet or

14   be funded.

15        Q    And what is it about the wording of

16   the bill that specifically leads you to believe

17   it would have an impact on the GLBA?

18        A    Well, I don't know whether the

19   wording of the bill or whether the

20   circumstances at the time.  I think that had

21   more to do with it than how the bill is worded.

22   Because, as you know, as I said before I have

23   some trouble with the wording of the bill and

1    what it means.

2                But I think in the context of what

3    was happening at the time, since it appeared to

4    me that the law was being passed for the -- to

5    deal with the controversy that was in the

6    state.   That to me, the context of it was why I

7    felt the group was being, the GLBA was at risk

8    in the situation.   Not necessarily the way the

9    bill was written.

10        Q    When you say the controversy of the

11   time, was that the controversy about --

12        A    Yes.

13        Q    -- gay and lesbian student groups on

14   an Alabama university campus?

15        A    Auburn.   It's Auburn, not Alabama.

16        Q    Particularly at Auburn?

17        A    Yes.

18             MR. McDONALD:   I think she's using

19   Alabama in the generic sense as the State of

20   Alabama campuses.

21        Q    (BY MS. HARLOW:)   You had said there

22   was a state controversy about it.   And I'm just

23   trying to get a sense --

1       A      Well, I think at that time it was

2    concentrated at Auburn. I don't think there

3    was anything happening on any of the other

4    campuses at that time. It may have been, but I

5    wasn't aware of it. But it was primarily

6    Auburn.

7       Q      I see. Did you discuss the proposed

8    bill with anyone at Auburn University?

9       A      No, I don't think I discussed the

10   bill with anybody at the other universities,

11   the bill itself.

12               I think I discussed it after the

13   bill had been passed. In other words, how we

14   were going to cope with and how we were going

15   to deal with the bill.

16               But I don't remember any

17   conversations. I had talked to Pat Barnes

18   about their situation there. But I don't know

19   whether I discussed the bill or not. I just

20   don't remember that.

21       Q      What conversation did you have with

22   Pat Barnes about their situation there?

23       A      I was trying to find out -- actually

1    I was calling to be of support to her. She was
2    under tremendous pressure and getting some very
3    negative things said about her. I had called
4    her mainly to tell her that I appreciated her
5    courage and her willingness to stand up under
6    the circumstance. And just to find out what
7    the whole circumstances were there, because
8    there had been a particular group functioning
9    there, I think. I've forgotten the exact name
10   of the group. And I wanted to know something
11   about that group if they attempted to come here
12   and take the same kind of actions against us
13   here at this university.

14              So we discussed more her situation
15   and how she was handling it. And I was trying
16   to be supportive of her and tell her, you know,
17   how much I appreciated her courage in doing
18   what she was doing.

19         Q    When you say there was a particular
20   group that had been active at Auburn, to what
21   are you referring?

22         A    I had heard that there was an
23   external group that was helping the students on

1    campus to oppose the registration of the group.

2    And I don't know what the name -- at this point

3    I can't tell you the name of that organization

4    or group.

5            But I was trying to get a handle on

6    what they were doing, who was representing

7    them, whether they had an office in the state,

8    that type of thing so that we could be prepared

9    for any eventuality here in case they attempted

10   to come down and to try to do something here.

11           Since we already had a registered

12   group I felt that if they were going to target

13   Auburn they were probably going to target the

14   rest of us sooner or later.

15           Q    The legislation that actually did

16   pass was passed so that it would go into effect

17   in May of 1992.

18           Do you recall whether prior to May

19   of '92, during that spring of that year, you

20   had any discussions with the GLBA about their

21   activities while the bill was pending in the

22   Alabama State Legislature?

23           A    Yes, we did have some discussions.

1    But it still had to do with -- I think they had

2    already been registered at the time and there

3    were some things that they wanted to do.  And I

4    had, I think, asked them at the time, because

5    there was an effort on Auburn's part to get

6    some advice from federal court about this

7    issue, on how they ought to go.

8              And I had assumed that that,

9    probably wrongly, that there would be something

10   coming out of the court that would be more

11   beneficial in terms of direction for all of us

12   that I hoped would put the issue to rest as to

13   their right to association on this campus.  And

14   all their rights.

15             And with their concurrence, and we

16   discussed it at one of their meetings on how we

17   ought to proceed here on this campus, I think

18   it was sort of a joint agreement on our part

19   that we would try to do everything pretty low

20   key here until the things were settled at

21   Auburn; primarily through the court.

22             As it happens, the court did

23   nothing, particularly because there was no

# Foshee & Turner
REGISTERED PROFESSIONAL REPORTERS

42

1  controversy, so there was no real resolution at
2  that time.
3      Q    Do you recall particularly
4  discussing with the GLBA whether they should
5  hold a dance while the bill was pending?
6      A    Yes, we did talk about that.
7      Q    And did you recommend to the GLBA
8  that they might want to put off holding that
9  dance?
10     A    Yeah.  I think what I said was I
11 think while this was a hot controversy, and
12 there was a church group that was getting ready
13 to have a state convention, and one of their
14 main issues at the time was homosexuality, and
15 I said I feel like if -- that we just need to
16 be careful about how we proceed.  I wouldn't
17 recommend it until things cool down, that we be
18 low key.  Which they had agreed to at the time,
19 I think.
20     Q    Right.
21     A    The trust between the two of us was
22 that I was not doing this to restrain them in
23 any way from doing what they wanted to do, but

220 Park Place Tower • Birmingham, Alabama 35203 • Telephone (205) 251-4200
**1-800-888-DEPO**                    LASER PRINTED

1    just trying to give some advice on how we might

2    manage the situation here, since we are in a

3    community that is very much dominated by that

4    particular denomination.

5         Q       By what particular denomination are

6    you referring to?

7         A       Southern Baptist.

8         Q       And just so I understand your

9    testimony, you said you recommended and you had

10   a discussion with them about remaining low key.

11   Did that mean postponing their dance?

12        A       Right.  Which they had agreed to.

13               I might add that if they'd have said

14   they wanted to go ahead and do it we would have

15   tried to facilitate that.  But I think we were

16   trying to operate in a way that was both

17   beneficial to the group and to the university.

18        Q       Do you recall any specific

19   discussions you might have had with the GLBA

20   about the pending legislation?

21        A       I don't remember whether I did.

22   I'm sure I probably gave a copy of the bill to

23   -- I don't think George Hite Wilson was the

1    president at the time.  There was a young woman

2    who was president.  I don't remember her name.

3         Q    Would that have been Carol Strong --

4    or Carol Story?

5         A    Yes, I think that's correct.  I

6    think I may have either told Carol about it or

7    given her a copy of the bill or we may have

8    talked about the legislation.

9         Q    During the pendency of this

10   legislation did you write anything down about

11   your consideration of the bill or your

12   conversations about the bill?

13        A    I don't think so.  I don't remember

14   it if I did.  Most of my conversations were

15   verbal with Mr. Fulford.

16        Q    You didn't submit any analysis of

17   the bill in writing to him?

18        A    No, I don't think so.  I'll be happy

19   to check but I don't think I did.

20        Q    Okay, I would appreciate it if you

21   could check.

22        A    Okay.

23        Q    How did you eventually come to learn

1    that the legislation had passed?

2          A     Well, that's vague to me right now,

3    but I think I read about it in the newspaper

4    and then was given a copy of the bill by Mr.

5    Fulford after the bill was passed.

6          Q     Did you take any action upon the

7    bill's passage?

8          A     No.  In terms of saying that any

9    organization could not be on campus?  No.

10          Q     Did you participate in any

11    discussions during that spring or summer of

12    1992 about what the university would do to

13    comply with the law?

14          A     Yes, I'm sure that we had some

15    discussion.  I think Ms. Roberts and I talked a

16    little bit about it.  We were not sure about

17    what we were going to do.  We felt that we were

18    going to leave everything as it was unless we

19    were directed otherwise.  And we felt that

20    probably since the bill was vague to us and we

21    did not really understand some of the words in

22    it that we were going to have to get an

23    attorney general's opinion sooner or later on

1    what it meant.

2        Q    Anything else you can recall about

3    discussions you may have had in the spring or

4    summer of 1992 about attempting to enforce this

5    legislation?

6        A    No.  I'm sure I talked with George

7    Hite Wilson in particular about it, because he

8    was concerned.  And he and I talked about it.

9    I can't give you all the specific details

10   except that in my -- and I think I probably

11   said, given what I knew about the cases at

12   Texas A&M and other places, that I just didn't

13   see how this law could be constitutional, but

14   that it would probably have to be resolved in a

15   court.

16       Q    Did you mention -- do you recall

17   mentioning to George Hite Wilson during that

18   time period that you felt you would have to

19   eventually seek an attorney general's opinion?

20       A    Yeah.

21       Q    When you say you felt you would

22   eventually need to seek an attorney general's

23   opinion, what would trigger that need?

1        A      Funding.  I mean, we were already
2   doing the other.  And we decided unless
3   somebody directed us otherwise we were not
4   going to go back on that position, in terms of
5   registration.  But when we get to the funding
6   issue I felt we had to go and make sure from
7   the attorney general's point of view what the
8   words meant.

9        Q      Did you see a particular distinction
10  in the legislation between funding and
11  facilities?

12       A      No.

13       Q      And when you say that you would have
14  to get some direction from the attorney general
15  about the funding, was it your opinion that you
16  would need that direction before you could
17  approve funding to the Gay Lesbian Bisexual
18  Alliance?

19       A      Yes, correct.  That was the position
20  we took, yes.

21       Q      So that if any requisition form came
22  to you for the Gay Lesbian Bisexual Alliance
23  you felt you weren't in a position to sign off

1     on those prior to getting the attorney

2     general's opinion?

3          A     Or at least some legal advice,

4     correct.

5          Q     When you say at least some legal

6     advice, I thought I understood you to say you

7     needed that from the attorney general?

8          A     Yes, that's true.

9          Q     Did the subject of the GLBA

10    obtaining an on-campus bank account come to

11    your attention during the summer of 1992?

12         A     Yes, it did.

13         Q     And how did that come to your

14    attention?

15         A     It was sent to me and to Mr.

16    Branch, who is our associate controller,

17    requesting such an account.  I think that was

18    in June maybe, middle or late June.

19         Q     And by "it was sent to me," was that

20    a letter?

21         A     Yes, it was a letter.

22         Q     From the GLBA?

23         A     Yes, that's correct.

1    Q    And what was your response to that
2    letter?

3        A    Since we had not received the
4    attorney general's opinion at the time -- I
5    don't think we got it until after I received
6    the request -- I was concerned, and I think I
7    shared this with GLBA, that if we took their
8    money and put it into a university account,
9    what would happen to that money? Would it -- I
10   mean -- they could ostensibly lose their funds
11   or something could happen to the money. They
12   may not be able to -- we may be blocked in some
13   way as they are making expenditures of their
14   money. And they didn't have a whole lot.

15       So, essentially, if it got into the
16   university account it would be tied up. That
17   was my concern, since we had not received the
18   opinion from the attorney generals yet.

19       Q    And during the summer of 1992 had
20   you already asked for the opinion of the
21   attorney general?

22       A    No, this was now the summer of --
23   when did they do that? That was the last of

1  '93 is when they requested the account, I

2  believe.

3          Q     Let me just show you a document here

4  so we can make sure we have this chronology

5  down.

6          MS. HARLOW:  Could you mark this as

7  Plaintiff's 3, please?

8          (Whereupon, Plaintiff's Exhibit No.

9  3 was marked for identification.)

10         Q     (BY MS. HARLOW:)  This is a letter

11 from, I believe it is Carol Story, as president

12 of the -- what was then the GLSA in 1992, with

13 regard to a bank account.

14         Does that refresh your recollection

15 as to why --

16         A     You know what, I don't remember this

17 letter.  I really don't.  I do remember the

18 letter -- the second one that came last summer.

19 But I do not remember this or what the

20 disposition of it was at the time.

21         I think this was -- obviously the

22 request was about the same time the controversy

23 was going on in Auburn.  And I may have in the

1    meeting put this in the same category of other

2    items that we needed to put on hold until we

3    got some direction of what was going to happen

4    there.  I really don't remember this letter.

5              MR. McDONALD:  Let me help.  This

6    may help to refresh his recollection.

7              MS. HARLOW:  Let's mark that

8    document as well.  This is Plaintiff's 4.

9              (Whereupon, Plaintiff's Exhibit 4

10    was marked for identification.)

11              THE WITNESS:  Okay.  I read it.

12              MS. HARLOW:  Wait until there's a

13    question.

14              THE WITNESS:  Excuse me.

15              MS. HARLOW:  What we've done now is,

16    in addition to Carol Story's letter I have

17    shown Dean Adams a memorandum that he wrote on

18    July 21st, 1992 to Maxey Roberts.  And this

19    does have to do with the bank account question

20    for the GLBA.

21              THE WITNESS:  Okay.  So I had made

22    the recommendation, obviously, by this letter,

23    that there should be an account opened.  And I

1   assume that we didn't because we were waiting

2   for whatever decisions were going to be made

3   relative to this to be made.  It's the only

4   thing -- obviously I didn't remember I wrote

5   the letter so --

6        Q    (BY MS. HARLOW:)  Does rereading the

7   letter help refresh your recollection about

8   what you ultimately told the GLBA about opening

9   an on-campus bank account?

10        A    I would assume that I told them that

11   until we could figure out what this law meant

12   that we were not going to do that.  I would

13   assume.  I don't remember exactly what I said

14   to them.

15        Q    After the GLBA made this request in

16   the summer of 1992 for an on-campus bank

17   account, was it your understanding that an

18   opinion from the attorney general, the State

19   Attorney General, would then be sought about

20   how to interpret this law?

21        A    I think eventually that was our

22   understanding, that that would be the direction

23   we would have to go.

1    Q    Do you remember when it was first

2  decided that the university would go ahead and

3  request an opinion from the attorney general?

4    A    Sometime in the end of '92 and the

5  beginning of '93.

6    Q    I believe you said earlier your

7  concern about the on-campus bank account was

8  that if GLBA put its funds into such an account

9  those funds might disappear or be unavailable

10  to them?

11    A    Well, they wouldn't disappear, but

12  they certainly might be tied up.  Somebody

13  might say you can't do this, you can't do that,

14  and then they would have access to none of

15  their money.  That was my concern.

16    Q    Right.  That's what I was trying to

17  clarify.  Your concern was about any monies

18  they might put into an on-campus account; not

19  only money that might be allocated through the

20  Student Government Association?

21    A    Correct.

22    Q    And was your concern about their

23  money being tied up related to this particular

1    legislation?

2         A    That's correct.

3         Q    Did you advise any other student

4    group that because of this legislation their

5    money, if put in an on-campus bank account,

6    might be unavailable to them?

7         A    No.

8         Q    To your knowledge, has any

9    University of South Alabama administrator

10   advised any group other than the GLBA that if

11   they placed monies in an on-campus account

12   those monies might be unavailable to them

13   because of this law?

14        A    No.

15        Q    This memorandum that we were looking

16   at a moment ago, Plaintiff's 4, refers to a

17   conversation you had with Ginny Gauld.  In the

18   final paragraph there.

19        A    Uh-huh, yes.  She is Vice President

20   for Student Affairs at the University of

21   Alabama, Birmingham.

22        Q    Do you recall what that conversation

23   was about?

1    A    I had called her to see what they

2    were going to do at the university there.  And

3    she had advised me that their counsel had --

4    well, what they had done, had gone through a

5    fact-finding process and determined that the

6    group, the Gay Lesbian Bisexual Alliance,

7    there, neither foster nor promoted.  And they

8    were going to fund the group.

9         However, I think even to this point

10   there has been no funding occur as I understand

11   it.  No funding has occurred.

12        Q    Have you had more recent

13   conversations with Ms. Gauld about this issue?

14        A    Three or four weeks ago.

15        Q    And is that how you learned that no

16   funding had occurred?

17        A    Uh-huh.  I don't think there had

18   been any requests for funding either.

19        Q    Is there anything else you can

20   remember from either of these discussions with

21   Ms. Gauld about the issue of this legislation?

22        A    No, huh-uh.

23        Q    When you said that the University of

1    Alabama at Birmingham had undertaken a

2    fact-finding process, do you know what that

3    entailed?

4        A      I don't have any idea how they did

5    it or -- none whatsoever.

6        Q      Have you ever advised any other

7    group, besides from the GLBA, that for any

8    reason its monies would be at risk if they

9    placed them in an on-campus bank account?

10       A      I always remind groups who want to

11   open a university banking account that they are

12   then -- that that money, as I understand it,

13   and as the state auditor understands it,

14   becomes state money and is therefore subject to

15   the review of the auditor and to the state

16   audit rules.  And so some things that they may

17   have liberty to do with money on an outside

18   account they would not have liberty to do with

19   a university account.

20       Q      Have you ever advised any other

21   group that all of their money might be subject

22   to being tied up for any account if they opened

23   it on an on-campus bank account, other than the

1    GLBA?

2         A    No.

3         Q    Were you aware in the fall of 1992

4    that the Gay Lesbian Bisexual Alliance planned

5    to ask the SGA for an appropriation funding?

6         A    Probably.  Yes, if they were going

7    to ask for it, yes.

8              MS. HARLOW:  Let's mark this

9    Plaintiff's 5.

10              (Whereupon, Plaintiff's Exhibit No.

11    5 was marked for identification.)

12         Q    (BY MS. HARLOW:)  This is the --

13    this document is the minutes from the Student

14    Services staff meeting on October 6th of 1992.

15    It's redacted but there is a paragraph here

16    about the GLBA.

17              Does this clarify for you whether in

18    the fall of 1992 you were aware that the GLBA

19    planned to ask the SGA for funding?

20         A    Uh-huh.

21         Q    And what does this document reflect?

22         A    I assume it reflects our request and

23    concern that we would need an attorney

1    general's opinion before we could -- I could

2    sign off on any requisitions for GLBA.

3            Q    The way this is phrased, the report

4    on the GLBA is three sentences long and that

5    last sentence starts with the word "I."  Would

6    that be you that was providing this?

7            A    Probably, yes, uh-huh.  Yes.

8            Q    Was it your understanding in October

9    of 1992 that the university had already

10   requested an opinion from the attorney general?

11           A    No.  I think it was really probably

12   off of the memo that I had sent in June, is

13   what I was assuming.  And I think there may

14   have been conversations between myself and the

15   GLBA about this.

16           I don't know what the nature of the

17   request was at this point.  Maybe you have that

18   information.  I don't really remember what they

19   were requesting or whether they did indeed

20   request.  October 6th would have been right

21   before their budget meeting for SGA.  So I

22   don't remember whether they requested or not.

23           Q    What I'm asking is the last sentence

1    says, "I think she," and I believe that's a

2    reference to Ms. Roberts --

3          A    That's correct.

4          Q    -- "is waiting for an opinion from

5    the attorney general."

6          A    Now, I think that was a verbal

7    request, not a written request, that we were

8    asking for their assistance or help.

9          Q    So you at this time believed that a

10   verbal request had been made?

11         A    Or some conversation was going on,

12   yes.

13         Q    What was your understanding of that

14   conversation that was going on between Ms.

15   Roberts and the attorney general?

16         A    I really don't have any recollection

17   at this time what that was, at this point.

18         Q    Would that have been to do with the

19   interpretation of this statute?

20         A    Of the statute primarily, correct.

21         Q    Dean Adams, do you recall that an

22   observance of WORLD AIDS DAY took place at the

23   University of South Alabama in December of

1    1992?

2          A     Yes, I do.

3          Q     Did you meet before that observance

4    with Mike Mitchell, who I believe is the

5    president of the SGA, and George Hite Wilson,

6    to discuss the planned activities for that day?

7          A     I probably did.  But I don't

8    remember the meeting.

9          Q     Do you have any recollection of

10   discussing with those two individuals how the

11   GLBA would fund the observance of WORLD AIDS

12   DAY?

13         A     Yes, I do.  I think they were going

14   to make some requests for funding for it.

15               And I again, considering that we

16   still didn't know what this law meant or what

17   the implications of it were, if there were some

18   ways that we could fund the activities of WORLD

19   AIDS DAY through SGA printing the flyers and

20   that type of thing.  Finding some other way so

21   that we could stay within the law, whatever

22   that meant at that point, and still fund their

23   activities without getting into a situation of

1    someone saying that we were not observing the

2    law, whatever it meant -- or means.

3         Q    So was the university's position at

4    that time that funding could not go directly to

5    the GLBA?

6         A    As we understood the law, yes.

7         Q    And if I understand correctly, you

8    spoke with Mr. Mitchell and Mr. Wilson about

9    funding to support WORLD AIDS DAY that would go

10   through the SGA's own committees?

11        A    That's correct.

12        Q    And did you discuss with these two

13   individuals that kind of funding because of

14   Section 16-1-28, this legislation?  Was your

15   discussion about funding through an SGA

16   committee rather than funding through the GLBA

17   directly, did that come out of this

18   legislation?

19        A    That's correct.

20        Q    Was it your recommendation that the

21   funding issue be resolved in this manner; that

22   is, by funding through an SGA committee rather

23   than to the GLBA directly?

1    A    Yes, yes. And I think it was agreed
2  upon by all parties at that time that that
3  would be the way to do this.
4            MS. HARLOW: Can you mark this
5  Plaintiff's 6?
6            (Whereupon, Plaintiff's Exhibit No.
7  6 was marked for identification.)
8     Q    (BY MS. HARLOW:) This is a document
9  that was produced to us by your attorneys.
10  Does this reflect the funding for WORLD AIDS
11  DAY that was paid for by the Public Relations
12  and Advertising Committee of SGA in 1992?
13     A    I don't know whether that's exactly
14  what was spent, but this -- it looks familiar
15  from what they were planning to do, yes. There
16  may be other funds spent by the SGA in addition
17  to this, but I don't know how much or for what.
18            By the way, this would have been the
19  vote only in the Appropriations Committee, not
20  the Senate.
21     Q    Right, this document seems to
22  reflect something that became Appropriations
23  Bill 11-16-92-01,; is that right?

1          A          That's correct.

2          Q          And it reflects an appropriation to

3     the SGA Public Relations and Advertising

4     Committee?

5          A          Uh-huh.

6          Q          Dean Adams, let's turn to the next

7     quarter, which would have been winter quarter

8     of 1993.  Do you recall the GLBA requesting

9     direct funding to itself during that quarter?

10         A          If you're speaking to the money for

11    a speaker, is that what the appropriation was?

12    Refresh me on what the appropriation would have

13    been.  I don't remember.

14         Q          Let me see if I've got a document

15    that could refresh your recollection.

16              MS. HARLOW:  Let's mark two more

17    documents.  Why don't you make this 7 and this

18    8.

19              (Whereupon, Plaintiff's Exhibit Nos.

20    7 and 8 were marked for identification.)

21              THE WITNESS:  Yeah, this was --

22         Q          (BY MS. HARLOW:)  Let me ask you a

23    question just so we are clear on what you are

1    responding to here.

2              What I've given you, Dean Adams, is

3    Plaintiff's 7, which is a letter from the dean

4    to George Hite Wilson dated January 7, 1993.

5    And the second exhibit, Plaintiff's 8, are

6    several documents beginning with a letter dated

7    January 29, 1993.

8              MR. McDONALD:  I think they got

9    marked in reverse order.

10             MS. HARLOW:  Oh, they did.  I'm

11   sorry.  So 8 is the letter from Dean Adams and

12   7 is the document that begins with a cover

13   letter from Mike Mitchell to Maxey Roberts.

14        Q    (BY MS. HARLOW:)  These documents

15   are both dated in January of 1993.  Does this

16   help you recall, Dean Adams, whether the GLBA

17   requested its own funding from the SGA in

18   January of 1993?

19        A    Yes, yeah, I'm aware of this.

20        Q    Do you recall how you first became

21   aware that GLBA was seeking funding to come

22   directly to that organization?

23        A    I think I was notified by the SGA

1    president that their budget request was going

2    to be on the -- at the budget meeting for that

3    quarter.  That's how I first was aware of it.

4    At the time I was not aware until the evening

5    of the budget meeting what the actual request

6    was for, but I understood they were requesting.

7         Q    When you had the conversation with

8    the president of the SGA --

9         A    Uh-huh.

10        Q    -- do you recall anything else about

11   what was said about the GLBA request?

12        A    He may have asked me what I planned

13   to do or what, you know, how the university was

14   going to respond to that.  And I think I told

15   him at the time the SGA should do what they

16   thought they had to do, and I would have to do

17   what I had to do.  You know, and that -- which

18   they did.

19        Q    Then did you actually attend the

20   meeting --

21        A    Yes.

22        Q    -- at which this request by the GLBA

23   was considered?

1       A       Uh-huh.

2       Q       Before that meeting took place do

3    you recall meeting with Mike Mitchell and

4    George Hite Wilson about this particular budget

5    request?

6       A       I don't remember meeting with George

7    about it.  I may have but I don't have any

8    recollection of it.  I know, I know -- I'm sure

9    that Mike, in knowing that this had been a

10   controversial issue, probably let me know about

11   it.  But I don't remember meeting with George.

12      Q       Did you discuss with Mr. Mitchell

13   before the SGA meeting itself what he should --

14   what steps he should take with regard to this

15   request?

16      A       No, I think he asked me more about

17   what steps I might take if it were passed.

18      Q       And did you specifically respond to

19   him about what steps you might take?

20      A       No, I did not.  I think what I said

21   was we were still waiting for the opinion and

22   that I didn't know what I'd do; but they should

23   do what they had to do and I would do what I

1    had to do.  I think those were my exact words.

2    Both to him and also in the meeting that night

3    when I was asked by some member of the Senate.

4             (Ms. Roberts left the room.)

5             MS. HARLOW:  We'll wait a minute

6    until she gets back.

7             MR. McDONALD:  You can go ahead.

8             MS. HARLOW:  Oh, I can go ahead,

9    okay.

10   Q    (BY MS. HARLOW:)  Dean Adams, this

11   letter that you wrote to Mr. Wilson on January

12   27th, it reflects that you've asked him to

13   "submit a complete list of speakers, topics,

14   and overall purpose for the activities you

15   propose for funding."

16   A    Uh-huh.

17   Q    Do you recall whether you asked Mr.

18   Wilson to provide such a list prior to when the

19   SGA would actually consider his budget

20   proposal?

21   A    Well, I must have because of the

22   letter of the 27th.  I don't know when they did

23   the -- when the budget hearing itself occurred.

1    So obviously I must have.

2       Q     You don't recall -- do you recall,

3    Dean Adams, a discussion with Mr. Mitchell

4    where you suggested that the SGA put off voting

5    on this funding request until Mr. Wilson could

6    submit a more detailed budget?

7       A     I don't remember that, no.

8       MS. HARLOW:   Let's mark a couple

9    more here as 9 and 10.

10       (Whereupon, Plaintiff's Exhibit Nos.

11    9 and 10 were marked for identification.)

12       Q     (BY MS. HARLOW:)   Dean Adams, these

13    are two versions of the SGA proposed budget for

14    the winter quarter of 1993, which is the

15    quarter we've been discussing.

16       A     Uh-huh.

17       Q     The one with the arrows on it

18    indicates that the GLBA was proposed to receive

19    $651.

20       A     Uh-huh.

21       Q     The second version has removed that

22    proposal and has removed GLBA from the list

23    totally.

1          A     Uh-huh.

2          Q     Do you have any knowledge about how

3     that removal came about?

4          A     No, I sure don't.  Because as I

5     remember, and it may have been in the spring

6     quarter rather than the winter quarter, they

7     indeed passed a budget for GLBA.  So I don't.

8     No, I don't remember.

9          Q     You don't recall having any

10     discussions about Mr. -- with Mr. Mitchell

11     about the GLBA tabling the request?  I'm sorry,

12     about the SGA tabling the request of the GLBA

13     until you could get further guidance from the

14     State Attorney General?

15          A     I may have said that but I don't

16     remember.  All of my conversations with GLBA

17     and SGA at that particular point in time were

18     related to what we were going to do with the

19     attorney general's opinion.  I mean, I'm sure

20     that I had numerous discussions with them about

21     getting that opinion.

22          Q     So you may have recommended that the

23     SGA table this particular request until you

1    could get further guidance from the State

2    Attorney General?

3         A    Given my letter that I wrote to

4    George, I would say yes.  I misspelled his

5    name.  I noticed that.  But I have no

6    recollection of that.  I really don't.

7         Q    Plaintiff's 7 is a transmittal from

8    the SGA president to Ms. Roberts --

9         A    Uh-huh.

10        Q    -- of the GLBA's detailed budget

11   request.

12        A    Yes.

13        Q    Do you have any knowledge about

14   whether that budget was ever provided to the

15   State Attorney General?

16        A    No, I don't.  I would assume that it

17   went in as a part of the package when we

18   submitted it, but I have no idea whether it did

19   or not.  I did not see the final transmittal to

20   the attorney general.

21        Q    And Dean Adams, I assume that from

22   your prior testimony your position remained at

23   this time that the university could not proceed

1    with funding, through SGA funds, directly to
2    the GLBA until you received guidance from the
3    State Attorney General; is that correct?
4         A    That's correct.
5         Q    When did the university first
6    request an opinion from the State Attorney
7    General in writing?
8         A    I assume it was about this time, the
9    end of January, the first of February.
10        Q    Did you discuss with anyone how that
11   written request to the State Attorney General
12   would be made?
13        A    Ms. Roberts and I, I think, may have
14   talked about it but I don't remember seeing the
15   written document, the written request itself.
16   I think it actually came from Dr. Whiddon, but
17   I don't remember having seen that.
18        Q    Did you have any discussions with
19   Dr. Whiddon about that request to the State
20   Attorney General?
21        A    The content of it, no, I did not.
22   That was between Ms. Roberts and him.
23        Q    Do you know why it was determined

1     that at that point a written request should be

2     made to the State Attorney General for

3     guidance?

4          A      I did because all the verbal

5     requests had not been responded to, so I think

6     it was time to put it in writing and do

7     something more. I think we were trying to get

8     some kind of informal guidance and assistance.

9     And since that was to no avail we then

10    proceeded to the more formal process.

11         Q      Can you tell me any more about how

12    the university arrived at its position that you

13    would not proceed with funding to the Gay

14    Lesbian Bisexual Alliance until you did receive

15    some guidance from the State Attorney General?

16         A      I think I covered that. I think our

17    concern was that the, at least from our

18    perspective, the law was not directed in any

19    way in terms of our understanding of what some

20    words meant in the law.

21          We had seen others in the state not

22    observe the law. We felt we had an obligation,

23    since the law was there, to have some kind of

1    direction on how we should observe the law, you

2    know, what the law meant.  And so we felt that

3    the only way to clarify that was through the

4    attorney general's office.

5        Q    And I gather from your testimony

6    that certainly up until the point of January of

7    1993, the State Attorney General's office had

8    not directed you to do anything in terms of

9    enforcing this statute?

10       A    No.  Nor had they -- yes, that's

11   correct.

12       Q    Was there anything in the language

13   of the statute that led the university to take

14   the position that funding to the Gay Lesbian

15   Bisexual Alliance was particularly problematic

16   under the statute?

17       A    Well, I think the words "foster and

18   promote" were of concern to us.  We didn't know

19   what that meant.

20       Q    Let me mark for you, before you get

21   into this, the actual final enacted language of

22   the law so that we don't get confused here.

23            MS. HARLOW:  This will be

1  Plaintiff's 11.

2         (Whereupon, Plaintiff's Exhibit No.

3  11 was marked for identification.)

4    Q    (BY MS. HARLOW:)  Again, my question

5  is whether there's anything particular in the

6  language of this statute that led the

7  University of South Alabama to believe that

8  there was an issue with regard to the Gay

9  Lesbian Bisexual Alliance in particular?

10   A    As I have just mentioned to you, the

11  words, that fosters or promotes a life-style or

12  actions prohibited by the sodomy and sexual

13  misconduct laws, inclusive.  And sections are

14  named.

15   Q    And why does that language trigger

16  some connection to the Gay Lesbian Bisexual

17  Alliance?

18   A    Well, I don't know that the words in

19  and of themselves do, except in the context of

20  the law as I explained to you before.  This law

21  was passed, and I think it was understood to be

22  passed, in direct opposition to any homosexual

23  group having access to a campus or to funds.

1           I don't think, given the words by

2    themselves, that you could construe that that

3    applied only to gay and lesbian organizations,

4    but in the context of the law being passed we

5    all understood, I think those of us in higher

6    education, what it meant.  What the effort was

7    being -- why the law was passed.

8           Q    Okay.  Let's turn to the spring

9    quarter of 1993.  Do you recall whether in that

10   quarter the GLBA applied for direct funding?

11          A    Yes, I am more in recollection of

12   that than I am the others.  And I think the

13   request was much similar to the one that

14   occurred in the winter quarter, as I look at

15   the request of the winter quarter.

16          Q    Were you at the Student Government

17   Association meeting when a vote took place in

18   the spring quarter of 1993 about the GLBA

19   funding request?

20          A    Yes, I was.

21          Q    And did you speak at that meeting at

22   all about that particular funding request?

23          A    Yes.

1        Q       And what did you say?

2        A       Now, the words that I attributed to

3    the previous meeting were the words that I said

4    in that meeting; namely, that I had been asked

5    by a senator from the floor to give some

6    statement.

7                And I said some statement similar to

8    what I said before, in that we were still

9    waiting, this was some three or four months --

10   actually, I don't know when the first contact

11   was made with the attorney general's office on

12   an informal basis, but it had been a long time.

13   And we were still waiting for an opinion;

14   and that I didn't know what action I would have

15   to take or could take; and that the Senate

16   should do what they had to do and that I would

17   do what I had to do. And I think then the

18   Senate proceeded to pass the allocation.

19       Q       Do you recall whether you made it

20   clear at that meeting that if the Senate

21   proceeded to pass the allocation that you would

22   not be in a position to sign off on that

23   allocation until you received guidance from the

1    State Attorney General?

2           A      Yeah, I think I made it pretty clear

3    that that would have to be -- I would have to

4    consider that.

5           Q      Would you have to consider that?

6    Or was it your position that you would not be

7    able to sign off on the funding until you

8    received --

9           A      I believe I had been directed at the

10   time that we ought to wait, from counsel here,

11   for the attorney general's opinion, if I

12   remember.

13          Q      Do you recall any discussions with

14   the GLBA at this time, the spring quarter of

15   1993, that concerned whether or not they could

16   actually spend the allocation that had been

17   made by the SGA?

18          A      I probably did.  And I probably

19   shared with them, again, the same thing I said

20   at the Senate; you know, whether or not I would

21   be permitted to sign off on the requisition

22   until we got the opinion.

23          Q      Did you share with them that you

1  would not be in a position to sign off until

2  you got the opinion?

3      A      Probably so.  I would have

4  reiterated pretty much the same statement I

5  made at the Senate to them.

6          MS. HARLOW:  Let's mark this 12.

7          (Whereupon, Plaintiff's Exhibit No.

8  12 was marked for identification.)

9      Q      (BY MS. HARLOW:)  These are, again,

10  some minutes.  This version dated April 20th,

11  1993 from the Student Services staff meeting.

12      A      Right.

13      Q      There is a reference in here to --

14  what it says is, quote, the GLBSA sent their

15  charter to the State Attorney General

16  requesting a ruling, end quote.

17      A      Uh-huh.

18      Q      Do you have any reason to believe

19  that that statement is true?

20      A      The one on the sending the charter?

21      Q      Right.

22      A      It was strictly hearsay.  I have no

23  idea whether it occurred and it didn't occur.

1    I was just sharing with them that someone had

2    said that to me and I was not aware of that.

3         Q    You never saw any reflection of that

4    in any kind of document?

5         A    No, I sure didn't.

6         Q    Did there come any time during the

7    spring quarter of 1993 when you would have

8    informed the GLBA that this allocation was

9    available for their use?

10        A    No.  And toward the end of the

11   quarter I went to Mike and I said, you know,

12   "I've been anticipating the allocation for the

13   GLBA to come forward and I haven't seen it.

14   What's happened to it?  Where did it go?"

15             And he informed me at the time that

16   George Hite Wilson had come to him and said

17   that there had been some controversy in the

18   group over the speaker they wanted to bring in,

19   or whether the speaker was going to be

20   available to them.  And that they had withdrawn

21   their request, that they were not going to

22   bring their speaker in.

23             In the meantime, I think Mr. Wilson

1    had become the chair of our Horizons Committee

2    in Jaguar Productions.  And Jaguar Productions

3    had decided to bring in the speaker, to pay for

4    the speaker.  Which did happen in the fall

5    quarter, not in the spring or the summer.

6           Q      Other than this conversation with

7    Mr. Mitchell, did you have any other knowledge

8    of this alleged controversy within the GLBA

9    about its speaker?

10          A      No, I didn't know anything about it.

11   I didn't know they had any -- to this day I

12   didn't know, other than what I was told by

13   Mike, that there was some problem internally

14   about it.

15          Q      So you've never seen any documents

16   that --

17          A      No.

18          Q      -- that reflect that?

19          A      I have nothing that would tell me

20   that they had a controversy.

21          Q      And did you ever see any documents

22   that would reflect that they had withdrawn

23   their budget request?

1        A        No, but I wouldn't, normally, on any

2    group that would withdraw their request or

3    would not fulfill their request.  That would

4    not come to me or would not come to my

5    attention other than verbally from the

6    treasurer or from the president of SGA.

7        Q        During the spring quarter of 1993 do

8    you recall having any discussions with George

9    Hite Wilson about the GLBA's activities?

10       A        I'm sure I did because I tried to

11   stay in touch with him.  But you'd have to be

12   specific about what we talked about, because I

13   wouldn't remember.

14       Q        Did Mr. Wilson ever mention to you

15   any controversy that the GLBA was having about

16   its speakers?

17       A        Well, I remember seeing him later

18   on, I think, about it and mentioning.  I said,

19   "What happened?"

20             And he said, "Well, we just decided

21   to wait."

22             I mean, that's -- and I don't know

23   if that's -- that's a paraphrase.  But he said

1    we had just decided to wait on the speaker.

2    Either they couldn't get him to come at the

3    time they wanted him to come or something was

4    going on.  I remember I was talking to him

5    about it.  Because I was surprised that I did

6    not get the requisition.  I thought for sure it

7    would come forward.

8         Q    If you got the requisition would you

9    have been in a position to sign off on it and

10   allow the funding to actually go to the GLBA

11   during the spring quarter of 1993?

12        A    Who knows.  I don't know.  You're

13   asking me to make some conjecture about

14   something I don't know, what I could have done

15   or what I could have done at that time.

16        Q    As you've told me about, if I

17   understand correctly, your position and the

18   university's position was that you could not

19   actually fund the GLBA until you had received

20   an opinion from the attorney general?

21        A    That's correct.

22        Q    And if I'm correct, you had not

23   received an opinion from the attorney general

1    at any point during the spring quarter of 1993?

2           A      That's correct.

3           Q      So is it still your testimony that

4    you're not sure what you would have done if you

5    had gotten the requisition form for that

6    funding?

7           A      I'm sure if I had made a decision

8    after all of that time differently than what we

9    had been, it would have been a surprise.

10          Q      And would that have been not only a

11   surprise but contrary to the direction you had

12   gotten from other officials at the University

13   of South Alabama?

14          A      That's correct.   That we ought to

15   wait for the attorney general's opinion.

16          Q      Why did you then expect to get a

17   requisition form if what that would have meant,

18   if I understand your testimony correctly, was

19   that GLBA would have already spent the money

20   and been asking you to reimburse it?

21          A      Well, if they would have had a

22   speaker they would have had to have had a

23   contract.   And that would have had to have been

1  signed by both -- would have to have been

2  signed by me.  So in that particular case,

3  they would not have been able to invite a

4  speaker without a contract.  So I anticipated

5  that contract coming forward.

6  Q  You anticipated the contract coming

7  forward even though there wasn't the

8  expectation that they could actually get the

9  SGA money?

10  A  Oh, yes.  I mean, students often

11  will do that.  I mean, they are -- simply

12  because I had made a statement or something

13  does not prevent students from doing what they

14  think they ought to do, you know.  I mean, that

15  often occurs.

16  Q  Dean Adams, are you certain in your

17  recollection that the dispute about a speaker

18  that you believe you had -- the discussion --

19  let me start over.

20  You've testified to a discussion you

21  had with Mr. Mitchell --

22  A  Uh-huh.

23  Q  -- where he recounted a dispute that

1  the GLBA was having about its speaker.  Are you

2  certain that that dispute occurred in the

3  spring quarter and not the winter quarter of

4  1993?

5       A    No, I'm not.

6       Q    So that that dispute could have been

7  about the speaker they were planning to invite

8  in the winter quarter?

9       A    I don't know.  I don't know that the

10  speaker was different from one quarter to the

11  other.  Was it the same speaker?  I don't know

12  what they listed in their request.  But, no,

13  I'm not sure that it was.  It may have been the

14  previous quarter.

15            But I feel very sure once -- because

16  the bill was passed -- no, I need to go back

17  there.  Because I had anticipated once the

18  appropriation was passed that there would be

19  something coming forward.

20            Since there was -- whatever happened

21  in the winter quarter happened, I didn't

22  anticipate anything coming forward.  So I

23  wouldn't have been thinking, okay, what am I

1    going to do now?  But I was anticipating that.

2            So I feel pretty sure that the

3    controversy had more to do with what was

4    happening in the spring quarter than the

5    winter.  It may have been different but I feel

6    pretty confident.  Because I was anticipating

7    the requisition or something coming forward

8    that I would have to cope with or deal with.

9    But I don't know.

10           MS. HARLOW:  Let me show you another

11   document here.

12           (Whereupon, Plaintiff's Exhibit No.

13   13 was marked for identification.)

14       Q    (BY MS. HARLOW:)  Dean Adams, these

15   are the responses to our interrogatories that

16   you and your attorney submitted to us.  If I

17   could direct you to your response to

18   Interrogatory No. 6, which you can find at

19   pages 4 and 5.

20           The second sentence there says,

21   "Generally the discussions from time to time

22   would be if the Gay Lesbian Bisexual Alliance

23   requested funding, that it would be necessary

1    to obtain an attorney general's opinion."

2              Do you see that there?

3         A    Yes, right.

4         Q    From your testimony today I gather

5    that what that means, and please correct me if

6    I'm wrong, is that no funding could be given to

7    the GLBA before an attorney general's opinion

8    was obtained?

9         A    Yeah, I think we have pretty well

10   established that, that that was what we feel we

11   had to do.

12        Q    If you turn over to the next page on

13   page 5, the third paragraph down, there's a

14   reference to a speaker that came to the

15   university during the winter quarter of 1993.

16   Do you know what speaker that refers to?

17        A    No, I don't. I don't remember what

18   speaker they were going to invite.

19        Q    And is it still your recollection

20   that Jaguar Productions brought a speaker to

21   campus in winter quarter of 1993?

22        A    No, I don't think -- I don't know

23   that they did. Winter quarter of '93? Oh,

1    this would have been this past -- that would

2    have been a year ago right now. No, I don't

3    recall that we did bring.

4              I think we advised them that if

5    something happened and we could not fund them

6    because we were waiting for the attorney

7    general's opinion, we could bring the speaker

8    through Jaguar Productions and still have the

9    speaker here so that would not interfere with

10   their agenda of having the speaker here. And

11   have it as a general interest speaker for the

12   entire campus funded through Jaguar

13   Productions.

14             I think the dates are off here.

15   Maybe my dates are off. I was speaking of

16   winter quarter -- I was speaking of fall

17   quarter of '93 when we, in fact, did bring the

18   speaker here with Jaguar Production funds. So

19   that dates are incorrect.

20        Q    Okay, that's what I want to clarify.

21   That speaker in the fall quarter of 1993,

22   rather than the winter, is reflected here.

23        A    That's correct.

1          Q     Who was that speaker?

2          A     Dr. Howard, I think was his name,

3  from Emory University.

4          Q     And --

5          A     I think we made that offer prior to

6  that -- to the GLBA. Until this whole thing

7  was resolved we did not want to interfere with

8  their programming. And we were trying to find

9  other ways to fund their programs without --

10  until the controversy could be -- you know, we

11  got some advice. And that was one of the ways

12  to do that. And we had done that pretty

13  consistently.

14        Q     Dr. Howard came to U.S.A. in the

15  fall quarter of '93 sponsored by Jaguar

16  Productions; is that correct?

17        A     That's correct.

18        Q     Were there any other speakers that

19  quarter that you recall that may have addressed

20  similar issues?

21        A     Yes, we had Dr. McGee here from

22  Baylor University.

23        Q     And what issues did Mr. -- I'm

1   sorry, Dr. McGee speak about?

2          A    His issue was to discuss the moral

3   issue related to homosexuality.

4          I think at the time -- when we do

5   bring any kind of controversial speaker to

6   campus, whether it's abortion or whatever it

7   may be, political issues, we try to be sure

8   that we bring all sides of an issue to the

9   students' attention and opportunity to hear all

10   the sides.

11          I think, at best, you could describe

12   Mr. McGee as neutral on the issue. He

13   certainly did not take any pro or con stance.

14   He just talked about the issues related to it.

15   So probably if somebody would want to challenge

16   us on it, he was not an anti speaker by any

17   stretch of the imagination.

18          Q    If I understand correctly, when --

19   and, again, correct me if I am wrong. When

20   Jaguar Productions brings a speaker on what is

21   seen as a controversial issue, you try to then

22   balance that perhaps with another speaker?

23          A    That's correct.

1          Q     Who actually decides the speakers or

2   programs that will be conducted by Jaguar

3   Productions?

4          A     The board of Jaguar Productions

5   approves the speakers, which is made up of

6   different chairs within Jaguar Production.

7   All students. It's predominantly students.

8          Mr. Wilson, for instance, was a

9   chair of the Horizons Committee which invited

10   the speakers, essentially.

11          I think we tried to help with

12   suggestions for speakers, but the final

13   approval on that -- I say we, Paula Smith, who

14   would have been the advisor. I didn't --

15          I think on the latter speaker I

16   helped because I knew of Mr. McGee. I didn't

17   know him personally, but I knew of him. And so

18   I made a call on Paula Smith's behalf to find

19   out about the speaker, whether he would be

20   someone that would be worthy of having there.

21   Then that suggestion was brought to the Jaguar

22   board, I think, for approval.

23          Q     Who in your office most directly

1  supervises Jaguar Productions?

2      A      Paula Smith.

3      Q      Paula?

4      A      Paula, P-A-U-L-A.

5      Q      And what is Ms. Smith's position?

6      A      She has a coordinator title for

7  student activities, I think is her full title.

8  She's the coordinator of the student activities

9  office.  Student activities programs.

10      Q      And would she be the one to assist

11  Jaguar Productions in presenting both sides of

12  any controversial issue?

13      A      Uh-huh.  She would attempt to at

14  least find speakers and get some kind of

15  dossier on them.

16      Q      Dean Adams, have you ever had any

17  discussions regarding the SGA funding of any

18  other group, aside from the GLBA, in light of

19  Section 16-1-28?

20      A      No.

21      Q      Have you ever had any discussion

22  regarding any aspect of the enforcement of

23  Section 16-1-28 that related to a student group

1    other than the GLBA?

2         A    No.

3         Q    We spoke earlier about a request for

4    an on-campus bank account.  That occurred in

5    the summer of 1992?

6         A    Right.

7         Q    I gather that another request

8    occurred in the summer of 1993; is that

9    correct?

10        A    That's correct.

11        Q    Do you recall what your response was

12   to the request in the summer of 1993?

13        A    I don't think I gave a written

14   response to it.  But I think the request came

15   before we had the attorney general's opinion,

16   so I go back to that.  I think we were waiting

17   for that to determine.  Because we were in the

18   same kind of bind, we felt, if they put their

19   money in the university.  But I don't believe I

20   gave a written request.  I think I gave a

21   verbal response to it.

22        Q    How did you become aware that the

23   State Attorney General had actually issued a

1    written opinion?

2    A    I got a copy of the written opinion

3    from our attorney's office.

4    Q    And then did you have any

5    discussions about how the University of South

6    Alabama would proceed once you had received

7    that opinion?

8    A    Yes, because the opinion simply

9    reiterated the language. It did not clarify

10   the language for us. So we were left in the

11   same bind as we were from the beginning.

12   And Ms. Roberts and I determined

13   that since the attorney general was not willing

14   to deal with the language of the bill, we would

15   have to deal with it and that we would go

16   through a fact-finding process. We would

17   define the words "foster and promote" based on

18   what legal definitions were available to us.

19   And then we would proceed with a fact-finding

20   group to determine whether the GLBA had indeed

21   violated -- or were in violation of the law.

22   Q    Were there any other groups aside

23   from the GLBA that were to be studied by such a

1  fact-finding committee?

2      A    Well, we discussed a little bit

3  about the words, particularly the sexual

4  misconduct laws, and what we would have to do.

5           And I'll use one group in

6  particular, even though they would not have

7  been eligible for funding. Let's say the Young

8  Democrats had requested funding. Well, the

9  democratic party has a plank on gay rights.

10 Well, indeed, if they had requested it, or some

11 group like that had had a plank, would we then

12 proceed to look at that group?

13          And I think we felt we needed to get

14 through this first fact-finding process and see

15 if, indeed, we could conduct one in a way which

16 was both within the law and definitive enough

17 for us to proceed. Then we would talk about

18 whether there were any other groups. But

19 initially there was no serious discussion of

20 taking any other groups through this process.

21     Q    And was the focus on the GLBA

22 because of, as you've testified to, your

23 understanding of the background of this

1    legislation?

2         A    Correct.

3         Q    Who selected the members of the

4    fact-finding committee?

5         A    I did.

6         Q    And how did you choose those

7    members?

8         A    I wanted it to be a group that would

9    have no direct affiliation with my office, so

10   that these people would not be perceived as

11   being coerced or told to do something by me

12   and, therefore, by virtue of being subordinates

13   would have to do such.  Even though that

14   wouldn't be my style anyway.

15              But in any case, I wanted a faculty

16   to chair the committee who would convene the

17   committee and conduct.

18              And I wanted it to be some members

19   of my staff; those members of the staff who

20   were in direct contact with GLBA and students.

21              I also wanted the students to be

22   students who would not be affiliated with the

23   group so we could not be seen from the outside

1    as trying to stack the group one way or the

2    other.

3          Q    Did anyone you invited to be on the

4    committee decline that invitation?

5          A    No, I don't think so.

6          Q    Did you envision that while the

7    fact-finding committee was proceeding with its

8    work that the GLBA would be eligible to receive

9    SGA funds?

10         A    Given that we still had no

11   direction, no.

12         Q    Your attorneys have provided to us a

13   memo, a one-page memo, that you gave to the

14   committee members directing them how to

15   proceed.  Do you recall whether you also gave

16   any verbal directions to the fact-finding

17   committee?

18         A    I went and met with the committee at

19   their first meeting.  We did have a first

20   meeting, which was prior to knowledge of your

21   suit or aware that the suit was even being

22   filed.

23               And I think we just went over that

1   charge that I had in the letter. They were

2   concerned about, as I remember it, about time.

3   I gave them a considerable amount of

4   documentation on defining the words "foster and

5   promote." And they were -- they received

6   copies of the statutes and all -- the sexual

7   misconduct and sodomy statutes. And I

8   indicated to them if they needed any further

9   assistance, that legal counsel here would be of

10  some help to them; you know, to ask for what

11  they needed and we would provide it.

12       Q     When you say you gave them

13  documentation about the words in the statute,

14  what kinds of documents did you provide to

15  them?

16       A     I think we had some other case law

17  where the words "foster and promote" were

18  defined and used in other situations. And we

19  gave them that, that language.

20       Q     I'd like it if you could produce to

21  us whatever documents were provided to the

22  fact-finding committee.

23                 MR. McDONALD: Okay.

1          MS. HARLOW:  If you can try to find

2    those in your files.

3          THE WITNESS:  We've got them

4    somewhere I'm sure.

5     Q    (BY MS. HARLOW:)  At that first

6    meeting do you recall anything about the

7    discussion that took place?

8     A    No.

9     Q    Would you describe it as being kind

10   of a planning meeting?

11    A    Yes, I -- it was more of how do we

12   proceed, what kinds of things they wanted to

13   do.  There was some discussion of whether, who

14   should -- how the report should come.  Should

15   it come to me in writing?  We talked about how

16   to do that.

17         I indicated if they wanted to

18   interview certain people that we would request

19   the students to come and talk with them or

20   other people.  Whatever they want.  It was more

21   how they were going to proceed.

22    Q    Right.  Do you recall any other

23   specifics about how they did plan to proceed?

1    A    No, I pretty much left it up to them
2    on how they conducted the meeting and what they
3    did.   I mean beyond coming up with, you know,
4    the finding.

5    Q    Did you set a timetable in which
6    they should do that?

7    A    Yes.   I think I said it in a letter.
8    And I was trying to be flexible on that because
9    I didn't know what all they might want to do.
10   But I was looking for a pretty quick
11   turnaround.   I think I gave them three weeks or
12   some such time to work.

13                Frankly, I was trying to get the
14   fact-finding meeting done before the budget
15   meeting occurred so we had some direction we
16   felt confident that we could take.   We could
17   have --

18                I might add that we might have been
19   able to move quicker on the fact-finding after
20   the attorney general's opinion, but there was
21   just no one here to try to get faculty and
22   staff together.   In July and August it's almost
23   impossible.

1       Q     Dean Adams, I believe you testified

2   earlier that it was your view that there was

3   not a need for legislation like this; is that

4   correct?

5       A     That's correct.

6       Q     Are you aware of any facts that

7   might support the need for such a statute?

8       A     No.

9       Q     There was one activity listed in

10   some of the documents I got about activities on

11   campus that I was unsure of what it was. And

12   that was something called Sexual Awareness

13   Week. Is that an event that's held at the

14   University of South Alabama periodically?

15       A     Yes, we have, we have a week of

16   activities where we hopefully can bring to the

17   awareness, especially of our younger students,

18   issues around human sexuality.

19       Q     What kind of programs take place

20   during that week?

21       A     Well, a little bit of everything.

22   We talk about sexually transmitted diseases and

23   health issues. We talk about relation issues.

1    We try to combine both fun and seriousness with
2    it so to catch the students' attention. We've
3    had -- we try to talk about safe sex and how
4    that ought to -- how you can manage that. Just
5    the general overview of human sexuality and how
6    to approach it.
7         Q    Who sponsors Sexual Awareness Week?
8         A    Jaguar Productions.
9         Q    Does Jaguar Productions have its own
10   budget separate and apart from the Student
11   Government Association?
12        A    Yes, it does.
13        Q    And where does Jaguar Productions
14   get its budget? Where are its funds --
15        A    From the activity fee also. It does
16   not entertain requests from student
17   organizations, however, for allocation of its
18   money. You can come with an idea to JP if you
19   want to and they'll look at it and see if they
20   want to fund it. But it's not an allocated
21   body.
22        Q    I see. Setting aside this lawsuit
23   for a moment, have there been any other

1  lawsuits against the University of South
2  Alabama that have alleged anything having to do
3  with sexual orientation, discrimination, in the
4  last five years?
5      A     I really don't know.  Not in my
6  area.  You might ask our attorney, she could
7  answer that better than I could.
8      Q     But you're not aware of any other
9  litigation on that issue?
10      A     No.  She would know.
11          (Whereupon, a break was taken.)
12      Q     (BY MS. HARLOW:)  I only have one
13  more question for you, Dean Adams.  Did you
14  review any documents in preparation for your
15  deposition here today?
16      A     You would think not but, yes, I did.
17  Some of them I didn't remember.
18      Q     Do you recall what documents you did
19  review?  Can you describe them in any way to
20  me?
21      A     I primarily went back through what I
22  had said in the interrogatory in your
23  discovery.  And beyond that that's about it.

1        Q       Have all of the documents that you

2    did review then, been provided to us

3    previously?

4        A       I think so.

5                MS. HARLOW:  I have nothing further.

6                MR. McDONALD:  No questions.

7                (Whereupon, the deposition was

8    concluded.)

9                        *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1          C E R T I F I C A T E

2
STATE OF ALABAMA
3
COUNTY OF BALDWIN
4
I do hereby certify that the above
5
and foregoing transcript of proceedings in the
6
matter aforementioned was taken down by me in
7
machine shorthand and the questions and answers
8
thereto were reduced to writing under my
9
personal supervision, and that the foregoing
10
represents a true and correct transcript of the
11
proceedings given by said witness upon said
12
deposition.
13
I further certify that I am neither
14
of counsel nor of kin to the parties to the
15
action, nor am I in anywise interested in the
16
result of said cause.  My commission expires
17
01/18/98.
18

19

20

21          ROBIN  L.  HAMMOND
            COURT  REPORTER
22

23

220 Park Place Tower ● Birmingham, Alabama 35203 ● Telephone (205) 251-4200
**1-800-888-DEPO**                    LASER PRINTED

1    LRS92-668:2/24/92:AA/hb

2  H. 454  By Turnham, Sanderson, Fuller, Burke, Gaines, Flowers, White,
        Knight, Higginbotham, Carothers, Starkey, Bowling, Lindsey,
        Beasley, Anderson, Williams, Letson, Cosby, Morrow, Carter, Ford,
3      Walker, Harvey, Biddle, Payne, Carns, Hawkins, Hammett, Hooper, Cullins,
        Warren, Hall, Johnson, Laird, Haynes, Dolbare, Black (L), Blakeney, Petelc
4      Mikell, Turner, McMillan, McKee, Cagle, Crow, Hogan, Mathis, Newton (C),
        Poole, Holladay, Layson, Clay, Rockhold, Gullatt, Sanderford, Parker (T),
5      Smith (C), Powell, McDaniel, Hill, Collins, Richardson, Smith (R),
        Haney, Millican, Venable, Gaston, Curry, Willis, Morton, Rogers (F),
6      Rich, Newton (D) and Butler

7  Rl    2/26/92
    RFD   Judiciary

8  SYNOPSIS: Under existing law, appropriations of public funds

9             are made to the public colleges and universities.

10            This bill would prohibit any college or university

11            from spending public funds to sanction any group

12            that promotes a lifestyle prohibited by the sodomy

13            and sexual misconduct laws.

14

15               A  B I L L

16          T O  B E  E N T I T L E D

17              A N  A C T

PLAINTIFF'S
EXHIBIT
1
2-9.94

18

19        To prohibit any college or university from spending

20  public funds to sanction any group that promotes a lifestyle

21  prohibited by the sodomy and sexual misconduct laws.

22  BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

23        Section 1.  No public funds shall be used by any

24  college or university to sanction the activities of any

25  organization or group that fosters or promotes a lifestyle

26  prohibited by the sodomy and sexual misconduct laws of

27  Sections 13A-6-63 to 13A-6-65, inclusive, of the Code of

28  Alabama 1975.

29        Section 2.  This act shall become effective

30  immediately upon its passage and approval by the Governor, or

31  upon its otherwise becoming a law.

Reps. Turnham, Sanderson, Fuller, Burke, Gaines,
Flowers, White, Knight, Higginbotham, Carothers,
Starkey, Bowling, Lindsey, Beasley, Anderson,
Williams, Letson, Cosby, Morrow, Carter, Ford,
Walker, Harvey, Biddle, Payne, Carns, Hawkins,
Hammett, Hooper, Cullins, Warren, Hall, Johnson,
Laird, Haynes, Dolbare, Black (L), Blakeney,
Petelos, Mikell, Turner, McMillan, McKee, Cagle,
Crow, Hogan, Mathis, Newton (C), Poole, Holladay,
Layson, Clay, Rockhold, Gullatt, Sanderford, Parker
(T), Smith (C), Powell, McDaniel, Hill, Collins,
Richardson, Smith (R), Haney, Millican, Venable,
Gaston, Curry, Willis, Morton, Rogers (F), Rich,
Newton (D), Butler

H. 454



2-9-94

Enrolled, An Act,

To prohibit any college or university from spending
public funds or using public facilities, directly or
indirectly, to sanction, recognize, or support any group that
promotes a lifestyle or actions prohibited by the sodomy and
sexual misconduct laws; to prohibit any group from permitting
or encouraging its members or others to engage in or provide
materials on how to engage in the lifestyle or actions.

BE IT ENACTED BY THE LEGISLATURE OF ALABAMA:

Section 1.  No public funds or public facilities
shall be used by any college or university to, directly or
indirectly, sanction, recognize, or support the activities or
existence of any organization or group that fosters or
promotes a lifestyle or actions prohibited by the sodomy and
sexual misconduct laws of Sections 13A-6-63 to 13A-6-65,
inclusive, of the Code of Alabama 1975.

Section 2.  No organization or group that receives
public funds or uses public facilities, directly or
indirectly, at any college or university shall permit or
encourage its members or encourage other persons to engage in
any such unlawful acts or provide information or materials
that explain how such acts may be engaged in or performed.

```
1            Section 3.  This act shall not be construed to be a

2    prior restraint of the first amendment protected speech.  It

3    shall not apply to any organization or group whose activities

4    are limited solely to the political advocacy of a change in

5    the sodomy and sexual misconduct laws of this state.

6            Section 4.  This act shall become effective

7    immediately upon its passage and approval by the Governor, or

8    upon its otherwise becoming a law.

9
10
11
12
13        Speaker of the House of Representatives
14
15
16
17
18        President and Presiding Officer of the Senate
19
20
21                   House of Representatives
22
23    I hereby certify that the within Act originated in and was
24    passed by the House April 16, 1992, as amended.
25
26                              Greg Pappas
27                                 Clerk
28
29
30
31    Senate              APR 30 1992              Passed
32
```

Dear Sir,

We at the Gay and Lesbian Student Alliance would like to open an account with the University of South Alabama. Your cooperation in this matter will be greatly appreciated.

Thank you,

Carol Strong
President - GLSA

Phone - 343-5107
or 343-6657

Mailing address:
311 Azalea Circle
Mobile, AL
36608

RECEIVED

JUN 2 1992

Dean of Students
University of South Alabama

PLAINTIFF'S
EXHIBIT
3
2-9-94

ATTACHMENT XVI

July 31, 1992

TO:     Ms. Maxey Roberts
         University Attorney

FROM:   Dr. Dale T. Adams
         Dean of Students

RE:     Gay & Lesbian Student Alliance

Attached find a request from the GLSA for a campus account.
I am sure this is a forerunner to asking for funds from
SGA for a social event.

With that in mind, I am asking for your opinion and
recommendation for our action on this matter in light of
the law passed in the last general assembly.

The constitution for the organization is attached. As you
can see their purpose as stated is education and support.
I do not believe that either of these purposes are in
violation of the law.

UAB at this point has declared the group "legal" based on
their interpretation of the law (via conversation with
Ginny Gauld). It would be my recommendation to stay the
course at this point; open an account. We have allowed them
to continue to use the facilities.

Attach:

PLAINTIFF'S
EXHIBIT

2-9 4/24



STUDENT SERVICES STAFF MEETING
October 6, 1992

PRESENT: Jarmora Valrie, Paula Smith, Tom Martin, Al Clark, Don Christian,
Mike Mitchell, Bernita Pulmas, Phil Theodore, Dean Adams.

PLAINTIFF'S
EXHIBIT

29-9-4 5

22.  The Gay-Lesbian Student Alliance will be asking SGA for money.  We are waiting for an opinion from the attorney.  I think she is waiting for an opinion from the Attorney General.

Appropriations Bill # 11-16-92-01          Date: 11-11-92

Sponsor: Appropriations Committee

Appropriations Chairperson: _Bryan D'Angelo_

Senator Representing: _Bryan D'Angelo_

Purpose: Allocation Recommendation

Stating: After due consideration and majority approval by this
committee, we recommend that the _____
_Public Relations & Advertising Committee_

receive _252.50_ for the purpose of _____
_100 flyers for WORLD AIDS DAY @ $102.50 &_
_Ad in Miss U.S.A. Program Book @ $150.00_ .

Stipulations/Limitations _____
_____
_____

Organization's representative(s) _Becky Hargrove_
_____

Voting Results:              In favor      Opposed to     Abstain

Appropriations Committee        2              0              C

Student Senate              _____          _____          _____

TT  R~ 365350 - 7 365324    2/23



26
29.94



TELEPHONE: (205) 460-7191
UC 280 • MOBILE, ALABAMA 36688-0002

January 29, 1993



FEB 3 1993

Ms. Maxey Roberts
University Attorney
AD 131
Mobile, AL 36688

Dean of Students
University of South Alabama

Dear Ms. Roberts:

Attached is a copy of the itemized budget/appropriation request form that the Gay, Lesbian, and Bisexual Alliance will be resubmitting to the Student Government Association (SGA). Please feel free to forward these documents to the State Attorney General Jimmy Evans if matters should necessitate such action.

Sincerely,

*Michael Mitchell*

Michael Mitchell
SGA President

MM:cj

Enclosures

PLAINTIFF'S EXHIBIT

29-9

# BUDGET/APPROPRIATION REQUEST
### (circle one)

For **WINTER** Quarter, 19⁻93

## PLEASE PRINT IN BLACK INK OR TYPE

## Organization Information

Name of Organization  GAY, LESBIAN, AND BISEXUAL ALLIANCE

Number of Active Members __25__ # of quarters as a registered organization __4__

Name of Organization President George Hite Wilson ___ Phone # __666-9824__

    Local Mailing Address  PO BOX 81571 Mobile AL  36608

Name of Student Submitting Request same _____ Phone # _____

    Local Mailing Address _____

Name of Faculty/Alumni Advisor Lawrence Schehr ___ Phone # 460-6291

    On-campus Address  Foreign Language Dept HUMB 322

## Financial Information

Amount of funds received from SGA this school year (since Summer Qtr.) __0__

Does organization have an on-campus account? yes_____ no __X (see attached)

    If yes, account #_____

### Amount of Funds Generated by Organization

|  | This Quarter | This school year (since Summer Qtr.) |
|---|---|---|
| Local Dues | 40.00 | 115.00 |
| Fund Raisers | 0.00 | 94.00 |
| Donations | 35.00 | 50.00 |
| Other Sources |  |  |
| TOTAL | 75.00 | 259.00 |

Total cost of project(s) being sponsored by organization
this quarter (please attach itemized expense list)    $ 625.00

Total Funds Requested from SGA
(Please indicate the projects for which you are requesting funds) $ 698.00

(OVER)

Name and Nature of Project(s) for which money is being requested: Speakers Bureau
presentations (Human Sexuality class, Zeta Tau Alpha and Residence Life Council),
and guest speaker Bill Rubenstein.

If Chapter 701.1 of Code-of-Laws applies, please indicate which requirement is met
here:

Potential Benefits to Membership: Public speaking opportunities, information on
gay, lesbian and bisexual legal issues, and fostering improved relations with
community and campus.

Potential Benefits to Student Body: Fostering understading of cultural diversity and
eliminating barriers which exist from homophobia and fear.  Students will be
able to discuss pertinent issues regarding sexual orientation and learn about
homosexuality in a positive manner.

I have received a copy of the SGA Code-of-Laws and regulations concerning Allocation
of SGA Funds.  I have read these rules and regulations before filling out this form.  I
will have a representative of my organization who is knowledgeable of the project in
attendance at the budget/appropriation meeting.

Signature of person submitting request:

George Hite Wilson
President, Gay, Lesbian and Bisexual Alliance


FOR OFFICE USE:

_____ rec'd          _____ reg. org.          _____ attachments          _____ funds rec'd to date

Gay, Lesbian and Bisexual Alliance
Budget Request
Winter Quarter 1993

Social/Support Committee
    Plates, Napkins, cups, etc (NO FOOD/BEVERAGES          10.00

                                                            10.00
Public Relations Committee
    Flyers (100 per month/3 months)                       [1]48.00

                                                            58.00
Finance & Administration Committee
    Bank Fees                                             [2]15.00

                                                           [15.00]
Speakers Bureau & Forum Committee
    Guest Speakers  Fee                                    350.00
    Guest Speakers  Transportation/Lodging                 150.00
    Presentation Equipment: brochures, displays, etc.       50.00
    Gay, Lesbian and Bisexual Resource Library              75.00
       (books, journals, etc.)
                                                          $683.00
                                                        [2][$698.00]

This is a revised budget request initially submitted January 20,
1993. Changes[1] reflect Executive Council's review, unless otherwise
noted ([1] and [2]).
    [1] Original request should have read 100 flyers per month vice
per quarter.
    [2] Bank fees are requested due to GLBA having an off-campus
account (Central Bank). The off-campus account eliminates the
risk of losing GLBA funds, raised through membership dues,
donations and fund-raising, which would become campus funds in
an on-campus account, thereby denied to any group whose
"lifestyle" promotes the violation of Alabama Sodomy and
Sexual Misconduct Laws. Interpretation of Alabama House
Resolution 454 is pending, per Dr. Dale Adams, Dean of
Students and Maxey Roberts, University Attorney.


The Gay, Lesbian and Bisexual Alliance (GLBA) events for the Winter
Quarter 1993 include participation in New Orleans Day, Homecoming,
and other activities on campus. Additionally, the GLBA will
sponsor guest speaker attorney Bill Rubenstein, Director of the
ACLU's Gay and Lesbian Rights Project. Mr. Rubenstein is a Harvard
Law School Graduate and speaks on topic involving gay, lesbian and
bisexual equal rights, sodomy laws, and HIV/AIDS legal issues. The
University of Alabama Law School sponsored Mr. Rubenstein lecture
during the Fall 1992. Mr. Rubenstein's lecture tremendously
benefits the campus, students and community as he eloquently
explains the law and its interpretation and how it affects the
community, homosexual and heterosexual.

The GLBA's Speakers Bureau will conduct forum on topic including Homophobia, Sexual Orientation, the Military Ban, HIV/AIDS and Safer Sex, and other gay and lesbian issues to any class, campus or community group to foster understanding and mutual respect. The Bureau participated in an Understanding Sexual Orientation Forum in Fall 1992. Currently scheduled: Human Sexuality class, Residence Life Council and Zeta Tau Alpha sorority.

George Hite Wilson, President
Gay, Lesbian and Bisexual Alliance
Submitted January 29, 1993


January 27, 1993

Mr. Gerald Hite Wilson
608 Azalea Road, Apt. 1304
Mobile, AL 36609

Dear Mr. Wilson:

Given the law passed and the restrictions placed on funding
and space for certain groups on campus, we are asking the
attorney general's office to interpret the law in light of
your organization's recent funding request. The language of
the bill seems ambiguous and we need clarification before we
can proceed with funding.

Please submit a complete list of speakers, topics, and over-
all purpose for the activities you propose for funding. This
will be submitted for review by the attorney general's office.

Thank you for your cooperation.

Sincerely,

Dale T. Adams
Dean of Students

DTA/smcd

PLAINTIFF'S
EXHIBIT

29-94

# STUDENT GOVERNMENT ASSOCIATION
## PROPOSED BUDGET
### Winter Quarter 1993

Operating .................................................. $10,000.00
Salaries ................................................... 10,000.00
Appropriations ............................................. 4000.00
    Subtotal .............................................. 24,000.00

BackTrack Committee ........................................ 3300.00
Hillsdale Interest Committee ............................... 284.00
Publications ............................................... 5,000.00
Public Relations/Advertising Committee ..................... 2873.00
Social and Athletic Committee .............................. 3950.00
Student Escort Committee ................................... 544.00
    Subtotal .............................................. 15,951.00

|                                          | Requested | EC Proposed |
|------------------------------------------|-----------|-------------|
| Alpha Area Council                       | 575.00    | 325.00      |
| Alpha Epsilon Delta                      | 544.00    | 289.00      |
| ASEAN Student Association                | 980.00    | 980.00      |
| Campus Watch                             | 400.00    | 355.00      |
| Chinese Student Association              | 1000.00   | 0.00        |
| The English Club                         | 531.62    | 531.62      |
| Epsilon Area Council                     | 270.00    | 270.00      |
| Flag Football Club                       | 627.99    | 627.99      |
| Gay, Lesbian, Bisexual Alliance          | 884.00    | 651.00 ←    |
| Pakistan Student Association             | 1230.00   | 930.00      |
| Sigma Tau Delta-English Honor Society    | 531.63    | 531.63      |
| Singapore Student Association            | 277.00    | 10.00       |
| Theater USA Players                      | 750.00    | 750.00      |
| USA Chess Club                           | 400.00    | 400.00      |
| USA Dance Team                           | 1500.00   | 1500.00     |
| USA Equestrian Club                      | 1500.00   | 1500.00     |
| Vietnamese Student Association           | 1137.75   | 1137.75     |
| Subtotal                                 | 13,138.99 | 10,788.99   |

&rarr; (arrow pointing to Gay, Lesbian, Bisexual Alliance)

Total ...................................................... $50,739.99


PLAINTIFF'S
EXHIBIT
9
29-94

## STUDENT GOVERNMENT ASSOCIATION
## PROPOSED BUDGET
### Winter Quarter 1993

```
Operating ............................................. $10,000.00
Salaries .............................................. 10,000.00
Appropriations ........................................ 4651.00
    Subtotal .......................................... 24,651.00

BackTrack Committee ................................... 3300.00
Hillsdale Interest Committee .......................... 284.00
Publications .......................................... 5,000.00
Public Relations/Advertising Committee ................ 2873.00
Social and Athletic Committee ......................... 3950.00
Student Escort Committee .............................. 544.00
    Subtotal .......................................... 15,951.00
```

|  | Requested | EC Proposed |
|---|---|---|
| Alpha Area Council | 575.00 | 325.00 |
| Alpha Epsilon Delta | 544.00 | 289.00 |
| ASEAN Student Association | 980.00 | 980.00 |
| Campus Watch | 400.00 | 355.00 |
| Chinese Student Association | 1000.00 | 0.00 |
| The English Club | 531.62 | 531.62 |
| Epsilon Area Council | 270.00 | 270.00 |
| Flag Football Club | 627.99 | 627.99 |
| Pakistan Student Association | 1230.00 | 930.00 |
| Sigma Tau Delta-English Honor Society | 531.63 | 531.63 |
| Singapore Student Association | 277.00 | 10.00 |
| Theater USA Players | 750.00 | 750.00 |
| USA Chess Club | 400.00 | 400.00 |
| USA Dance Team | 1500.00 | 1500.00 |
| USA Equestrian Club | 1500.00 | 1500.00 |
| Vietnamese Student Association | 1137.75 | 1137.75 |
| Subtotal | 12,254.99 | 10,137.99 |

```
    Total ............................................. $50,739.99
```


PLAINTIFF'S EXHIBIT

2-9-94  10

## § 16-1-28. No public funds or public facilities to be used to promote lifestyle or activities prohibited by sodomy and sexual misconduct laws.

(a) No public funds or public facilities shall be used by any college or university to, directly or indirectly, sanction, recognize, or support the activities or existence of any organization or group that fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws of Sections 13A-6-63 to 13A-6-65, inclusive.

(b) No organization or group that receives public funds or uses public facilities, directly or indirectly, at any college or university shall permit or encourage its members or encourage other persons to engage in any such unlawful acts or provide information or materials that explain how such acts may be engaged in or performed.

(c) This section shall not be construed to be a prior restraint of the first amendment protected speech. It shall not apply to any organization or group whose activities are limited solely to the political advocacy of a change in the sodomy and sexual misconduct laws of this state. (Acts 1992, No. 92-439, §§ 1-3.)

**Effective date.** — The act which added this section became effective May 14, 1992.

PLAINTIFF'S EXHIBIT

2994 11

STUDENT SERVICES STAFF MEETING
April 20, 1993

PRESENT:  Phil Theodore, Bernita Pulmas, Mike Nuss, Jarmora Valrie, Tom Martin,
Carol Jackson, Paula Smith, Al Clark, Brenda Glusman, Mike Mitchell, Dean Adams

PLAINTIFF'S
EXHIBIT

2994  12

18. At SGA meeting last night, the senators voted 17 yes and 4 no, to fund the Gay, Lesbian, Bisexual Student Alliance in the amount of $570 for a speaker. The students felt since their program was educational in nature there was no reason to continue to deny their application for funds. Last year [unknown to us] the GLBSA sent their charter to the State Attorney General, requesting a ruling. To date, there has been no response. We asked the AG three months ago for a ruling and have had no response.

UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

GAY LESBIAN BISEXUAL ALLIANCE,　　　*
　　　Plaintiff,　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　　　　　*　　　Civil Action No.
　　　　　　　　　　　　　　　　　　　*　　　93-T-1178-N
JIMMY EVANS, in his official　　　　　*
capacity as Attorney General　　　　　*
of the State of Alabama,　　　　　　　*
FREDERICK P. WHIDDON, in his　　　　　*
official capacity as President　　　　*
of the University of South　　　　　　*
Alabama, and DALE ADAMS, in his　　　 *
official capacity as Dean of　　　　　*
Students of the University of　　　　　*
South Alabama,　　　　　　　　　　　　*
　　　Defendants.　　　　　　　　　　　*

DEFENDANT ADAMS' RESPONSE
TO PLAINTIFFS' FIRST SET OF INTERROGATORIES
TO DEFENDANTS WHIDDON AND ADAMS

COMES NOW Defendant Dale Adams, and would respond to the Plaintiffs' First Set of
Interrogatories to Defendants Whiddon and Adams, as follows:

By and through counsel for Defendant Adams, a general objection to the term "Defendants"
is raised, because it calls for knowledge beyond that of the Defendant when it includes "any of the
employees, agents, or representatives of the University of South Alabama", in that it is not possible
to have knowledge of all of the actions, statements, communications, by any and all employees,
agents or representatives of the University of South Alabama. Responses to the interrogatories are
predicated upon the knowledge that the Defendant Adams has as of this time.

　　　1.　　　State whether Defendants communicated in any way with any member of the Alabama
state legislature or any of its committees or offices regarding the legislature's consideration of the



PLAINTIFF'S
EXHIBIT
13
2-9-94

bill that became Section 16-1-28 of the Alabama Education Code. If so, describe each such communication.

To my knowledge, no Defendant communicated with any member of the Alabama State Legislature or any of its committees or offices regarding the legislature's consideration of a bill that became Section 16-1-28 of the Alabama Education Code, except that I was requested by the University's Office of Government Relations to review the proposed bill. Further, Representative Ken Kvalheim, a member of the University's Board of Trustees, discussed with me the proposed bill generally, and advised that he did not believe it would pass.

In my discussion with Rep. Ken Kvalheim, I advised him that I had concerns about the effect such legislation would have on the University of South Alabama and the Gay Lesbian Bisexual Alliance, a student organization registered at the University of South Alabama. He advised me again that he did not believe that the legislation would pass.

2.      State whether Defendants in early 1992 made any written or oral statements to the press or to USA students, faculty, trustees or alumni about the Alabama state legislature's consideration of the bill that became Section 16-1-28 of the Alabama Education Code. If so, describe each such statement.

Not to my knowledge, except that I may have mentioned the bill to the President of the Student Government Association, advising him of a general overview of the proposed legislation. Also, I may possibly have spoken with officer(s) of the GLBA about it and possibly with officials of Auburn University. I have no documents on which to base a time or date or nature of discussion.

3.      State whether Defendants at any time from May 14, 1992, to the present have made any written or oral statements to the press or to USA students, faculty, trustees or alumni about Section 16-1-28 of the Alabama Education Code. If so, describe each such statement.

The only statements made to USA students since May 14, 1992 to the present, were when the Gay Lesbian Bisexual Alliance representatives would ask me about the status of funding and the effect of Section 16-1-28 of the Alabama Education Code, to which I responded that

- 2 -

the University would have to seek an Attorney General's opinion with regard to that matter, which the University did, in February, 1993, with an Attorney General's opinion received on or about July 29, 1993. In addition, on a quarterly basis, there are luncheons with student leaders on campus, including a representative of the Gay Lesbian Bisexual Alliance. Such representatives from time to time would raise the question of funding, and the reason for an Attorney General's opinion. Such questions were responded to generally, as it was the opinion of the University attorney, Ms. Maxey Roberts, that it would be necessary to seek an Attorney General's opinion with regard to funding, due to Section 16-1-28, Code of Alabama, 1975.

Specifically, it had been determined that the provision of University space and facilities for which there was no specific charge would be appropriate under the guidelines for registration of University organizations. However, there was a concern with regard to whether there could be funding by the Student Government Association. The Student Government Association receives its funding from a portion of the Student Activity Fee, which is collected by the University of South Alabama on a quarterly basis as a part of the overall registration of students. Such funding is allocated to student organizations, as well as to SGA projects and services. The SGA holds regular quarterly budget meetings, at which the SGA considers requests for funding. Funding is not automatic, and there is no entitlement to funding by an organization. The activities that are to be funded or subsidized must benefit the University and the students in a timely and direct manner. Organizations seeking such funding must be able to show that a substantial effort has been made to fund a project by the organization, itself. No individual organization can receive more than $1500 in one SGA fiscal year. Funding is often much less than $1500 per student organization, and many student organizations that are registered by the University never receive funding, either because they do not request such funding or that they do not meet the allocation rules that are set forth by the SGA Code of Laws, a copy of which is attached as Attachment 1.

In addition to the above and foregoing, I was asked by a reporter from the Mobile Press Register to comment upon the GLBA. I made general comments upon their activities and that they were a registered organization on campus and that they were provided the use of

University facilities, as are other student organizations registered on campus. I no longer have a copy of the subject article.

4.     State whether Defendants at any time from January 1, 1992 to the present have made any written or oral statements to the press or to USA students, faculty, trustees or alumni about the presence or activities of gay-identified student groups at USA or other schools. If so, describe each such statement.

No, except as set forth in the response to interrogatory No. 3.

5.     State when and how each Defendant became aware of the specific requirements of Section 16-21-28 of the Alabama Education Code after that provision had been enacted.

Upon passage of Section 16-1-28, the subject Code section was forwarded to the University of South Alabama. The newspaper carried a story of such. The Office of Governmental Relations at the University provided me with a copy of same.

6.     Describe the date, all participants, and a summary of the discussion for each and every meeting in which Defendants have participated that discussed or related to USA's compliance with Section 16-1-28.

There are no records on which I can recapitulate dates, discussions or participants in meetings, etc., in which Defendants may have participated with regard to USA's compliance with Section 16-1-28. Generally the discussions from time to time would be if the Gay Lesbian Bisexual Alliance requested funding, that it would be necessary to obtain an Attorney General's opinion. In the Fall of 1992, it was believed that the Gay Lesbian Bisexual Alliance stated that it did not intend to request funding, and because of that, there was not a request for an attorney general's opinion earlier in time. I recall having a couple of discussions with the University's attorney and with Dr. Whiddon. I also talked with Mr. Michael Mitchell, President of the Student Government Association with regard to the issue of funding the GLBA. I had advised Mr. Mitchell that the University did provide facilities for the GLBA to meet or to have functions; however, if the GLBA specifically asked for funding from the SGA, which was part of the student activity fee collected by the

- 4 -

University, that because of Section 16-1-28, there was a question as to whether or not such allocation could be in fact made to the GLBA. The concern was that the language of the statute appeared to imply that any state funding could not be used by the University, the SGA to fund or support an organization which may violate Section 16-1-28. I advised him at that time that the University would need to seek an Attorney General's opinion in the event the GLBA requested funding.

After the SGA funded the GLBA request in the Winter or Spring Quarter of 1993, I did not receive any transmittal regarding the funding, in accordance with the SGA Code of Laws relating to rules for allocation for SGA funding, a copy of which was previously submitted as a part of my response to interrogatory No. 3. I asked Michael Mitchell what had happened, and he stated that the members of the GLBA had had a controversy over the type of speaker who would be brought. The GLBA had withdrawn the request to fund the speaker. I have no other knowledge of the nature of the controversy and I did not inquire.

However, the GLBA was approached by me and Jaguar Productions to advise the GLBA that if it wanted a speaker on a particular topic related to AIDS, or any program of an educational nature. The Jaguar Productions would be glad to fund such speaker as a general interest speaker for the entire University community. In fact, that is what occurred in the Winter quarter of 1993.

Further, recently, in the Fall, 1993, at an SGA meeting, the status of the lawsuit was reviewed and discussed. Generally what was mentioned was that a lawsuit had been brought against the University and University officials, which related to whether or not the GLBA should be prohibited from being funded by the SGA, and that the nature of the law, Section 16-1-28, was as interpreted by the Attorney General, and was our only guide. All actions were frozen until this issue was resolved.

7.     Describe the date, the parties, and a summary of the discussion for each and every phone or face-to-face conversation in which Defendants have participated that discussed or related to USA's compliance with Section 16-1-28.

In addition to the response to interrogatory No. 6 above, during the period from June through August, 1993, I discussed the general issue of Section 16-1-28, but not the University's

compliance, with various Student Affairs officers at the state public higher education institutions in Alabama with regard to what actions those institutions were carrying out.

Generally what I learned from the other institutions, which included the University of Alabama in Birmingham, the University of Alabama in Huntsville, and the University of Alabama in Tuscaloosa, was that they were either ignoring the law as it might apply to them, or that they had been advised by their university counsel that the law was so vague or had such questions with regard to constitutionality that the position of the institution would be that they would proceed with providing funding under the usual mechanisms for student organizations at their particular campuses. However, the extent to which those organizations were actually funded out of state dollars or student activity fees, versus merely being provided a place to meet and facilities in which to have functions, was not discussed by me with the student affairs officers.

I talked with Pat Barnes at Auburn, and I talked with Kathleen Randall at the University of Alabama at Tuscaloosa, and Mr. Gauld, and with Jeannie Fischer at the University of Alabama at Huntsville, and asked them how they were handling the situation. University of Alabama in Birmingham advised that they were not complying, based on advise of the system attorney. Ms. Randall, University of Alabama, Tuscaloosa, had talked with the administration, and administration was in favor of registering the organization, which of course the University of South Alabama had already done, and funding the organization, and they decided to take any adverse publicity from the shoulders of the administration, in the event that anyone raised a question related to that.

8.    Describe the date, all participants, and a summary of the discussion for each and every meeting in which Defendants have participated that discussed or related to the Gay Lesbian Bisexual Alliance ("GLBA") at USA.

Please refer to response to interrogatories No. 6 and No. 7 above. Also from time to time the GLBA would be discussed at the Student Services staff meetings. Specifically, discussions would center about whether or not the organization had requested funding, which the GLBA did not request with the SGA, except on one specific occasion, which was

withdrawn, and further, the necessity of going forward with an Attorney General's opinion in the event that request was made. A copy of the applicable Student Services staff meetings is attached as Attachment 2.

In the Spring Quarter, 1993, I met with officers of the GLBA and the faculty advisor with regard to plans for the Spring dance and social event. A concern that we had was that there could be an effort to break up the event or for problems to ensue, because part of the entertainment was presented by female impersonators. It was open to all students on campus. However, there was a concern for security. I met with the officers of the organization about security, and that was thoroughly discussed to assure that there would be no problem a the social event or dance.

9.     Describe the date, the parties, and a summary of the discussion for each and every phone or face-to-face conversation in which Defendants have participated that discussed or related to the GLBA at USA.

Please refer to response to interrogatories 6, 7, and 8 above. From time to time, I would have general discussions with the GLBA president to determine what activities the GLBA was involved in. This is not unusual, and I do this with many student organizations. I further wanted to stay in touch with him to see if they were going to ask for any funding. He was clearly advised, and had been advised from the beginning, that the University would certainly provide facilities and space for meetings and social activities, but that for specific funding of specific projects, we would have to seek an Attorney General's opinion. I had also advised him that if that request was outstanding for a period of time, we certainly wanted to work with the GLBA, so that if it wanted a speaker on campus or if the GLBA needed some support of some other type, we would work with the membership, so that they would not be prevented from having a speaker because we were awaiting a decision with regard to whether or not we could fund the GLBA. I wanted the GLBA president to be aware that if he had any questions or concerns or felt that there were any problems on campus for the GLBA or the members of the GLBa, because of their involvement with the GLBA, that I was there to assist him and the members of the GLBa in whatever way possible.

10.    Describe the date, all the participants, and a summary of the discussion for each and every meeting in which Defendants have discussed Section 16-1-28 or its enforcement with any other state employees or officials, including but not limited to the Attorney General of Alabama.

Please refer to response to interrogatory No. 7. In addition, the only communication of which I am otherwise aware is a specific request from Dr. Whiddon as president of the University of South Alabama to the Attorney General for an opinion with regard to Section 16-1-28, and its enforcement.

11.    Describe the date, the parties, and a summary of the discussion for each and every phone or face-to-face conversation in which Defendants have discussed Section 16-1-28 or its enforcement with any other state employees or officials, including but not limited to the Attorney General of Alabama.

Please see response to No. 7 and No. 10 above.

12.    State whether Defendants believe that GLBA "fosters or promotes a lifestyle or actions prohibited by the sodomy and sexual misconduct laws of Sections 13A-6-63 to 13A-6-65, inclusive." If Defendants answer in the affirmative, state:

a)  Which section(s) of those provisions of the Alabama criminal law are implicated by GLBA's activities;

b)  how Defendants believe that GLBA "fosters or promotes a lifestyle or actions" that are prohibited by the section(s) listed in response to subsection (a).

The request for an Attorney General's opinion dated July 29, 1993, was specifically to determine the definition under Section 16-21-28, as to what organizations would "foster or promote a lifestyle or actions prohibited by the sodomy and sexual misconduct laws of Sections 13A-6-63 to 13A-6-65, inclusive."

I was not certain as to what organizations would be deemed to "foster or promote a lifestyle or actions prohibited by the sodomy and sexual misconduct laws of Sections 13A-6-63 to

- 8 -

13A-6-65, inclusive", as that language is used in Section 16-21-28, <u>Code of Alabama, 1975</u>.
The University administration was not certain as to that utilization of the terminology, either.
Therefore, an Attorney General's opinion was requested, advising as to that. When the
Attorney General's opinion responding to this request did not provide clarification, the
defendants felt it appropriate to appoint a fact finding body to undertake an inquiry as to
whether or not the GLBA fell within the statute. Prior to the commencement of any work
on the part of the committee, the litigation was filed, so the inquiry could never to
undertaken. Based on the description of the GLBA's purposes in its charter, and my
understanding of the GLBA's activities, and my understanding of the words "foster or
promote" as they are generally use, I do not personally believe that the GLBA comes under
the statue.

13. With respect to Defendants' denial of the allegations in paragraph 14 of plaintiff's complaint,
state:

   a) all facts and circumstances that Defendants contend support Defendants' denial of the
   allegations in that paragraph; and

   b) identify all documents that support Defendants' factual contentions in response to
   subsection (a) above.
   I did not have adequate information on which to admit this allegation.

14. With respect to Defendants' denial of the allegations in paragraph 30 of plaintiff's
complaint, state:

a) all facts and circumstances that you contend support your denial of the allegations in that
paragraph;

The University took no action to prevent the student group from registering and from
providing information and education to others in the University community. The GLBA has
been, since its initial request, a registered organization. During that year, the University of
South Alabama did not interfere with the GLBA's ability to function as a registered student
organization or with its constitutional rights. Throughout the year, I advised the GLBA that

- 9 -

if the GLBA requested funding, the University would need to request an Attorney General's opinion because of the Public Funds and Facilities Statute. However, my office also worked with the GLBA to advise it of assistance with regard to speakers that the organization desired without separate and specific funding. Support of the GLBA included allowing utilization of University facilities, including a ballroom for a dance sponsored by the GLBA in the Winter or Spring quarter of 1993, provision for allowing a reimbursement to the president of the GLBA for monies that had been expended on various functions by the GLBA, which funding was provided through the SGA, and advice to the GLBA that money placed in a University account might be prohibited from certain uses. The latter is not an unusual situation, and some student organizations do not have internal accounting for such reason. As noted in the attached statement with regard to opening bank accounts, it is not unusual for student organizations not to have an account within the institution. The University does offer some banking services through the business office to registered student organizations, usually. However, as I noted to the GLBA, if the University held GLBA funds and then it was determined that the University could not fund the GLBA, there might be a question as to how those funds could be utilized. To prevent that, I suggested that it might be well for the GLBA to open an outside bank account. This is not an unusual measure for student organizations, as can be seen in the section for student organizations on opening bank accounts that many organizations do in fact have bank accounts outside the institution, and that some suggestions as to what needs to be considered in opening such are made within the guidelines.

It should further be noted that SGA was asked to fund a speaker, and the SGA appropriated the funds. That request was not denied. The GLBA subsequently withdrew the request because there was a controversy over the choice of speaker within the organization. My office, through Jaguar Productions, an internal part of the University, sponsored a speaker that was on the subject matter the GLBA had originally decided. The speaker was a professor from Emory University, Dr. Howard, who spoke on the history of Gays in the South. He also held an afternoon seminar open to all students. The content of his speech at night, which I attended, was to give an overview of the civil rights struggle for gays and lesbians in the South. He cited historical events, as well as giving reasons for the difficulty for gays in the South.

Also, please see response to interrogatory No. 6.

b)  identify all documents that support Defendants' factual contentions in response to subsections (a) above; and

None

c)  provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants' faculty contentions in response to subsection (a), above.

Dr. Dale Adams, USA, UC 111, Mobile, AL 36688, 460-6171;
Ms. Paula Smith, Jaguar Productions, USA, UC 108, Mobile, AL 36688, 460-7144;
Mr. Michael Mitchell, SGA president, USA UC 280, Mobile AL 36688, 460-7191;
SGA Senate, USA UC 280, Mobile AL 36688, 460-7191;
Mr. George Hite Wilson, USA, UC 280, Mobile AL 36688, 460-7172.


15.    With respect to Defendant's denial of the allegations in paragraph 31 of plaintiff's complaint, state:

a)  all facts and circumstances that Defendants contend support Defendants' denial of the allegations in that paragraph;

As set forth in response to interrogatory No. 14, the GLBA was not singled out as being denied a University bank account.  I advised the GLBA that if the GLBA placed monies, whether its own fees or dues, into a University account that the University controlled or held, the University might be in a position to deny the organization's ability to expend those funds through a requisitioning process, because of the Public Funds and Facilities Statute.  Other student groups are also advised that if expenses do not meet requirements of state law, as certain entertainment expenses would not, they would not be able to utilize funding that was through a University account, and required the requisitioning process through the University accounting system.

As noted in responses to interrogatory No. 6 and No. 14, funding, as well as payment of items through funding, must meet SGA funding rules set forth in the attached, as well as the

- 11 -

University rules with regard to what maybe funded and what cannot be funded. For example, the University cannot write a check for or allow funding for reimbursement of alcoholic beverages. Also, there would be limitations as to reimbursement for travel, lodging and registration fees, by the University, as well as under Chapter 701 of the SGA Code of Laws, a copy of which is attached.

Further, if it would appear that the funding does not benefit the University and students in a direct manner, for example, if an organization wanted to donate generally to a particular outside interest, then funding could not be directed through the internal mechanism of the University, and could not be reimbursed or made through SGA funding, as set forth in the guidelines for allocating funding for and student organization. For example, a student organization may feel that it is appropriate to give to a not-for-profit entity that has a particular mission or scope, even though it may be an excellent not-for-profit entity, or may have an excellent end result, generally for the public, it would be difficult to fund that through SGA funding or through a University account. For such reason, I advised the GLBA that there were limitations on University accounts, and they needed to be aware of those.

b) identify all documents that support Defendants' factual contentions in response to subsection (a) above;
None.

c) provide the name, address and telephone number for all persons who Defendants believe have knowledge of any of Defendants' factual contentions in response to subsection (a) above.

Myself; Mr. Bob Broach, Associate Controller, USA AD 380, Mobile AL 36688, 460-6244.

16. With respect to Defendants' denial of the allegations in paragraph 32 of plaintiff's complaint, state:

a) all facts and circumstances that Defendants contend support Defendants' denial of the allegations in that paragraph;

The GLBA was never barred from receiving funding. The SGA appropriated $600 of funds on the only occasion the GLBA requested funding under the allocation rules of the SGA, following the format that the SGA required. That request was for a speaker in the Winter quarter, 1993. Within the GLBA organization, there was disagreement as to which speaker would be selected, and the GLBA withdrew the request for funding before funding was made and before the recommendation for funding and the sign-off for funding that is required for all organizations was directed to the Dean of Student Services. Therefore, there was never a rejection of the funding by the Dean of Student Services or by the University, but it was withdrawn before the University could proceed through the allocation channels that is necessary. Any funding that is made pursuant to the SGA Code of Laws under chapter 700, Allocation Rules, and chapters 701 through 703, must receive the subsequent approval or sign-off process through the University at the Dean of Student Services level. That never occurred in this instance because before that requisitioning process for funding reached the Dean of Student Services office, the GLBa withdrew the request.

Jaguar Productions, which is an internal part of the University, working with students and presenting speakers and programs of interest, obtained a speaker with an emphasis on the subject matter that had originally been contemplated by the GLBA. John Howard, History of Gay and Lesbian America, October 11, 1993, and Dr. Dan McGee, Homosexuality -- Morals Dimensions of the Current Debate, November 15, 1993. The arrangements for Dr. Howard's appearance on campus had been made prior to the lawsuit being filed.

b) identify all documents that support Defendants' factual contentions in response to subsection (a) above;

None.

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants' factual contentions in response to subsection (a) above.

Dr. Dale Adams, Dean of Student Services, USA, UC 111, Mobile, AL 36688, 460-6171; Mr. Michael Mitchell, SGA president, USA UC 280, Mobile AL 36688, 460-7191; Mr. George Hite Wilson, USA, UC 280, Mobile AL 36688, 460-7172.

17.     With respect to Defendants' denial of the allegations in paragraph 35 of the plaintiffs' complaint, state:

a) all facts and circumstances that Defendants contend support Defendants; denial of the allegations in that paragraph;

In the Summer quarter of 1993, and not the Summer quarter of 1992, I advised the GLBA that there could be limitations on their own funds if they placed those funds in a University account, and that I would not recommend at this time, given the uncertainty of the law and the lack of an Attorney General's opinion on how it affected funding of the GLBA, that they not open a University account. However, at no time did I tell them that they were prohibited from opening a University account through the Business Office, pursuant to the Section on opening bank accounts found in the attachment that has previously been noted. Rather, as noted above, I advised them that if they did that, the University might be in a position to not be able to allow them access to those funds, because they might be deemed to be in violation of state law, and further, that there were other restrictions on expenditures from those accounts. The University accounts, even if they are student organization accounts, must meet all state laws, with regard to what expenses can be made from state funds, and therefore, if the organizations had expenditures outside of those that could be paid from State funds, those could not be approved.

b)   identify all documents that support Defendants; factual contentions in response to subsection (a) above;

None.

- 14 -

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants factual contentions in response to subsection (a) above.

Dr. Dale Adams, Dean of Student Services, USA, UC 111, Mobile, AL 36688, 460-6171;
Mr. Michael Mitchell, SGA president, USA UC 280, Mobile AL 36688, 460-7191;
Mr. Bob Broach, Associate Controller, USA AD 380, Mobile AL 36688, 460-6244.
Mr. George Hite Wilson, USA, UC 280, Mobile AL 36688, 460-7172.


18.   With respect to Defendants' denial of the allegations in paragraph 36 of plaintiff's complaint, state:


a) all facts and circumstances that Defendants contend support Defendants' denial of the allegations in that paragraph;

As noted above, there was never a refusal of SGA funds to go directly to the GLBA. When I advised the GLBA that if it was funded, we would need to obtain an Attorney General's opinion with regard to the ability to fund the GLBA, because of the statute, the GLBA took other mechanisms. They were never refused SGA funding.


First of all, in the Fall quarter of 1992, defendants never refused to allow SGA funds to directly to GLBA. The GLBA never requested funds in the Fall quarter, 1992. At all times, the GLBA was advised that if it requested funding, there would need to be a request for an opinion from the Attorney General's office. There was a request made by the University administration, and specifically the defendants, that the GLBA work with the University so that the GLBA could process its own needs and at the same time allow the University to seek an appropriate opinion and to work through the process of that. The president of the GLBA did request reimbursement for some small expenses, and the SGA refunded that individual for some expenses in association with some program or project of the GLBA that was not stopped in any way and the GLBA president was reimbursed for those expenses. Subsequently, the GLBA's one request for funding, as noted in response to these interrogatories, was for a speaker and before the requisitioning process that would have carried out the SGA approval for such funding reached the Dean of Students Services office for sign-off of the requisitioning process, the GLBA had withdrawn the request for the funding, because of an internal disagreement within the GLBa as to what speaker would be asked.

- 15 -

b)   identify all documents that support Defendants; factual contentions in response to subsection (a) above; and

None.

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants' factual contentions in response to subsection (a) above.

Dr. Dale Adams, Dean of Student Services, USA, UC 111, Mobile, AL 36688, 460-6171;
Mr. Michael Mitchell, SGA president, USA UC 280, Mobile AL 36688, 460-7191;
Mr. George Hite Wilson, USA, UC 280, Mobile AL 36688, 460-7172.

19.    With respect to Defendants' denial of the allegations in the second sentence of paragraph 37 of plaintiffs; complaint, state:

a)   all facts and circumstances that Defendants contend support Defendants' denial of the allegations in that paragraph;

First of all, to respond to this, the complaint must be deemed to refer to the Winter and Spring quarters of 1993. I never, and to my knowledge Defendant Whiddon never, directed the SGA to table the GLBA's budget request at any time. I consistently advised the GLBA that if it wanted specific funding, we would need to seek an Attorney General's opinion with regard to the applicability of the Public Funds and Facilities Statute. However, during the Winter quarter, 1993, the GLBA asked for funding from the SGA. The SGA allocated funding for a speaker for the GLBA. Before the requisitioning process for final approval of that allocation for funding came to me, as Dean of Student Services, the GLBA withdrew its request for a speaker, because as I understood the matter, the members of the GLBA disagreed as to the speaker to be brought. Therefore, there has never been a denial of funding for the GLBA by me or by Dr. Whiddon. I have never, and to my knowledge Dr. Whiddon has never directed the SGA to table GLBA budget requests.

- 16 -

b) identify all documents that support Defendants; factual contentions in response to subsection (a) above;

Minutes of SGA meetings.

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants' factual contentions in response to subsection (a) above.

Dr. Frederick P. Whiddon, President, USA, AD 130, Mobile AL 36688, 460-6111.
Dr. Dale Adams, Dean of Student Services, USA, UC 111, Mobile, AL 36688, 460-6171;


20.     With respect to Defendants' denial of the allegations in paragraph 38 of plaintiff's complaint, state:

a) all facts and circumstances that Defendants contend support Defendants denial of the allegations in that paragraph;

b) identify all documents that support Defendants' factual contentions in response to subsection (a) above,

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants factual contentions in response to subsection (a) above.

Please see response to interrogatory No. 16.

21.     With respect to Defendants' denial of the allegations in paragraph 41 of plaintiff's complaint, state:

a) all facts and circumstances that Defendants contend support Defendants denial of the allegations in that paragraph;

As noted in response to interrogatories 14, 15, 16, and 19, the University never prevented the GLBA from opening an internal bank account, and further, never denied funding to the GLBA, because the only instance in which funding was specifically requested was withdrawn before I had an opportunity to approve or disapprove such funding. A fact-finding committee was appointed, as set forth in response to interrogatory No. 12, and the work of that committee did not go forward because the GLBA filed suit against the University prior to the committee commencing its work.

b) identify all documents that support Defendants' factual contentions in response to subsection (a) above, and

No others except as set forth in responses to other interrogatories.

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants factual contentions in response to subsection (a) above.

Dr. Dale Adams, Dean of Student Services, USA, UC 111, Mobile, AL 36688, 460-6171;
Mr. Michael Mitchell, SGA president, USA UC 280, Mobile AL 36688, 460-7191;
Mr. George Hite Wilson, USA, UC 280, Mobile AL 36688, 460-7172.

22. With respect to Defendants' denial of the allegations in the first two sentences of paragraph 44 of plaintiff's complaint, state:

a) all facts and circumstances that Defendants contend support Defendants denial of the allegations in that paragraph;

The University has never hampered or silenced the GLBA. Please see response to interrogatories 6, 14, and 16 and 20. The GLBA's constitution, a copy of which has been submitted in request for production of documents in this lawsuit, speaks for itself, and sets forth the reason for the organization of the GLBA. All of the purposes and activities of the GLBA cannot be specifically stated or definitively stated.

b) identify all documents that support Defendants' factual contentions in response to subsection (a) above,

GLBA constitution and bylaws, an organization file submitted pursuant to response for production of documents.

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of Defendants factual contentions in response to subsection (a) above.

Dr. Dale Adams, Dean of Student Services, USA, UC 111, Mobile, AL 36688, 460-6171;
Mr. Michael Mitchell, SGA president, USA UC 280, Mobile AL 36688, 460-7191;
Mr. George Hite Wilson, USA, UC 280, Mobile AL 36688, 460-7172.

23.     Identify each and every person whom Defendant may use as an expert witness, whether by affidavit or deposition, in creating the record in this matter. For each expert witness, describe : (1) the person's education and relevant training and experience; (2) his or her employment history; (3) a summary of the expert's proposed testimony and expert opinion; (4) all documents and facts upon which the expert may base his testimony or opinion; (5) a list of all the expert's published and unpublished writings that relate to the subject matter of the expert's proposed testimony; and (6) a list of all other cases in which the expert has provided testimony during the past five years, specifying the name of the case, the case number, the court, the date, and the party by which the expert was retained.

At the present time, to my knowledge, expert witnesses have not been identified.

24.     If Defendants' response to any numbered request in plaintiff's first set of admission of fact to Defendants Whiddon and Adams, served herewith, is anything other than an unqualified admission, provide the following information for each such response:
    a) state all facts and circumstances that you contend support your refusal to unqualifiedly admit the request;
    b) identify all documents that support your refusal to unqualifiedly admit the request; and

c) provide the name, address, and telephone number for all persons who Defendants believe have knowledge of any of the factual contentions upon which Defendants base their refusal to unqualifiedly admit the request.

For a request for admission of fact 1, I would refer to the responses set forth hereinabove.

With regard to request for admissions No. 4, I would refer you to responses to the interrogatories set forth above.

With regard to request for admissions No. 5, I would refer you to responses to the interrogatories set forth above.

With regard to request for admissions Nos. 6 and 7, I would refer you to interrogatory responses set forth above.

_____
Dale T. Adams

On this 22ⁿᵈ day of _December_ , 199⒊ , personally appeared before me Dale T. Adams, Dean of Student Services, University of South Alabama, who after first being duly sworn does acknowledge and certify that the above and foregoing Response to Plaintiff's First Set of Interrogatories is true and correct to the best of his knowledge.

_____
Notary Public
My Commission Expires: 7/1/96

SEAL

- 20 -

This the 27th day of December, 1993.

_____

J. Fairley McDonald, III
George W. Walker, III

COPELAND, FRANCO, SCREWS & GILL, P.A.
Post Office Box 347
Montgomery, Alabama 36101-0347
(205) 834-1180

Counsel for Defendants FREDERICK P.
WHIDDON and DALE T. ADAMS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 27th day of December, 1993,
I have served a copy of the foregoing Response upon the following
counsel of record by United States Mail, postage prepaid and
properly addressed:

Fern Singer, Esq.
WATTERSON AND SINGER
Post Office Box 530412
Birmingham, Alabama 35253

Ruth E. Harlow, Esq.
William B. Rubenstein, Esq.
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
132 West 43rd Street
New York, New York 10036

Howard A. Mandell, Esq.
Post Office Box 4248
Montgomery, Alabama 36103

_____
Of Counsel

-21-

program sponsored by another organization. Where registration of an organization is withdrawn, it shall cease to exist as an organization.

# FUNDING AND ACCOUNTING

## Financial Accountability

Financial accountability is most often overlooked by the general membership because (1) they take it for granted that the leaders will always operate in good faith for the well-being of the organization, and (2) without a regular report on the financial affairs of the group, the membership will not be mindful of money matters.

It is essential for your organization to practice sound fiscal policies which reflect the integrity of your leadership. Plan an annual budget which is approved by the general membership and have your financial records reviewed at least once a year by your faculty advisor or other outside auditor.

## Opening Bank Accounts

One of the first orders of business for an organization is to open a checking account. The university offers banking services through the Business Office to registered student organizations (See Appendix A). All off-campus accounts are the responsibility of the organization. The University does not govern nor take responsibility for accounts other than those through the Business Office. It is the decision of the club to choose a bank that will meet the needs of its organization. We recommend that you ask the following questions before opening an account:

1. What minimum deposit or average balance is required of an organization?
2. What charges are incurred for services such as issuing (printing) checks, writing checks, making withdrawals, etc.?
3. Is the bank conveniently located?

All recognized student organizations are considered either profit or non-profit by local banks and the Internal Revenue Service. If the bank of your choice asks you to furnish your tax exempt number, you must contact the I.R.S. for specific guidelines.

*Savings accounts:* Most organizations should place at least part of their treasury in an interest-bearing passbook savings account. Even though your account balance may be minimal, your organization will benefit with more money in savings than in checking.

Bank officials will also be happy to advise you on managing your accounts. Organizations with larger funding bases may want to consider other investment opportunities.

## SGA Funding

The Student Government Association gets its funding from a portion of the student activity fee. With this funding they allocate money to student organizations as well as fund SGA projects and services.

SGA holds a quarterly budget meeting. Organizations who wish to request funds should contact the SGA office (See Appendix A) before the beginning of each quarter to find out the budget deadlines for that quarter and to pick up budget request forms. After the budget meeting each quarter, the appropriations committee has limited funds which may be allocated to student organizations. Therefore it is recommended that organizations request money at the beginning of the quarter.

The following rules and regulations concerning allocation of SGA funds should be read carefully before filling out request forms (See Appendix B):

### SGA Code-of-Laws
### TITLE VII. Rules for Allocation of
### SGA Funds

#### Chapter 700. Allocation Rules

1. Activities being funded or subsidized by the SGA must benefit the University and the students in a timely and direct manner.

2. Every organization seeking an SGA allocation must be able to demonstrate that a substantial effort has been made, on the part of that organization, to fund the project on its own.

3. No organization shall receive an allocation of more than $1500.00 in one SGA fiscal year.

4. All requests must contain itemized price estimates.

5. Any organization which uses any part of an SGA allocation for private commercial gain shall have the remainder of its allocation cut off and shall not receive an SGA allocation for the remainder of that academic year.

6. Organization must submit receipts for actual expenditures to the SGA Treasurer by 5 pm of the fifth day of the quarter following the quarter in which the event was held. Organizations with on-campus accounts must submit copies of original receipts to the SGA Treasurer. If organizations with on-campus accounts turn in receipts and those receipts total less than the amount allocated by the SGA then the SGA Treasurer will have the balance of funds transferred back to the SGA. Organizations with on-campus accounts who fail to turn in receipts to the SGA Treasurer by the required time will have their allocation transferred back to the SGA by the SGA

6

Treasurer. Those organizations with on-campus accounts who lose their allocation must go through the allocation process again. Organizations with no on-campus account must submit original receipts to the SGA Treasurer by the required time. Organizations with no on-campus account will receive allocated funds for actual expenditures up to the amount allocated by the SGA. If organizations with no on-campus account fail to turn in actual receipts to the SGA Treasurer by the required time they will lose their allocation. The organizations with no on-campus account who lose their allocation must go through the allocation process again.

7. An allocation must be spent as stipulated by the SGA if such stipulation is applicable.

8. Within ten (10) days after the budget/appropriation meeting at which funds are approved, the organization representative must contact the SGA Treasurer regarding distribution of approved funds. Failure to comply with this stipulation will result in the loss of the allocation and the origination must go through the allocation process again.

9. All advertising for an activity that is fully or partially funded by the SGA must effectively recognize the SGA's support.

10. All requests for funds submitted to the Appropriations Committee must be received by the chairperson at least 30 days prior to the time the allocation is to be used. With three-fourths approval of the Appropriations Committee, this rule may be waived.

11. All requests for any non-academic related or non-university wide publication must go through the Board of Student Communications. Determination of the status of publications seeking funds shall be made by the appropriate SGA reviewing body.

12. Any solicitation for funds from the SGA for a campus-wide publication must meet the following criteria, unless it is published quarterly or annually:

　　a. be a recognized student organization, and
　　b. be recognized by the Board of Student Communications.

13. All budget request forms must be completed as stated on the request for and code-of-Laws and be turned in to the SGA office by 5:00 p.m., five (5) days prior to the budget meeting each quarter. This law may be waived for any Senate meeting with 2/3 approval of the Senators present at that meeting.

**Chapter 701.** Student Government funds cannot be allocated to student organizations for travel, lodging, and/or registration expenses for conferences or conventions unless:

1. The organization requesting the funds demonstrates with documentation the educational benefit of the event and the necessity of their attendance because they are:
　　a. submitting a paper at the event, or
　　b. participating in competition at the event, other than delegation of the year, chapter of the year, spirit awards or equivalents thereof, or
　　c. submitting a project or display at the event, or
　　d. hosting the convention within two years of the date that the appropriation is approved by the Senate.

2. The organizations requesting the funds must attach to the Budget/Appropriation Request a list of the people planning to attend the event, the majors and minors of all students on the list, the office, if any, a copy of the registration form, a travel itinerary, and any other information received by the organization related to the conference, convention or trip.

3. Within two weeks of their return, the organization requesting the funds must submit all receipts of expenditures, an itinerary of the conference showing dates and time of conference activities, a report of their activities, and physical proof of the fulfillment of one of the requirements in Chapter 701.1 (photographs of display, copy of paper submitted, awards won, letter of intent from national or regional organization stating that conference will be hosted here within two years) to the executive council. Failure to comply will result in the loss of the allocated funds.

**Chapter 702.** Any one organization may only receive up to $150.00 per person, but not more than $750.00 total, for travel, lodging, and/or registration expenses in one year.

**Chapter 703.** Activities being funded or subsidized by the SGA must benefit the University and the students in a timely and direct manner.

## EVENT PLANNING

### Organizing Successful Events

　　This section to organizing events will be of great benefit to you if you are just entering the world of campus programming. And, if you are a veteran, it will serve to jar your memory, maybe even give you a few new ideas. The main purpose of this section is to lay out a step-by-step approach to organizing a program that will accomplish what you want it to and give you fewer last minute headaches. If you have questions or needs not covered by this guide, please call or stop by the Campus Involvement Office. We'll try to answer your questions or help you solve your problem. Before beginning your program decide:

1. What you want to accomplish through the program.
2. How you can develop it to reach the greatest number of people.